```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF TEXAS

 3                          MARSHALL DIVISION

 4    OPTIS WIRELESS TECHNOLOGY,    )(

 5    LLC, ET AL.                   )(    CIVIL DOCKET NO.

 6                                  )(    2:17-CV-123-JRG-RSP

 7    VS.                           )(    MARSHALL, TEXAS

 8                                  )(

 9    HUAWEI TECHNOLOGIES CO.,      )(    DECEMBER 1, 2017

10    LTD., ET AL.                  )(    11:19 A.M.

11                    CLAIM CONSTRUCTION HEARING

12               BEFORE THE HONORABLE JUDGE ROY PAYNE

13                 UNITED STATES MAGISTRATE JUDGE

14

15    APPEARANCES:

16    FOR THE PLAINTIFFS:(See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
17

18    FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
19

20    COURT REPORTER:    Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25    (Proceedings recorded by mechanical stenography, transcript
      produced on a CAT system.)
```

1                            I N D E X

2

3    December 1, 2017

4                                                      Page

5         Appearances                                    1

6         Hearing                                        3

7         Court Reporter's Certificate                 112

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.
 2              THE COURT:  Good morning.  Please be seated.
 3              For the record, we're here for the claim
 4    construction hearing in Optis Wireless Technology, et al.,
 5    versus Huawei Technologies, which is Case No. 2:17-123 on
 6    our docket.
 7              Would counsel state their appearances for the
 8    record, please?
 9              MS. TRUELOVE:  Good morning, Your Honor.  Jennifer
10    Truelove with McKool Smith for Plaintiff Optis.  With me
11    today, I have Mr. Kevin Burgess --
12              MR. BURGESS:  Good morning, Your Honor.
13              MS. TRUELOVE:  -- Christine Woodin, and Kevin Hess,
14    all from McKool Smith.
15              MR. HESS:  Good morning.
16              MS. TRUELOVE:  Also -- also David DeZern from Gray
17    Reed & McGraw.
18              MR. DEZERN:  Good morning.
19              MS. TRUELOVE:  With us from the client, I have
20    Stacie McNulty, Mark Born, and Richard Misiag.  And we're
21    ready.
22              THE COURT:  Thank you, Ms. Truelove.
23              MR. SMITH:  Good morning, Your Honor.  For the
24    Huawei Defendants, Huawei Device USA, Inc., and Huawei
25    Device Company Limited, Michael Smith.  And with me at
```

1  counsel state, Mr. Bob Haslam --

2       MR. HASLAM:  Good morning, Your Honor.

3       MR. SMITH:  -- Mr. Greg Nieberg --

4       MR. NIEBERG:  Good morning.

5       MR. SMITH:  -- and Mr. Anupam Sharma --

6       MR. SHARMA:  Good morning, Your Honor.

7       MR. SMITH:  -- and Mr. Stanley Young --

8       MR. YOUNG:  Good morning.

9       MR. SMITH:  And with us from the client, Weiguang

10  Kong, Mr. Liangxin Yang, and Laric Zhu.  And we're ready to

11  proceed, Your Honor.

12       THE COURT:  All right.  Thank you, Mr. Smith.

13       I will also note for the record that earlier this

14  morning, we distributed to counsel for both sides a set of

15  preliminary constructions of the disputed terms.

16       I wanted to state for the record that the purpose

17  of issuing those preliminary constructions is not to

18  dissuade either side from taking whatever position you think

19  is appropriate on these terms.  Rather, it's to let you know

20  where the Court is after the initial review of the pleadings

21  and the record, and to allow you to focus your time and

22  attention where you think the Court may have most missed the

23  mark.

24       I do reserve the right to amend these preliminary

25  constructions and not uncommonly do alter them based on the

1   arguments received at this hearing.  So I hope that you'll

2   take them in that spirit.

3           I would like to hear the arguments on a

4   term-by-term basis, but I'm happy to take them in whatever

5   order counsel think would be most efficient or to group them

6   if -- if counsel deem that helpful.

7           Mr. Burgess?

8           MR. BURGESS:  Your Honor, thank you.  I think the

9   parties have agreed to just take the terms in the order that

10  you've listed them in your preliminary --

11          THE COURT:  All right.

12          MR. BURGESS:  -- with -- you know, and -- and you

13  haven't always adopted one or the -- one side or the other's

14  proposal, but we'll sort of make an estimation of who's --

15  who's the farthest away, and they'll go first.

16          THE COURT:  All right.  That's fine.  I'll turn it

17  over, then, to counsel for Plaintiff to lead off.

18          MR. DEZERN:  Thank you, Your Honor.  David DeZern

19  for Plaintiffs.

20          I believe the first term up is from the '238

21  patent, and given the description of the procedure from

22  Mr. Burgess, I believe someone from Huawei's counsel may

23  want to start.

24          THE COURT:  All right.  Thank you, Mr. DeZern.

25          MR. SHARMA:  Good morning, Your Honor.

1          THE COURT:  Good morning, Mr. Sharma.

2          MR. SHARMA:  Your Honor, the first term I'd like to

3    argue is the variable length code table in which we

4    appreciate the Court's construction that was given to us as

5    guidance this morning.

6          I would like to approach the construction, two

7    parts.  The first part in the construction given by the

8    Court, we talk about a table for transforming each variable

9    length code into a value that denotes a number of non-zero

10   coefficients in a block.

11         And second part, within a given table, each

12   variable length code is unique and mapped to one unique

13   value.

14         Your Honor, I think the second part is correct.  It

15   matches the descriptions in the specification.  It matches

16   how the claims operate.  It also matches how the invention

17   operates.

18         On the first part, the table part, Your Honor, I

19   think the -- the variable length code table is used both by

20   the encoder and the decoder.  And that's the construction we

21   had adopted to capture that.

22         And maybe I can quickly go through our presentation

23   and show how the variable length code table is used both

24   from the encoder and decoder side and also highlight along

25   the way that -- how each code is unique and how it maps to

1   one unique value.

2        In the patent, the '238 patent describes a code

3   table and a VLC table.  And the purpose of the code table

4   and the VLC table is to collectively transform a coefficient

5   number value into a variable length code, or VLC.  I'll use

6   the term VLC as a shorthand for variable length code.

7        In the example shown in the patent, Chart 2 takes

8   the coefficient of a value and maps it into the code number

9   based on the code table you want to use.  And that mapping

10  between the coefficient number value and the code number,

11  based on a code table, is unique.  So that part is

12  satisfied.

13       Similarly, in a VLC table, a code number is mapped

14  into a variable length code, VLC, using a particular VLC

15  table.  There also the code number maps uniquely to one

16  variable length code -- a unique code which is for a given

17  table.

18       So if you look at the whole transformation process,

19  you are starting from coefficient number value on the

20  left-hand side, going to the code table and going through

21  the VLC table and ending up with a VLC.  The whole process

22  is unique, one-to-one mapping.

23       And that is true -- that is needed because both the

24  encoder and decoder use the VLC table to convert coefficient

25  numbers into bit streams or VLCs and then convert the VLCs

1    back into the coefficient numbers.

2           And as shown over here on the encoder side, Code

3    Table 3 is used, and the VLC Table No. 3 is used.  In this

4    example, Coefficient No. 4 is provided, which through a

5    two-step process, converts into a VLC which is 0100.

6           Now, this stream is then sent over to the decoder,

7    and the decoder uses the same table, VLC Table 3 and Code

8    Table No. 3.  And the same bit stream 0100 is then

9    transformed into Coefficient No. 4 by using the same tables

10   that were used on the encoder side.

11          And, again, the process works over here because

12   there's a unique mapping from the coefficient numbers to

13   code numbers and that a unique mapping from the code numbers

14   into the bit stream, and that mapping is unique one-to-one.

15          Similarly, on Figure 19 on the decoder side, the

16   same tables are used.  And, again, each of the tables has

17   unique mapping.  The VLC Table No. 3 here maps the bit --

18   bit stream into unique code number, and then the Code Table

19   3 maps the code number into unique coefficient number.

20          And the reason for the symmetry is because both the

21   encoder and decoder have to encode the same value and

22   extract the same value.

23          THE COURT:  Now, we are construing this term in the

24   context of Claim 1.

25          MR. SHARMA:  Yes, Your Honor.

1          THE COURT:  And does Claim 1 encompass both the

2     encoding and decoding?

3          MR. SHARMA:  Claim 1, as drafted, Your Honor,

4     mentions a decoder, but as you go through the claims, a vast

5     majority of limitations are drafted as to what would have

6     happened on the encoding side.

7          For example, in the variable length decoding unit,

8     it is considered to perform variable decoding on a coder

9     stream which is generated by coding the number of non-zero

10    coefficients in the current block.  That encoding happened

11    at the encoder side.

12         Similarly, earlier in the limitations when they

13    talk about a picture decoding unit, it talks about the

14    process that occurred on the encoding side, and the decoder

15    was simply to reverse this process on the decoder.

16         So the claim -- the preamble mentioned the

17    receiving apparatus, but the receiving apparatus is undoing

18    what the encoder had done on the encoding side.

19         This is -- this other embodiment in the patent

20    which is a simplified one, it's separating a two-step

21    process of going through a code table.  It simply goes

22    through a VLC table.  And here the Coefficient No. 4 is

23    mapped into a unique VLC.  Each entry in the coefficient

24    number value table is unique and has a corresponding

25    one-to-one mapping with a unique bit stream.

1          And, similarly, on the decoder side, same unique

2    mapping is used to then recreate the coded bit stream.  This

3    bit stream is coded at the encoder side.  And by using the

4    same process, you recreate the Coefficient No. 4 on the

5    decoder side.

6          And just to emphasize the uniqueness part of it,

7    this -- all the experts agreed because our -- the expert for

8    Pan -- PanOptis gave Mr. -- Dr. Richardson gave a

9    declaration when he talked about variable length code

10   tables, and so did Dr. Schonfeld, the expert for Huawei.

11   And both experts agreed that each table has to have a unique

12   mapping between the coefficients and the VLCs, or the

13   variable length code tables.

14         Here's an example from the declaration from

15   Dr. Schonfeld, expert for Huawei, and his example was

16   rebutted -- or not rebutted by the Plaintiffs' expert.

17         This table shows on the left-hand side, 0 through 8

18   are the total number of coefficients.  On the right-hand

19   side are the corresponding variable length code tables.

20         We have modified this example to show that for

21   No. 4 and 5, you have the same variable length code.  So in

22   this case, this construction will satisfy PanOptis'

23   construction but would not satisfy Huawei's construction

24   because uniqueness property is not met, which is that the

25   uniqueness property is captured in the Court's construction.

1          And I -- if you were to use that table, which does

2    not have a unique value, the encoder and decoder would not

3    work.

4          If the -- if you will take a number set of 3, 1, 4,

5    just as an example of one here, they would be encoded by the

6    encoder using the same table as 0001, 01, and then 0000s and

7    a 1.  These values will be the ones that have been encoded

8    by the encoder to create the coded stream, and the coded

9    stream is then given to the decoder.  The decoder will use

10   the same table.  It will be able to get to No. 3 because it

11   has a unique mapping in the table.  It will get transformed

12   01 into 1 because that has unique mapping.

13         However, when it comes to 0001, it will not know

14   how it was encoded.  It -- it could be 4, or it could be 5,

15   and, therefore, the property uniqueness, which is mentioned

16   in Huawei's construction and reflected in the Court's

17   construction would avoid this problem.

18         And the reason our expert mentioned is simple.

19   Each variable length code within the VLC table is not a

20   unique association.  If that is not true, then the decoder

21   will not be able to recover the original value that was

22   encoded.

23         On that one, the expert for PanOptis gave a

24   declaration in Paragraph 28.  He gave various examples of

25   variable -- variable length coding schemes, Huffman coding,

1    Golomb coding, Unary code, and so on.

2         And expert for Huawei examined each of those and

3    concluded that in each of those examples, the variable

4    length code was unique, and the unique mapping between the

5    coefficients and the -- I think that's all I have to say on

6    this one, Your Honor.  Unless you have any questions, I will

7    sit down.

8         THE COURT:  So is your difference with the

9    preliminary construction that it does not reflect the "and

10   vice versa" that you believe should be in it?

11        MR. SHARMA:  Yes, Your Honor.  I think everything

12   else will be correct over here.

13        THE COURT:  All right.

14        MR. SHARMA:  And the reason is because that's how a

15   person skilled in the art would understand a variable length

16   code table to be, and that's how it is described in the

17   patent, that the encoder uses a table, and the same table is

18   then used -- used by the decoder to encode it.  And that

19   will reflect the core understanding and meaning of variable

20   length code table.

21        THE COURT:  All right.  Thank you, Mr. Sharma.

22        MR. DEZERN:  Your Honor, David DeZern for

23   Plaintiffs.

24        May I approach with notebooks?

25        THE COURT:  Yes.

```
1              MR. DEZERN:  May I proceed, Your Honor?

2              THE COURT:  Yes.

3              MR. DEZERN:  First off, I would like to state that

4    PanOptis would be willing to accept the Court's preliminary

5    construction.  It adopts PanOptis's construction and adds

6    the additional language, which I believe resolves one of the

7    issues between the parties.

8              As you're aware, the parties propose competing

9    structure -- excuse me, competing constructions for the

10   "variable length code table" term presented here.

11             And as was explained in the briefing, there were

12   two areas of disputes, the first being Huawei's requirement

13   that the variable length code be unique, and the second

14   being the perspective of it being from the encoder versus

15   the decoder.

16             I believe the Court's preliminary construction,

17   which adds "within a given table, each variable length code

18   is unique and maps to one unique value" resolves the unique

19   between the parties and seems to be consistent with both

20   parties' understanding of how the claimed invention works.

21             So addressing the issue of the perspective of the

22   variable length code table, Huawei's admitted that the --

23   that Claim 1 is directed to a decoder.  The variable length

24   code table used in Claim 1 is used to transform variable

25   length codes into numbers, not the other way around.
```

1          And I believe this is evident from this excerpt of

2     Claim 1, which presents in -- in yellow highlight the two

3     places where the disputed term "variable length code table"

4     appears.  And as you can see, as part of a coefficient

5     number decoding unit, it's configured to decode to obtain a

6     number of non-zero coefficients.

7          The variable length code is used as part of that

8     coefficient number decoding unit, and the purpose in -- in

9     the claim is to convert variable length codes to numbers and

10    not the other way around.

11         THE COURT:  Are there other claims that are

12    asserted that use this term from the other perspective?

13         MR. DEZERN:  No, Your Honor.  Claim 1 is the only

14    claim in the '238 patent.

15         THE COURT:  All right.

16         MR. DEZERN:  And I believe your question to

17    Mr. Sharma hit the -- hit the issue exactly on the head,

18    that -- that the -- the claim is directed to the decoder

19    where variable length codes are transformed into numbers,

20    not the other way around.

21         Huawei's position that it's the same table I don't

22    think is quite accurate.  It is -- it is necessarily the

23    same mapping.  The -- the encoder must map the number to the

24    variable length code which the decoder is then able to

25    understand.  But it's not exactly the same table.  One table

1    is in the -- the encoder, which maps it, and another is in

2    the decoder, which decodes the variable length code.

3           And the claim is directed to the latter, and that's

4    why I believe the Court's preliminary construction adopting

5    PanOptis's proposed construction is drafted in the correct

6    direction of an encoder and the additional language

7    regarding within a given table each variable length code

8    being unique resolves the other issue.

9           THE COURT:  Do you contend that the two tables

10   would be different?

11          MR. DEZERN:  Well, I contend the -- the mapping

12   would have to be the same.  But they're not -- they're not

13   the exact same table.  You -- if you went to go find one,

14   one would be in the encoder, one would be in the decoder.

15          THE COURT:  And would they be -- even though they

16   are located in two different places, would they be the same

17   table?

18          MR. DEZERN:  Not necessarily.  I don't believe

19   there's any requirement that they be arranged or presented

20   in the same way.  So long as the value that's transformed to

21   the variable length code can be transformed back to that

22   value, I believe that's -- that's all that -- that would be

23   implied.

24          THE COURT:  All right.

25          MR. DEZERN:  So unless you have any other

1    questions, Your Honor --

2            THE COURT:  No.  Thank you, Mr. DeZern.

3            Mr. Sharma, why should we construe this term to

4    include both the encoder and decoder perspective?

5            MR. SHARMA:  Your Honor, if I may switch the

6    slides.

7            Your Honor, as shown in all the examples over here,

8    the -- although the claim is drafted as a decoder, it draws

9    heavily on how the encoder works.  The code -- the variable

10   length coding unit, if I go back here, the coefficient of

11   the decoding unit, that's the limitation of which the two

12   terms a part of, it receives a coded stream, which is

13   generated at the encoder side.  So even though the claim by

14   itself is on the encoder/decoder, it relies heavily on what

15   had been done on the encoder and reverses this process.

16           And every example that is shown in the

17   specification shows -- and over here, even though I said

18   same table is used on both encoder/decoder side, I meant was

19   the mapping on the encoder side as shown as Code Table 3 and

20   VLC Table 3 in this example, same mapping will be maintained

21   on the decoder side.

22           Obviously, you could have replicas of the same

23   table on two ends or the same mapping between the

24   coefficients and VLCs at both ends, and that --

25           THE COURT:  But each claim doesn't have to cover

1    all of the embodiments.  This claim is drafted from the

2    decoder perspective.  So why do we need to include in it the

3    encoder embodiments?

4         MR. SHARMA:  Your Honor, let me clarify.  It is not

5    as much the encoder embodiments but making sure that the

6    same mapping process is being used on the encoding side so

7    that the decoder can undo the decoding process.

8         Just to give you an example from the Plaintiffs'

9    expert, Plaintiff expert gave an example of how the encoder

10   uses VLC Table No. 2.  This is from Paragraph 30 of the

11   Plaintiffs' expert.  And it mentions that, okay, now then to

12   decode that value, its has to use the correct VLC table and

13   mentions that you either use the VLC Table 2 to encode it --

14   to decode it.  If they use VLC Table No. 3 to decode it,

15   then you will get the wrong value.

16        But, yes, I think the -- you don't have to -- to

17   include the table at the encoder side, but you have to use

18   the concept of mapping, the same mapping is being used in

19   the encoding, and the same mapping is used to decode the

20   value, that's part of the claim, because it is encoding a

21   stream that was -- it is decoding a stream that was encoded

22   on the encoder side.

23        THE COURT:  Okay.  I do understand your argument.

24   Thank you, Mr. Sharma.

25        MR. SHARMA:  Your Honor, if you don't mind the next

```
 1    term is --
 2             MR. DEZERN:  Please proceed.
 3             MR. SHARMA:  Your Honor, the next term is also from
 4    the '238 patent.  And it's a longer phrase.  It refers to a
 5    coded stream that was generated by quoting the number of
 6    non-zero coefficients included in the current block.  And
 7    how this construction explains or clarifies that, when the
 8    decoder stream was created, it used only the number of
 9    coefficients that were converted into a variable length
10    code.  And all this process happened on the encoder side.
11             Even though the word "only" does not appear in the
12    claim language, somebody reading the patent and the
13    specification would understand that when this coded stream
14    was created for decoding, the coded stream included only one
15    value, and it was total number of coefficients which were
16    then converted into a bit -- a coded stream using VLC
17    tables.
18             Here -- the larger phrase over here.  The bigger
19    phrase is coefficient number decoding unit.  That's a unit
20    on the decoder side that will decode the number of
21    coefficients.  It has three different units.  There's a
22    determining unit, which makes a prediction; a selecting unit
23    that selects a VLC table, that's a table that will be used
24    to decode, and as the invention works, same table or a
25    sim -- or a table of same mapping would have been used on
```

1    the encoding side; and then the last element is the variable

2    length decoding unit that is con -- configured to perform

3    variable length decoding on a coded stream.

4           And the issue is what does this coded stream

5    contain?  And this coded stream was generated by coding the

6    number of non-zero coefficients in the current block.

7           So since the coded stream was created on the

8    encoder side, I want to first show how the coded stream was

9    created.

10          This is Figure 8C from the patent which describes

11   how the coded stream was created on the encoder side.

12   The -- on the left-hand side is coefficient number.  These

13   are the total number of coefficients that applicant coded --

14   provided to unit 206.

15          The second input, unit 206 is a VLC table selecting

16   unit.  That unit 303 provides a selected VLC table, variable

17   length coding table, to 206.  And based on that, it outputs

18   a coded stream.  And that is then sent over to the decoder.

19          So the coded stream that is mentioned in the claims

20   refers to the output of unit 206, which is coefficient

21   number encoder because it's present on the encoding side.

22          THE COURT:  Doesn't PanOptis contend that this

23   coding can also use surrounding blocks to make a prediction?

24          MR. SHARMA:  Yes, Your Honor.  So if you look at

25   the coefficient -- the unit 201, that's a predictive value

1  calculating unit.  That unit -- we look at number of

2  non-zero coefficients in surrounding block to make a

3  prediction, and those are sent separately.  Those are

4  already present in the coded stream.

5       So what happens, Your Honor, you are getting a

6  series of blocks, and each block, some part of the

7  information will contain the total number of coefficients

8  as they come in.  The decoder will save that information for

9  later use.  So you're getting a series of coefficients from

10  the encoder side, the decoder will keep decoding them and

11  keep saving them for exactly the purpose Your Honor alluded

12  to.

13       THE COURT:  And would your inclusion of the word

14  "only" in the construction allow that?

15       MR. SHARMA:  Yes, Your Honor.

16       THE COURT:  Why do you need that word?  I am always

17  suspicious of an effort to include a limiting term like that

18  in a construction unless I understand what it is your

19  concern may be understood if we don't emphasize "only."

20       MR. SHARMA:  Yes, Your Honor.  That's a fair point.

21  And we also agonized over the issue whether putting the word

22  "only" in the claim.

23       Your Honor, the way the invention operates and all

24  the embodiments operate, they operate -- in this limitation,

25  coefficient number of decoding unit on the coded stream, and

1  that coded stream contains only non-zero coefficients.

2         Now, the data that comes in from the receive --

3  from the encoder side that you receive can have multiple

4  other things, and those things I'll show you in a minute are

5  handled by different units.

6         So our construction clarifies that the unit, which

7  is the coefficient number decoding unit, what does it

8  handle, what is input to this unit, and what it outputs from

9  that unit.  There may be other things that are input to the

10  decoder, but they're handled by different units.

11         So our construction clarifies to what's obvious to

12  one of skill in the art is the coefficient number encoding

13  unit or the decoding unit is receiving number of

14  coefficients which have been encoded and transforming back

15  then into the coefficients.

16         And if you look at the -- the description -- Your

17  Honor, do you have another question before I move on?

18         THE COURT:  No, go ahead.

19         MR. SHARMA:  Yeah.  So if -- in the description of

20  Figure 8C, it mentions that the coefficient number encoder

21  206 -- that's present in Figure 8C -- directly transforms

22  the number of coefficients into a variable length code.

23         So in this case, it is transforming the coefficient

24  number into a variable length code based on the VLC table

25  that is given by 303.

1          And now the VLC table was created or selected based

2  on the input from unit 201, this predictive value

3  calculating unit, and that made the decision based on the

4  number of non-zero coefficients and surrounding blocks.

5          But all the input that is coming on the -- input

6  that is coming into VLC are the coefficient numbers, and the

7  only output that comes out of it is series of VLCs that

8  encoded those coefficients.

9          And if you take a step up and look at the whole

10 encoder, the coefficient number encoder that we were just

11 discussing in the previous slide, this Figure 8C, is unit

12 111 highlighted in yellow, and that outputs the coded

13 stream.  The coded stream is the claim term that defines the

14 stream that we're discussing about.  And that was generated

15 by the encoder.

16         Now, the other units over here, coefficient value

17 encoder 112 and inter-picture predicting unit 107, they also

18 create values that are sent over to the decoder.  All these

19 different inputs are combined in the bit stream generating

20 unit and sent out to the decoder, which are shown in

21 different colors over here.

22         Yeah, so -- so to the extent PanOptis agrees that

23 the bit stream can contain many values, that is true.  The

24 bit stream that goes out of the encoder contains many

25 values, however -- however, the output of the coefficient

1    number encoder 111 is the counterpart of the coefficient

2    number.  Decoder contains only number of non-zero

3    coefficients that have been encoded into variable length

4    code.

5         Now, if you come to the decoder side, the same

6    input arrives at the decoder, and there's a counterpart over

7    here, the bit stream analyzing unit 1401.  It takes a bit

8    stream which has different values.  It has number of

9    coefficients that have been encoded.  It has the values of

10   coefficients that have been encoded.  It also has motion

11   vectors.  And the bit stream analyzing unit will send

12   appropriate data type to different units.

13        The total -- total number of coefficients -- that's

14   the term we are discussing over here in yellow -- is shown

15   to send to coefficient number decoder that will decode the

16   number of coefficients, the VLCs to get the values.

17        Other things in data streams, such as coefficient

18   values, those are sent to unit 1404 that will then decode

19   coefficient values.  Finding motion vectors and so on, they

20   are sent to the inter-picture prediction decoder 1408.

21        So I'll admit to the extent -- and Pan -- PanOptis

22   is correct, the bit stream that comes in has many, many

23   values and so on.  However, I disagree -- I will disagree

24   from PanOptis that the -- all those values are then given to

25   the coefficient number decoder.  Those values are parsed by

1    the bit stream analyzing unit, and the -- only the number of

2    coefficients are sent to the 1403, the coefficient value

3    decoder.

4         Your Honor, this is simply a text with -- just --

5    simply with a lot more words to state.

6         THE COURT:  Is the part that you have just walked

7    me through from the specification --

8         MR. SHARMA:  Yes.

9         THE COURT:  -- that is an embodiment of this

10   invention, but is all of that reflected in the claim?

11        MR. SHARMA:  Yes, Your Honor.  The only portion

12   that is captured in the claim -- first of all, all the

13   embodiments in this invention work in the same manner.  The

14   claim at issue is coefficient number decoder that is

15   captured in 1403.  The -- the decoding part of how the

16   coefficient value decoder works, 1404, or how the inter

17   prediction decoder works, 1408, those are not explicitly

18   called for in that -- in that claim.

19        The claim at a whole at a high level captures how

20   the decoder would work, but the -- but the limitation issue

21   is what does coefficient number decoder do, and that's what

22   we're trying to focus on is -- is what -- in the claim term,

23   what does a claim term receive and what does a claim term

24   decode and how the decoding is done.

25        THE COURT:  All right.

1          MR. SHARMA:  And here, Your Honor, I have excerpted

2    the coefficient number decoding unit from the claim.  The

3    claim, as you know, Your Honor, is about a column long, but

4    the -- all the claim terms that we're discussing over here

5    are about coefficient number decoding unit.

6          That, Your Honor, is actually the key part of the

7    claim.  A lot of the description of the encoder/decoder

8    work, the patent -- the background were known in the prior

9    art, block level coding, discrete post sine transforms, all

10   these were present in the prior art.

11         The novel part of the patent was taking coefficient

12   numbers -- the total number of coefficients in a block and

13   encoding them, sending them over, and decoding them.  And

14   that's what they claim specifically because that, they

15   believe, to be the key part of the invention.

16         So looking at the claim term over here, Claim --

17   coefficient number decoding unit, that unit maps to unit

18   1404 -- 1403, coefficient number decoding unit at Figure 17.

19         And as mentioned earlier, this has three different

20   parts.  The variable length decoding unit, which is a unit

21   within 1403.  It receives a coded stream that was generated

22   by coding the numbers of non-zero coefficients in the

23   current block.  And that's the part which is highlighted in

24   yellow.

25         As you saw earlier, in the encoder side, there was

1  a corresponding coefficient number encoder that received

2  only the number of non-zero coefficients and converted them

3  into variable length streams using the table.

4        The thing was sent over, along with other bits of

5  data.  On the receiver side, the bit stream -- bit stream

6  comes in and is parsed out.  And 1403 is the unit that

7  corresponds to that.

8        Now, if I go look inside 1403, Figure 20C shows how

9  the decoder works on the -- on the decoding side.

10        And the same process is repeated over here.  There

11  is a predictive value calculating unit that Your Honor

12  mentioned earlier that will decide by looking at other

13  surrounding coefficients what table to use.  1603 will

14  select the table, and coefficient number decoder will then

15  transform it.

16        Now, the coded stream that was created on the

17  encoding side, which is based only on number of

18  coefficients, is provided to unit 1506.  And the patent

19  states the coefficient number decoder 1506 transforms

20  directly a variable length code into the number of

21  coefficients without transforming them into code number.

22        So in this embodiment, it will take the variable

23  length codes, use the table, and output a coefficient

24  number.  All the embodiments in the patent use the same

25  process.  They may use code tables.  They may not use code

1    tables.  But they all use variable length code tables.

2          And in our embodiment, the bit stream coming into

3    this decoding unit has only one thing, the variable length

4    codes that have been -- that are based on the number of

5    coefficients.  And output from the unit is only one thing,

6    that's coefficient numbers.

7          And our construction simplifies or clarifies that

8    issue, how this unit is working.

9          And as I mentioned earlier, one of the -- the --

10   the critique that Pan -- PanOptis has is, well, the bit

11   stream can contain many, many other things.  And that is

12   true, but that's not the claim term at issue.  The claim

13   term at issue is coded stream and how that coded stream was

14   created.  And they've shown that coded stream was created in

15   yellow by using only number of coefficients sent over, along

16   with other data, and then the -- at the coefficient number

17   decoder, that's the claim term at issue again over there,

18   that receives only the coded stream and does not receive

19   other portions.  And those are handled at other units in the

20   embodiment such as the coefficient value decoder or the

21   inter-picture prediction decoder.

22         Okay.  One last thing, Your Honor.  In the opening

23   brief, PanOptis mentioned that this is a comprising claim

24   and can have other things.  And that is true, the comprising

25   claim can have other things like may include coefficient

```
 1   value decoder.  They can also have a coefficient --
 2   inter-picture prediction decoder.
 3          However, the case law is clear that even though you
 4   may have other limitations, but the limitations that are
 5   drafted that are present in the claims cannot be modified
 6   under the guise of comprising limitations.
 7          That's all, Your Honor.  Do you have any questions?
 8          THE COURT:  No.  Thank you, Mr. Sharma.
 9          MR. DEZERN:  Your Honor, before I begin, I believe
10   I miscounted and handed up all of my notebooks to the Court
11   instead of saving one for opposing counsel.  And if I could
12   beg to get one on those back.
13          MR. NIEBERG:  We'll take ours back.
14          MR. DEZERN:  Okay.  Yeah.  Well, we could trade,
15   however -- however you prefer.
16          I apologize.
17          May I proceed?
18          THE COURT:  Yes, go ahead.
19          MR. DEZERN:  Right here.  Your Honor, as Mr. Sharma
20   was just discussing, the only difference between the
21   parties' two proposed constructions is that Huawei wants to
22   add only to this description of the disputed term "generated
23   by coding."
24          Here's the context in which it appears in the claim
25   where it describes the coded stream.
```

1          I believe that the problem -- the main problem with

2     Huawei's position of "only" is that they're essentially

3     reading in parts of specific embodiments from the

4     specification into the claim.

5          So here we have Figure 17, which is an embodiment

6     of the decoder in the '238 patent.  And in this embodiment,

7     there's -- there's a block diagram of different parts, and

8     it includes Section 1401, the bit stream analyzing unit,

9     which I believe Mr. Sharma was just discussing which is

10    described here in the specification where it explains that

11    this -- this bit stream analyzing unit extracts from the

12    input bit stream various types of information, including the

13    number of non-zero coefficients, the values, motion vectors,

14    et cetera.

15         Now, the -- the '238 patent presents this as a

16    potential structure for the decoder, and then goes on to

17    describe embodiments of -- embodiments that decode the

18    number of non-zero coefficients based on this extracted

19    stream.

20         But the problem with Huawei's construction is

21    there's nothing -- there's nothing in the claim that

22    requires that extraction from the inputted bit stream to be

23    provided -- to be part of the coded -- coded stream.

24         So -- and I think in their briefs, and we heard

25    again today, that -- that Huawei's acknowledged that,

1  generally, the -- the generic bit stream that is provided to

2  the decoder includes a lot of different information.

3      And, you know, Huawei's position is that this claim

4  language describing the coded stream means that this coded

5  stream is generated by coding only the number of non-zero

6  coefficients.

7      Whereas, our position is that the claim language

8  only requires the number of non-zero coefficients -- I'm

9  sorry, no.  Our position is that it at least requires the

10  number of non-zero coefficients because it is part of a unit

11  which is -- as you see at the top, is configured to decode

12  to obtain the number of non-zero coefficients.  Therefore,

13  at least that information must be in the stream, which is

14  provided to it, but the claim language doesn't exclude

15  anything else or require these other details from the

16  embodiments in the specification.

17      So unless Your Honor has any -- any questions, I'll

18  sit down.

19      THE COURT:  All right.  Thank you, Mr. DeZern.

20      MR. SHARMA:  I just wanted to make one quick point,

21  Your Honor.

22      The -- the claim is extremely long, has many units,

23  multiplexing unit, audio processing unit, picture decoding

24  unit, and then block decoding unit and a reproducing unit.

25  But, finally, the claim boils down to what is key part of

the invention, coefficient number decoding unit.  And all

the embodiments of the patent, every one of them on the

encoding side and the decoding side, show that the

coefficient number encoding unit and decoding unit handle

only the number of coefficients.  There's no description in

the specification of these objects handling anything else

except those.

        And, finally, the claim term says variable length

decoding units configured to perform variable length

decoding, and it has to be read in the light of the

specification.  It takes in the number of VLCs and

transforms them into the number of coefficients.

        And if there were something else, it added -- other

things went into unit 1403, then coefficient number decoder

would not work.  There's no description in the specification

or -- or in the background that if it handled other values,

if -- if it got motion vectors, if it got value to the

coefficients, how would it decode them?  The unit is not

configured to operate that.

        Our construction clarifies that, and any confusion

down the road in case the Plaintiff would actually -- would

like to argue that coefficient number decoder can accept

other things besides number of coefficients.

        THE COURT:  I'm -- what I'm understanding, really,

is that this dispute is about whether something can be

1   identified within an accused device as a variable length

2   decoding unit if it does more than just decode based on

3   the -- the number of non-zero coefficients and what is

4   claimed in here.

5          MR. SHARMA:  Yes, Your Honor, I think you hit the

6   nail on the head.  The issue is going to be is -- is the

7   accused product will have something which is number of

8   coefficients, other things.  Things have changed, constantly

9   evolved, and will it be capturing other things, which is not

10  in line with the specification or the invention or the

11  patent described as the key part of the invention.

12          In the background and the last column, they

13  describe key part of invention is taking total number of

14  coefficients and putting them into VLC, and then decoding

15  them on the reverse side.  And that all -- every

16  specification -- every embodiment operates in that manner,

17  so they have implicitly defined coefficient number decoder

18  to that embodiment.

19          THE COURT:  All right.  I will consider your

20  arguments in that light.  Thank you.

21          MR. SHARMA:  Thank you, Your Honor.

22          MR. HASLAM:  I want to address the ordering vector.

23  I know we put the interleaver limitation both in the

24  ordering vector and the reordering circuit.  I'll argue it

25  in connection with the reordering circuit.

1          The reason for doing them both is -- I think this

2     came through our papers -- is that we believe there is a

3     clear and unmistakable disclaimer of interleavers, and

4     perhaps reordering circuit is the best place to put that, so

5     I -- I --

6          THE COURT:  That's fine.

7          MR. HASLAM:  Okay.  Our concern with the Court's

8     preliminary construction on ordering vector is that it gives

9     no meaning to the term "vector," which we believe is a

10    one-dimensional array of numbers.  And if -- if the Court

11    were to modify its construction to say one or more ordering

12    patterns that form a one-dimensional array of numbers that

13    together define a reordering of the bits of the mother code

14    word, we'd be happy with that.

15         THE COURT:  And what do you rely upon for arguing

16    that vector has to be one dimension?

17         MR. HASLAM:  Both a declaration of Mr. -- Dr. Bims

18    and the dictionary definition of vector.  And I think it's

19    particularly important to make sure that we give meaning to

20    the word "vector" because of how it came to be in the

21    claims.

22         Can we go to Slide 51 first?

23         If we look just at the bottom part here, this was

24    the -- there was a rejection over Li and two other

25    references to the claim which originally just had the term a

1    reordering circuit for reordering the mother code word and

2    regenerating a reordered mother code word.  To get around

3    those three references and with respect to Claim 1, to get

4    around the Li reference, they specifically added an ordering

5    vector.

6           So I think it is important that we give meaning to

7    the term "vector," and I don't believe it does.  And if we

8    want an example of what a vector is and -- and where the

9    specification -- and it does say it with respect to a

10   preferred embodiment, but I believe, consistent with the

11   expert declaration, it's what a person of ordinary skill

12   would understand.

13          If we can go back to Slide 50.

14          Here is the top of Column 7, and it -- it talks

15   about the one or more puncturing patterns used sequentially.

16   Those patterns, put together, form the ordering vector.  And

17   when it gives the exemplary ordering vector given below,

18   what it means by exemplary there is, is that's what the

19   vector -- the ordering vector would be if you used the

20   puncturing patterns which are immediately described before

21   in Column 6 -- at the bottom of Column 6.

22          And -- and when you look at those puncturing

23   patterns, at the bottom of Column 6, what you'll see is P1,

24   P2, and P3 that are a series of 1s and 0s which were --

25   which basically specify the 1s mean you keep that bit in

1    that order -- in that place, 0s mean you don't.

2           And the combination of those three, P1, P2, and P3,

3    if you look at them in the bottom of Column 6, you will see

4    that the combination of those three has a 1 in every

5    position, which indicates that it will keep ultimately every

6    bit of the original stream, but it will be reordered as set

7    forth in Column 7.

8           So the reordering will be Bits 1, 4, 7, 10,

9    et cetera, 2, 5, 8, 11, which is a reordering that is done

10   by the puncturing pattern.  But the pattern goes to make a

11   vector.  And I think that's what's missing from the Court's

12   construction is a term which they used to distinguish over

13   the prior art is -- is a -- a mathematical term.  We've

14   given dictionary and -- and other definitions, as well as

15   the expert declaration, that it is a linear array of

16   numbers.  It can be a column in a matrix.  It can be a row

17   in a matrix, but it is a linear array of numbers which tells

18   you where to start and where to stop in the bit stream.  And

19   it tells you the order in which those terms are to be given

20   to the modulator.

21          And so I think for those reasons, we -- we believe

22   that the -- definition does not give effect to the term

23   "vector," which is a term of -- of art, I think, not one

24   that is -- when given an ordinary lay stream (sic) meaning.

25   But even if you look at the dictionary definitions, it's a

1    one-dimensional array of numbers, which can then be used to

2    reorder as these puncturing patterns, when they're put

3    together, accomplish.

4         THE COURT:  Does the specification anywhere talk

5    about a one-dimensional nature of this?

6         MR. HASLAM:  Those terms do not appear in the

7    specification, but if you look at the -- the only place that

8    it gives an example of an ordering vector is at the top of

9    Column 7, and there it is, a one-dimensional array of

10   numbers, which tells you which bit is first, number one, and

11   then the order in which those bits are to be sent.

12        THE COURT:  What is there in the specification that

13   would indicate that a multi-dimensional ordering vector

14   couldn't accomplish the same thing?

15        MR. HASLAM:  There is nothing in the specification

16   that says it can.

17        THE COURT:  All right.  I -- so the argument is

18   simply that because there is nothing to the contrary in the

19   specification, we should include?

20        MR. HASLAM:  No.  It's because the example that's

21   given is consistent with the meaning of what a vector is.

22   The term "vector" has a meaning.  We've given you dictionary

23   definitions.  We've got an expert declaration that a vector

24   has a meaning in the art, and it's a one-dimensional array

25   of numbers.

1          THE COURT:  It was my recollection that your

2     dictionary definitions did not all include this

3     one-dimensional nature.

4          MR. HASLAM:  Go to Slide 54.

5          The first one is a -- a matrix with one row or one

6     column.  One row or one column is a one-dimensional array of

7     numbers.  If you have a matrix that's 3-by-3, and it's one

8     column, it's -- it's the order 1, 2, 3, if you go across the

9     row.  And if it's down, it's whatever is 1, 5, 7, or

10    whatever the matrix -- size of the matrix is, it's a

11    one-dimensional array of numbers going down.

12         It is not a two-dimensional array or a

13    four-dimensional array or a six-dimensional array, because

14    you're not sure where you're supposed to start and stop

15    which is one of the benefits that's touted in the

16    specification for using this reordering -- this ordering

17    vector to create the reordered mother code word.

18         One of the things it says is, is that allows the --

19    the transmitter to pick where it starts and stops within the

20    sequences, as it has to send more and more sequences if it

21    has to retransmit.

22         A mathematical expression quantity, such as

23    velocity, that possesses both magnitude, amplitude, and

24    directions; a set of numbers in an order; in an order.  And

25    we believe when you put those two together, the order is --

1   it's a -- it's a one-dimensional order.  It's not a matrix.

2   A one-dimensional array -- the last one is a one-dimensional

3   array.  A set of items arranged in a single column or row.

4           But I think the dictionary definitions we've

5   provided contain the -- the element that it's a

6   one-dimensional array of numbers.

7           Now, the one-dimensional array can be a column

8   in -- in a matrix.  It can be a row in a matrix.  But it --

9   as these things say, it's one-dimensional so that it has an

10  order and a direction.

11          And that's -- that's consistent with what's in

12  Column 7.  And it's consistent with the way the invention is

13  described as to reordering in such a way that the reordering

14  vector tells -- sets the order of bits that are to be

15  modulated.  In other words, this is what sets the order

16  which -- which will go to the modulator, which is then

17  responsible for -- in this reordered order, set by the

18  ordering vector, that's the order the bits go to the

19  modulator, and that's the order in which they go out over

20  the physical airways.

21          And in the Column 7 embodiment, the way they would

22  go out is 1, 4, 7, 10, in that order.  And the concept of

23  vector is it has an order to it.  And it's a -- it's a

24  one-dimensional array or column or however the Court wants

25  to capture it.  But I believe that the current definition

```
 1   does not capture or give meaning to a term that was

 2   specifically added during prosecution to overcome prior art.

 3           And if the Court has any further questions --

 4           THE COURT:  Not -- not on that part of it, no.

 5           MR. HASLAM:  Okay.

 6           MR. BURGESS:  I guess we can do it like this.  It's

 7   half the term, but -- we'll talk about the split first.

 8           Thank you, Your Honor.  May I proceed?

 9           THE COURT:  Yes.

10           MR. BURGESS:  Could I have -- slides -- yeah, could

11   I have Slide 39, please?

12           Let me just start, Your Honor, with the -- Huawei's

13   suggestion that the prosecution history somehow supports

14   this construction.  It doesn't.

15           It is true that the ordering vector limitation was

16   added in the prosecution history to distinguish three

17   different references, Li, Eroz, and Kleider.  We'll talk

18   more about those later with respect to their disclaimer

19   argument.

20           But the important point here is that the -- the

21   one-dimensional nature that Huawei is proposing as part of

22   the construction has nothing whatever to do with any of

23   those distinctions.  There's no mention anywhere in the file

24   history of -- of the ordering vector being one-dimensional,

25   or, in fact, of anything about the ordering vector other
```

1    than that it's used to reorder the mother code word.

2           Now, I think actually the dictionary definitions

3    that Huawei cites are quite instructive.  So I only remember

4    two from the briefing, but there was a third, and I'm going

5    to ask them to bring up one of their slides in a minute

6    because I noticed something that I want to point out to the

7    Court.

8           But here's the first one, and this -- this is the

9    one that actually bears the closest resemblance to what they

10   propose.  And -- and they -- they cite to the Microsoft

11   Computer Dictionary definition of vector.  And in their

12   brief, they highlight Definition No. 3, which starts with:

13   In data structures.  So first of all, this is not a computer

14   patent.  This is a telecom patent.

15          Second of all, there's no suggestion anywhere in

16   the patent that the particular data structure that's used to

17   represent the ordering vector and memory has any

18   significance.  There's just -- the patent is completely

19   agnostic.  It -- it just doesn't matter.

20          And so this is just a wrong definition.

21          But if we look at -- sorry, there's -- if we look

22   at the -- the telecom -- oh, this is yours?

23          MR. HASLAM:  Yeah -- no, that's yours.

24          MR. BURGESS:  No, it's mine.

25          If we look at the Telecom dictionary definition

1  that they also cite in the same footnote of their brief,

2  this is actually, I think, directly contrary to their

3  position.  Because if you look at this -- again, this is

4  telecom, that's actually what this patent relates to -- not

5  a single one of these definitions suggests that there's any

6  significance to the particular way that a vector would be

7  represented in memory in terms of being a one-dimensional

8  array or -- or any other type of structure.

9          And, in fact, if you look at -- and what I've

10  highlighted here is actually what Huawei highlighted in the

11  footnote in their brief where they discussed this

12  definition, a set of numbers in an order.  Well, that's all

13  that matters.

14          The ordering vector needs to be a set of numbers in

15  and order, and that order is what's used to -- to reorder

16  the mother code word.  And that's -- that's what the

17  ordering vector does.

18          And -- and I believe they say that there's no

19  concept of order in the Court's proposed construction, or

20  a -- vector in the Court's proposed construction.  I don't

21  think that's right.  I actually believe that this concept

22  of -- of a set of numbers in an order, that's exactly what a

23  pattern is.  That's what an ordering pattern is.  It's a set

24  of numbers in an order, and that's -- that's all that's

25  required.  And that's -- that's what a vector is.

1            If -- if I could ask you to switch over to your

2     slides and -- and pull up your Slide No. 94 (sic).  Yeah.

3            I hadn't seen the -- the top definition before,

4     which was from the Oxford English Dictionary.  And, of

5     course, they -- they highlighted the part that's math when

6     this isn't -- not really a math patent either.  But if you

7     look at the -- the second part that they ignore, that's

8     actually very instructive.  Any element of a vector space.

9            So in telecom, for example, a vector space could

10    be -- in fourier analysis, in telecom, a vector can be a

11    function, right?  It's an extremely -- it's an extremely

12    broad concept, and the notion that somehow it's limited to a

13    one-dimensional array, a particular data structure, that --

14    that just -- that's just sort of orthogonal.  It just

15    doesn't -- it doesn't fit here.  Maybe it fits in computer

16    science when you're talking about how you write an algorithm

17    in the most efficient way.  But it just doesn't make sense

18    in the context of a telecom patent.

19            I think that's all I have, Your Honor, unless you

20    have questions on this part of the dispute.

21            THE COURT:  No.  Thank you, Mr. DeZern (sic).

22            MR. HASLAM:  I have just one quick rebuttal.

23            The notion that this is not a computer-implemented

24    invention and that it somehow deals with telephony, if

25    they're prepared to stipulate that this doesn't read on

1   computers, we could probably all go home right now, but he's

2   not going to stand up and say it doesn't, because what's in

3   the -- what's in the phone and what implements these is a

4   computer.

5          And so -- and these are data structures.  I mean,

6   the notion that this is not a data structure when it -- when

7   it basically is -- it is a set of numbers that are -- a

8   puncturing pattern is contained somewhere in a memory so

9   that a processor that then wants to do the reordering can go

10  to that memory and pull out this data structure which

11  contains these puncturing patterns.

12         But -- but I just close with Column 7 says that the

13  puncturing patterns form the vector.  The vector is not the

14  puncturing pattern itself.  It's the series of puncturing

15  patterns that forms the vector.  And the vector is, we

16  believe -- notwithstanding the arguments, is a

17  one-dimensional array of numbers, as -- as indicated by the

18  specification.

19         THE COURT:  All right.  If you want to go ahead and

20  address the interleaver issue.

21         MR. HASLAM:  Put up Slide 38, yeah.

22         On Slide 38, I've -- I've put up what was the

23  original claim language, the reordering circuit for in --

24  for reordering the mother code word and generating a

25  reordered mother code word.

1          Now, that's a circuit -- and that -- it's a circuit

2     in a telephone admittedly, but it's a circuit that does

3     computing operations.

4          The examiner, with respect to Claim 1, said Li

5     substantially teaches, et cetera.  And -- and with respect

6     to the reordering circuit, the examiner said:  Li has a

7     bit-by-bit interleaver, which he called the reordering

8     circuit.

9          So the examiner matched the bit-by-bit interleaver,

10    which is a structure in Li.  And he said that structure is a

11    reordering circuit for reordering the mother code word and

12    generating a reordered mother code word.

13         And he -- and what the examiner specifically said

14    is Li has a bit-by-bit interleaver, paren, quote, a

15    reordering circuit, close quote, close paren, interleaving

16    the code word received from the encoder and outputting an

17    interleaved code word.  Then he gives a citation in Li.  An

18    interleaver mixes or reorders the bits.  And it does so, so

19    that it can help overcome what are referred to burst errors,

20    which are errors which will occur close together in time, so

21    that it might wipe out a series -- a -- a consecutive

22    sequence of bits.  And by interleaving them, using forward

23    error correction, you can help mitigate the effects of such

24    burst errors.

25         The -- and the examiner went on to cite with

 1  respect to the other claims, the other two, Eroz and

 2  Kleider, both of which had interleavers.

 3       So the examiner, for all the claims that were then

 4  pending, cited a reference and found a reordering circuit

 5  for reordering the mother code word and generating a

 6  reordered mother code word was an interleaver.

 7       THE COURT:  How would the statements of the

 8  examiner constitute a disclaimer by the patentee?

 9       MR. HASLAM:  Because the -- well, because when they

10  came back, they amended the claim -- it's the fact that they

11  amended the claim, and the arguments they made over the --

12  to try to get over it.

13       So number one, they didn't argue -- they didn't not

14  amend the claim and argue that Li's interleaver was not the

15  reordering circuit.  They -- that was an argument that was

16  available to them.

17       Examiner:  You've got it wrong.  Li's interleaver

18  is not a reordering circuit for reordering the mother code

19  word and generating a reordered mother code word.

20       That's essentially one of the arguments they're

21  making now.  Well, we didn't have to say or didn't have to

22  amend the claim.  The fact of the matter is they amended the

23  claim, and they amended the claim -- if we can go to the --

24  maybe it's the next slide.  They amended the claim to add

25  the wherein clause that I've highlighted.

1          So the first thing is, is they didn't say Li's

2   interleaver is not a reordering circuit.  What they did say

3   is Li fails to teach, suggest, or -- and -- and what's

4   important here is this argument is made with respect to the

5   amended claim.  These arguments are made with respect to the

6   amended claim, not the original claim.  They could have

7   tried to make these arguments with the original claim and

8   said, look, Li just is -- is apples and oranges to our --

9   our reordering circuit.  They didn't.  They amended it.  And

10  these arguments are distinguishing features of Independent

11  Claim 1, as amended.

12         They go on, and they say:  Li fails to teach,

13  suggest, or render obvious a reordered mother code word that

14  is generated based on an ordering vector, wherein the

15  ordering vector -- and then they cite the claim language.

16  So they distinguish it based on the fact that Li's

17  bit-by-bit interleaver is not an ordering vector or a

18  reordering -- or an ordering vector.

19         They say:  In contrast, Li's interleaver breaks a

20  correlation of sequential fading coefficients, maximizes the

21  diversity of the system, and breaks the correlation among

22  sequentially-coded bits and the correlation among the bits

23  associated with the same seven symbols.

24         So they said basic -- they basically said this is

25  what Li's interleaver does.  It's not a reordering -- it's

1   not an ordering vector.  It doesn't meet the amended claims

2   with respect to the reordering based on an ordering vector.

3           They don't make the argument that Li's interleaver

4   is not a reordering circuit for reordering the mother code

5   word and generating a reordered mother code word.  They rely

6   on the ordering vector.

7           Let's go to the next slide.

8           Now, the patentability of an apparatus claim

9   depends on the claim structure, not the use or the purpose

10  of that structure.  It covers what a device is, not what a

11  device does.

12          It must distinguish from the prior art in terms of

13  structure rather than function.

14          What they distinguished in the arguments they made

15  to the Patent Office were based on the -- the function of

16  Li's interleaver.  And, in fact, they were accurate as to

17  what Li's interleaver did.  And as our expert, Mr. Bims,

18  said, that is what every interleaver does.  It reorders the

19  bits in order to break up the sequential nature of the bits

20  to overcome potential burst errors in transmission.

21          Next slide.

22          And here I've just said on Slide 42 -- it's in the

23  brief, I won't bother to read it -- it's Paragraphs 51, 56,

24  and 63 from the declaration of Harry Bims, indicating that

25  what they distinguished it on is applicable to every

1    interleaver.  And, in particular, what they -- what they

2    said Li's purpose was, was, in fact, the purpose of the

3    by-by-bit interleaver in Li.

4          So by -- whether they distinguish it by saying

5    we're not a bit-by-bit interleaver, or in Li, in contrast of

6    the reorder -- the ordering vector, does this, they

7    essentially said we are not a structure that does those

8    things.  And what those things are is what Li's bit-by-bit

9    interleaver did.

10          Go to the next slide.

11          What they essentially said is that they took the

12    purpose of a bit-by-bit interleaver, and they

13    distinguished -- they said, well, that's what Li is.  And

14    that's in contrast to what we do.  But as Li said, he's

15    talking about those purposes are a bit-by-bit interleaver.

16          So when -- when the -- when the inventors said Li

17    is in contrast to our ordering vector, they effectively, in

18    so many words, said every interleaver is in contrast to our

19    ordering vector, but at a minimum -- at a minimum, what they

20    said is Li's bit-by-bit interleaver, which has the purpose

21    that they then recited in their word -- their language back

22    to the Patent Office, describes Li's bit-by-bit interleaver.

23          So there is at a minimum, we believe, a clear

24    disclaimer that the ordering vec -- the reordering circuit

25    wherein there's an ordering vector is in contrast to Li's

1   bit-by-bit interleaver, which breaks the correlation of

2   sequential fading coefficients, et cetera, as they said, to

3   the Patent Office.

4         And -- and we believe that any person of ordinary

5   skill in the art reading this later would think -- would

6   come to the conclusion at a minimum that Li's bit-by-bit

7   interleaver, which has the purpose which the inventor said

8   is in contrast to our claims, as amended, would clearly say

9   they said we don't do what Li did.  So it's not a bit-by-bit

10   interleaver.

11         Let me see the next slide.  Next slide.

12         I'll just make -- in the interest of time, there

13   are several arguments that -- and I put it on Slide 45, some

14   of the arguments that Optis now makes trying to distinguish

15   Li, and these are things that they might have said many,

16   many years ago to the Patent Office.  But they didn't.

17         Next slide.  Next slide.

18         And here's the problem with the arguments they make

19   today to try to distinguish Li.  And we've cited two cases

20   here, Norian Corp versus Stryker and Tech Properties Limited

21   versus Huawei.

22         We hold the patentees to the actual arguments made,

23   not the arguments they could have made.  The question is

24   what a person of ordinary skill would understand the

25   patentee would disclaim during prosecution; not what the

1   patentee needed to disclaim during prosecution.

2          The Norian Court says:  There's no principle of law

3   that the scope of surrender is limited to what's absolutely

4   necessary.  It frequently happens that they surrender more

5   through amendment than what may have been absolutely

6   necessary.

7          So you can forget the -- the post hoc arguments

8   that they make today about what's different between Li

9   and -- and the claimed invention.

10         What's -- what matters, what the notice function

11  serves, what people of ordinary skill in the art can rely on

12  is what they told the Patent Office back when they were

13  prosecuting this patent.  And the one thing I think is -- is

14  a clear and unmistakable disclaimer in the language of the

15  Federal Circuit is they disclaimed, at a minimum, Li's

16  bit-by-bit interleaver.

17         Thank you.

18         THE COURT:  Thank you.

19         MR. HASLAM:  If the Court has any questions, I'll

20  be happy to --

21         THE COURT:  Not right now.

22         Mr. Burgess.

23         MR. BURGESS:  Your Honor, I'm sorry, I forgot to

24  hand these up.  Can I bring them?

25         THE COURT:  All right.

1          MR. BURGESS:  Thank you.

2          About the file history, I think some context is

3     helpful.

4          As I mentioned a few minutes ago, there were -- in

5     the initial rejection, there were three references that

6     were -- that were cited.  Li was certainly one of them.

7     There was also the Eroz reference and the Kleider reference.

8          And it's noteworthy that all three of those -- in

9     all three of those references, the examiner noted that there

10    was an interleaver.  And here we see the examiner -- and we

11    already saw this, so I'll be -- I'll be quick.

12         But here we the see the examiner's comments on Li

13    where he specifically says:  Li's -- Li's bit-by-bit

14    interleaver is a reordering circuit.  He clearly makes that

15    link.

16         Here's what he said about Eroz.  He said the --

17    interleaving the punctured mother code word -- and that's --

18    that's a function, but he also clearly links that to the

19    reordering circuit, the interleaving function.

20         Now, what's -- what's interesting is had the

21    patentee intended to do what Huawei says or the applicant

22    intended to do what Huawei says the applicant did, namely

23    disclaim interleavers, he would have simply said just

24    squelch all of this.  A reordering circuit is not an

25    interleaver or an interleaver is not a reordering circuit.

1   But the patentee didn't do that.  In fact, took great pains

2   not to do that.

3          And if we look at the same language that we -- we

4   just saw, I just -- I just have a different -- I read this

5   differently.

6          The first part of what I've highlighted, the first

7   sentence is simply the patentee saying Li fails to teach,

8   suggest, or render obvious, and then cites the claim

9   language.

10         And the next sen -- the next sentence says:  In

11  contrast, i.e., in contrast to what the claim requires, Li

12  does these things.  Li's interleaver breaks a correlation,

13  maximizes diversity, and breaks the correlation among

14  sequentially coded bits in the correlation among the bits

15  of -- the bits associated with the same seven symbols.

16  That's just what Li says.  That's just a quote, if I recall

17  correctly, from Li.

18         And all that's clear here is that the patentee is

19  saying on the one hand, this is what the claim requires, and

20  on the other hand, this is what Li's interleaver does.  And

21  they're not the same.  And that's all he had to say.  There

22  was no need to -- the examiner didn't require any

23  additional -- additional explanation.

24         The point is, there's a claim limitation.  Li's

25  particular interleaver doesn't do it.  There's no suggestion

1  here that interleavers in general would be unable to perform

2  this function.  It's -- it's simply -- simply that the way

3  that the interleaver in Li is used, this is what it does,

4  that's different from what the claim requires.  That's all

5  that's clear.

6        Now, Huawei makes much in its brief and also here

7  today of the idea that, look, all interleavers are the same.

8  And this particular way that the patentee or the applicant

9  characterized Li in the file history, that's true of all

10 interleavers.

11       Well, that's just not true.  An interleaver is just

12 a component.  What an interleaver does -- and Li says this.

13 We can look at Li.  Here's Li.  If you look at the fourth

14 line from the top, it says:  A random bit-by-bit interleaver

15 permits the order of the punctured encoded -- encoder output

16 bits and -- and then -- and then continues.

17       So what an interleaver does -- and I don't think

18 there's any dispute about this -- it takes -- it takes a set

19 of bits at its input or symbols at its input, and it

20 reorders them.  That's what it does.

21       Now, the effect that that has on the system depends

22 on the particular system in which the interleaver is used

23 and -- and how it's used within the system.

24       So in the particular context of Li's invention or

25 Li's paper, these -- these several effects are what you get.

1    But -- but notice -- notice that one of the things that Li

2    says that his bit-by -- bit-by-bit interleaver does is to

3    maximize the diversity order of the system, okay?

4           Well, if we go forward a few slides and look at

5    Eroz, and Eroz describes what his interleaver does, and he

6    says it's done to break up the fades and make them appear

7    sequentially independent to the decoder.  Well, it doesn't

8    say anything about maximizing the order of a system.  And

9    that's relevant simply to make the point that not all

10   interleavers do the same thing.

11          Eroz is a different sort of system.  It's a

12   trellis-coded modulation system.  It's different.  And so

13   the interleaver has different effects.  And so it's just the

14   component that can be used to accomplish many different

15   things.

16          But giving them the benefit of the doubt and

17   assuming they're right, that all interleavers in the

18   universe do these several things that the applicant

19   describes Li's interleaver is doing -- or that Li describes

20   his interleaver -- even if that's true, there's nothing here

21   that says that an interleaver used in a different system

22   couldn't also do what the claim requires.  There's no

23   suggestion of that.

24          The -- all the patent -- all the applicant is

25   saying here is that in Li, the interleaver doesn't do -- do

 1   what the claim requires.  That's it.

 2          And -- and I think that it's telling to look at --

 3   look at what the applicant said about Eroz because, again,

 4   in Eroz, we just saw the -- the examiner said:  Look, Eroz

 5   has got an interleaver.  That's the reordering circuit.

 6          But not only did the -- did the applicant not say

 7   with respect to Eroz, oh, no, no, an interleaver is not a

 8   reordering circuit, just like he didn't say that with

 9   respect to Li, didn't mention interleavers at all.

10          So here's the -- here's the distinction over Eroz.

11   In contact -- in contrast, Eroz appears to make a

12   distinction between required symbols and optional symbols.

13   In Eroz, the required symbols are always transmitted, while

14   the optional symbols are transmitted depending upon channel

15   quality feedback.

16          And so here, the distinction over Eroz isn't based

17   on the interleaver.  It's really based more on -- this is

18   actually really based more on the ordering vector, the idea

19   that you're actually going to transmit all of the -- all of

20   the reordered mother code word, which he's saying Eroz

21   doesn't necessarily do that, and that's the difference.

22          And, you know, as to the idea that -- oh, I think

23   it's important to recognize that the -- the claims were all

24   amended in the same way.  So Claim 1, which was -- which was

25   what -- which was what Li was referenced with respect to,

1   and then Claim 12, which is what Eroz was referenced with

2   respect to, this same sort of language is added to keep the

3   claims all -- all in parallel.

4          So the idea that each part of -- each part of this

5   amendment had to sort of carry a certain amount of baggage

6   with respect to each of these limitations I think is just --

7   just fundamentally misunderstanding what happened.

8          And I think -- I think that's really it, Your

9   Honor.  I mean, the fundamental point is this has got to be

10  clear and unmistakable.

11         And by -- by mentioning that, I don't want to

12  suggest that this gets anywhere close.  I actually think

13  that it's -- all that's clear is that the -- the applicant

14  was saying that here's what the claim does, here's what Li

15  does, they're not the same.

16         THE COURT:  All right.

17         MR. BURGESS:  That's it.

18         THE COURT:  Thank you, Mr. Burgess.

19         MR. BURGESS:  Thank you.

20         MR. HASLAM:  Counsel did put up the slide that had

21  the argument with respect to Li, and he did have a slide

22  with Eroz.  Most of his other arguments are arguments that

23  they're making today about the prosecution history, which

24  they didn't make back then.  So I want to bring us back to

25  what was actually said.

1          Li was cited with respect to Claims 1 through 4 or

2    1 through 5.  Li was the only reference cited against those

3    claims.

4          So with respect to Claim 1, they did add the

5    reordering circuit with the vector.  And they distinguished,

6    at a minimum, and I don't think I heard counsel actually

7    really grapple with this -- they really distinguished at a

8    minimum the bit-by-bit interleaver.

9          THE COURT:  You know, my problem with that is if

10    that passage that you read from the applicant's --

11          MR. HASLAM:  Response.

12          THE COURT:  -- response had said Li's device does

13    this, he would not have distinguished all devices.  The fact

14    that he referred to that as an interleaver, it does not

15    persuade me that he was saying no interleavers are in the

16    invention.  He was characterizing that component as an

17    interleaver, but it -- there's no way that I can draw from

18    that that he's saying that his argument could have ended

19    with interleaver.  Li had an interleaver, period.  That

20    would be different if he -- but he still goes on to describe

21    the device that would not -- in a way that allow -- doesn't

22    allow me to conclude that he is distinguishing any

23    interleaver.

24          MR. HASLAM:  Let me go to the narrowest first then.

25    Let me put aside for a moment whether the disclaimer is to

1    any interleaver, and let's just talk about Li.

2         They -- I think these are undisputed facts.  They

3    could have argued, without amending the claim, that Li's

4    interleaver is not our reordering circuit and then told them

5    why.  But they didn't do that.  They amended the claim.

6         And then what they said is:  Our amended claim

7    which has the ordering vector is contrasted with Li's

8    interleaver which breaks the -- the -- it goes on and says

9    what it is.  What he's talking about Li's interleaver is a

10   bit-by-bit interleaver.  And I think at a minimum -- if --

11   if this is all I can convince the Court of, he

12   distinguished a circuit from his -- from the amended circuit

13   that used an ordering vector and said Li's bit-by-bit

14   interleaver, which breaks the correlation, maximizes this,

15   and breaks the correlation among optionally -- among

16   sequentially coded bits is in contrast to my amended claim.

17        That, I think, clearly says to somebody reading

18   this after the fact, okay, what Li's structure is, because

19   as -- as we indicated, you distinguish on structure, Li's

20   bit-by-bit interleaver which does these things is not our

21   amended reordering circuit.

22        So at a minimum, they disclaimed bit-by-bit

23   interleavers.  Whether the Court is convinced that they went

24   beyond that and distinguished all interleavers, that's --

25   that's my argument.  I understand the Court is not persuaded

1    by it, but -- but at a minimum, I don't think you can read

2    this and say that they didn't at a minimum disclaim Li's

3    bit-by-bit interleaver.

4           And with respect to Eroz, they -- the argument that

5    was made today about, well, Eroz was -- didn't do all three

6    of these things, then they didn't have to amend the claims

7    that the examiner cited Eroz against.  But they amended

8    every independent claim to add the ordering vector, which I

9    think suggests that when they did that, they were

10   distinguishing at a minimum Li's bit-by-bit interleaver.

11          Thank you.

12          THE COURT:  All right.  Thank you, Mr. Haslam.

13          MR. BURGESS:  Your Honor, can I just have one brief

14   follow-up comment?

15          THE COURT:  All right.

16          MR. BURGESS:  Very brief.  Just -- just to follow

17   up on that, at a minimum what they distinguished was Li's

18   bit-by-bit interleaver as used in Li's system because Li

19   tells us what his bit-by-bit interleaver does which is

20   simply to permit the order.  It's only when you stick it in

21   his particular system that you get the effects that Li

22   recites.

23          And so I would agree that they distinguish Li's

24   bit-by-bit interleaver as it's used in Li's system, but

25   that's fundamentally different from the way the invention

```
 1   works.
 2            THE COURT:  All right.  Before we go on to the next
 3   term, we will take the morning recess, and then come back
 4   and continue.  Thank you.
 5            COURT SECURITY OFFICER:  All rise.
 6            (Recess.)
 7            LAW CLERK:  All rise.
 8            THE COURT:  Thank you.  Please be seated.
 9            All right.  Let's move to the next term.
10            MR. BURGESS:  Your Honor, I think that we've agreed
11   that for the reordering circuit, for reordering and
12   generating, that that's -- really the issue we're fighting
13   over there is the same issue we just discussed, so we don't
14   probably need any further comment on that.
15            THE COURT:  I agree.
16            MR. BURGESS:  And, also, we don't feel like we need
17   to talk about gross rate channel.  So from the '216 patent,
18   that leaves puncturing pattern, which I'll address now, if
19   that's okay with Your Honor, and then fixed rate -- then
20   fixed net rate channel.
21            THE COURT:  All right.
22            MR. BURGESS:  So, Your Honor, the term here is
23   puncturing pattern, and I think -- I've shown it here in
24   Claim No. 2.  It only shows up in a dependent claim.  And
25   what I've highlighted here and what I think is really
```

```
 1    important context in the claim to understand what the term

 2    means.  I mean, as -- as Phillips tells us, start with the

 3    language of the claim.  And the -- and the context here is

 4    that we're not using a puncturing pattern in the same way we

 5    would use it in the prior art.  For example, Figure 3 of the

 6    patent.  But we're using it to reorder the mother code word

 7    as -- as we see, for example, in Figure 5 of the patent.

 8            And the -- the issue that -- that we have with --

 9    with Huawei's proposal and -- and with Your Honor's

10    preliminary construction is the bit about bits to be

11    removed.  And I think if we -- if we could bring up the '216

12    patent, and I can illustrate what I think -- I think, Your

13    Honor, the point that I'm trying to make.

14            Could I see Figure 3, please?

15            So here's the prior art.  I mean, it says -- it's

16    designated as such at the bottom of the page.  And the thing

17    I'd like to call Your Honor's attention to are the three

18    vertical columns, the three stacks.  And in the middle of

19    each of those columns, you see there's -- there's

20    puncturing, puncturing pattern P1, a puncturing pattern P2,

21    and there can be an arbitrary number up to N.

22            And -- no, just zoom back out, please.

23            And -- and the point is that when that puncturing

24    occurs, bits are removed.  And, in fact, if you look at this

25    and you read the corresponding description in the patent,
```

1    what you'll see is that it -- after -- after P1 is applied,

2    you don't use the same mother code word because -- because

3    it's not -- the bits have been removed.  You actually have

4    to -- to run it through the coding and generate a new mother

5    code word, which you then puncture with P2 and so on.

6            But the point is that in the prior art system you

7    actually are when you're puncturing, removing bits.

8            Could we go to Figure 5, please?

9            But in the -- you can just maybe zoom in on that

10   top big block.  Yeah, that works.

11           But in the -- the claim and -- and the -- the

12   description in the patent of what's being claimed, the

13   mother code word is generated once, as you can see here.

14   And -- and a single reordering vector is used that's formed

15   from puncturing patterns, but those puncturing patterns

16   aren't actually used to remove any bits.  Because as you can

17   see here --

18           THE COURT:  They did remove bits from these blocks

19   or subblocks.

20           MR. BURGESS:  Well, okay.  In the prior art, Your

21   Honor, as we just discussed, but in -- in the actual -- in

22   the actual claims -- and maybe -- maybe it's -- maybe it's

23   easier to look at one of my slides than to look at this

24   figure.

25           Let's -- let's look at my Slide No. 80.

1          So here's -- here's a description.  This is from

2    the bottom of Column 6 and the top of Column 7 about how the

3    ordering vector, which is shown on the right, is actually

4    formed.  And on the left, we see the puncturing patterns

5    from with -- from which the ordering vector is formed.

6    And -- and the important point, Your Honor, is if you look

7    at P1, for example, you see there's a 1, and then there are

8    two 0s, in the prior art, when that puncturing pattern was

9    applied, the 1 represents that that first bit is going to be

10   selected and the two 0s represent that the second and the

11   third bits are going to be removed or discarded, okay?

12   That's the way the prior art works.

13          But when P1 is used to form the -- the ordering

14   vector, those two 0s aren't removed.  In fact, the first 0

15   shows up as the 2 that's highlighted in red.  That's that

16   bit that comes from P2.  And the second 0 shows up as the --

17   the -- the 3 that's in the brown highlighted bit.  It comes

18   from P3.  If you put P1, P2, and P3 together, if you

19   superimpose them, none of those bits are being discarded.

20          And -- and, again, if we go back to -- and I won't

21   do it, but if we go back to the figure, the easy way to see

22   that is you -- you only generate the mother code word once.

23   And the reason you're able to do that is because you weren't

24   throwing anything away.  Everything -- everything is used.

25   It just gets shuffled around.  It just gets reordered.

1        So -- so the point, Your Honor, is simply -- and

2    I'll -- I'll stop here.  But the point is, is that there's a

3    difference between the way that puncturing patterns are used

4    in the prior art and the way they're used in the invention.

5        THE COURT:  I understand that.  My concern is that

6    your -- that I do think this is a term that should be

7    construed, and your proposed construction is far broader

8    than what's encompassed in the pat -- patent.  It would

9    include any manner of reordering.

10       MR. BURGESS:  What we -- so we proposed -- we

11   propose --

12       Can we have 78?

13       So we've got -- you know, our -- our leading

14   proposal was we don't need to construe this.  But,

15   secondarily, we said a -- a bit selecting pattern used to

16   fully or partially reorder the mother code word.

17       And -- and I think that given the way that a

18   puncturing pattern is used in -- in the invention, which is

19   not to discard bits, that bit selecting patten is a -- is a

20   fair description.

21       THE COURT:  All right.  Your -- your concern is

22   just with the implication that not all of the bits can end

23   up in the reordered mother code; is that --

24       MR. BURGESS:  Right.  Our -- our concern is that

25   the -- the constructions suggests that there are going to

```
 1   be -- some subset of the bits are going to be removed.

 2   And -- and while that would be true, if we were claiming the

 3   prior art in the invention, they're not.  They're all passed

 4   through.  That's how it has to work.

 5           THE COURT:  All right.

 6           MR. BURGESS:  Should I pass the lectern, Your

 7   Honor?

 8           THE COURT:  That -- that's fine.  I'm just looking

 9   for a way to accommodate that --

10           MR. BURGESS:  Okay.

11           THE COURT:  -- that concern.  But let -- why don't

12   you let me hear from Huawei, and then if there's anything

13   else you want to add, I'll be happy to consider it.

14           MR. BURGESS:  Okay.  Thank you.

15           THE COURT:  Thank you, Mr. Burgess.

16           MR. HASLAM:  The argument you just heard conflates

17   the ordering vector from a puncturing pattern.  The

18   dependent claim says where the ordering vector -- and I

19   don't have the claim language right in front of me, but I

20   guess -- it's wherein the ordering vector is based on at

21   least one puncturing pattern, each of the at least one

22   puncturing pattern being used to reorder the mother code

23   word.

24           And I think if we look at the bottom of Column 6

25   and the top of Column 7, we see the -- the error, I think,
```

1    that infects the -- the Plaintiffs' claim construction.

2         We are not arguing that the mother code word drops

3    bits.  But the specification, when it talks about puncturing

4    patterns, clearly indicates that the puncturing pattern

5    itself keeps bits and removes bits.

6         P1, as -- as -- as counsel said, where there's a 1,

7    you keep the bit.  Where there's a 0, you drop it.

8         But if you look at this sequence of P1, P2, and P3,

9    you will see, ultimately, there's a 1 in every place.  So

10   every bit will be maintained, but in a different order.

11        And if we go to the top of Column 7 --

12        THE COURT:  So are -- just to make sure we're all

13   on the same page --

14        MR. HASLAM:  Yeah.

15        THE COURT:  -- would -- you don't dispute that,

16   even under your construction, there can be applications

17   where not -- where no bits are removed from the reordered

18   mother code?

19        MR. HASLAM:  That's correct.  And that's based on

20   the ordering vector, which we're not talking about here.

21   We're talking about the puncturing pattern.

22        And the top of Column 7 says, talking about a

23   preferred embodiment, but it says:  The mother code word 506

24   is sequentially punctured using one or more puncturing

25   patterns, P1, P2, P3, through Pn, that together form the

ordering vector.  And then it gives an exemplary ordering

vector as given below, and -- at Column 6.  And that is the

mother code word that would contain all of the bits based on

an ordering vector that is made up of those puncturing

patterns.

But each individual pattern indicates what bits to

keep and what bits to remove.  And it's the sequence or the

grouping of the puncturing patterns that makes up the

ordering vector.  And the independent claim says:  It is the

ordering vector which reorders the mother code word.

So we agree that the -- when you use the ordering

code word, the ordering vector in Claim 2, which is

comprised of at least one puncturing pattern, the end result

will be that you have not added or dropped any bits from the

reordered mother code word.  But Claim 2 is talking about

the individual constituents in this dependent claim of what

the ordering vector is.  And the ordering vector and the

vectors that they give the examples of, a puncturing

pattern -- as he said, the prior art, the puncturing pattern

is it removes bits.

The difference here is between the prior art, the

prior art just punctured.  Here they use an ordering vector,

which they have defined as a combination of or at least one

puncturing pattern that simply reorders the bits.

So I think they're -- we're -- they're sort of

1    mixing apples and oranges between the ordering vector which

2    is comprised of puncturing pattern, but the puncturing

3    pattern itself removes and add -- it keeps and removes bits,

4    the ultimate combination used in whatever your ordering

5    vector -- just keeps all of these bits in a reordered mother

6    code word.

7              THE COURT:  All right.

8              MR. BURGESS:  Your Honor, could I make one comment

9    just to short of address your question about how to

10   accommodate the concern that we have?

11             THE COURT:  Yes.

12             MR. BURGESS:  I would suggest that if we were to

13   take the Court's preliminary construction and change

14   "preserved" to "selected" and "removed" to "ignored," that

15   that would more fairly characterize what actually -- the way

16   in which the puncturing patterns are being used in the

17   invention, as opposed to the prior art.

18             THE COURT:  All right.  I will consider that

19   request.

20             And, Mr. Haslam, if you want to speak to that, go

21   ahead.

22             MR. HASLAM:  Well, it -- it injects an ambiguity as

23   to what needs to be removed.  The puncturing pattern -- I

24   think there was -- as counsel said, there's no dispute as to

25   what a puncturing pattern is.  He -- he referred to it in

1   the prior art as something that -- that removes bits.  So if

2   it's just going to be that are bits that are ignored,

3   they're not ignored.  They're removed.  That's what he said

4   the puncturing pattern -- the puncturing is in the prior

5   art.  It removed them.  That's -- that's what a puncturing

6   pattern does, and that's what the -- all the example -- the

7   one example in the patent is, it ignores them.  It's the

8   combination of the ordering vector, which is what puts it

9   back together.

10          THE COURT:  All right.  And I take it neither side

11  wants to address gross rate channel; is that right?

12          MR. BURGESS:  That's correct, Your Honor.  That's

13  my understanding.

14          MR. HASLAM:  That's correct, Your Honor.

15          THE COURT:  All right.  Does that mean that you

16  agree with the preliminary construction, or you just don't

17  want to argue it?

18          MR. BURGESS:  We -- we agree with it, Your Honor.

19          MR. HASLAM:  We -- given the briefing, we agree

20  with it.

21          THE COURT:  Okay.  Thank you.

22          All right.  So I assume, Mr. Burgess, your side

23  wants to address fixed net rate channel?

24          MR. BURGESS:  Yes, Your Honor.

25          So, Your Honor, Huawei has argued and your

1   preliminary has agreed with Huawei that this term is

2   indefinite.

3          We -- we disagree, and I'd like to try to sort of

4   resolve the issue down to what we're actually fighting over.

5          Can I have Slide 74?

6          This is our expert, Dr. Haimovich's, declaration,

7   where he says that fixed has a well-known meaning and that

8   net bit rate has a well-known meaning.  And I take it from

9   Huawei's briefing, and counsel can correct me if I'm wrong,

10  that there isn't really a dispute about that.  I think we're

11  all on the same page.  And I think what we're arguing about

12  is given -- given the understanding of what that means at

13  what level and sort of the protocol stack -- they make this

14  layers' argument -- at what level do we apply that?  And --

15  and I -- my response to that question is twofold.

16         Number one, the patent is agnostic to and makes no

17  mention of the concept of layers.

18         And, number two, the claims in the specification

19  tell us exactly which set of bits need be transmitted at a

20  fixed net bit rate -- or a fixed net rate.

21         So can we look at 73, please?

22         So here's Claim 34, and Your Honor will recall that

23  sort of the impetus for the invention here was in the prior

24  art, when we were going to have an incremental redundancy

25  scheme, we have these subblocks that were always of the same

1  size.  And we have to transmit those out.  And the patent

2  says:  Look, that's not efficient, because in general, the

3  entity that's doing the transmitting doesn't have control

4  over the available bandwidth.  Sometimes it will have a big

5  chunk, sometimes it will have a little chunk.  And so the

6  innovation is, rather than sending out these fixed chunks,

7  let's take the whole mother code word, reorder it, and then

8  we can bite off as much as we want at -- at each given

9  transmission interval, depending on how much bandwidth we

10 have available.  And that's what most of the patent is

11 about.

12         And what's here on Slide 73 is at the very end in

13 Columns 9 and 10.  And this is a different embodiment.  And

14 the idea here is that rather than being subject to the

15 vagaries of the network in determining how much bandwidth

16 is available, in this embodiment, the transmitter has the

17 ability to determine the bandwidth.  And so what this is

18 about is the transmitter being able to use the invention

19 to set an arbitrary code rate or an arb -- arbitrary bit

20 rate.

21         As -- as it says in the first block there that's

22 highlighted:  To flexibly obtain arbitrary code rates for LA

23 link adaptive schemes on variable rate channels where, i.e.,

24 the transmitter controls the occupied bit rate channel.  So

25 the transmitter has at least some ability to decide how much

1  bandwidth it's going to use.

2         And -- and so in this -- in this context, one of

3  the things the transmitter can decide to -- to do is to

4  always send the same number of bits from the reordered

5  mother code word.  And, in fact, if you look at the part

6  that comes in Column 10, the part that's highlighted in

7  yellow and under -- underlined in red, it says:  For re --

8  retransmission, if employed, the same number of bits if the

9  same code rate is desired, more or fewer if not, are taken

10  from the same ordering vector.

11         And so what this tells you is that one of the

12  things the transmitter can decide to do is every

13  transmission interval, take the same number of bits from the

14  ordering vector and then by extension, also from the

15  reordered mother code word, and that is exactly what the

16  claim means when it refers to fixed net rate channel.

17         THE COURT:  And how -- how do we know that this is

18  what net is referring to?

19         MR. BURGESS:  That -- that this is what net is

20  referring to?

21         THE COURT:  Yeah, the use of the term "net" in

22  Claim 34.

23         MR. BURGESS:  Well -- well, first of all, Your

24  Honor, I would -- I would refer back to our expert's

25  declaration, and also, I think -- I think in -- even in

1    Huawei's briefing, there's -- there's an agreement that what

2    net means is sending the interesting bits, the information

3    bits, right, that's -- that's what's going to be in the --

4    the reordered mother code word.

5         And so I think -- I think even though -- even

6    though the description in the patent doesn't use the term

7    fixed net rate channel, I think there's a pretty good

8    mapping here.  You have, for example, the claim referring to

9    at least one quality of service requirement.  You've got

10   reference to the same thing that's highlighted in brown at

11   the end of Column 9 here, you've got a reference to desired

12   code rate, the patent refers to suitable code rate or the

13   wanted code rate.

14        It seems to me we're talking about -- this is

15   clearly the embodiment that's intended to be covered by this

16   claim.  And -- and the reference to fixed net rate channel

17   simply means every time the transmitter grabs the same

18   number of bits from the reordered mother code word and

19   transmits those.  There's no ambiguity here about which

20   layer we're talking about.  That's just a red herring.  None

21   of that matters.  All -- all this -- it's very simple, it's

22   just saying, every time you grab the same number of bits

23   from the reorder -- reordered mother code word and send

24   those, that gives you a fixed net rate.

25             THE COURT:  All right.

1          MR. HASLAM:  You can leave that up for a moment.

2          We're talking about a net rate channel, and we

3     heard, basically, I think the thrust of the argument is,

4     well, that's really talking about something like a code rate

5     or a coding scheme.

6          But if we look at the definition of gross rate

7     channel, there was no disagreement that it's the rate at

8     which bits may be transmitted, not a code rate.  It's the

9     rate at which bits are transmitted.  It may be influenced by

10    the code rate, but the channel is the bits.  So we're

11    talking about the bits.

12         And if we -- if we look at Slide 73 that was just

13    up there and he's talking -- there it's saying that the only

14    place -- I think they've said in their briefing, the only

15    place but the place where that net fixed rate channel is

16    described is in Columns 9 and 10.

17         But if we look at 9, it says -- it should be

18    understood that the bit ordering scheme of the present

19    invention may also be used to flexibly obtain arbitrary code

20    rates for LA schemes on variable rate.  So everything it's

21    talking about in 9 and 10 is about obtaining arbitrary code

22    rates, not a fixed code rate, not a net code rate, and

23    certainly not a net fixed code rate, language which is never

24    used anywhere in the specification.  And it's arbitrary, and

25    it's variable.

1          And then it -- at the top of Column 10, it says,

2     then, as many bits as is needed to obtain the subsequent

3     ones are transmitted from the reordered mother code word, as

4     many bits as is needed.  That's the same language that's

5     used to describe every other gross rate channel

6     implementation here.

7          And the term gross rate appears in the

8     specification about 15 times.  And if we look at what the

9     invention is about, what they -- what they said when they

10    talked about the problems associated with the fixed rate

11    implementations before, at the bottom of Column 3 and top of

12    Column 4, but particularly at Column 4, on Lines 18, it

13    says, after talking about the prior art, and then talking

14    about the problems of the prior art, they say:  Accordingly,

15    there's a need for a wireless communications system and

16    method that addresses the aforementioned problems of the

17    traditional wireless communication system by supporting

18    incremental redundancy error handling schemes using

19    available gross rate channels.  This need and other needs

20    are satisfied by the wireless communication system,

21    transmitter, receiver, and method of the present invention.

22         And then their specification talks time and time

23    and time again about gross rate channels.  It never mentions

24    a fixed net rate channel, and I think the Court has it right

25    that there is nothing in the specification which tells the

1  person of ordinary skill in the art what a fixed net rate

2  channel is.

3            THE COURT:  Thank you.

4            What is the next term?

5            MR. BURGESS:  I think we'll move on to the '851

6  patent, Your Honor.

7            THE COURT:  All right.

8            MR. HESS:  Kevin Hess for the Plaintiffs, Your

9  Honor.

10            There are only two terms at issue here for the '851

11  patent.  And the first is -- the first at issue is this

12  transmit/transmitting term, and before we get into the

13  parties' constructions, I think it would be helpful to

14  orient ourselves into the claim and see exactly how this

15  fits into the rest of the claim language.

16            So you can see here that what's claimed in the

17  relevant claims is a receiving unit configured to receive a

18  first data and a second data, multiple streams of data, each

19  of those streams of data comprising multiple blocks that are

20  divided in frequency.  There's also a calculating unit

21  that's configured to calculate CQI values for those blocks

22  on those datastreams and then a transmitting unit configured

23  to transmit CQI values back to the base station.

24            The last clause there is a wherein clause that's

25  related to how the calculation is done.  You can see that

1    it's referring to how the plurality of blocks where the

2    second data is calculated with respect to the first and so

3    on for the second block.

4            So turning to, first, PanOptis's proposed

5    construction, I just wanted to make a note here that

6    PanOptis's construction was merely intended to clarify that

7    the first and the second words here in the claim language

8    refer to the first data and the second data.

9            In the claims, there's -- there's first and second

10   that are being used in a couple of different ways, and you

11   can see that the parties agree that in this claim

12   limitation, the first data refers to the first -- I'm sorry,

13   the first absolute CQI value refers to an absolute CQI value

14   on that first data stream, and the same for second.

15           That's the only change we're trying to make with

16   our proposed construction just to clarify exactly what that

17   first and second word was supposed to mean, but if Your

18   Honor would feel more comfortable with the plain and

19   ordinary meaning of this -- this claim language, then, of

20   course, we'd be fine with that.

21           The problem with Your Honor's preliminary

22   construction, as it currently stands, is that it just adds a

23   limitation that just isn't there.

24           Huawei's proposal and the Court's preliminary

25   construction would rewrite the claims to totally change

their meaning, specifically requiring that what's
transmitted is CQI values for multiple blocks of the first
data and multiple blocks of the second data when that's just
not supported by the claim language.

Why this is important, we can look at Figure 6 here
to show the first row there is related to the first data,
the second row, the other substream, is related to the
second data, and you see we've got multiple CQI values that
have been calculated for each of these blocks of data.

What's claimed is transmitting the first absolute
CQI value for the first data and the second data relative to
that value in the same block.  In the same block is
crucially important here, and we don't think the Court's
preliminary construction gives any meaning to that that
phrase.

Huawei's proposal and the Court's construction here
is that all of the blocks -- I'm sorry, all of the CQI's
values for all of the blocks in both datastreams are
transmitted back up to the base station, and I think that
cuts pretty clearly against the actual claim language that
is -- that is in Claim 1 and, again, in Claim 5.

So if you look at what's done in the calculating
step here, you're calculating values, the first absolute CQI
value per each of the blocks in that data.  And you do it
again, the second absolute CQI value per each of the blocks

1    for the second data.

2          Crucially, that same -- that same phrase is not

3    included in the transmitting unit limitation.

4          THE COURT:  But the first limitation that you're

5    referring to up there, the calculating unit, that is

6    calculating a first absolute channel quality indicator.  And

7    then the next limitation is transmitting the first absolute

8    CQI.

9          Why isn't the "the" first absolute CQI, the "a"

10   first absolute CQI referred to in the preceding limitation?

11         MR. HESS:  Yes, Your Honor.

12         So what's -- what's actually being claimed here is

13   not calculating a first absolute CQI value.  What's claimed

14   is calculating a first absolute CQI value per each of the

15   blocks.

16         THE COURT:  Right.

17         MR. HESS:  So there are clearly multiple CQI values

18   that are being -- that are being calculated for each of the

19   datastreams.

20         And what's then transmitted back to the base

21   station is not just this "the" here for the first absolute

22   CQI value in this transmitting limitation, it doesn't hang

23   out on an island on its own.  What's being transmitted is

24   the first absolute CQI value and the relative CQI value of

25   the second absolute CQI value in the same block.

1          THE COURT:  Why doesn't that require that it be for

2     each of the blocks?  I understand that relative is what ties

3     into the same block.  Clearly, you can't determine that

4     relative relationship without looking at the same block, but

5     I don't understand how you're proposing that the per each in

6     the first limitation isn't built into the second limitation.

7          MR. HESS:  I think it's pretty clearly not if you

8     look at the prosecution history.  This exact limitation

9     was -- had a slight amendment to it, and the amendment is

10    not as crucial as what the patentee -- the applicant said

11    about this limitation.

12         And I'll just read it here:  Claims 11 and 18 are

13    amended to clarify that the first CQI value -- the first is

14    an absolute value and is not a relative value.

15         THE COURT:  Of course.  The --

16         MR. HESS:  Right.  So I'm actually not

17    understanding the dispute then.

18         THE COURT:  Well, it -- it is referred to as an

19    absolute value in the claim limitation itself.

20         MR. HESS:  Right.  So it's an absolute singular.

21         What's being transmitted, the first CQI value

22    that's being transmitted is a singular value for the first

23    data and a singular value for the second data.

24         THE COURT:  But how does that address whether it's

25    for each block?

1          MR. HESS:  Well, because up here we're talking

2    about per each of the blocks, plural, and what's actually

3    transmitted is in the same block, singular.

4          THE COURT:  Well, the reason it's in the same

5    block, singular, is because there's only one -- it -- it's

6    saying it's in each block.  So, of course, that would be

7    referring to a single pair of blocks.

8          MR. HESS:  Well, I -- I don't know if that's fair,

9    especially in light of the -- the intrinsic record and the

10   specification where the patent discloses many different ways

11   of calculating CQIs and many different ways of feeding back

12   CQI to the base station, including -- this is -- and this is

13   not from -- Huawei complains in its briefing that we're

14   picking and choosing from various embodiments.  This quote

15   right here is not from an embodiment.  This is from the

16   means for solving the invention in Column 2 and the

17   background of the specification.

18          And what it says is:  A feedback generating section

19   generates the feedback information from an absolute value,

20   singular, of a C -- CQI of the reference antenna and the

21   relative values for the other multiple secondary antennas.

22          There's other embodiments that talk about giving

23   back in an absolute value, another absolute value, and then

24   here, this last one:  By this means, feedback information is

25   generated such that the CQI reference of the antenna alone

1    is given an absolute value.

2          THE COURT:  Show me where there's something that

3    indicates that Claim 1 -- let me think.  I think that's the

4    claim we're dealing with here.  Yes, that -- that the first

5    absolute CQI shouldn't be read as applying to each of the

6    blocks.

7          MR. HESS:  In the calculating step or in the -- the

8    transmitting step, because I think it's a different answer

9    depending on what limitation you're talking about.

10         THE COURT:  In the transmitting step, then.

11         MR. HESS:  So in the transmitting step here, we've

12   clearly got three elements of this limitation.  We're

13   transmitting.  And what are we transmitting?  We're

14   transmitting two things.  The first ab -- absolute CQI value

15   and the relative CQI value of the second absolute CQI value

16   in the same block.

17         And I know that's a mouthful, and it's coming out

18   very quick, but the point is that there's a singular value,

19   and what's transmitted is the second value that's in the

20   same block, not in all the same blocks, not per each of the

21   blocks.  And that's exactly the per each of the blocks

22   language from the calculating limitation is exactly what

23   Huawei is trying to read into its construction.

24         But that's -- that's clearly not -- the patentee

25   took great pains not to include per each of the blocks in

1   the transmitting step here.  And I think that's -- that's

2   about as -- as -- as good as we can do to explain sort of

3   the -- the discrepancies between the two parties'

4   constructions.

5        THE COURT:  What is the antecedent for the article

6   "the" in the transmitting unit limitation?

7        MR. HESS:  Well, I would not take it just with the

8   first absolute CQI value by itself.  What's being claimed is

9   when you transmit, you're transmitting a pair of -- of CQI

10  values.  The first absolute CQI value, and which one?  The

11  one that's in the same block as the second absolute CQI

12  value.

13        And what's claimed is not necessarily the

14  penultimate or the first or the second CQI values.  What's

15  claimed is transmitter configured to transmit a pair of CQI

16  values.

17        THE COURT:  So you're saying it could read -- you

18  could substitute "a" for "the" there, and it would be the

19  same thing?

20        MR. HESS:  I think that's right, but I think that

21  changes -- certainly less substantial than reading out in

22  the same block and reading in.

23        Your Honor, before, expressed skepticism with

24  Defendants reading in the word "only" into a claim

25  construction, and I think, you know, we should approach

1    this -- this construction with the same skepticism when "for

2    each" is injected into the claim construction where it

3    doesn't belong, especially, again, considering the fact that

4    the other limitation surrounding the transmitter step

5    actually had that language included, and the patentee chose

6    not to include that in his limitation.

7              THE COURT:  Okay.

8              MR. HESS:  Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Hess.

10             MR. HASLAM:  Just a few comments.

11             I think the Court asked the right question, and

12   that is "the" in a claim usually requires an antecedent, and

13   the antecedent is in the calculating unit, and it's a first

14   CQI value for each of the blocks.

15             And I think the Court's construction is supported.

16   If we look at the wherein clause in the claim -- keep going,

17   it's down further, a little further.  Keep going, keep

18   going.  There.

19             The wherein clause is talking about the

20   calculating.  So the wherein clause is further defining the

21   calculating unit.  And -- and I won't walk through it, but

22   it's clear that the wherein clause, when it talks about how

23   you go about calculating the absolute value and the relative

24   value clearly is talking about how you do it for multiple

25   blocks, a first block and a second block, and you do it in

1  the same block, which is you're pairing the absolute and the

2  relative for each block.  And I think the wherein clause

3  further supports the Court's claim construction that the

4  antecedent for transmitting the first absolute CQI value and

5  the relative CQI value, the antecedent is the first absolute

6  CQI value for each of the blocks for the first data, et

7  cetera, for the second.

8        So I think the Court's claim construction is

9  faithful to the claim language, the specification, and

10  particularly the prosecution history.

11       When they amended the claims, they pointed to

12  Figure 6 as exemplary of what the claim was talking about.

13  And Figure 6 is where you do it block-by-block, not on an

14  averaging basis.  You do it block-by-block, and that

15  embodiment is specifically referred to in the specification

16  as being important when you want to do frequency scheduling.

17       And frequency scheduling is when you want to

18  determine what are the best channels on which to

19  communicate.  And to do that, you need to go on a

20  chunk-by-chunk or block-by-block basis to determine which is

21  the best channel to send on.

22       So the Claim 1 embodiment, I think, reads on Figure

23  6, which is introduced in the specification as an embodiment

24  which enhanced -- which enables frequency scheduling which

25  requires sending block-by-block for each of the blocks

1    during the -- that have CQI and a relative CQI value

2    measured.

3            THE COURT:  Thank you, Mr. Haslam.

4            MR. HESS:  If, Your Honor, I may just make one

5    quick reply --

6            THE COURT:  Sure.

7            MR. HESS:  -- on -- on this term.

8            Go back to our slides, please.

9            The only point I wanted to make is that it seems

10   like the parties agree here that the wherein clause relates

11   to the calculating step.  And there's no dispute that the

12   calculating that's being done is on a chunk-by-chunk basis.

13   And, clearly, there's a dispute as to what is being

14   transmitted after all that calculation is being done.

15           And we think that's pretty clear based on the claim

16   language that is what is being transmitted is only one pair

17   of blocks, a value in the first data and that same value --

18   or a value in the second data that's in that same block.

19           So unless there's any objections, I'd like to move

20   on to the next term.

21           THE COURT:  Is the same block term or phrase used

22   anywhere but where the relative value is introduced?

23           MR. HESS:  I'm not exactly sure which relative

24   value introduction you're talking about here.  But you can

25   see it's in the calculating step, the very last part, from

1    the first absolute CQI value to the second half of the CQI

2    value in the same block.

3            So that's talking about how when you make the

4    calculation, you're looking at two blocks, two values, that

5    are in the same block.  And you do it per each of the blocks

6    in the calculating step.  But then once you get to the

7    transmitting unit, you're not transmitting for each of the

8    blocks.  You're transmitting a value and another value in

9    the same block.

10           THE COURT:  It just appears to be clear that the

11   reference to the same block in the transmitting limitation

12   is talking about the fact that you can't come up with a

13   relative value without knowing what the two values are that

14   are being compared.  And so they're -- they're in the same

15   block, but I don't -- I don't see that as indicating that

16   that's all that's transmitted is one pair of values, but

17   anyway, I understand your argument.

18           MR. HESS:  Moving on then to the wherein clause.

19   I'll be brief.  It's a very, very long claim term.  You can

20   see here it's this entire last limitation.  And I don't want

21   to belabor reading both the parties' constructions, but I

22   think it might be helpful to see exactly how the parties

23   have tried to clarify this -- this rather long claim term.

24           Huawei's construction has made a few changes.  They

25   dropped the "wherein" for some reason, and then changed the

1    words "first" and "second" to "initial" and "next."

2         In your preliminary construction, Your Honor, you

3    noted that you'd be rejecting this temporal -- or the

4    "initial" and "next," which we argue would introduce

5    temporal constraint where one doesn't belong.

6         So moving on from there, we can take a look at

7    PanOptis's construction.  And really all we're trying to do

8    is -- is give meaning to the jury as far as what a relative

9    value calculation actually is.

10        Most of us in the room might -- might understand

11   that when you're taking a relative value, you're talking

12   about the difference between two values.

13        But the specification -- in -- in addition to that

14   sort of general knowledge, the specification is -- is very

15   clear that what -- what is happening when you're calculating

16   this relative value is you're finding the values between two

17   values.  CQI values between the CQI value of the reference

18   substream, and the CQI values of the substreams, other than

19   the reference substream.

20        So when we see the values between two values, and

21   this is, you know, repeated throughout the specification, we

22   are just trying to clarify for the jury that what that

23   means, the relative value calculation is finding this value

24   between two values, and that's a sub -- a subtraction

25   operation, and that's what we've tried to --

1          THE COURT:  Why couldn't it be a ratio or a

2    percentage or --

3          MR. HESS:  I don't believe that -- that finding a

4    ratio or a percentage is really finding the value in between

5    two values.  I think that's generally understood to mean

6    just subtracting the two.

7          THE COURT:  Is there anything else that -- other

8    than the reference to between that you think supports that

9    it has to be subtraction?

10          MR. HESS:  No.  But I think it's -- it's just not a

11    reference to between.  It's several references throughout

12    the specification referring to how this calculating step is

13    actually done, and how it's done repeatedly is define the

14    values between the two values.  And we think that it might

15    be helpful to tell the jury that that calculation is just a

16    subtract -- a subtraction operation.

17          THE COURT:  When I see a limitation like that, I'm

18    assuming that you have a concern about prior art.  And so

19    I'm looking for something that makes it clear that that

20    limitation should be put in.  And I don't think that the

21    word "between" is enough to get you a limitation to

22    subtraction, but --

23          MR. HESS:  Understood, Your Honor.  We still think

24    it would be helpful to the jury to explain what the relative

25    value calculation actually is.

1          THE COURT:  Okay.

2          MR. HESS:  That's why we're trying to incorporate

3    that language from the spec.

4          THE COURT:  Good to know.  Thank you.

5          MR. HASLAM:  Just one comment on that.

6          The claim -- the claim term isn't between.  It's

7    just calculated with respect to something that is greater

8    than or less than is a comparison of two -- two values.

9          We have no problems with the claim -- Court's claim

10   construction.  I do have one question, and it's about the do

11   not necessarily reference a temporal time order.

12         Does that mean that the first and second blocks

13   could be any two blocks within the stream?  And was the

14   Court's concern that it didn't have to be the very first one

15   that came in and the second one that came in?

16         THE COURT:  I -- I didn't see anything that

17   indicated to me that it had to be that the first one was

18   before the second one in order -- in time order.  That's --

19         MR. HASLAM:  Okay.

20         THE COURT:  -- that's what I'm indicating there.

21         MR. HASLAM:  Okay.  Thank you.

22         MS. WOODIN:  Good morning, Your Honor.  Christine

23   Woodin for the Plaintiffs.

24         Next we have the '284 patent, and I think that

25   someone from Huawei will begin, but I will approach with

1   binders if that's all right.

2         THE COURT:  All right, Ms. Woodin.  Thank you.

3         MR. HASLAM:  Your Honor, I think that what I'm

4   raising -- raise is the "reserve for" not meaning "set aside

5   just for."  I think the Court's claim construction with that

6   note basically gives no effect to the word "reserved," which

7   is used in the specification.

8         If we can put that first slide up.

9         The specification -- depending on how you count it,

10  but the specification has 36 embodiments.  But -- but

11  whatever, it has 20 or 30 embodiments, only one of which

12  uses the word "reserved."

13        The others talk about using it.  The others talk

14  about how it -- it can make use of it.  This is the only

15  place that the patentee uses the word "reserved" with

16  respect to a transport format.  And I think the Court's

17  claim construction basically says that reserve doesn't mean

18  what we think the word "reserve" means is to read the word

19  out of the -- out of the claim.

20        And -- and I -- you know, there are many places I

21  could start on this argument, but I think the one thing is,

22  reserve here is -- is used with respect to one embodiment.

23  And the argument that -- that there's many embodiments in

24  the claim should encompass or be broad enough to encompass

25  the embodiments that are disclosed in the specification, I

1    think, runs -- runs afoul of the fact that the Courts have

2    recognized that not every claim has to cover every

3    embodiment.

4         And -- and as I will show you, there are other

5    patents off of this patent which have claims which use the

6    terms, for example, used for or used other language to claim

7    what is referred to here as reserved, which I think

8    indicates that there are other ways of claiming more

9    broadly, which they have done, but that in this particular

10   claim, they have used the word "reserved."

11        For example, the 9,295,053, which is a continuation

12   or a divisional of the '284, the claim uses the first subset

13   of values is for determining the transport block size.  And

14   by reading out reserved, I think the Court has basically

15   said, well, the -- the reserve claim means the same as one

16   that they later claimed on other embodiments.  Published

17   Application 20160165593, which is on Slide 79, but what

18   PanOptis argues for here is that reserved should be

19   interpreted as used for.

20        Well, they knew how to do that because in this

21   later application, which is pending, they've actually

22   claimed the "used for" language.  And, again, the 8,948,117,

23   they claimed "reserved for."

24        So it is, I think, first and foremost, the notion

25   that the claim has to include all of the embodiments

1   disclosed in the '284 patent isn't correct.  And I think the

2   Court's claim language, as I said, doesn't give meaning to

3   the term "reserved."

4        THE COURT:  Now, why can't reserved include the

5   concept that the transport format values will be found in

6   that subset without meaning that nothing but the transport

7   format values will be found in that subset?

8        MR. HASLAM:  Because of the way that the term

9   "reserved" is used in the specification.  And the term

10   "reserved" is used, for example, in Table 10.  Reserved for

11   1110 and 1111 are reserved, which means they don't contain a

12   value for the RV value for those signals 14 and 15.

13        Now, this is in a shared field, not the joint --

14   joint coding field.  But it's -- it's the way they used the

15   term "reserved."

16        The same thing is -- is -- if I reserve something,

17   it's set aside for me.  It's not set aside for anyone else.

18   And here they're saying these two values are reserved for --

19   for subsequent use or for later use, but they're not now

20   available to be used for RV values.

21        Likewise, in the -- if we can go to the -- there's

22   a reserve for out of range -- if we can go back to the spec.

23   This is another place.  '284, 27, 1 to 20, transport.  The

24   prior art yields up $2^5-1=31$ transport format values.  One

25   value reserved for out of range.  That indicates that that

1    value is used for out of range only, not for anything else.

2         So consistent -- these are -- these are different

3    uses of the word "reserved," but they're using the word

4    "reserved" in a way which connotes that it is exclusively

5    set aside for either future use, or it's set aside for one

6    value, an out of range value.  And that should inform the

7    definition or the -- the construction of the word "reserved"

8    in the claim we're talking about.

9         And if we look, for example, at Table 3, Table 3,

10   you have the TF ranges on the right-hand side, which have

11   both TF values, transport format values, and RV values.

12   That -- how can you say, as illustrated there, that the

13   values that they say are TF ranges, which are the first, I

14   think, 12, are reserved for transport format when they also

15   explicitly indicate an RV value?  It indicates both.

16        What might indicate in -- in Table 3 as -- as

17   something that's reserved are the RV ranges, the 1, 2, 3 at

18   bottom there, because it says a transport value is not

19   available.  So there, when you send those last three bit

20   streams in Table 3, you're indicating only an RV range.

21   You're not indicating transport format range.

22        And, likewise, in Table 4, you've got -- and here

23   you've got a transport format for the first 12, but it also

24   indicates an RV range, and the RV ranges vary.  So it's not

25   something that you can say is necessarily implicit.  It is

1    explicitly being defined here as a set of transport format

2    ranges which can occupy the first 12 spots and different RV

3    values.

4           So here, you're explicitly linking a transport

5    format and an RV value, and that is not what is -- is

6    reserved for either one's use.  It's -- it's used by both.

7           And -- and what Table 4 depicts, I think, is

8    consistent with Claim 1 with respect to the RV range because

9    the RV Ranges 0, 1, and 2 are not available.

10          And if we go to, I think, since reserved here is, I

11   think, being used in its ordinary context, if we look at

12   what the meaning of reserved is, held in reserved, kept

13   back, or set aside, designated as unavailable, except for a

14   certain purpose or user, kept in reserve, that's consistent

15   with the definition of reserve.  It's consistent with the

16   use of the out of range being reserved in one.  It's

17   consistent with those two values in Table 10 being reserved.

18   Set apart for someone or some particular use or purpose.

19   Cannot be used for any other purpose, kept, or set apart.

20          I -- I think that by reading out reserved, the

21   Court has -- has broadened the claim, and potentially it

22   covers all the embodiments in the specification, but it --

23   it doesn't need to, as the Federal Circuit has said.

24   They've got other applications where they have claimed the

25   claim broader.

```
 1          And it -- by reading out the term "reserved" and --
 2   and broadening it beyond its ordinary meaning, I think the
 3   Court has done an injustice to the claim, an injustice to
 4   the language that the inventors chose.  They had all those
 5   embodiments they could have chosen, and one place in the
 6   specification, they talk about reserved, and that's the
 7   claim term they decided to use in the claims that they're
 8   asserting here.
 9          And I think you have to give effect to that.
10   That's our argument.
11          THE COURT:  All right.  Thank you, Mr. Haslam.
12          MS. WOODIN:  Can I have Slide 24?
13          So we agree with Your Honor's preliminary
14   construction, rejecting Huawei's attempt to rewrite the
15   claims.  And I first take issue with Huawei's continued
16   statements that Your Honor is reading out "reserved."  The
17   construction says it's construed according with its plain
18   and ordinary meaning.  It just reject -- rejects Huawei's
19   attempt to narrow the term.  It doesn't read "reserved" out
20   of the claim term.  It's still going to be there.
21          And so Huawei relies on this language from the
22   patent to say that this is only one embodiment, one of 36, I
23   think, they said.  But this is actually where the patentee
24   introduces in the summary of the invention the idea of
25   having a first subset of values reserved for the transport
```

1    format and a second subset of values reserved for the

2    redundancy version.

3         The remaining embodiments in the summary of the

4    invention refer back to this.  They say:  Wherein the first

5    subset and wherein the second subset.  And then it's

6    followed up by a detailed description that spans pages and

7    pages and gives examples of how this first and second subset

8    of values is used.

9         And Huawei admits that their interpretation of the

10   claims would read out every example that the patentee gives

11   in the detailed description of the -- of the invention.

12        And the fact that the patentee refers back over and

13   over again to this first subset and second subset I think is

14   completely inconsistent with how Huawei's suggesting that

15   Your Honor read the patent.

16        Every paragraph that includes the word "embodiment"

17   shouldn't be read in isolation as a separate embodiment.

18   The patentee introduces this idea, and then provides

19   different ways that it can be implemented.

20        And in their argument now, Huawei points to Tables

21   9 and 10, which is the only time that "reserved" appears in

22   the table.  But as counsel acknowledged, those are actually

23   tables of the alternate shared field approach that the

24   patent describes, which is not claimed in the '284 claims.

25        And I think that it's clear from how Huawei

1    interprets "reserved" with a set just aside for that it's

2    narrower than the claim language.  And I just wanted to

3    point out that that's supported by the case law that Huawei

4    cites.

5            So if we could switch to Slide 31.

6            So Huawei cites this Customedia Techs case to

7    support its position where the Court construed reserved

8    advertising data storage to mean data storage section set

9    just aside for.

10           And I believe Your Honor wrote the opinion in this

11   case, and you may recall that there, the patentee had made

12   statement after statement in the prosecution history

13   centered on the word "reserved," continually saying that it

14   was reserved specifically for or set just aside for this

15   specific data.

16           In fact, the examiner -- this is a quote from the

17   opinion where the Court is quoting the examiner who

18   commented that it was difficult to even search for prior art

19   because the patentee was using the word "reserved" in such a

20   different way than the prior art did.

21           And so I think that Huawei's reliance on this case

22   is inapposite, but -- but more than that, I think this shows

23   that the "set just aside for" language is narrowing the term

24   "reserved" and that that's not the plain and ordinary

25   meaning.

1          So we agree with your Court's preliminary

2    construction, and unless you have any questions for me, I'll

3    go ahead and sit down.

4          THE COURT:  All right.  Thank you, Ms. Woodin.

5          MR. HASLAM:  The word "reserved" appears in the

6    general background portion of the patent.  And where they

7    describe the specific embodiments, the word "reserved" only

8    appears in the two places that I indicated.

9          And, yes, counsel was right, it is with respect to

10   the shared, which is not what's covered here, but that

11   wasn't the thrust of my argument.  The argument is if you

12   wanted to know what they meant by reserved and you look at

13   how they use reserved there, it is set aside for either out

14   of range, or it's reserved for future use.

15         Now, I recognize in general at -- at oral arguments

16   we make arguments, and the Court asks questions.  But if I

17   were to be -- indulge myself, I would ask at least

18   rhetorically, given the plain and ordinary meaning, and it

19   doesn't mean just set aside for, I -- I am perplexed as to

20   what -- when we get to the jury, what it is I can argue

21   reserved means.  It means nothing.

22         THE COURT:  I -- I don't think you're limited to

23   nothing, but --

24         MR. HASLAM:  But --

25         THE COURT:  I think that what you are limited to is

 1   not "set aside just for," but...

 2           MR. HASLAM:  And I guess this may -- may or may not

 3   come up in motions at some point.  I don't want to run afoul

 4   of the Court's construction, but I --

 5           THE COURT:  I -- we -- I will elaborate more on

 6   what I think the term includes.  But I would rather not do

 7   it off the cuff because I think I will be hearing about it

 8   afterwards.

 9           MR. HASLAM:  I certainly understand.  But with

10   that, I guess, you know, we'll have to deal with what comes

11   out in the construction.  But I just think that plain and

12   ordinary meaning, as argued by PanOptis, essentially does

13   read reserved right out of the claim and gives it no meaning

14   whatsoever.

15           I mean, the jury's going to think when I called a

16   restaurant for reservations, that's time set aside for me.

17   I don't want to go there and say, well, you know what,

18   there's 17 other people sitting at all the tables, sorry, I

19   don't care what your reservation was.

20           THE COURT:  That's not the first time I've heard

21   that metaphor.

22           MR. HASLAM:  Okay.  That's -- that's all I have.

23           THE COURT:  All right.

24           MS. WOODIN:  I have just a comment.

25           THE COURT:  All right.  Go ahead, Ms. Woodin.

1        MS. WOODIN:  In -- in thinking about the use of the

2    word "reserved," I just wanted to point out that in the

3    alternate approach in the patent, there's a shared field

4    where depending on whether it's an initial transmission or a

5    retransmission, the values can be used for either a

6    redundancy version, or they can mean something different and

7    be a transport format.

8        And in the jointly encoded approach, values are

9    actually reserved for, you know, one meaning.

10        And I think that that is one way in which the

11    patentee distinguishes the shared field approach from the

12    jointly encoded approach.

13        THE COURT:  All right.  Thank you.

14        MS. WOODIN:  So the next -- so the next claim term

15    is from -- is wherein the redundancy version of the protocol

16    data unit is implicit in the transport format indicated --

17    indicated by a sub -- corresponding value of the first

18    subset.

19        And, Your Honor, we're -- we're happy with your

20    preliminary construction on this one.  So unless Huawei

21    would like to argue it, I think we can move on.

22        MR. HASLAM:  We're happy with the Court's

23    construction.

24        THE COURT:  All right.  Thank you.

25        MS. WOODIN:  If you could switch to Slide 4.

```
 1              And the last term for the '284 patent is

 2   "processing unit."  We believe this term should not be

 3   subject to 112(6), but to the extent that Your Honor

 4   believes it should be, as the preliminary construction

 5   shows, we think that the corresponding structure that you

 6   identified is correct.

 7              THE COURT:  All right.

 8              MS. WOODIN:  Unless you have -- no questions?

 9              THE COURT:  I -- I don't.  I think this is always a

10   difficult determination.  It has to do with just what

11   description is set out in the claim for this term.  And

12   under the circumstances of this claim, I think 112(6) is

13   appropriate.  But -- so if -- but if you don't have any

14   comment on the proposed structure, that's fine.

15              MS. WOODIN:  Okay.  Thank you.

16              THE COURT:  Thank you.

17              MR. HASLAM:  I have just -- I think just one

18   question.  In the structure, you refer to the -- according

19   to an algorithm, the algorithm is what's referred to in the

20   cited references to the specification and the figures.  Is

21   that what the Court intended?

22              THE COURT:  Yes.  Although I think in the order,

23   we'll talk about the fact that I'm not sure that an

24   algorithm is required here, but to the extent it is, it

25   would be what is set out.
```

1           MR. HASLAM:  Okay.  Understood.  Thank you.

2           MR. YOUNG:  Your Honor, Stanley Young for the

3   Huawei Defendants on, I believe, the last term, Item 13, "in

4   response to."  Not only am I last, but I'm unlucky in that

5   I'm what stands between all of us and lunch, so I will try

6   not to be too long.

7           The Court's note in its preliminary construction is

8   not sufficient to capture the meaning of that term as it is

9   used in the claims.

10          Rather than some causal relationship being

11  required, we believe it should be a binding causal

12  relationship or a determinative causal relationship or a

13  mandatory causal relationship.

14          And what we see in Figure 6A is why.  Just to take

15  the example of the triggering event, Item 616, leading to a

16  scheduling request 604.  There's a branching there.  There's

17  a yes, and there's a no.  If there is a triggering event,

18  you go back up to Item 604.  There are no maybes in there.

19  There are no contingencies.  There are no further ifs.

20  There's just a yes there.

21          The same is true for Items 604 and 608.  The

22  transmission of the scheduling request takes place.  Without

23  any contingency, other than what's listed there in 602 and

24  608, the transmission of the buffer status information takes

25  place, once the scheduling grant in 606 is received.

1          THE COURT:  What would be your authority for

2    reading Figure 6A into the claim?

3          MR. YOUNG:  Well, it is -- first of all, as we've

4    cited in our claim -- in our papers, we have the American

5    Calcar case, which does construe the terminology in response

6    to.  And it refers to it being as a cause and effect

7    relationship that excludes action on the part of the user,

8    which is a different event or contingency.  If it's a

9    different event, an intervening event or contingency, then

10   it's not in response to the initial cause.

11         Let me give the Court an analogy.  Let's say that

12   you have a lawsuit in which the District Court dismisses a

13   case.  It goes up to the Supreme Court, and the Supreme

14   Court reverses the dismissal, which had been affirmed by the

15   Federal Circuit, and says we will remand for proceedings

16   consistent with our opinion.  It goes back down to the

17   Federal Circuit.  The Federal Circuit has to make a

18   decision, given the Supreme Court decision, whether to

19   affirm the reversal or tell the District Court not to

20   dismiss the case.

21         In that event, the Federal Circuit decision is an

22   intervening contingency or determination.  And whatever the

23   District Court does is going to be in response to the

24   Federal Circuit order.

25         Now, it is true that the Supreme Court decision has

1   some -- some causal effect.  It wouldn't have come back down

2   to the District Court without the Supreme Court's decision,

3   but it -- whatever the District Court does is actually not

4   in response to the Supreme Court's decision.  It's in

5   response to what the Federal Circuit does in light of that

6   decision.

7          So another way of putting this would be that while

8   what Your Honor describes in the preliminary construction

9   may be a sufficient cause, if it's not a -- maybe a

10  necessary cause, but if it's not a sufficient cause, then in

11  our view, there is not responsiveness.  And -- and -- as we

12  can see in the diagram from American Calcar, that's what the

13  Federal Circuit held with respect to that very same language

14  in a different patent.

15         Now, the -- going back to the diagram here, there's

16  the yes/no.  There is the language at Column 3, Lines 15

17  through 18, which says:  If a triggering event has occurred,

18  then the UE transmits a second SR.  The if/then language

19  does not allow for something else intervening to determine

20  whether the then happens or not.  I mean, that's -- that's

21  software.

22         If you have if/then, then -- then if the condition

23  occurs, the consequence must also occur.

24         THE COURT:  Mr. Young, isn't this just clearly and

25  expressly an embodiment?

1          MR. YOUNG:  This is an embodiment.  Let me go on to

2     address some of the other embodiments that are relied on by

3     PanOptis.

4          Those embodiments are all in Column 7.  There are a

5     couple also in Column 3.  But let me focus on the ones in

6     Column 7.  And this is something that we didn't put in our

7     papers, so I'm going to indulge the Court and use the ELMO

8     here.

9          If we could go to the ELMO.

10         And you'll see at Column 5, there's a description

11    of what Figures 5 and 6 are.  Figure 5 illustrates a further

12    improved scheduling message flow between the eNodeB, the

13    base station, and two UEs, two mobile terminals.  That's in

14    contrast to what's in Figures 6a and 6b, which illustrates a

15    process according to an embodiment of the invention.

16         And if you look at 6b, it's talking about just a

17    single mobile terminal, what goes on inside a cell phone,

18    not what goes on between a base station and two user

19    devices.  That's important because of what happened during

20    prosecution.

21         During prosecution, the examiner said there are two

22    sets of claims here in this application.  There's one set of

23    claim drawn to a mobile terminal, determining that a

24    triggering event has occurred, et cetera.  This is Exhibit

25    24 to our papers, by the way.

1          The second set of claims was drawn to receiving an

2     SR from a second mobile terminal while the first mobile

3     terminal is utilizing the uplink resource; that is, you have

4     two mobile terminals in that second set of claims.

5          That second set of claims was canceled in response

6     to the examiner's election restriction.  And that second set

7     of claims, it's what's in Figure 5.  Figure 5 has the first

8     UE and the second UE communicating with the base station.

9     That Figure 5 is what is being described in Column 7.  If

10    you look at Columns -- Column 7 at Line 22, it talks about

11    Figure 5.

12         And Figure 4 is what's being discussed prior to

13    that point, which is really the same thing.  You should see

14    the diagram.  You have the base station and the two terminal

15    units.

16         What's described in Figure 5 and in Column 7 is

17    very different from what's described in Figure 6 and in the

18    claims of the patent as actually issued.  What's described

19    in Column 7 and Figure 5 was canceled in response to this

20    election requirement.

21         So all of the examples that PanOptis points to

22    where it tries to allow for some sort of intervening cause

23    are from embodiments that are not claimed and that

24    correspond to claims in the original application that were

25    canceled.

1          Now, this is an important issue, and I'll point to

2    02 Micro.  This -- this is going to be an issue that will

3    determine whether the case goes one way or the other.

4          There are infringement allegations that relate to

5    scenarios where there is an intervening cause.  And for the

6    Court, I think, to say that there is -- it suffices to have

7    some causal relationship would be an error in light of the

8    specification and how these claims should be construed.

9          THE COURT:  I think what you're asking us to do at

10   claim construction is to get into the very factual nature

11   of -- of infringement, and, I mean, the -- this very strong

12   language you're proposing that there not be any occurrence

13   of any intermediate condition, event, or -- or

14   determination.  And it's a very simple thing to come up with

15   an intermediate condition, event, or determination.

16         It's been -- you know, if you use the example of

17   dialing my phone number and causing my phone to ring,

18   that's -- my phone is ringing in response to you dialing the

19   number.

20         But it depends upon the intermediate conditions

21   that there is a line connected between the two, that the

22   phone company's switches are working, that my phone is

23   properly plugged in.  There are all sorts of ways you could

24   say, well, that didn't directly cause it, it took a lot of

25   other events.

1          But I think that's a fact issue about whether

2     something is in response to it.  And I just -- my -- I don't

3     see a justification for slicing it as thinly as you're

4     seeking to do here.

5          MR. YOUNG:  Well, Your Honor, at this point, I -- I

6     would propose Your Honor's note in the preliminary

7     construction, but modified to substitute some for binding or

8     mandatory or determinative --

9          THE COURT:  What does that even mean?  When -- use

10    my example --

11         MR. YOUNG:  Yes.

12         THE COURT:  -- where you're dialing my phone

13    number.  What is the binding cause of it?

14         MR. YOUNG:  I think if there's no contingency

15    between my calling and Your Honor getting the ring tone or

16    getting the -- the ring, that that -- that would satisfy

17    that event.

18         To take the Court analogy, if the Supreme Court's

19    decision were we order the Federal Circuit to order the

20    District Court to dismiss the case, that -- then the

21    District Court's dismissal would be, I believe, in response

22    to the Supreme Court's order.

23         But if there's some option in the middle, the --

24    the Federal Circuit has an opportunity to apply the Supreme

25    Court's decision and make a decision one way or the other,

1   then I think the fair reading of that situation is that the

2   District Court's order is in response to what the Federal

3   Circuit does and not in response to the Supreme Court.

4        THE COURT:  Well, there's always an option there.

5   The Federal Circuit could say, we don't think that's what

6   the Supreme Court meant.

7        You're -- you're wanting to eliminate any

8   intermediate condition, and that -- I -- I just -- I have a

9   problem saying that "in response to" requires that kind of

10  direct no -- no intervening condition, event, determination.

11       I do think that's going to be a very fact specific

12  thing, and there may be situations where it's not in

13  response to, even though there is, you know, some very vague

14  causal connection.

15       MR. YOUNG:  Well, it -- Your Honor is correct,

16  there -- there may be, and probably will be some factual

17  issue.  We do believe that a further construction is going

18  to be useful to the jury, that implementing what's shown in

19  Figure 6a, which really is the only embodiment that's

20  relevant to the claims of this patent.

21       As we mentioned in our papers, the '311 patent,

22  which is based on the same specification, has the

23  cancellation contingency that is the first example relied

24  upon by PanOptis, but that's a different patent.  Those

25  claims are not in this patent.

1          And we respectfully disagree with the Court's

2     inclination on this issue.  And I think at this point, I

3     don't have anything else.

4          THE COURT:  All right.  Well, I -- I appreciate

5     your argument on that, Mr. Young.

6          MR. YOUNG:  Thank you, Your Honor.

7          MR. DEZERN:  Thank you, Your Honor.  David DeZern,

8     again, for Plaintiffs.

9          I think your -- your phone analogy exactly captures

10    the issue, and you recognize the mischief that can be

11    achieved with how you frame something that occurs in

12    response to something else, and whether or not there's

13    something intermediate is entirely arbitrary in terms of how

14    you frame that second event.

15         So unless Your Honor has any questions, I will sit

16    down.

17         THE COURT:  Thank you, Mr. DeZern.  I do not.

18         Are there any other matters to come before the

19    Court this morning?  I guess it's now afternoon.  If not,

20    good enough.

21         Then thank you, and we're adjourned.

22         COURT SECURITY OFFICER:  All rise.

23         (Hearing concluded.)

24

25

1                               CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                        1/1/18
     SHELLY HOLMES, CSR-TCRR                   Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25