```
1                 IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF TEXAS

3                           MARSHALL DIVISION

4    OPTIS WIRELESS TECHNOLOGY,      )(
     LLC, PANOPTIS PATENT            )(
5    MANAGEMENT, LLC, OPTIS          )(
     CELLULAR TECHNOLOGY, LLC,       )(
6    PLAINTIFFS                      )(    CIVIL CASE NO.
                                     )(    2:17-CV-123-JRG-RSP
7    VS.                             )(    MARSHALL, TEXAS
                                     )(
8    HUAWEI TECHNOLOGIES CO. LTD.,   )(
     HUAWEI DEVICE USA, INC.,        )(
9    HUAWEI DEVICE CO. LTD.,         )(    AUGUST 20, 2018
     DEFENDANTS                      )(    9:16 A.M.

10

11                     TRANSCRIPT OF JURY TRIAL

12        BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                   UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:      Mr. Samuel F. Baxter
                              McKool Smith, PC
17                            104 E. Houston Street
                              Suite 300
18                            Marshall, Texas 75670

19

20   COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                              Official Court Reporter
                              United States District Court
21                            Eastern District of Texas
                              Marshall Division
22                            100 E. Houston
                              Marshall, Texas 75670
23                            (903) 923-7464

24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFFS:        Mr. Theodore Stevenson, III
                                Mr. Marcus L. Rabinowitz
 2                              McKool Smith, PC
                                300 Crescent Court
 3                              Suite 1500
                                Dallas, Texas 75201
 4
                                Mr. Kevin L. Burgess
 5                              Ms. Lindsay M. Leavitt
                                Mr. Kevin P. Hess
 6                              Ms. Christine M. Woodin
                                McKool Smith, PC
 7                              300 W. 6th Street
                                Suite 1700
 8                              Austin, Texas 78701

 9                              Mr. David T. DeZern
                                Gray Reed & McGraw, LLP
10                              1601 Elm Street
                                Suite 4600
11                              Dallas, Texas 75201

12
     FOR THE DEFENDANTS:        Mr. Robert T. Haslam
13                              Mr. Stanley Young
                                Mr. Anupam Sharma
14                              Mr. Thomas E. Garten
                                Mr. James Hovard
15                              Ms. Tess Hamilton
                                Covington & Burling, LLP
16                              333 Twin Dolphin Drive
                                Suite 700
17                              Redwood Shores, California 94065

18                              Mr. Heng Gong
                                Covington & Burling, LLP
19                              The New York Times Building
                                620 Eighth Avenue
20                              New York, New York 10018

21                              Mr. Paul J. Wilson
                                Mr. Ali Mojibi
22                              Mr. Christopher G. Higby
                                Covington & Burling, LLP
23                              One CityCenter
                                850 Tenth Street, NW
24                              Washington, DC 20001

25
```

```
 1   FOR THE DEFENDANTS:         Mr. Michael C. Smith
                                 Siebman Forrest Burg & Smith, LLP
 2                               113 East Austin Street
                                 Marshall, Texas 75670
 3

 4

 5                    P R O C E E D I N G S

 6          (Jury panel in.)

 7          COURT SECURITY OFFICER:  All rise.

 8          THE COURT:  Thank you.  Be seated, please.

 9          Good morning, ladies and gentlemen.  Thank you for

10   being here on time.

11          My name is Rodney Gilstrap.  And I am the resident

12   United States District Judge here in the Marshall Division of

13   the Eastern District of Texas.

14          I have lived in Marshall since 1981.  I practiced law

15   here and in the immediate area for 30 years before being

16   appointed to the federal bench.  I've been here in this

17   position since 2011.  And I was born in Florida, but as they

18   say, I got to Texas as quick as I could.

19          I came to Texas to go to college and then stayed and

20   went to law school at Baylor University in Waco.

21          I am married, and I have two grown children.  And my

22   wife owns and operates a retail floral business here in

23   Marshall.

24          Now, I tell you all these things because in a few

25   minutes, I'm about to get the same information about each of
```

1   you that I've just given you about me, and I think you're

2   entitled to know as much about me as I'm about to find out

3   regarding each of you all.

4          We're about to engage in the selection of a jury in a

5   civil case involving allegations of patent infringement.

6   However, before I go any further, I'd like to briefly review

7   with you how we came to have our American jury trial system for

8   civil cases such as this one.

9          If you go back in ancient history and you look at the

10   first five books of the Old Testament, the Pentateuch, you'll

11   find that the Jewish nation empaneled juries for purposes of

12   establishing property ownership and property value.  The

13   ancient Greeks began using a jury system about 1500 BC.

14          The Romans, as they did many things, borrowed and

15   copied the jury system from the ancient Greeks.  And it was the

16   ancient Romans that brought the jury system to what is today

17   the United Kingdom, or England, in the fourth century when they

18   crossed the English channel and conquered that island.

19          The jury system flourished in England for 800 years,

20   and then in the 12 century AD, a tyrannical king came to the

21   throne of Great Britain known as King John, and King John set

22   about to do away with the jury trial system among many other

23   things while he was on the throne.  This led to a crisis in

24   England, and it went nearly to the verge of civil war between

25   King John and his barons.

```
 1          That civil war was avoided by a document -- an
 2   agreement between the king and his barons that was signed at a
 3   place called Runnymede, and that document setting forth their
 4   agreement, which restored and protected the right to trial by
 5   jury in England, is known as the Magna Carta.
 6          The Magna Carta is one of the most important documents
 7   in all democracy and was a precursor to our constitution.  In
 8   fact, ladies and gentlemen, 28 of the 50 states in the United
 9   States have adopted verbatim from the Magna Carta the language
10   that guarantees the right to trial by jury.
11          So you can see that by the time our founding fathers
12   came to America as British colonists, the concept of trial by
13   jury was deeply engrained in them.  And the right to trial by
14   jury flourished here in British America for over a hundred
15   years until another tyrannical king came to the throne of Great
16   Britain.  This time it was King George, III.  And King George,
17   III set about imposing restrictions and limitations on his
18   British colonists here in America, one of which was to restrict
19   and curtail the right to trial by jury.  That led to, as you
20   all know, eventually our American Revolution.
21          And when Thomas Jefferson sat down to write the
22   Declaration of Independence, which if you'll read that
23   document, sets forth the specific reasons why America believed
24   it should separate itself from Great Britain and form an
25   independent country, he gave the various reasons and complaints
```

1    against King George, III.  And one of those specific complaints

2    set out in the Declaration of Independence is the king's

3    attempts to restrict and curtail the right to trial by jury.

4           So you can see that that right was coveted and valued

5    by those British colonists who became Americans and American

6    citizens after our revolution was complete.

7           As a matter of fact, the constitution of the United

8    States was passed and ratified by the several states on the

9    clear understanding that as soon as it was passed, 10 important

10   amendments would be added to it, and those ten important

11   amendments were added promptly after the constitution was

12   ratified.  We know those ten amendments to be the Bill of

13   Rights.

14          And among those ten amendments is the Seventh

15   Amendment, which guarantees constitutionally the right of every

16   American citizen to have a right to a trial by jury in a civil

17   case such as this one.  Not only in a criminal case, but in a

18   civil case.

19          And the Seventh Amendment, along with the other nine

20   that comprise the Bill of Rights, were ratified in 1791.  So

21   since 1791, every American citizen has had a constitutional

22   right to settle their disputes in civil matters through a trial

23   by jury.

24          So I -- I always tell citizens who appear for jury

25   duty, like you have this morning, that in my opinion, jury duty

1   is the second highest form of public service that any American

2   can perform, and in my opinion, the highest form of public

3   service any American can perform is to serve in the armed

4   forces of our nation.

5        By being here today, by presenting yourself for jury

6   duty in this case, you are rendering very real, tangible, and

7   important public service.  And you are, in a very real way,

8   preserving, protecting, and defending the right to trial by

9   jury.

10       Now, ladies and gentlemen, the lawyers in this case

11  are going to address the members of the jury panel.  In a

12  little while they're going to ask various questions of you.

13  And I want you to understand that they are not attempting to

14  inquire into your private affairs unduly.  In other words,

15  they're not trying to pry into your personal business or be

16  nosy.  They are entitled to ask the questions that they're

17  asking for the purpose of securing a fair and an impartial jury

18  to hear the evidence in this case.

19       I don't know if it will happen today, it very rarely

20  does, but it is possible, so I want to mention it to you.  If

21  you should be asked a question that you think in your own

22  personal opinion is so personal and so private that you are not

23  comfortable answering it in front of everyone else on the

24  panel, then you have the option to simply say, I'd like to talk

25  about that with Judge Gilstrap.  And if that's your response,

1    I'll make and provide an opportunity for you to answer that

2    question outside of the presence of everyone else on the panel.

3          I will tell you, ladies and gentlemen, that doesn't

4    come up very often.  But it has happened, and I want you to

5    know that you do have that option if that should occur today.

6    Again, it's not likely, but it is possible.

7          The important thing for you all to remember as we go

8    forward with the jury selection process, and as you are asked

9    questions by the lawyers in this case, is that you should give

10   full, complete, and truthful answers.  There are no wrong

11   answers to the questions as long as your responses are full,

12   complete, and truthful.

13         Now, ladies and gentlemen, I anticipate that the case

14   that we're here for today will start later today.  We'll select

15   the jury, and then we'll begin the evidence later today.  And I

16   expect that the trial of the case will go through the end of

17   this week, and it is possible that it could extend over into

18   Monday of next week.  Don't know that that will happen, but it

19   is possible.

20         So at this point, I need to ask of the entire panel if

21   there are any of you on the panel who have prepaid,

22   nonrefundable airline tickets someplace, if you have a surgical

23   procedure scheduled, if you have an immediate member of your

24   family with those kind of circumstances, or if there is some

25   very important reason why you could not be here all of this

```
 1   week and perhaps into Monday of next week, then I need to know
 2   about that.
 3          I'm not -- I'm not inquiring about insignificant or
 4   trivial things, but if there is an important and a pressing
 5   reason why if selected you couldn't be here to serve throughout
 6   the trial, then I need to know about that.  And if that applies
 7   to any of you, if you'd raise your hands, and let me make a
 8   note of it at this time.
 9          Okay.  No. 3, No. 7, No. 9.
10          Anybody else in the jury box?
11          Anybody outside of the jury box?
12          I don't see any other hands.
13          3, 7, and 9.
14          Okay.  Thank you very much.
15          At this time, I'm going to call for announcements in
16   the case of PanOptis et al. Versus Huawei Device U.S., Inc. Et
17   al., this is Civil Case No. 2:17-CV-123.
18          And, counsel, as you give your announcements, please
19   identify yourselves, the members of your trial team, and any
20   corporate representatives that you have representing the
21   parties that you represent in the case.
22          We'll begin with the Plaintiff.  What says the
23   Plaintiff?
24          MR. BAXTER:  Good morning, Your Honor.
25          THE COURT:  Good morning.
```

```
 1              MR. STEVENSON:  My name is Sam Baxter, McKool Smith.

 2              And I have with me my law partners, Mr. Ted Stevenson,

 3   Jennifer Truelove, Kevin Burgess, and our corporate rep from

 4   PanOptis, Mr. Ray Warren.

 5              The most important member of our team is Mr. Moreno

 6   who is going to run the graphics for us today, Your Honor, and

 7   the rest of the trial.

 8              And we're ready, Your Honor.

 9              THE COURT:  Thank you.

10              What says the Defendants?

11              MR. SMITH:  Your Honor, for the Defendants, Michael

12   Smith.

13              And at counsel table with me, for Huawei, is our

14   corporate representative Mr. Emil Zhang.  Also from Huawei in

15   the gallery, Mr. Steven Geiszler.  And at counsel table with

16   me, Mr. Bob Haslam, Mr. Stan Young, and Mr. Ali Mojibi.

17              And we're ready to proceed, Your Honor.

18              THE COURT:  All right.  Thank you.

19              Ladies and gentlemen, as I've told you, this case

20   arises under the patent laws of the United States.

21              What the plaintiffs are claiming in this case is that

22   their patents were infringed by the Defendants, and the

23   Plaintiffs are seeking money damages because of that alleged

24   infringement.

25              The Defendants deny that they infringe the Plaintiffs'
```

1    patents, and they contend that those patents are invalid.

2           Now, that is a very short informal way of describing

3    the case in layman's terms.  And I know each of you have seen

4    the patent video prepared by the Federal Judicial Center.  And

5    having done that, you know a lot more about patents than most

6    people do when they arrive for jury duty.  You're going to

7    learn a lot more about it as we proceed.

8           As I say, the lawyers are going to question the panel,

9    and then have an opportunity to inquire in various ways

10   regarding the members of the panel so that they can exercise

11   their peremptory challenges and help secure a fair and

12   impartial jury to hear the evidence in the case.

13          Let me remind you, again, there are no wrong answers

14   as long as your response are full, complete, and truthful.

15          I don't think it will happen today, but if a lawyer in

16   the case on either side should ask a question of the panel that

17   I think is improper or out of bounds, I will certainly stop

18   them, but you should understand these are all experienced trial

19   lawyers, and they are well aware and familiar with the rules of

20   civil procedure that apply in federal courts, the local rules

21   of this court, and I don't expect that to happen.

22          One thing I do want to call your attention to, ladies

23   and gentlemen, before we allow the lawyers to question the

24   panel is the burden of proof that will be applied in this case.

25   And I want to visit with you about that because it is quite

```
 1   likely that some of the lawyers will want to know about your
 2   ability, if you're selected, to apply the burden of proof in
 3   this case.
 4         A jury in a case like this may apply two burdens of
 5   proof.  One burden of proof is called the preponderance of the
 6   evidence.  And I'll say that again, the preponderance of the
 7   evidence.
 8         And the second burden of proof that's applied in a
 9   patent case is called clear and convincing evidence.  And I'll
10   repeat that, clear and convincing evidence.
11         Now, when responding to lawyers' questions about the
12   burden of proof, I need to instruct you that when a party has
13   the burden of proof on any claim or defense by a preponderance
14   of the evidence, it means that the jury must be persuaded by
15   the credible or believable evidence that that claim or defense
16   is more probably true than not true.  I'll say that again, more
17   probably true than not true.  This is sometimes talked about as
18   being the greater weight and degree of credible testimony.
19         Let me see if I can give you an example.  I think all
20   of you on the panel can see in front of me and in front of our
21   court reporter the statute of the Lady of Justice.  She's
22   blindfolded.  She holds the sword of justice lowered at her
23   right side.  At her left side, she holds the Scales of Justice
24   above her head, and they are balanced and completely equal.
25         When you think about the burden of proof in this case,
```

1    understand that when all the evidence has been presented in

2    this trial, those of you serving on the jury will be asked to

3    answer certain questions by the Court.  Those questions are set

4    forth in what's called the verdict form.  And when you

5    determine how to answer those questions, think about all the

6    evidence that's been presented in the trial as if it has been

7    set on one side of those scales or the other.

8            If it helps one side, it should go on one side.  If it

9    helps the other, it should go on the other side.  And then when

10   all the evidence in your mind has been placed on those balanced

11   and equal scales, if those scales tip in favor of the party who

12   has the burden of proof by a preponderance of the evidence, and

13   even if they tip ever so slightly, then that party has met its

14   burden of proof by a preponderance of the evidence, the greater

15   weight and degree of credible testimony, more probably true

16   than not true.

17           On the other hand, the jury in this case will also be

18   asked to apply a second burden of proof called clear and

19   convincing evidence.  And applying the same example, when all

20   the evidence in the case in your minds has been placed on one

21   side of the scales or the other, the party who has a burden of

22   proof by clear and convincing evidence, to meet that burden of

23   proof, the scales must tip in that party's favor, and they must

24   tip more than ever so slightly.  They must definitely tip in

25   favor of that party for them to meet their burden of clear and

convincing evidence.

Clear and convincing evidence, ladies and gentlemen, means that the jury has an abiding conviction that the truth of the party's factual contentions are highly probable.  Let me say that again for emphasis, an abiding conviction that the truth of the party's factual contentions are highly probable.

Now, that's a higher standard of proof than the preponderance of the evidence.  However, ladies and gentlemen, none of you should consider any of what I've just told you with regard to what you hear about in the media and you see on television and in the movies, which is a third and completely different burden of proof called beyond a reasonable doubt. Beyond a reasonable doubt is the burden of proof applied in a criminal case, and it has no application whatsoever in a civil case such as this one.  You should not confuse clear and convincing evidence with beyond a reasonable doubt.  It is not as high as that third and different and inapplicable burden of proof.  But clear and convincing evidence is a higher burden than the preponderance of the evidence.

I give you these instructions and explanations in case some of the lawyers will inquire of you whether or not you're able and willing to apply those two different burdens of proof to the evidence that will be presented in this case.

Now, before the lawyers address the panel, I'm going to ask each of you to tell me as much about you as I told you

1    about me when I came out this morning.  Each of you have before

2    you and on the screens in front of you nine specific questions

3    to answer.  And we're going to go through the panel one at a

4    time and let each of you answer those questions at this time.

5         We're going to do it in the following manner, and I

6    want to explain this to you.  Our Court Security Officer has a

7    handheld microphone.  We'll begin by bringing it to Panel

8    Member No. 1, Ms. Smith, and I'll ask Ms. Smith, when she gets

9    the handheld microphone, to stand and to answer those nine

10   questions.  Then we'll pass the handheld microphone to Panel

11   Member No. 2, Ms. Settles, and we'll go through the same

12   process.

13        Whenever you are answering a question, whether it's

14   these nine questions, ladies and gentlemen, or whether it's

15   specific questions that the lawyers may pose to you when they

16   examine the panel, you should wait until you get the handheld

17   microphone before you answer.  And you should stand using the

18   handheld microphone and then answer the question.  It's a large

19   courtroom.  There are a lot of people here.  It's important

20   that we do it this way so that not only the lawyers but the

21   Court and everyone can hear your answers.  So if you'll use the

22   handheld microphone now and when other questions are asked

23   later, and if you'll stand when you give your answers, the

24   Court will appreciate it.

25        All right.  We'll begin with Panel Member No. 1,

 1    Ms. Smith.  And if you'll stand when you get that microphone

 2    and give us your answers to those nine questions, please.

 3            JUROR SMITH:  Hello.  My name is Kathy Ann Smith.  And

 4    I live in Omaha, Texas.  I have two adult children, both boys.

 5    And my place of employment, I work for the 76 -- 276th Judicial

 6    District, Adult Probation, in Daingerfield, Texas, and I'm the

 7    fiscal officer.  I have been there 24 years.  I do have some

 8    college.  I graduated from high school from Paul Pewitt in

 9    Omaha, Texas.  My husband's name is Edward Smith, Sr.  He works

10    at U.S. Steel and has been there for 20 years.

11            THE COURT:  Have you ever served on a jury?

12            JUROR SMITH:  I have never been chosen to serve on a

13    jury, no, sir.

14            THE COURT:  Okay.  Thank you, Ms. Smith.  If you'll

15    hand the microphone to Ms. Settles.

16            JUROR SETTLES:  My name is Christine Settles.  And I

17    live in Diana, Texas.  I have four adult daughters.  I own a

18    call center in Gilmer, Texas.  We do IT support.  I have owned

19    it for six years.  I have an Associate's in business

20    administration from BYU Idaho.  My husband's name is Phillip

21    Settles.  He owns an independent insurance agency in Jefferson,

22    Texas.  He has owned that for six years.  And I have never been

23    on a jury.

24            THE COURT:  Thank you, ma'am.  Panel Member No. 3.

25            JUROR DESLATTE:  I'm Stacy Deslatte.  I have three

```
 1   grown children.

 2           THE COURT:  And, ma'am, hold that microphone a little

 3   closer, please.

 4           JUROR DESLATTE:  Oh, I'm sorry.

 5           THE COURT:  Thank you.

 6           JUROR DESLATTE:  Can y'all hear that?  Okay.

 7    I --  right now I work for Greenleaves of Tyler, which is a

 8   plant -- it's indoor landscaping, and I'm also a self-employed

 9   artist.  The Greenleaves job, I think I've had for eight years.

10   And the -- and then I've been an artist for -- since 2000.

11           THE COURT:  Okay.

12           JUROR DESLATTE:  My educational background, I have a

13   degree in chemical engineering -- Bachelor's degree.  My spouse

14   is Bryan Deslatte, and he works for OSISoft which is a

15   manufacturing software control operation out of California.

16   And he's worked there since 2006 -- '7 -- 2007.  And I have

17   been on two different juries.  One was a civil jury in Gregg

18   County, I don't know, in the late '80s.  And the other was a

19   criminal court case in Harrison County.

20           THE COURT:  How long ago was that?

21           JUROR DESLATTE:  I think that was five -- about five

22   years ago.

23           THE COURT:  Okay.  Thank you very much.

24   Next is Panel No. 4, Mr. Read.

25           JUROR READ:  Yes my name is Joey Reed.  I live in
```

```
 1    Karnack, Texas.  I have three children.  I am retired.  I'm
 2    from General Motors, 30 years.  My education, graduated from
 3    Marshall High School and went to a four-year trade school.  I
 4    am divorced.  And I did -- I was chosen one time in a criminal
 5    case, which was settled out of court.
 6              THE COURT:  And I assume your work at General Motors,
 7    was at their plant in Shreveport?
 8              JUROR READ:  Correct.
 9              THE COURT:  Okay.  Sir.  Thank you very much.
10              Next is Panel Member 5 -- No. 5, Ms. Garcia.
11              JUROR GARCIA:  Okay.  My name is Diana Garcia, and I
12    live in Pittsburg.  I don't have any children.  I work for
13    Titus Regional Medical Center.  I've been working there almost
14    a year.  I just graduated from high school last year.  I'm not
15    married.  And I've never done this before.
16              THE COURT:  Okay.  Now, if you'll hold the microphone
17    a little closer.
18              Tell me again where you work.
19              JUROR GARCIA:  I work for Titus Region Medical Center.
20              THE COURT:  One more time.
21              JUROR GARCIA:  Titus Regional Medical Center.
22              THE COURT:  Titus Regional Medical Center.  Okay.
23              Never had any jury service?
24              JUROR GARCIA:  No.
25              THE COURT:  All right.  Thank you, ma'am.
```

```
 1              Next is No. 6.

 2              JUROR LOBDELL:  My name is Jason Lobdell.  I live in

 3   Gilmer.  I don't have any children.  I work -- I'm an assistant

 4   manager at Walmart Super Center in Gilmer.  I've worked for

 5   Walmart for 15 years.  I graduated from White Oak High School.

 6   My spouse's name is Melanie.  She also worked for Walmart.

 7   She's worked there for 15 years.  And I have never been picked

 8   for a jury.

 9              THE COURT:  Never served?

10              JUROR LOBDELL:  Never served.

11              THE COURT:  All right, sir.  Thank you.

12              If you'll hand the mic to Ms. Boyd, No. 7.

13              JUROR BOYD:  I'm Vickie Boyd.  And I have three grown

14   children.  I'm employed at Bowden Floral in Gilmer, Texas.

15   I've worked there three years.  A high school education.  My

16   spouse's name is Donald Boyd, and he's medically retired.  And

17   I was on a criminal case.

18              THE COURT:  And where was that and how long ago?

19              JUROR BOYD:  It was in Mississippi in 2001/2002.

20              THE COURT:  And what did Mr. Boyd do before he was

21   medically retired?

22              JUROR BOYD:  He was a -- he was an electrician in the

23   shipyard in Pascagoula.

24              THE COURT:  Okay.  Thank you, Ms. Boyd.

25              Take the microphone around to Panel Member No. 8,
```

1   Mr. Humphrey.

2         JUROR HUMPHREY:  Yes, sir.  My name is Seth Humphrey.

3   I live in Jefferson, Texas.  I have two children, a boy and a

4   girl.  I work at General Cable in Scottsville, Texas.  I've

5   worked there for 19 years.  Graduated from Jefferson High

6   School.  Wife's name is Jennifer Humphrey.  She's a

7   hairstylist.  She's done that for 15 years.  And I don't feel

8   like I've served on a jury.  I was an alternate in a civil

9   case.

10         THE COURT:  And where was that, sir?

11         JUROR HUMPHREY:  Marion County.

12         THE COURT:  And how long ago?

13         JUROR HUMPHREY:  About two years ago.

14         THE COURT:  Okay.  Thank you, Mr. Humphrey.

15         If you'll hand that to Panel Member No. 9,

16   Ms. Youngblood.

17         JUROR YOUNGBLOOD:  My name is Gina Youngblood.  I'm a

18   business office manager.  I'm from Hughes Spring, Texas.  I'm a

19   business officer manager at a long-term care facilities.  I've

20   done that job for 16 years.  Been at Magnolia Place for a year

21   and a half.  I don't have any children.  My husband works for

22   Delta Fabrication out of Daingerfield, Texas.  He's been there

23   two years.  And I've been called but never served on a  jury.

24         THE COURT:  And did you give us your educational

25   background, please, ma'am?

 1             JUROR YOUNGBLOOD:  Oh, I graduated high school and

 2    have some college.

 3             THE COURT:  Thank you.

 4             Next is Panel Member No. 10, Ms. Taylor.

 5             JUROR LESA TAYLOR:  My name is Lesa Taylor.  I live in

 6    Hallsville, Texas.  I have one son.  I work for Fastenal, which

 7    I'm an onsite account rep up at the DeNovo facility in

 8    Jefferson.  I graduated high school.  My husband's name is John

 9    Taylor.  He's the store manager for Dealers Electric here in

10    Marshall.  He's been with them for 17 years.  I've served on a

11    criminal and civil case here in Harrison County.

12             THE COURT:  How long ago, ma'am?

13             JUROR LESA TAYLOR:  One of them was 12 years ago, and

14    one of them was about eight years ago.

15             THE COURT:  Thank you very much.

16             If you'll pass the microphone to Panel Member No. 11,

17    Ms. Raney.

18             JUROR RANEY:  Okay.  My name is Belinda Raney.  And I

19    live -- I currently live in Pittsburg, Texas.  I have no

20    children.  I do have a grown stepson.  My -- currently, I'm

21    employed at Ferndale Club in Pittsburg, Texas.  My last 30

22    years, over 30 years, has been in oncology data management,

23    prior to that.  I've been at Ferndale for probably just a

24    month.  That's my retirement job.  I have an Associate's degree

25    plus.  And my spouse's name is Eddie Raney, and he's -- he was

```
 1    a system analyst, but he's joined me at Ferndale.  And also for

 2    a month.  Never chosen for jury duty.

 3              THE COURT:  Okay.  Thank you, ma'am.

 4              Next is No. 12, Ms. Fennell.

 5              JUROR FENNELL:  Good morning.  My name is Charlotte

 6    Fennell.  In Gilmer.

 7              THE COURT:  Okay.

 8              JUROR FENNELL:  That's where I live.  I have two

 9    beautiful daughters.  My place of employment is Edward Jones,

10    financial, but it is on-call, like a substitute teacher.  I've

11    worked there for three years now.  My educational background is

12    I have a degree in education a BA, an AA in business, and an AS

13    in art.  My spouse's name is Rusty Fennell, and his place of

14    employment is Highway 80 Rescue Mission.  He's the associate

15    director there.  And he is our contemporary pastor for First

16    Baptist in Gilmer.  He's worked at Highway 80 for the past

17    almost 15 years.  I'm from California, so -- Southern

18    California, so I served at a criminal case in California, and I

19    was chosen at the foreman over 20 years ago.

20              THE COURT:  And that was a civil case?

21              JUROR FENNELL:  Criminal.

22              THE COURT:  Criminal case?

23              JUROR FENNELL:  Uh-huh.

24              THE COURT:  Okay.  Thank you, ma'am.

25              No. 13, Ms. Gabel.
```

1          JUROR GABEL:  Hello.  I'm Jaime Gabel.  I'm from

2    Naples, Texas.  I have two girls.  My place of employment is

3    Titus Regional Medical Center.  I've been there 18 years.  I

4    have an Associate's in health science.  I am divorced.  And I

5    was on a civil trial in Morris County about two years ago.

6          THE COURT:  Thank you very much.

7          Next is No. 14, Ms. Wooldridge.

8          JUROR WOOLDRIDGE:  My name is Jacque Wooldridge.  I do

9    not have any children.  I'm from Pittsburg, Texas.  I work with

10   Walmart pharmacy as a lead pharmacy technician.  And I've been

11   there about seven years.  I have a Bachelor's of Science in

12   interdisciplinary studies, as well as national certification

13   board with the Pharmacy Technician Certification Board.  I am

14   divorced.  And I've been summoned for jury duty once but was

15   excused due to college.

16         THE COURT:  Okay.  Thank you very much.

17         Next we'll start on the first row with No. 15,

18   Mr. Morris.

19         JUROR MORRIS:  Good morning.

20         THE COURT:  Good morning.

21         JUROR MORRIS:  My name -- my name is Leo Morris.  And

22   I live here in Marshall, Texas.  I have three grown male boys.

23   I'm retired from the City of Houston.  I was what you call a

24   field supervisor for Public Works and Engineering there in

25   Houston.  I worked there for 28 years.  My educational

```
 1  background, I was -- I graduated high school from Lincoln High
 2  School in Dallas, Texas.  And I have two years of college
 3  experience at Texas Southern University in Houston and one year
 4  here at Wiley College here in Marshall.  I am divorced.  And I
 5  did serve on a grand jury back in 2009 in Houston, Texas.
 6          THE COURT:  And have you ever served on a jury other
 7  than that grand jury experience?
 8          JUROR MORRIS:  No.
 9          THE COURT:  Okay.  Sir.  Thank you very much.
10          Next is No. 16, Ms. Hall.
11          JUROR HALL:  My name is Debra Hall, and I live in
12  Linden, Texas, which is Cass County.  And I have four children,
13  two boys, two girls.  They're all grown.  I work for Jefferson
14  ISD.  I am the district nurse, high school nurse.  I teach
15  health class and a dual credit medical terminology class for
16  Panola College, and I have worked there for about two years.
17  Before that, I retired and got bored.  I had -- I graduated
18  from Jefferson High School.  And I have a Bachelor's degree of
19  science in nursing from East Texas Baptist University, so I am
20  an RN.  My husband's name is Kent Hall, and he's worked for
21  U.S. Steel in Lone Star, Texas.  He worked there for 40 years
22  as a machine operator and safety guy.  And I have served one
23  time as -- on a criminal case, that was in 2004.
24          THE COURT:  And where was that, ma'am?
25          JUROR HALL:  In Marion County.
```

1          THE COURT:  Okay.  Thank you very much.

2          Next is No. 17, Mr. Danner.

3          JUROR DANNER:  Hello.  My name is James Danner.  I

4    live in Gilmer, Texas.  I have three children, one deceased.

5    I've worked for Walmart transportation for 19 years out of

6    Palestine, Texas as a commodities relocator specialist.

7    Graduated Gilmer High School and went to Northwest Arkansas

8    Vocational School.  My spouse's name is Patty Danner.  She

9    worked at the First National Bank at the Walmart branch, and

10   she's retired, taking care of the house and me now.  And I've

11   never served on a jury.

12         THE COURT:  All right, sir.  Thank you very much.  If

13   you'll hand the microphone to Ms. Goss, No. 18.

14         JUROR GOSS:  My name is Robin Goss.  And I live in

15   Longview, Texas.  I have two children.  I work for Neiman

16   Marcus as the receiving office manager.  Been there 16 years.

17   Some college.  My husband's name is Troy Goss.  He works at

18   Delek Refinery in Tyler as a refiner technician.  He's been

19   there eight years.  And I've never served prior.

20         THE COURT:  All right.  Thank you.

21         If you'll take the microphone around to No. 19,

22   please.

23         JUROR HUBBARD-SMITH:  My name is Arlene Hubbard-Smith,

24   and I am standing by the way.  I live in Lone Star, Texas.  I

25   have two grown children.  I work for Outreach Health Services

1    as an attendant for a teenage autistic boy, and I've been

2    working with him for about nine years.  I have a GED education

3    at -- plus a year of business school with a diploma in computer

4    accounting.  My wife's name is Paula Smith.  She used to be a

5    pharmacy tech, but she is now disabled.  And I served on a

6    criminal case in Dallas in about 1992.

7           THE COURT:  All right.  Thank you very much.

8           Next is No. 20, Ms. Newton.

9           JUROR NEWTON:  I'm Chastity Newton.  I'm from

10   Marshall, Texas, born and raised.  I have two children, six and

11   seven years old.  I work at Cabot Corporation.  It's here in

12   Marshall.  I've been there for 15 years.  I'm in inside sales.

13   Graduated from high school here in Marshall, Texas.  My

14   husband's name is Bryan Newton.  He's from Marshall, as well.

15   He worked with me for about 20 years, and then he got let go.

16   They had a big layoff two years ago, and so now he's working

17   over in Longview at DXP.  He is a pump mechanic.  He's only

18   been there for two years.  I served once in a criminal case

19   here in Harrison County.  That was about 10 years ago.  And

20   unfortunately, for me, I caught a virus, and I had to be

21   dismissed.  So I don't know what the outcome of that was.

22          THE COURT:  And that's your only prior jury service?

23          JUROR NEWTON:  Uh-huh, yeah.

24          THE COURT:  Thank you very much.

25          No. 21 is next, Ms. Marsh.

1              JUROR MARSH:  My name is Joshlyn Marsh.  And I
2    currently live in Gilmer, Texas.  I have one three-year-old
3    son.  I work as a music teacher in K through first at Pittsburg
4    ISD.  I've worked there for four years, and I graduated from
5    the University of Utah.  My spouse's name is Bradley Marsh.  He
6    works as a salesman for Plantation Shutter Warehouse, and he's
7    worked there about seven years now.  And I've never been
8    selected to serve on a jury.
9              THE COURT:  Okay.  Thank you very much.
10             Next is No. 22, Ms. Clayton.
11             JUROR CLAYTON:  Good morning.  My name is Vicki
12    Clayton.  And I live in Queen City, Texas.  I have one grown
13    son.  I work for Jeff Peace Financial in Atlanta, Texas.  I'm
14    his assistant, and I manage client services.  I've been there
15    ten years.  I have a Bachelor of Arts and Science from Texas
16    A&M University at Texarkana, Texas.  My husband's name is
17    William Clayton.  He works at Walmart.  He's been there about
18    15 years.  My husband and I are both ordained ministers for
19    over 30 years.  And I have never served on a jury before.
20             THE COURT:  All right.  Thank you very much.
21    No. 23 is next, Mr. Taylor.
22             JUROR ALFRED TAYLOR:  Yes, I'm Alfred Taylor.  I live
23    in Hallsville, Texas.  I have two grown adult boys.  My place
24    of employment, I'm a retired teacher.  I taught school for 35
25    years.  I'm currently working part-time in a retail hardware

1   store in Hallsville, Texas.  My educational background, I have

2   a Master's in secondary education from SFA.  My spouse is

3   Beverly Ann Taylor.  She is also a retired school teacher.  She

4   taught for 36 years.  And she is currently retired from

5   Hallsville Independent School District.  My prior jury service,

6   I've been on two juries.  Both were criminal cases here in

7   Harrison County.

8         THE COURT:   How long ago was that, Mr. Taylor?

9         JUROR ALFRED TAYLOR:   The last one was about a month

10  ago.

11         THE COURT:   All right.  And when you taught in the

12  public school system, what subjects did you teach?

13        JUROR ALFRED TAYLOR:   It was industrial technology, it

14  was drafting and electronics, welding, machine shop.

15        THE COURT:   All right.

16        JUROR ALFRED TAYLOR:   All industrial tech classes.

17        THE COURT:   Thank you, sir.

18  Next is No. 24, Mr. Collie.

19        JUROR COLLIE:   My name is Warren Collie.  I live in

20  Gill community which is a Marshall mailing address.  I have two

21  grown adult daughters.  And I'm machinist by trade.  I'm

22  machine shop supervisor at Integrated Power Services in

23  Shreveport, Louisiana.  I've been there for 37 years.  I'm a

24  high school graduate from Bossier City and vocational technical

25  training after high school.  I'm unmarried.  And I served on a

```
 1   jury for Harrison County in a criminal case 26 months ago.

 2           THE COURT:  26 months ago?

 3           JUROR COLLIE:  Yes, sir.

 4           THE COURT:  A little over two years?

 5           JUROR COLLIE:  Yes, sir.

 6           THE COURT:  Thank you very much.

 7   If you'll hand that to Panel Member No. 25, Ms. Kyle.

 8           JUROR KYLE:  Good morning.

 9           THE COURT:  Good morning.

10           JUROR KYLE:  My name is Linda Kyle.  I live in

11   Jonesville, Texas.  I have two grown daughters.  And I work at

12   Little Works in Progress Pediatric Therapy in Shreveport.  I

13   have worked there almost five years.  I went to Humble High

14   School and Massey Business College in Nacogdoches, Texas.  My

15   husband is Richard Douglas Kyle.  He is a contractor, does HSSC

16   audits for various oil and gas companies.  About 25 years ago,

17   I served criminal trial in Nacogdoches, Texas.  I was also on a

18   civil -- selected for a civil trial, but they settled out of

19   court before we heard evidence.

20           THE COURT:  And tell me, does your husband work for

21   himself or does he work for a company?

22           JUROR KYLE:  He contracts with individual companies,

23   so, yes, I guess you'd say self-employed.  He does audits for

24   various plants.

25           THE COURT:  And is it limited to the oil and gas
```

 1   business?

 2           JUROR KYLE:  Yes.

 3           THE COURT:  Okay.  Thank you very much, ma'am.

 4           Next is No. 26, Ms. Roberts.

 5           JUROR ROBERTS:  My name is Alisa Roberts.  I live here

 6   in Marshall, Texas.  I don't have any children.  I'm an

 7   assistant manager and zipline campus tour guide at Gators &

 8   Friends Exotic Petting Zoo in Greenwood, Louisiana.  I've been

 9   there since early February of this year.  I graduated from

10   Sherman High School and have a Bachelor's degree in religion

11   and foreign missions from East Texas Baptist University.  I'm

12   unmarried.  And I have never served on a jury.

13           THE COURT:  Thank you very much.  Next is No. 27.

14           JUROR CASAREZ:  My name is Edith Casarez.  And I live

15   in Marshall, Texas.  I have two baby boys, and I've been with

16   Access Family Health Clinic for over three years now as a

17   medical assistant.  And I graduated from Marshall High School

18   and attended Tyler Junior College.  My husband's name is Miguel

19   Casarez, and he recently started working with Cactus Wellhead

20   in Shreveport, and he's a welder.

21           THE COURT:  What -- what's the name of his business?

22           JUROR CASAREZ:  He works at Cactus Wellhead in

23   Shreveport --

24           THE COURT:  Okay.

25           JUROR CASAREZ:  -- as a welder.  And I've never served

1   before on a jury.

2           THE COURT:  Okay.  Thank you very much.

3           Next is No. 28, Ms. Jones.

4           JUROR JONES:  My name is Misty Jones.  And I'm from

5   Pittsburg, Texas.  I have two adult children.  I work for

6   Guaranty Bank & Trust, and I'm the IT administrative assistant

7   there.  I've been there for almost two years.  I have an

8   Associates of Science.  My husband's name is Michael Jones.  He

9   works for AEP at the Pirkey Power Plant in Hallsville, and he's

10  an electrician.  And he's been there for about ten years, and

11  I've never served on a jury.

12          THE COURT:  All right.  Thank you very much,

13  Ms. Jones.

14          Pass that microphone back to the Court Security

15  Officer, please.

16          Ladies and gentlemen, I need to say a couple

17  additional things to you before I turn the questioning over to

18  the lawyers.

19          The jurors that are selected from this panel to serve

20  in this case will serve in the role of the judges of the facts.

21  And the jurors selected in this case will make the sole

22  determination about what the facts are in this case.

23          Now, my job as the Judge is to rule on questions of

24  law, evidence, procedure, to maintain the decorum of the

25  courtroom, and to oversee hopefully an efficient flow of the

1    evidence during the trial process.

2            Also, I'd like to say a couple things to you about our

3    judicial system that I hope will put things in a proper

4    perspective for you.

5            In every trial like this one, besides the parties

6    themselves, there are always three participants:  The jury, the

7    judge, and the lawyers.  With regard to the lawyers, it's

8    important, I think, for you to understand that our judicial

9    system is an adversary system, which simply means that during

10   the course of the trial, each of the parties through their

11   lawyers will attempt to present their respective cases to the

12   jury in the very best light possible.

13           Now, it's no surprise to any of you that lawyers are

14   sometimes criticized in the public media, but the Court has

15   observed that much of that criticism is due to a basic

16   misunderstanding of our adversary system of justice where the

17   lawyers act as advocates for the competing parties.

18           As an advocate a lawyer is ethically and legally

19   obligated to zealously assert his or her client's position

20   under the rules of our adversary system.  And by presenting the

21   best case possible on behalf of their clients, the lawyers

22   hopefully will enable the jury to better weigh the relevant

23   evidence, to determine the truth, and to arrive at a just

24   verdict based on that evidence.

25           This adversary system of justice has served our

country well for over 200 years, and America's lawyers have
been, continue to be, and will be in the future an integral
part of our justice system.

So as we go forward with the trial, even though it's
possible from time to time I might frown or growl at the
lawyers over the course of the case, it's simply because I'm
trying to make sure that their advocacy doesn't get outside of
the boundaries of our adversary system.

But keep in mind, ladies and gentlemen, the lawyers
are simply doing their jobs in representing their clients, and
I think that that is something that you should be aware of as
we go forward.

Also, ladies and gentlemen, I want you to understand
that over the course of the trial, I'm going to do my very best
to make sure that none of you on the jury have any idea about
what I think about the evidence because deciding what the facts
are from the evidence will be the job of the jury and will not
be my job in this trial.

So during the course of the trial, those of you
selected on the jury, should not take any expressions or
comments or anything else that you see, hear, or think you see
or hear from me as being something for you to consider in your
decision about the ultimate facts in the case.

All right.  At this time, counsel for the respective
parties will address the jury panel.

 1          Mr. Baxter, I understand you're going to represent the

 2  Plaintiffs.

 3          MR. BAXTER:  I am, Your Honor.

 4          THE COURT:  Would you like a warning on your time,

 5  sir?

 6          MR. BAXTER:  Yes, Your Honor.  If you would give me

 7  five and one.

 8          THE COURT:  Five-minute and one-minute warning.

 9          MR. BAXTER:  Yes, sir.

10          THE COURT:  I will do that, and you may proceed.

11          MR. BAXTER:  Thank you, Your Honor.

12          Your Honor, may it please the Court.

13          THE COURT:  You may proceed.

14          MR. BAXTER:  As I've introduced myself to you, ladies

15  and gentlemen, my name is Sam Baxter.  I'm a lawyer here in

16  Marshall, Texas.  I've been here now 48 years, I think.  I used

17  to be back in the old days the district attorney for Harrison

18  County.

19          I think probably I owe an apology to Juror No. 1

20  because I'm the one that brought Steve Cowan to East Texas and

21  tried to train him up.  He didn't train very well.  Are you

22  still working with Steve?

23          JUROR SMITH:  Yes, sir.

24          MR. BAXTER:  Okay.  I was the DA for a long time, and

25  then I sat as the district judge, not here, but in a lesser

1    court down the street in state court.  And eventually, my

2    creditors asked me to leave public service and to try to make a

3    living.  And so I've been practicing law ever since.

4            As Judge Gilstrap told you, this is a patent case, and

5    that's sort of good news and bad news.  And the bad news is

6    that patent cases sometimes are complicated and can be a little

7    dry.  The good news is that in this case, you're going to learn

8    some really interesting things about cell phones and cell

9    towers and how they work.  And when this case is over, you're

10   going to be an expert in how cell phones work, and I think

11   you're going to find it enjoyable.

12           Let me tell you, because Judge Gilstrap said that we

13   had a couple of minutes to kind of tell you about our case, let

14   me tell you that there are five patents in this case.  Four of

15   them I'm going to call cell phone patents because they really

16   have to do with how the cell phone and the tower that we all

17   fuss about, because there's not enough of them, communicate

18   with each other, and it's going to be instructive of -- about

19   how these patents save both battery life on your cell phone and

20   how they make the transmissions quicker and better and more

21   efficient using what you're going to hear a lot more than you

22   want to, bandwidth.  That's four of the patents.

23           Well, one of the patents is a video patent, and it has

24   to do with a complicated way in which they can compress video

25   and make it more efficient.  And once again, save you battery

1    life and bandwidth.  And my partner here, Dr. Burgess, is going

2    to be explaining a lot of that with experts, along with some of

3    my other colleagues.  But you're going to find that

4    interesting.

5            But there are two more facets that I think we ought to

6    talk about very briefly.  And that is a term that I have not

7    heard of before in this case, and that is these four patents,

8    the cell patents, are what are known as standard essential

9    patents.  And that is cell phones have a standard that they

10   follow, and everybody follows the same standard so that all the

11   phones will work with whatever tower it is that they connect

12   with.  And then they can talk to each other.

13           And so there is a body called ETSI, and you're going

14   to hear a lot about that.  And the ETSI group sets the

15   standards.  And phones that practice 4G, which is the current

16   technology, all use exactly the same standard.

17           Four of our patents are what are known as standard

18   essential patents.  And in order to practice the standard that

19   everybody use, we have to use those four patents, along with

20   others.

21           But you're going to hear a lot about that.  I'm not

22   going to go into the detail about the patents, but you will

23   hear the experts tell you how they work and why it is that the

24   Defendants in this case, Huawei, infringe these patents.

25           Now, let me ask you, does anybody know anything at all

 1   about the cell phone -- cell phone company Huawei, it's

 2   actually spelled with an H, it's a Chinese company, and they

 3   sell cell phones here in the United States, which are the

 4   products we're going to be talking about.  Anybody know

 5   anything about Huawei, heard about them in the news, seen their

 6   advertisements, know anything about their phones or might have

 7   a phone?  Anybody at all?

 8          All right.  They're represented by the lawyers over

 9   here.  This is Mr. Smith, he lives here in Marshall.

10          We also have Mr. Young and Mr. Haslam.  And they are

11   with the law firm known as Covington.

12          Anybody know these lawyers -- probably the only one

13   you have a chance to know is Mr. Smith.  Anybody know these

14   lawyers?

15          All right.  Now, let me ask you -- well, how many

16   folks got a cell phone?

17          Okay.  Everybody.

18          Let me ask you if these features are important to you.

19   If they are, raise your hand.

20          Battery life, is that important?

21          Let me ask you about speed of service, is that

22   important?

23          Being able to connect to the Internet, is that

24   important to you?

25          How many folks use their phone to look at something on

1   the Internet, whether it's products or news or Facebook or

2   whatever it is, how many people do that?

3          And do you depend on your phone to do that?  Everybody

4   do that?

5          Is there anybody on the jury panel that knows how to

6   program or work on computers; that is, in your job you're

7   called to program something or you're called to take it apart,

8   or you're like Mr. Moreno over here, you're sort of an expert

9   on making graphics and that sort of thing, anybody at all?

10         Okay.  Is there anybody that in their job is in charge

11  of negotiating contracts or deals with contracts?  Anybody at

12  all?

13         Yes, ma'am?

14         JUROR JONES:  Mine is --

15         THE COURT:  If you'll wait, ma'am, until you get the

16  microphone, please.

17         JUROR JONES:  I do.  Mine is mainly telecom invoices

18  with AT&T, Verizon, those kind of contracts.

19         MR. BAXTER:  And what do --

20         JUROR JONES:  Our executives --

21         MR. BAXTER:  What do you do with them, ma'am?

22         JUROR JONES:  I figure out what the executive wants,

23  and I'll go and get a phone that they need.  And then I fit it

24  in our service desk and to alert us when the contract is up.

25  And I will go back to the executive and let them know if they

1    want an upgrade or not.

2            If it's AT&T, I do the same thing.  And then we go

3    back and renegotiate a price for the phone lines that we have

4    with the company.

5            MR. BAXTER:  Let me ask you, when you engage in those

6    negotiations, is there some give and take in that?

7            JUROR JONES:  With -- are -- are you talking about,

8    like, the price?

9            MR. BAXTER:  Yes, ma'am.

10           JUROR JONES:  Yes, sir, there are -- they can -- they

11   will go lower, yes.

12           MR. BAXTER:  Okay.  So they make you an offer, and

13   then you -- do you counter with some number?

14           JUROR JONES:  I have never had a counteroffer, but

15   they usually -- when they go with a lower price, we usually

16   accept it and go with that.

17           MR. BAXTER:  Okay.  But there's some negotiation, and

18   there's some to and fro'ing?

19           JUROR JONES:  Yes, sir.

20           MR. BAXTER:  And the number starts here, then ends up

21   down here; is that right?

22           JUROR JONES:  Yes, sir.

23           MR. BAXTER:  And if you just say, no, I'm not going to

24   pay that, what happens then?  You never get the phone?

25           JUROR JONES:  Yeah, pretty much.

```
 1                MR. BAXTER:  That's what I need to know.

 2           Who here has negotiated their own contract, and I'm

 3      thinking primarily here about when you bought or sold a house.

 4      Anybody engage in negotiations in real estate about you made an

 5      offer on a house, and they said no, and they made a

 6      counteroffer?  How many people have done that?

 7           All right.  How many people think that the offer that

 8      you make, whether it's a high one or a low one, you're stuck

 9      with it forever, or is that negotiable, depending on what

10      happens with the other side?  Does everybody feel that way?  If

11      you do, raise your hand.  That was such a poor question, nobody

12      understood it.

13           Let me ask it again, just as poorly.  If you're in

14      negotiations about a house, and let's suppose that you're --

15      you're the seller, and you said I want a hundred thousand

16      dollars for the house.  And the prospective buyer says, no,

17      that's too much, I'll pay you 75, and they come down to 85 or

18      they come down to 75, are those numbers -- in effect, once you

19      make that offer, they're not written in stone because you think

20      people will negotiate with you?  Would that be fair?  Is that

21      question any better?  A little bit?

22           All right.  Anybody on the jury panel own any rental

23      property?

24           Ms. Settles, let me ask you.  What you got?

25                JUROR SETTLES:  We have 16 rental houses in the Gilmer
```

 1  area.

 2          MR. BAXTER:  Okay.  Do you have -- I take it you've

 3  got renters?

 4          JUROR SETTLES:  We do.

 5          MR. BAXTER:  All right.  Does there come a time maybe

 6  once in a while when the renter falls behind?

 7          JUROR SETTLES:  Quite often.

 8          MR. BAXTER:  Okay.  And they say, well, I can't pay

 9  this month or I can only pay X or things of that sort, does

10  that happen?

11          JUROR SETTLES:  There's a lot of negotiating.

12          MR. BAXTER:  Okay.  Is there also negotiating on your

13  side, and you can say, well, if you can't pay the $300.00,

14  could you pay 150?

15          JUROR SETTLES:  Constantly.

16          MR. BAXTER:  Okay.  If that happens, Ms. Settles, but

17  they just keep saying no, do you find out sometimes they just

18  kind of drag you out and keep staying in the house and you're

19  trying to be nice and trying to help them out and they don't

20  leave and they don't pay?

21          JUROR SETTLES:  Very true.

22          MR. BAXTER:  Okay.  Is it also true that maybe from

23  time to time you have to resort, unfortunately, to -- to

24  getting somebody like me to help you out?

25          JUROR SETTLES:  It is.

1          MR. BAXTER:  All right.  When you have to -- let's

2    suppose you're suing for back rent.

3          JUROR SETTLES:  Uh-huh.

4          MR. BAXTER:  And the renter hadn't paid in six months

5    and it's 300 bucks a month, they owe you $1800.00, but you had

6    agreed to take just 700 if they'd pay you.

7          JUROR SETTLES:  Yeah.

8          MR. BAXTER:  When you go to court, are you stuck with

9    that 700?

10          JUROR SETTLES:  Usually.

11          MR. BAXTER:  Can you tell them, though, I want you to

12    pay everything you owe?

13          JUROR SETTLES:  You can, but if they can't pay the

14    700, they're not going to pay the 1800.

15          MR. BAXTER:  I understand.  My question to you is:

16    When you go to court and they say, well, she offered me

17    $700.00, so that's -- she's bound by that, can you say no, no,

18    I offered it to you and you wouldn't take it, and so now you

19    have to pay the whole $1800.00 and all the judgment against

20    that?

21          JUROR SETTLES:  Yes.

22          MR. BAXTER:   Is that right?

23          JUROR SETTLES:  I believe so.

24          MR. BAXTER:  Is that what happened?

25          JUROR SETTLES:  We don't ever get it.

```
 1              MR. BAXTER:  Okay.  I got it.  Thank you, Ms. Settles.
 2              Now, who on this jury panel has a deer lease?
 3  Anybody?  Or goes deer hunting?  Anybody at all?  I got --
 4  there we go.  All right.  No. 9.  And you're Ms. Youngblood,
 5  aren't you?
 6              JUROR YOUNGBLOOD:   Yes.
 7              MR. BAXTER:  Okay.  Ms. Youngblood, we've met before,
 8  have we not?
 9              JUROR YOUNGBLOOD:  I don't think so.
10              MR. BAXTER:  Have you been on a jury panel in this
11  court before?
12              JUROR YOUNGBLOOD:  I was not selected.
13              MR. BAXTER:  Yes, ma'am.  Was that in the Abbott case?
14              JUROR YOUNGBLOOD:  It was so long ago, I don't
15  remember.
16              MR. BAXTER:  Okay.  I think I was the lawyer in that
17  case,and I think you were on the panel, and you were too far
18  out of the range.  That's been awhile ago, hasn't it?
19              JUROR YOUNGBLOOD:  It has been awhile, yes.
20              MR. BAXTER:  Yes, ma'am.
21              All right.  Tell me about your deer lease.
22              JUROR YOUNGBLOOD:  There's 700 acres in Dierks,
23  Arkansas.
24              MR. BAXTER:  Okay.  Do you own it or you lease it?
25              JUROR YOUNGBLOOD:  My husband leases it.
```

1            MR. BAXTER:  All right.  Mr. Moreno, can I see my

2    deer -- my deer lease slide, if you don't mind?  I think it's

3    probably No. 8.

4            All right.  So -- I had Mr. Moreno make this slide for

5    us, and it shows the deer and the stand and a sign that says

6    The Baker's Deer Lease, hunting by permission only.  Are you

7    familiar with that sort of concept?

8            JUROR YOUNGBLOOD:  Yes.

9            MR. BAXTER:  Okay.  If, in fact, I show up in Dierks,

10   Arkansas, with my little 22 rifle and I want to go out there

11   and go deer hunting but I don't have a permit -- that is, I

12   haven't paid my license fee -- you think I ought to be out

13   there in that deer stand to your exclusion?

14           JUROR YOUNGBLOOD:  No.

15           MR. BAXTER:  If you've paid for it, you get to be on

16   the property, right?

17           JUROR YOUNGBLOOD:  Correct.

18           MR. BAXTER:  And if I don't pay for it, I need to stay

19   off?

20           JUROR YOUNGBLOOD:  Correct.

21           MR. BAXTER:  Is that how a lease works?

22           JUROR YOUNGBLOOD:  Yes.

23           MR. BAXTER:  Is that how a license works?  You, in

24   effect, have a license to be on this property?

25           JUROR YOUNGBLOOD:  Correct.

```
 1              MR. BAXTER:  Okay.  Thank you, Ms. Youngblood.
 2   Now, who on the jury panel has had any experience with
 3   licenses, not driver's license, but a license to do something,
 4   like a deer lease, anybody at all?  Anybody got that?  All
 5   right.
 6              Now, my client, PanOptis, who is in Dallas, Texas, is
 7   a company that owns a lot of patents, and they've gone out in
 8   the marketplace, and they have bought patents from the
 9   high-tech companies, Ericsson, Panasonic, LG.  And they have
10   put those patents into families, cellular families.  And they
11   then, on behalf of themselves and the companies that they
12   bought these patents for, go out into the marketplace and have
13   license negotiations with companies.
14              Anybody got a problem with that?  Does that sound like
15   a good model?  Raise your hand.  Okay.
16              Anybody ever had -- applied for a patent?  Anybody
17   know anybody who's applied for a patent?
18              Yes, ma'am, No. 16.
19              JUROR HALL:  My uncle many, many years ago, probably
20   40 years ago applied for a patent, and that's all I know.  I
21   know he had a patent, but I have no idea what it was for.
22              MR. BAXTER:  Okay.  How many people -- and I'm going
23   to ask somebody specifically in a minute, how many people think
24   there are too many lawsuits in this world and way too many
25   lawyers?  I'm surprised it's not unanimous.  I'd raise my hand
```

1    on that one.

2          All right.  Let me -- let me go back to No. 24, if you

3    don't mind, Mr. Collie.

4          Tell me your feeling about lawsuits.

5          JUROR COLLIE:  I -- I -- now, naturally, I do agree

6    that they are very necessary and very important things to

7    protect -- that protects us, protects us from, you know, people

8    taking our things or our ideas.  However, I do feel like that a

9    lot of them, especially in civil cases, are what I would deem

10   frivolous, or, you know, they -- they -- they attack the

11   obvious.

12         MR. BAXTER:  Okay.  Is that in the patent field or is

13   that more in the I hurt my neck in the car wreck?

14         JUROR COLLIE:  I would say more in the personal injury

15   and I hurt my neck in the car wreck type.

16         MR. BAXTER:  Sometimes maybe -- as my son says, I just

17   overstated my case; is that right?

18         JUROR COLLIE:  Yes, sir.

19         MR. BAXTER:  In the patent field, do you have any

20   problem with someone enforcing their patent rights?

21         JUROR COLLIE:  No, sir.

22         MR. BAXTER:  All right.  Thank you very much,

23   Mr. Collie.  I appreciate it.

24         Ms. Youngblood, I'm going to ask you again, if you

25   don't mind, please, because I noticed on your questionnaire

1    that you said that you had some reservations about the patent

2    system or patent law or patent lawsuits.  And I don't know

3    whether I changed it in that Abbott case or not, but tell me

4    what your -- what your feelings are.

5         JUROR YOUNGBLOOD:  If someone has a patent, I really

6    feel like they shouldn't be infringed upon.

7         MR. BAXTER:  Okay.  You don't have any problem with

8    somebody coming to court if, in fact, someone is using their

9    technology; is that right?

10        JUROR YOUNGBLOOD:  No.

11        MR. BAXTER:  Okay.  Now, let me ask you this.  If

12   someone -- you own a piece of property -- I'm going to ask

13   everybody, Ms. Youngblood, thank you.

14        If you own a piece of property and somebody comes on

15   your piece of property and starts drilling for oil or gas and

16   by golly hit it, and you didn't give them permission to do it,

17   and they're taking your oil and gas, beside writing them a

18   nasty letter or talking to them in a mean kind of way, what are

19   you to do in order to get some recompense about them coming on

20   your property?  Or in your case, Ms. Settles, they just move in

21   your house.

22        Go ahead and give her the microphone.

23        And as long as I've got you there, Ms. Settles, and

24   since you're used to some of this, what -- what are to you do

25   when someone just camps out in your house and says, you know,

```
 1    it was empty, and I needed a roof, and so I'm here?  What --
 2    what -- and you politely ask them to leave and they just say
 3    no, I'm here?
 4              JUROR SETTLES:  You hire some legal representation.
 5              MR. BAXTER:  You've got to go --
 6              JUROR SETTLES:  You have to have someone who can back
 7    you up.
 8              MR. BAXTER:  Would the same be true, Ms. Settles, in a
 9    patent lawsuit if you feel like that you have technology
10    that -- that you own and then somebody is infringing or using
11    your license or using your technology, and they're not paying
12    for it?
13              JUROR SETTLES:  That would be your property just as
14    much as a home or --
15              MR. BAXTER:   Any problem about coming to court with
16    that?
17              JUROR SETTLES:  No.
18              MR. BAXTER:  Okay.  Nothing you would see wrong with
19    that?
20              JUROR SETTLES:  No.
21              MR. BAXTER:  All right.  Now, let me ask you this:
22    Let's suppose, unfortunately, one day somebody breaks into your
23    house and steals a gun.  And they go down -- where do they go
24    down to, Mr. Moreno, do you have that slide?
25              We took this one yesterday.  And they go down and they
```

1    pawn the gun.  And they get down here at the Marshall pawnshop,

2    and they sell the gun for 10 percent of its worth.  Let's say

3    it's a really nice Remington shotgun, and it's worth about a

4    thousand bucks, and they sell it to for a hundred.  And your

5    gun gets sold to somebody else, and you can't find it, but you

6    finally catch the burglar.  And the burglar says, well, okay,

7    yeah, I got your gun, but I only got a hundred dollars for it.

8           Now, how many people think that when it comes time for

9    restitution that all he's got to pay is the hundred dollars

10   back that he got from the pawnshop?

11          How many people think that he ought to pay a thousand

12   dollars back and maybe more because he broke the window coming

13   in your house, that he ought to pay it all back?

14          Okay.  Now, I'm going to show you some patent terms,

15   and I'm going to ask you your familiarity with them.  And tell

16   you that I think you're going to hear a lot more about them in

17   this trial.

18          And the first one we've talked about, which is

19   infringement, and does everybody understand that infringement

20   means that somebody owns a patent and somebody else is using

21   that technology, and, therefore, they infringe the patent?

22   Everybody understand that?

23          Here's the next term, and that's validity, and you're

24   going to hear, I think, in this case that one of the defenses

25   that Huawei has is they're going to say that one or more of our

1    patents are invalid.

2           Well, what happens is, is that people apply for

3    patents, and these patents that came from Ericsson or

4    Panasonic, they have experts that make these applications, and

5    they go to the Patent Office, and you're going to hear about

6    some of the to'ing and fro'ing with the Patent Office, but

7    eventually, the Patent Office grants a patent.

8           And Judge Gilstrap, I believe, is going to tell you

9    that if a patent is granted in the United States, then it is

10   presumed, and you will presume it as the jury for it to be

11   valid.  Anybody got any problem with that?

12          Now, oddly enough, though, one of the things that can

13   happen in a patent trial is the Defendant can say, well, maybe

14   I infringe it, but it's not really valid, and you shouldn't

15   have gotten it.  And the Patent Office made a mistake.

16          And that is when a new burden of proof is going to

17   click into this case that Judge Gilstrap has already told you

18   about of which you're going to hear a lot more about, which is

19   clear and convincing evidence.

20          And can you get that slide up for me, Mr. Moreno?

21          And clear and convincing evidence is a burden of

22   proof.  Remember, he told you that the statue of justice has

23   balanced scales, and it's the moving party's obligation, that's

24   us, to prove to you that the patent is infringed by a

25   preponderance of the evidence.  And if you were to stack BB's

1   on those scales and just remove one and put it on the other

2   side, those scales would tip ever so slightly.  And that's the

3   burden we have.

4           But when a Defendant says that a patent that is

5   presumed to be valid is not, then Judge Gilstrap, I believe, is

6   going to tell you that the burden is clear and convincing

7   evidence.

8           Let me tell you where you might have heard that in the

9   past.  If the State of Texas wants to remove children from your

10  home, or anybody's home, the burden that the State has in order

11  to take children is clear and convincing.

12          And I think that Judge Gilstrap's going to tell you at

13  the end of the day that it's an abiding conviction that the

14  truth of the party's factual contentions are highly probable,

15  and such evidence requires a higher standard of proof than

16  proof by a preponderance of the evidence.  And because they're

17  going to say that all the elements of our patent are met by

18  something called prior art that we'll be talking about in a

19  minute, they have to prove each and every one of them by the

20  standard that goes like that.

21          Now, if you're on this jury, can everybody hold the --

22  hold us to our burden of preponderance of the evidence, which

23  is tilting those scales ever so slightly, but also hold the

24  Defendant to this clear and convincing standard in which

25  they've got to mightily tip the scales.  Can everybody do that?

```
 1              And Judge Gilstrap is going to explain it to you, and
 2      it will be a lot clearer when he does.
 3              Now, I want to talk to you just a moment.
 4              Can you go back to that slide, that -- that patent
 5      terms, Mr. Moreno?
 6              The next term on that term is prior art, which is
 7      you're only going to hear in a patent case, and it's not really
 8      art, it's not a painting or a sculpture tour or anything, it's
 9      a publication, and the Defendants are going to say, well,
10      there's a publication that told you how to do it.  And that's
11      what prior art is.
12              We talked about these standard essential patents,
13      which is what four of these patents are.  So in order to
14      practice the 4G standard, which is what all of these phones
15      practice now, you've got to have standard essential patents,
16      and you're going to hear that four out of our five are standard
17      essential.
18              And then you're going to hear this last term called
19      FRAND.  And what happens is, is that when you have a standard
20      essential patent, that you go to these standardization bodies,
21      and they say, look, in order to do this cell phone work, you'll
22      need these patents, and they say, yes, that's right.  That
23      means that I, as the owner of that patent, must license it to
24      anybody that want it, as long as I get a fair price, and it's
25      reasonable, and I don't discriminate against anybody, and
```

1   that's called FRAND.  And you're going to hear in this case

2   that we're asking for a FRAND rate on four of the patents, but

3   a slightly different rate on the video patent.

4           Now, let me talk to you about damages just a moment.

5           And can I get up the slide, Mr. Moreno, that is trees?

6           THE COURT:  You have five minutes remaining, counsel.

7           MR. BAXTER:  Thank you, Your Honor.

8           Now, I want you to assume just a moment that this is

9   your property, and you own it, it's been in the family for a

10  hundred years.  And what you did is take the kids out there

11  when they were little and picnic and enjoy nature, and you just

12  love that property.

13          But, unfortunately, one day you decide to take a

14  two-week vacation and go to Florida.  And you go to the beach

15  and you have a good time.  And you have come home, and here's

16  what you find.

17          It's not a good day.  Somebody has come on your

18  property while you were gone and cut all your trees down.  And

19  you find out who it is, and you contact them, and you're not

20  very happy about it.  And after sort of expressing amazement

21  that they could come on your property and cut those trees while

22  you're gone, you start talking about how they're going to

23  compensate you for what they've done.

24          And their excuse is, well, we're sorry, we didn't

25  realize it was your property.  We thought it was somebody

1   else's.  And we had a timber deed.  And we cut those trees

2   down, and we're sorry.  And tell you what we're going to do to

3   express our sorrow to you, we're going to pay you for every

4   other tree we cut down because it was a lot of work, and we had

5   to get bulldozers in there and a lot of folks with chainsaws

6   and log trucks and we had to build roads.  And so we're just

7   going to pay you for 50 percent of your trees.

8          How many people say, that's a great deal, I'll be

9   taking that?  Anybody?

10          Well, you negotiate with them a while longer, and you

11   say -- they say, well, I tell you what, just as a show of good

12   faith, I'm going to pay you for 75 percent of those trees.  How

13   many say, deal?

14          Who's going to say I would like for you to pay for

15   every single tree you cut down and for the damage to my

16   property, so you're going to pay me more than a hundred percent

17   for the trees?  Who's going to say that?

18          Who all thinks that that's a fair attitude to take?

19   You see anything wrong with getting full value from property

20   that's been taken from you?  Anybody have any problem with that

21   at all?

22          Well, in a patent case, there's not much difference.

23   We're going to allege and have alleged and we're going to prove

24   that the Defendants, Huawei, the phone company, has, in fact,

25   taken our intellectual property and are using it.  And we've

put them on notice that it was ours.  We put them on notice how

they were taking it.  There were negotiations going back and

forth.  And at the end of the day, they simply refused to pay a

fair price for what they'd taken.  They wanted to pay for

something much less.

So is anybody going to have any problem when we come

into court with a damage expert and says we want full value --

full value for the property you've taken?  Does that cause

anybody any problem?

Now, let me tell you without telling you the exact

number, at the end of the day, it's going to be somewhere

around $10 million.  In a patent case, that's not very large.

But it's very important to us.  And it's important that

companies respect intellectual property and that companies,

when they use it, pay for it.

Does anybody have any problem with that at all?  Is

there anybody say, well, you just should have taken their

number?  They offered you something, and you didn't have to

come to court and get all these lawyers involved and drag me

away from my job to settle it.  Anybody feel that way?

THE COURT:  One minute remaining.

MR. BAXTER:  Thank you, Your Honor.

Does everybody feel that they can sit and listen to

the evidence, and if the evidence justifies a damage finding of

somewhere around $10 million, that you can award that to my

1   client if, in fact, we've proved they've taken and used our

2   intellectual property?  Anybody have a problem with that at

3   all?

4           If not, Your Honor, I thank you for your time, and I

5   appreciate your patience.

6           THE COURT:  All right.  Defendants may now address the

7   panel.

8           Mr. Smith, would you like a warning on your time?

9           MR. SMITH:  Yes, Your Honor.  If I could have five

10  minutes and one minute also.

11          THE COURT:  That will be just fine.  You may proceed.

12          MR. SMITH:  Thank you, Your Honor.

13          Ladies and gentlemen of the jury, on behalf of Huawei,

14  we appreciate your service this week.  We appreciate your being

15  here.

16          His Honor told you that today is the latest day in a

17  tradition that goes back thousands of years of -- of citizens

18  coming in and acting as jurors on disputes that are brought to

19  them by people.  So we're happy to be here today and presenting

20  our case to you.

21          I want to start out by -- you've answered all the

22  questions.  His Honor answered them.  Mr. Baxter told you a

23  little about himself, so let me just tell you a little bit

24  about myself as well.  Mr. Baxter is correct, I am from

25  Marshall.  I grew up here.  I actually grew up across the

1   street from Mr. Baxter over on West Burleson awhile back.  I

2   have three children, one in college, and two that are in high

3   school.  I've been at my current job for 10 years.  I've been

4   practicing law for 26 years.  I left Marshall to go to college

5   in Commerce at East Texas State, which now A&M Commerce.  It

6   also had A&M Texarkana back then.  And ended up going to Baylor

7   Law School before I came back.  My wife's name is Jamie Smith.

8   She's our Harrison County Treasurer, and she's been in that job

9   for 24 years.  And for some reason, I've never served on a

10  jury.  I was called one time, and they didn't want me for some

11  reason.

12          I want to tell you a little bit about this case, but

13  I'm not going to talk to you about the technical side of it at

14  this time.  Mr. Baxter gave you a little bit on that, and we'll

15  talk about that once we get in the case.

16          There are two things I want to focus on that you've

17  already heard about, but your job in this case, I think, is

18  going -- a big part of it is not going to be talking about,

19  well, here's what all the details of the technology is.  It's

20  taking what you learned from that evidence and deciding the

21  answers to the questions that the Court's going to ask you on

22  that verdict form at the end of the case.  And there are two

23  that I want to talk about.

24          The first thing is you're going to be asked -- it is

25  like a trespass case.  And the slides that Mr. Baxter put up

 1   of -- of talking about property lines and cutting trees and --

 2   and deer leases, that's all exactly right.  That's what this

 3   is.  It's a property case.  But the first rule in a property

 4   case is did you come onto the land?

 5           Ms. Settles, you have rent -- rent property.  We've

 6   talked about that previously.  Do you try to collect rent for

 7   people who aren't renting your houses?

 8           JUROR SETTLES:  No.

 9           MR. SMITH:  No, of course, not.  Thank you very much,

10   Ms. Settles.

11           The first issue -- there are two important issues I

12   want to talk about briefly, and the first is infringement.

13   They have to show that we're using what is in the patents, and

14   we believe that when you hear the evidence from the witnesses

15   there, when you see the evidence that comes in on the screens

16   and the paper evidence, that you'll see that we're not actually

17   doing what's in the patents that they bought and they're

18   asserting here.  We're doing something else.

19           The second question is an even more important one.  We

20   all agree that if somebody comes on your land and they're

21   squatting in your house, if they cut down your timber, all

22   that, that you deserve recompense.  You deserve to be able to

23   come into court, as the Plaintiffs have today, and put their

24   case in front of a jury.

25           But Mr. Baxter said let's assume that this land

 1   belongs to you.  And he's correct, we are going to start out

 2   this trial by assuming that these patents are valid, but we're

 3   going to put on evidence before you that causes you to

 4   understand that this was actually invented by someone else, the

 5   patents are not valid.

 6          So that's the summary of the issues I want you to be

 7   watching for.  Is there actually infringement?  And are the

 8   patents actually valid?

 9          Now, let me -- with that background, let me ask --

10   start asking some questions.

11          You've already been asked, does anybody know about the

12   computers and the Internet?  And I have a slightly different

13   question.

14          When you're visiting with your family or you're

15   visiting with your friends, and somebody says, well, I don't

16   know how to get something to work on a computer or on my phone

17   or something, are any of you the person that says, oh, wait,

18   let me help you with that, I think I know how to do that.  Or

19   your friends point to you and say, oh, Ms. So-and-so over here,

20   she knows how to do that.

21          All right.  Mr. Collie, tell us about that.

22          JUROR COLLIE:  Well, I just -- I always had a pretty

23   good understanding of how, you know, applications and programs

24   work.  And I've just always been that guy.  Maybe my friends

25   are not that smart.

```
 1          MR. SMITH:  Okay.  Thank you very much, Mr. Collie.
 2  Anyone else like that, you're the person that gets to answer
 3  that?
 4  Okay.  Ms. Wooldridge, tell me about your expertise there.
 5          JUROR WOOLDRIDGE:  My dad is an older gentleman.  I'm
 6  usually the one to help him deactivate his do not disturb on
 7  his phone so that he can hear his wife calling him.  I also did
 8  just get back from Walmart's home office testing updates to
 9  computer systems that we use in the pharmacy.  Though I didn't
10  have anything to do with the actual programming, I did test the
11  new releases on the builds to find bugs, write out bugs, and
12  attempt shortcuts and recreate situations in the real world so
13  that they could put out a good product.
14          MR. SMITH:  Okay.  Thank you very much, ma'am.
15          Let's hop over to the law.  Anyone on the jury panel
16  have any experience with the law?  I understand that you work
17  for the courts in Daingerfield, Ms. Smith.
18          JUROR SMITH:  Yes, sir, I do.
19          MR. SMITH:  But other than you, is there anyone else
20  that has worked in a law office for a court, has some
21  experience working around the legal system?
22          Okay.  Ms. Kyle, what's your experience in that
23  regard?
24          JUROR KYLE:  Many years ago, 25 years ago, I worked in
25  a probation department, and I also worked for private civil
```

1   attorneys for 11 years.

2            MR. SMITH:  Okay.  Thank you very much, ma'am.

3            Does anyone -- before you came in here today, did

4   anyone have any other knowledge through your work about patents

5   or trademarks or copyrights?

6            Okay.  Yes, ma'am, Ms. Deslatte?

7            JUROR DESLATTE:  You were right the first time, thank

8   you.

9            Well, many years ago, I worked for about 20 years at

10  Eastman Chemical in engineering and the art -- in the research

11  and development, and some of the research we did became -- you

12  know, was developed into patents.  I don't know that -- I

13  didn't do any applications myself or anything, but we were

14  doing technology research.

15           MR. SMITH:  All right.  Thank you very much,

16  Ms. Deslatte.

17           I wanted to ask the same question Mr. Baxter asked

18  about the Plaintiffs' counsel in this case.  Does anyone know

19  anyone on the -- on the Plaintiffs' counsel's team?  I believe

20  Mr. Baxter you've heard from, Ms. Jennifer Truelove, Ms. JoAnne

21  Garrett Bayliss, Mr. Todd Parrish in the gallery, does anybody

22  know Mr. Baxter or -- or any of the other people.

23           Let me ask a broader question.  Oh, I'm sorry, oh,

24  yes, sir.  Mr. Danner?

25           JUROR DANNER:  Yes, I haven't seen him since high

```
 1   school, but I went to school with Todd Parrish.

 2           MR. SMITH:  Okay.

 3           JUROR DANNER:  Years ago.

 4           MR. SMITH:  Okay.  Thank you very much, Mr. Danner, I

 5   appreciate that.

 6           Does anyone on the jury know anyone else in the

 7   courtroom before today, anyone on the jury panel, any -- anyone

 8   else?

 9           Okay.  Let's starts on the first row, Ms. Smith,

10   who -- who did you recognize?

11           JUROR SMITH:  Well, I'm familiar with her.

12           MR. SMITH:  Okay.  That's Ms. --

13           JUROR SMITH:  Jaime.  Jaime, yes.

14   Okay.  Thank you.

15           JUROR SMITH:  And, you know, she -- she was a

16   neighbor while I was in Hallsville.

17           MR. SMITH:  Okay.

18           JUROR SMITH:  I think that's the only one.

19           MR. SMITH:  Thank you, ma'am.

20           Who's next that knows someone?  We're going to work

21   our way down the aisle here.

22           JUROR SETTLES:  I know Juror No. 21 from church.

23           MR. SMITH:  Oh, okay.  Thank you very much, ma'am.

24           I think Ms. Boyd, you knew someone?

25           JUROR BOYD:  I do.  I know the Judge.
```

1          MR. SMITH:   Oh, okay.

2          JUROR BOYD:  I work for his wife.  I'm sorry.

3          MR. SMITH:  Okay.  Thank you very much, ma'am.

4          JUROR BOYD:  Okay.

5          MR. SMITH:  I -- I appreciate that.

6          Second row, anyone know anyone here before -- oh,

7    No. 4, thank you, Mr. Read?

8          JUROR READ:  Yes just being with Marshall all my life,

9    I'm just familiar with some of the faces in here.

10         MR. SMITH:  Okay.  Do -- do you know --

11         JUROR READ:  Not personally.

12         MR. SMITH:  Do you just know who someone is?

13         JUROR READ:  I've had a hair salon since '86 so some

14   of the people that came in.

15         MR. SMITH:  Okay.

16         JUROR READ:  In my business.

17         MR. SMITH:  Okay.  Thank you very much, sir.

18         Any -- anyone on the second row know someone else in

19   the courtroom?

20         Okay.  How about the first row in the gallery here?

21         Okay.  Ms. Hall, who do you know?

22         JUROR HALL:  I know Larry Nance.

23         MR. SMITH:  Okay.

24         JUROR HALL:  We're Jefferson people.

25         MR. SMITH:  Okay.  Anyone else on the first row?

```
 1              Second row?

 2              Ms. Marsh?

 3              JUROR MARSH:  I know Juror No. 2 from church.  And

 4    also, I taught Juror No. 12's daughter from school.

 5              MR. SMITH:  Okay.  Thank you very much.

 6              Where did you -- what did you teach her?

 7              JUROR MARSH:  Band.

 8              MR. SMITH:  Oh, okay.  Thank you very much.

 9              Anyone else on that row?

10              And I don't see any other hands on that.

11              I want to talk about large companies for a minute.

12    You already know what Huawei is.  It's a Chinese company that

13    is involved in telecommunications around the world.  And you're

14    going to hear a little bit more about that.

15              And I want to ask you questions about large companies

16    and your -- your opinions on that.

17              Remember, the Court said during his instructions that

18    we're -- what we're looking for -- for this system to work is

19    fair and impartial jurors, so I want to ask your opinions on

20    some things.

21              Some people think that you just can't trust large

22    companies.  Some -- and other people don't feel that way.  I

23    want to know, is there anybody on the jury that just feels

24    strongly you just can't trust a company that's large?  Anybody

25    on the front row that feels that way?
```

1          Anyone on the second row, just has the opinion you

2     can't trust companies?

3          How about the third row?

4          And in the back two rows?

5          Thank you very much.

6          Does anybody have an opinion that large companies, by

7     their nature, are unethical for some reason?  Anybody have that

8     opinion?

9          Anyone on the front row?

10         Ms. Smith, do you have an opinion one way or the other

11    about that or -- or does it depend on the facts?

12         JUROR SMITH:   It just depends on the facts.  I have a

13    problem with trust with anybody.  Just working in the judicial

14    system, you know.

15         MR. SMITH:  Okay.

16         JUROR SMITH:  You see different things every day.  So,

17    you know, you have to get your facts first.

18         MR. SMITH:  Okay.  Thank you very much, Ms. Smith.

19         Let me -- let me follow along with that.

20         Anyone in the gallery have -- have -- let me go back

21    and ask -- ask a -- ask a different -- the question a little

22    differently.

23         How many people would agree with a statement that

24    corporations put profits over ethics as a general statement?

25    Anybody on the front row?

1          Ms. -- Ms. Deslatte, let me -- let me catch you, if I

2     could.  Tell me what you think about that.

3          JUROR DESLATTE:  I don't know about if it's above

4     ethics, but I think that corporations are for profit.

5     That's -- that's the function of the corporation is to make

6     money for their stockholders.

7          MR. SMITH:  Okay.  Thank you very much, ma'am.

8          Now, let me talk a little bit -- start focusing more

9     on different types of corporations.

10         How many people -- I mean, we see things on the news

11    these days, and I want to ask you your beliefs about this.  How

12    many of you believe that foreign corporations are hurting

13    America's economy?  Anybody on the front row believe that

14    foreign corporations are hurting America's economy?

15         Mr. Lobdell, let me ask you about that.  Do you have

16    any -- any feelings about that or...

17         JUROR LOBDELL:  I don't -- they're not purposely going

18    out of their way to hurt America's economy.  They're a

19    corporation, maybe a foreign corporation, it's their job to

20    make money.  It's their job to compete.

21         MR. SMITH:  Does it matter to you whether it's an

22    American corporation or a foreign corporation?

23         JUROR LOBDELL:  Not -- well, as long as they're

24    following the law, no.

25         MR. SMITH:  Thank you very much, sir.

1              Second row, anybody have the -- the belief that

2     foreign corporations are hurting America's economy?

3              And the reason I'm asking that is that Courts -- as

4     the Court said, we're trying to get fair and impartial jurors,

5     and we all come into those -- through those doors into the

6     courtroom with different opinions and different beliefs.  And

7     that's fine.  You're -- you are absolutely entitled to your

8     beliefs.  But I need to know what those beliefs are as they

9     pertain to the issues in this case in the same way that you

10    would want to ask me about my beliefs if I were in your

11    position.  I want to ask you what your beliefs are about that.

12             On the second row there, Ms. Fennell, I see you

13    shaking your head, tell me what you think about that.

14             JUROR FENNELL:  Okay.  Well, I'm from Southern

15    California.  So I have a different view of cultural diversity.

16    I grew up with many different mom and pop stores, and -- and it

17    was honored out there, but when Walmart came in, it wasn't

18    welcome as much because they took over a lot of the mom and pop

19    locations and just knocked them out of the business.

20             But coming here to Gilmer, where there was no mall or

21    anything else, I learned to enjoy Walmart, so it doesn't affect

22    me as much as it used to when I lived in California.

23             MR. SMITH:  All right.

24             JUROR FENNELL:  Did you understand that?

25             MR. SMITH:  Thank you very much, ma'am.

1          Let me ask the same question moving down here in the

2     third row.  Anyone have any beliefs on whether foreign

3     corporations are hurting the American economy?  On the first

4     row there?

5          Mr. Morris, let me ask you about that, do you have

6     any -- you've worked in a -- in a variety of locations.  Do you

7     have any beliefs about -- about foreign corporations?

8          JUROR MORRIS:  No, I don't.

9          MR. SMITH:  Okay.  Thank you very much, sir.  I -- I

10    appreciate that.

11         And on the next two rows, same question?

12         Okay.  Yes, ma'am, Ms. Kyle?

13         JUROR KYLE:  It is my personal belief that foreign

14    corporations, particularly China, does steal technology from

15    the United States, for instance, cell phones, et cetera.

16    That's just my personal opinion.

17         MR. SMITH:  Okay.  And would that personal opinion be

18    something that you would bring into the jury service with you,

19    or would you be able to follow the evidence in this case and

20    find out if that's actually correct or not?

21         JUROR KYLE:  I believe I could follow the evidence.  I

22    think in a particular case that I would -- only what's

23    presented would be considered.

24         MR. SMITH:  Okay.  Thank you very much, Ms. Kyle.

25    I -- I appreciate your -- your candor.

```
 1            Now, let me ask some questions drilling down a little

 2   bit more.  Does anyone here on the panel know someone who was

 3   born in China?  Have an acquaintance or have a friend that was

 4   born in China?

 5            Does anyone here --

 6            THE COURT:  Well, let me ask, ladies and gentlemen, if

 7   you're going to raise your hand, raise it all the way.  I'm

 8   seeing a lot of hands that go about shoulder high that I don't

 9   think the lawyers are able to see with the people sitting

10   around you.  So if you're going to raise your hands, please

11   make sure you raise them above your heads so that everybody

12   will have an opportunity to see you're raising your hand.

13            I'm sorry, go ahead, Mr. Smith.

14            MR. SMITH:  Thank you, Your Honor.

15            Okay.  Let me ask that question again.  Does anyone

16   know someone who was born in China?

17            Yes, Ms. Marsh?

18            JUROR MARSH:  I've had flute students who were Chinese

19   born.

20            MR. SMITH:  Do you know if they were born on the

21   mainland or in Taiwan?

22            JUROR MARSH:  I couldn't tell you.

23            MR. SMITH:  Okay.  Is there anyone on the panel that

24   it makes a difference to you whether someone is from mainland

25   China, the People's Republic of China, or Taiwan?  Does anyone
```

```
 1   see a -- is there a distinction between those two locations

 2   that matters to anyone on the panel?

 3   Ms. Marsh?

 4          JUROR MARSH:  Sorry.  It doesn't really matter to me,

 5   but from my experience, it has mattered to the people who were

 6   from the different parts.

 7          MR. SMITH:  Thank you.

 8          JUROR MARSH:  Not to me personally.

 9          MR. SMITH:  Thank you very much.

10          But -- but other people on the panel, there's not a

11   reason you would distinguish between whether they were from the

12   People's Republic of China on the mainland or from Thailand?

13          Okay.  Thank you very much.

14          His Honor observed the history of the jury system that

15   we follow, and what we're doing right now is a process called

16   voir dire.  It comes from an old French word that means to

17   speak the truth.  And the reason we're asking you these

18   questions is to find out what your attitudes and what your

19   beliefs are to see if they affect your ability to be a fair and

20   impartial juror on this case.

21          The question I want to ask now is does anyone here

22   have a negative impression of Chinese companies as you come in

23   today?  As you come in, you already have a negative impression?

24          And, Ms. Kay (sic), you've already expressed your

25   opinions, and I appreciate that again.
```

```
 1            Anyone on the front row have a negative opinion as you
 2    come in today about companies from China?
 3            Second row, anyone have any -- any opinions --
 4    negative opinions about companies from China?
 5            And third row, on the gallery?
 6            And then the -- other than what we've already heard on
 7    the next two rows?
 8            Okay.  Now, what we -- what we're going to have -- oh,
 9    I'm sorry, yes, sir, Mr. Collie?
10            JUROR COLLIE:  I -- I just -- I tend to agree with
11    Juror 25 that -- that U.S. patents mean typically nothing to
12    Chinese corporations.  They -- they ignore them.  They mean
13    nothing.  It's not their law.  And when they come over here,
14    they should -- you know, they should have to abide by it.
15            MR. SMITH:  Okay.  Does anyone agree with Mr. Collie?
16    Anyone on the front row agree with Mr. Collie's opinion on
17    that?
18            Anyone on the second row agree with that opinion?
19            I mean, that's very important to me.  I need to
20    know -- and I appreciate Mr. Collie telling us that, because
21    that's what I need to know, if that view is shared by other
22    jurors so that we can discuss that and take that into
23    consideration.
24            Is there anyone in these first two rows that feels the
25    way Mr. Collie does?
```

1              How about in the third row?

2              All right.  Ms. -- Ms. Hall, you're -- you're shaking

3      your head.  Tell me what you think about that.

4              JUROR HALL:  I think our world is equal -- an equal

5      opportunity for everybody.  And in the United States, a lot of

6      our technology comes from other countries.  So if we didn't

7      have those input in there and listen to it, then we wouldn't be

8      what we are today.

9              MR. SMITH:  All right.  Thank you very much, ma'am.

10             The next question I want to ask is clearly, you

11     already know that the case that we're going to be here for the

12     next week on deals with an American company and a Chinese

13     company.

14             Now, the way I think about this is if I were on the

15     jury panel and it was the Dallas Cowboys against the Washington

16     Redskins, I could not -- I've got an -- I've got an interest

17     there.  I've got an opinion there, and I couldn't set it aside.

18     And I couldn't be fair to that other team.  So that's what I

19     want to know.  As you come in here today, is there someone who

20     thinks, well, I'm going to -- I'm going to -- the American

21     company is going to start out a little ahead.  The Chinese

22     company is going to start out a little bit behind just because

23     of where they're from.  Because if you have that belief, I

24     really want to know about it.

25             Anybody on the front row that would start my client

1    back a little bit?

2             Yes, ma'am, Ms. Deslatte?

3             JUROR DESLATTE:  Just in general, I will choose

4    something that's U.S.-made or U.S.-originated.

5             THE COURT:  Hold the microphone a little closer,

6    please.

7             JUROR DESLATTE:  I'm sorry.

8             I would choose a U.S. company if I had a choice

9    between two products and one was a -- a U.S.-made and one was

10   Chinese or any other country's, I would choose the U.S.  That's

11   all.  I guess I have somewhat of a bias.

12            MR. SMITH:  Would that -- if you were -- if you were a

13   juror in this case, could you follow the Court's instructions

14   and start the parties out even?

15            JUROR DESLATTE:  I -- I would listen -- yes, I believe

16   so.

17            MR. SMITH:  It -- thank you very much, Ms. Deslatte.

18   I appreciate that.

19            Is there anyone that feels differently from

20   Ms. Deslatte, you -- you would not start the parties out even

21   because of what you already know about who the parties are?  I

22   don't see any hands there.

23            Let me ask this one -- one last time a little

24   different way.

25            His Honor referred to the Scales of Justice and the

 1    statue that sits in the center of the courtroom is Lady

 2    Justice.  And you'll notice she wears a blindfold.  And that's

 3    a symbol.  It's a symbol of justice being impartial.  All

 4    parties being treated the same in the system, that's very

 5    important in this week.

 6         So what I want to know is, is there anyone that --

 7    because of anything you've heard so far, is going to treat my

 8    client differently than you would treat Mr. Baxter's client?

 9    Has anyone heard anything, other than what we've discussed,

10    that you believe would make a difference?

11         Now, I want to ask you some questions about the patent

12    system.  Mr. Baxter asked this, and I think there were a couple

13    of hands I wanted to follow up with.

14         Who on the jury panel either has a patent or works for

15    a company that has patents.

16         Ms. Deslatte, I know your -- your former employer did.

17         Is there anyone else in the first two rows who has

18    patents or -- okay.  Yes -- yes, ma'am, Ms. Raney?

19         JUROR RANEY:  In 2014, my husband started a company

20    called Raney Electronics, and he did put in a provisional

21    patent for an irrigation monitoring alert system.

22         MR. SMITH:  Did that end up being granted as a patent?

23         JUROR RANEY:  They -- the prototype is in

24    production -- you know, is actually in use.  And -- but funding

25    did not allow us to go to full production.  And we were using a

```
 1    grant from the federal government to help us with that.  And
 2    when all those grants were hatched -- you know, done away with,
 3    you know, with -- you know, decisions.
 4              MR. SMITH:  Because of that experience, as someone
 5    applying for a patent, would that cause you to lean towards the
 6    Plaintiff in this case, or is that something that you could set
 7    aside?
 8              JUROR RANEY:  I don't think so.  I wouldn't have --
 9    you know, I'd listen to the facts.
10              MR. SMITH:  All right.  Thank you very much, ma'am.
11              Anyone else applied for a patent or your -- you know
12    your company has patents?  Any involvement in -- in the patent
13    process?
14              I don't -- I don't see any hands there.
15              Was there anyone here that would have -- that had an
16    understanding of the patent system before you came in today,
17    before you saw the film this morning?
18              Okay.  Yes, Ms. Raney, I understand you did.
19              Anyone else have an understanding of the patent system
20    other than what we've talked about already?
21              Yes, ma'am, Ms. Roberts?
22              JUROR ROBERTS:  I've seen a short video clip of --
23    and, honestly, right now I can't think of who it is, but sort
24    of a cross between a news anchor and a late night TV host, and
25    he addressed the patent system.  And because it is held in
```

1    Marshall and I'm from there, he -- I've seen it passed around.

2           MR. SMITH:  Is there anything about what you saw that

3    would affect your ability to listen to the evidence and -- and

4    consider the facts of this case?

5           JUROR ROBERTS:  I think he does present a view that

6    was a little bit -- that would give me an impartiality to start

7    with, just how the whole patent system works with electronics.

8    He presented it as being a little unfair in some cases.

9           THE COURT:  You have five minutes, Mr. Smith.

10          MR. SMITH:  Okay.  Thank you, Your Honor.

11          All right.  Thank you very much, ma'am.

12          JUROR ROBERTS:  Yes.

13          MR. SMITH:  You know that the U.S. Patent and

14   Trademark Office is in charge of granting patents, but you're

15   going to be asked this week to look at whether a patent should

16   have been granted or not.

17          Now, let me ask this question.  Is there anyone here

18   that says you generally have a strong feeling of trust that

19   when the federal government does something, they get it right?

20   Anyone has a strong feeling like that?

21          All right.  So my next question is you're going to be

22   asked did the federal government get it right when it granted a

23   patent here under the Court's instructions.

24          Is there anyone here that says I just couldn't look at

25   that --  even though the Court's instructions tell me I have a

```
 1   role to play, I just couldn't second guess the Patent Office?
 2   Anyone that feels that way on the first row?
 3            Second row?
 4            And in the gallery?
 5            Thank you very much.
 6            Has anyone worked for a company that was involved in
 7   any type of patent litigation?
 8            Okay.  And that was your former employer?  Were you
 9   involved in that?
10            JUROR DESLATTE:  No.
11            MR. SMITH:  Thank you very much.
12            Let me ask another -- another question.  How many much
13   you would agree with the statement that patents encourage
14   innovation?  By a show of hands, how many people would agree
15   that patents encourage innovation?
16            Is there anyone that believes that patent -- oh,
17    Ms -- Ms. Garcia?
18            JUROR GARCIA:  Yes.
19            MR. SMITH:  You were kind of hesitant on that.  What
20   do you think about that?
21            JUROR GARCIA:  I don't know.  It's whatever type of
22   thing, to be honest.
23            MR. SMITH:  Okay.
24            JUROR GARCIA:  I don't know if that gives you a good
25   clear answer, but I'm like -- I don't know.
```

```
 1              MR. SMITH:  I appreciate --

 2              JUROR GARCIA:  I'm biased pretty much.

 3              MR. SMITH:  Thank you for that answer, ma'am.

 4              Anybody believe the opposite?  Anybody think that the

 5   patent system actually discourages innovation, that it's a

 6   negative towards innovation?  Anybody, by a show of hands, feel

 7   that way?

 8              Okay.  Has anyone -- does anyone here believe they've

 9   invented something, and they've chosen not to get a patent?

10   You've invented something, you've had an idea, you've come up

11   with something, you just chose to not get a patent for it?

12              All right.  Ms. Hubbard-Smith?

13              JUROR HUBBARD-SMITH:  Well, sometimes you -- you know,

14   you get an idea for something.  I've gotten an idea one time at

15   Mardi Gras about how to have something to catch the beads

16   better, and the next year I saw something similar to it.  But I

17   never acted on it, so somebody had the same idea, and they did

18   act on it, so it was their idea.

19              MR. SMITH:  All right.  Thank you very much, ma'am.

20              Who here has been a plaintiff in a lawsuit?  You filed

21   a civil lawsuit as a plaintiff?  Anyone on the panel?

22              Okay.  Some people think that just because a lawsuit

23   gets to court, that means that there must be merit to it.

24   Other people think that just because it gets to court, it

25   doesn't have -- doesn't tell you anything about whether it has
```

1  merit.

2          Let me ask the first one.  How many of you would

3  believe that just because a lawsuit makes it to court, it must

4  have some merit?

5          I don't see anybody raising their -- yes, ma'am,

6  Ms. Youngblood?  Does it mean anything to you that the lawsuit

7  got to court as far as whether it has merit or not?

8          JUROR YOUNGBLOOD:  I would think there would have to

9  be enough evidence produced to make it this far.  I'm not a

10 hundred percent sure.  I've never been in this kind of

11 litigation, but I would think you would have to have something

12 tangible to make it this far.

13         THE COURT:  You've got one minute remaining.

14         MR. SMITH:  Thank you, Your Honor.

15         Does anyone else agree with -- with that?

16         Okay.  Number -- number -- in the interest of time,

17 I'll just make a note of that Ms. Deslatte, thank you.

18         The last question I want to ask is the one that I was

19 taught to last -- ask last, and it's because I've asked the

20 questions that I can think of, the ones that I think will bring

21 out things about your background and experiences.  But there's

22 always a question that you don't think of, and a juror might

23 come up later and say, you know, if you'd asked me this, I

24 think you would have known about this.

25         As you sit here today, is there some reason, some fact

1   about you serving on this jury that you would want me to know,

2   you know, Mr. Smith, I really don't think I'd be good for this

3   particular case, but you haven't asked the question, but it's

4   something I think you should know, anyone on the front row that

5   feels that way?  Something I've missed that you think is

6   important?

7            Anyone on the second row?

8            And on the third row?

9            And in the gallery?

10           All right.  Thank you very much, ladies and gentlemen.

11  I appreciate your attention, and we look forward to presenting

12  our case to you.

13           THE COURT:  Counsel, approach the bench, please.

14           (Bench conference.)

15           MR. BAXTER:  Your Honor --

16           THE COURT:  Does Plaintiff have any challenges for

17  cause?

18           MR. BAXTER:  No, Your Honor.

19           THE COURT:  Do Defendants have any challenges for

20  cause?

21           MR. SMITH:  Yes, Your Honor.  Juror No. 9.  Yes, Juror

22  No. 9.

23           THE COURT:  Ms. Youngblood?

24           MR. SMITH:  Yes, sir.

25           THE COURT:  Any others?

 1            MR. SMITH:  No, Your Honor.

 2            THE COURT:  Okay.  Well, Ms. Deslatte, Ms. Boyd, and

 3    Ms. Youngblood all raised their hands about potential

 4    scheduling problems, and Defendants have challenged

 5    Ms. Youngblood for cause.  I'll retain those three venire

 6    members back and let everyone else recess.

 7            Is there anyone else that the Court should keep back

 8    and question here at the bench that you're aware of.

 9            MR. BAXTER:  Not from us, Your Honor.

10            MR. SMITH:  Not from us, Your Honor.

11            THE COURT:  Okay.  Take your seats, please.

12            (Bench conference concluded.)

13            THE COURT:  All right.  Ladies and gentlemen, I'm

14    going to excuse the members of the panel for a recess with

15    three exceptions.  And I'm going to ask you three to stay where

16    you are, let those around you slip out for recess, and then

17    just keep your seats where you're located.

18            And those are Panel Members No. 3, Panel Member No. 7,

19    and Panel Member No. 9.

20            The rest of you I'm going to excuse for recess.  And I

21    want to talk about a couple things before I actually let you

22    recess through the double doors in the back of the courtroom.

23            First of all, when you go through those double doors,

24    if you'll take a left, and go around the corner, you'll find

25    two important things:  The water fountains and the restrooms.

1          Number two, I'm going to ask you to stay in the

2   building, not to leave the building, stay on this first floor.

3   I don't expect this recess to be terribly long, but I do need

4   you to stay in the building.

5          Number three, talk about the weather, talk about your

6   grandchildren, your children, talk about sports, who's going to

7   win the World Series this fall, anything you want to talk

8   about, but do not talk about anything that's happened in the

9   courtroom this morning while you're on recess.

10          I need to make it clear to you, ladies and gentlemen,

11   you have not heard any evidence in this case at this point.  So

12   talk about anything and everything except anything that's

13   happened in the courtroom this morning.

14          With those instructions, those of you on the panel,

15   except those three, Panel Member 3, 7, and 9 are excused for

16   recess at this time.

17          COURT SECURITY OFFICER:  All rise.

18          (Jury panel out.)

19          THE COURT:  Be seated, please.

20          Ms. Marsh, is there a reason you stayed behind?

21          JUROR MARSH:  Yes, sir, after thinking, I thought that

22   I may need to ask you about something that may interfere within

23   the next week if it goes that long.

24          THE COURT:  All right.  If you'll keep your seat,

25   we'll get to you in just a moment.

1          Counsel, approach the bench, please.

2          THE COURT:  And, Ms. Deslatte, if you'd come up and

3    join us, please.  Ms. Deslatte.

4          (Bench conference.)

5          THE COURT:  Good morning.  These are microphones, and

6    you and I are just going to talk quietly here at the bench.

7          JUROR DESLATTE:  Okay.

8          THE COURT:  You indicated when we started this morning

9    that you might have a scheduling problem that would be

10   significant and could keep you from being available during the

11   course of the whole trial.  Can you tell me about that?

12         JUROR DESLATTE:  Yes, I have a scheduled vacation

13   starting -- I have airplane tickets on Saturday morning out of

14   Dallas.

15         THE COURT:  Okay.

16         JUROR DESLATTE:  So that'd keep me from Monday.

17         THE COURT:  Where are you going?

18         JUROR DESLATTE:  I'm going to Massachusetts to hike on

19   the Appalachian trail.

20         THE COURT:  Okay.  All right.  And the tickets are

21   bought and paid for?

22         JUROR DESLATTE:  Yes.  For many months.

23         THE COURT:  Okay.  Well, I don't know that the case is

24   going to go as far as Monday, but it could.  And I can't take a

25   chance of you being on the jury and the case going to Monday

```
 1    and then you're mad at me because you missed that airplane
 2    flight.
 3              JUROR DESLATTE:  Yeah, yeah.  Interesting case.
 4              THE COURT:  Mr. Baxter, do you have any questions for
 5    Ms. Deslatte?
 6              MR. BAXTER:  No, Your Honor.
 7              MR. SMITH:  No, Your Honor.
 8              THE COURT:  Ms. Deslatte, I'm not going to require you
 9    to serve on this jury --
10              JUROR DESLATTE:  Okay.
11              THE COURT:  -- but I want you to join the rest of the
12    group outside during the recess, and I don't want you to
13    mention anything we talked about in here.
14              JUROR DESLATTE:   Okay.  I can go out right now?
15              THE COURT:  If you'd just go right through the double
16    doors and join the rest of the group.
17              JUROR DESLATTE:  Okay.
18              THE COURT:  Thank you.
19              MR. BAXTER:  Thank you, Ms. Deslatte.
20              (Juror exits courtroom.)
21              THE COURT:  All right.  I'm going to excuse
22    Ms. Deslatte.
23              (Open court.)
24              THE COURT:  Ms. Boyd.
25              (Bench conference continued.)
```

```
 1            THE COURT:  Good morning.  It's been awhile.

 2            JUROR BOYD:  Yeah, a long time.  10 years.

 3            THE COURT:  Tell me about your scheduling problem.

 4            JUROR BOYD:  Okay.  My daughter is in Jackson,

 5   Mississippi, and she had an accident and they're having to go

 6   in every day or two and work on her hand that they may or may

 7   not be able to keep.  And if they call me, I would not want to

 8   be on a jury that I couldn't go.

 9            THE COURT:  She's in the hospital now in Jackson?

10            JUROR BOYD:  She's in the hospital now in Jackson.

11   She had a side-by-side accident, flipped it, and her hand was

12   under the vehicle.  So it's -- she's in surgery -- I mean,

13   she's in clean-up right now.

14            THE COURT:  When did the accident happen?

15            JUROR BOYD:   Two weeks ago.  And she's -- I think

16   she's fine, but I don't want to be committed here and then them

17   call me with she had a fleshing eating bacteria in her hand

18   because it happened in a creek and they've taken the whole of

19   her palm.  So, you know, I just don't want to be on the jury,

20   and then them call me that she's taken a turn because they were

21   afraid for a while it was going to be gone.

22            THE COURT:  Is there a specific surgical procedure

23   scheduled now, or is it just anything could happen?

24            JUROR BOYD:  Anything could happen.  But what they're

25   doing is every other day they go in and they clean it out and
```

1    they're checking for the bacterias and stuff.  But all of her

2    hand bones are crushed, and they're trying to get the bones put

3    back together.  But it's a wait and see.  And she could be

4    there for another couple of weeks and be fine.  I just don't

5    know that.

6              THE COURT:  I understand.  And this is your daughter?

7              JUROR BOYD:  Yes.

8              THE COURT:  Okay.  Any questions, counsel?

9              MR. BAXTER:  No.

10             MR. SMITH:  No, Your Honor.

11             THE COURT:  Okay.  Ms. Boyd, I'm not going -- I'm not

12   going to -- you'd be thinking about your daughter the whole

13   time you're on the jury anyway.  I'm not going to require that

14   you serve.  We have plenty of members.

15             JUROR BOYD:  And I'll be glad to do it another time.

16   I mean --

17             THE COURT:  Trust me, the clerk's office will keep

18   your name.

19             JUROR BOYD:  Yeah, I get called at Marion County quite

20   a bit.

21             THE COURT:  Well, I can't --

22             JUROR BOYD:  I can serve, but --

23             THE COURT:  -- I'm not going to -- I'm not going to

24   begin to answer for Marion County.  I'm going to excuse you,

25   and I'm going to let you join the rest of the panel outside

```
 1   during recess.  Just don't discuss anything we've talked about

 2   in here.

 3            JUROR BOYD:  Yes, sir.

 4            THE COURT:  Okay.  Thank you, ma'am.

 5            MR. BAXTER:  Good luck, Ms. Boyd.

 6            (Juror exits courtroom.)

 7            (Open court.)

 8            THE COURT:  Ms. Youngblood, would you join us?

 9            (Bench conference continued.)

10            THE COURT:  I'm going to excuse Ms. Boyd, obviously.

11   Good morning, ma'am.

12            JUROR YOUNGBLOOD:  Good morning.

13            THE COURT:  These are our microphones, and we're going

14   to talk quietly here at the bench.  I've got two things I need

15   to ask you about.

16            Number one, you raised your hand when we started and

17   indicated you might have a scheduling problem if you were

18   selected.  Tell me about that.

19            JUROR YOUNGBLOOD:  The 24th, I'm supposed to meet my

20   husband for a purchase of a horse trailer.  From that point, we

21   were going on vacation.  He's been out of the area working

22   since June, so we haven't gotten to see or spend any time

23   together since June.

24            THE COURT:  Okay.  Now --

25            JUROR YOUNGBLOOD:  All next week we're on vacation.
```

```
 1   There's no guarantee that the case would be over before Friday?
 2          THE COURT:  All right.  All right.  And it may be, but
 3   there -- as you say, there's no guarantee.
 4   Now, you and he are supposed to meet and buy a horse trailer?
 5          JUROR YOUNGBLOOD:  Uh-huh.
 6          THE COURT:  And where is that --
 7          JUROR YOUNGBLOOD:  I have to sign the note.
 8          THE COURT:  -- where is that going to happen?
 9          JUROR YOUNGBLOOD:  Ohio.
10          THE COURT:  Okay.
11          JUROR YOUNGBLOOD:  He's working in Kentucky, just
12   right close to Ohio.
13          THE COURT:  Okay.  And to close the purchase, you have
14   to be there to sign the papers?
15          JUROR YOUNGBLOOD:  I've sent an email asking if I
16   could do things remotely.  I didn't get an answer back before I
17   had to be here this morning, so...
18          THE COURT:  Okay.  Mr. Smith, do you have some
19   questions of Ms. Youngblood?
20          MR. SMITH:  Yes, I did, Your Honor.
21   Ms. Youngblood, you answered -- when I asked the question about
22   whether you believed that there must be some merit to the case
23   as a result of making it to open court, you thought that there
24   was.  Could you -- could you kind of repeat what you said
25   there?
```

1          JUROR YOUNGBLOOD:  I would think there would have to

2    be some kind of merit before you reach this point of so many

3    people being involved and something had to have been presented

4    somewhere to -- to bring up documentation and patents and who

5    they went through to get this far in legalities.

6          MR. SMITH:  Is that a belief that you would have

7    difficulty setting aside if you were chosen to sit on the jury?

8          JUROR YOUNGBLOOD:  No.  I would look at whatever was

9    presented here as what we look at.  That's just a guess on my

10   part.

11         MR. SMITH:  Would that -- but would my client start

12   out behind because of your assumption that there must be merit?

13         JUROR YOUNGBLOOD:  Oh, no.  No, you would have to --

14   both sides would have to present their case.

15         MR. SMITH:  That's all I have, Your Honor.

16         THE COURT:  Do you have any questions, Mr. Baxter?

17         MR. BAXTER:  No, Your Honor.

18         THE COURT:  All right.  Tell me again how long it's

19   been since you and your husband have been separated because of

20   his work?

21         JUROR YOUNGBLOOD:  Since June.  He was sent to

22   Kentucky in June.

23         THE COURT:  Does he do pipeline work or what --

24         JUROR YOUNGBLOOD:  He works for Delta Fabrication, and

25   they are rebuilding an automotive plant up there that builds

1   automotive parts.  The only day they get off is Sunday.

2          THE COURT:  Is it -- I mean is this the first time

3   this has happened, or is it common with his employment that

4   he's sent someplace and gone for long periods --

5          JUROR YOUNGBLOOD:  Since he's worked for Delta, this

6   the first time.

7          THE COURT:  And how long has he worked for Delta?

8          JUROR YOUNGBLOOD:  For two years now.

9          THE COURT:  Okay.

10         JUROR YOUNGBLOOD:  They pretty much remain local and

11  have weekends off, but when they went up there, he only gets

12  Sunday off.  And it's a 12-hour drive.

13         THE COURT:  All right.

14         JUROR YOUNGBLOOD:  And I work five days a week, so...

15         THE COURT:  Ms. Youngblood, I'm going to excuse you

16  from the panel.  We've got plenty of people to serve.  And I'm

17  sympathetic to your situation.

18         JUROR YOUNGBLOOD:  He used to work in Alaska and got

19  to come home for three weeks at a time.

20         THE COURT:  Of course, some wives are happy if their

21  husbands are gone for long periods of time.

22         JUROR YOUNGBLOOD:  It gets to the point it's time to

23  go back to work.

24         THE COURT:  Okay.  I'm going to ask you to join the

25  rest of the group outside during recess, but don't discuss

 1  anything we've talked about in here.

 2          JUROR YOUNGBLOOD:  Okay.

 3          THE COURT:  Okay?

 4          JUROR YOUNGBLOOD:  Okay.

 5          THE COURT:  Thank you.

 6          MR. BAXTER:  Good luck to you on your trip, ma'am.

 7          JUROR YOUNGBLOOD:  Thank you.

 8          (Juror exits courtroom.)

 9          THE COURT:  All right.  I'm going to excuse

10  Ms. Youngblood.  Those are the only three that we had marked.

11          We're going to seat eight jurors.  Each side has four

12  peremptory challenges, so eight and eight is 16 and three is

13  19.  I do have Ms. Marsh.  She's not on my list.

14          MR. SMITH:  She's outside the strike zone.

15          THE COURT:  She would be.  What is she, 21?

16          MR. SMITH:  Yes, sir.

17          THE COURT:  So we're going to strike through 19?  Is

18  that what you all --

19          MR. BAXTER:  Yes, Your Honor.

20          MR. SMITH:  Yes, Your Honor.

21          THE COURT:  The way you all count it?  Okay.  How long

22  do y'all need to strike your lists?

23          MR. BAXTER:  15 minutes, Your Honor, maybe.

24          THE COURT:  11:30?

25          MR. BAXTER:  Yes, Your Honor, be great.

1          THE COURT:  Okay.  Let me tell Ms. Marsh that we're

2     not going to need her up here, and then I'll excuse you all to

3     strike your list.

4          MR. SMITH:  Thank you.

5          (Bench conference concluded.)

6          THE COURT:  Ms. Marsh, I'm not going to call you up

7     because you're far enough back in the panel that you're not

8     going to be reached.  In other words, you're not going to be on

9     this jury no matter what happens.

10          JUROR MARSH:  Okay.  Thank you.

11          THE COURT:  But if you would, join the rest of the

12    panel outside during recess, and certainly don't discuss what I

13    just said or anything that's happened in the courtroom.

14          JUROR MARSH:  Okay.

15          (Juror Marsh exits courtroom.)

16          THE COURT:  All right.  Counsel, the Court will recess

17    and allow you time to exercise your peremptory challenges, and

18    then we'll reconvene and seat the jury that's been selected.

19          The Court stands in recess.

20          COURT SECURITY OFFICER:  All rise.

21          (Recess.)

22          COURT SECURITY OFFICER:  All rise.

23          THE COURT:  Be seated, please.

24          All right.  Ladies and gentlemen, if you will listen

25    carefully when your name is called, I'm going to ask that you

1   come forward and take your seat in the jury box.

2          We're going to seat eight jurors in this case.  I'm

3   going to ask that the first four jurors be positioned on the

4   front row of the jury box, and the second four jurors,

5   Jurors 5, 6, 7, and 8, be on the second row of the jury box.

6          And there are 14 seats in the jury box, so to make

7   sure that our eight jurors are centrally located, I'm going to

8   ask that Juror No. 1, when you enter the box, go to the front

9   row and stand in front of the third chair from the end.  Leave

10  two empty chairs past where you're standing.  And I'm going to

11  ask eight all jurors to remain standing until everyone is in

12  the box, and then I'll seat you.

13         So Jurors 1, 2, 3, and 4 should go to the front row of

14  the jury box.  Juror 1 should stop in front of the third chair

15  from the end, leave two blank chairs past you.  And then the

16  jurors going to the second row will just line up behind their

17  respective counterparts on the front row.  And that will give

18  us four and four centered in the jury box for a good position

19  from here forward throughout the end of the trial.  I hope

20  that's clear.

21         And with that, I'm going to ask Ms. Lockhart to call

22  the names of our eight panel members who have been selected as

23  jurors in this case.

24         COURTROOM DEPUTY:  Diana Garcia, Lesa Taylor, Belinda

25  Raney, Jaime Gabel, Jacque Wooldridge, Debra Hall, Robin Goss,

1    and Arlene Hubbard-Smith.

2           THE COURT:  I guess I'm going to have to say ladies of

3    the jury, not ladies and gentlemen of the jury.  Please have a

4    seat.

5           Those of you on the panel that were not selected to

6    serve in this case and on this jury, I'm about to excuse you,

7    but I want to excuse you with the heartfelt thanks and sincere

8    appreciation from the Court and the Court staff.  And I know I

9    speak for the parties and their counsel when I say we

10   appreciate each of you being here today and presenting yourself

11   for jury service, even though you weren't selected.

12          Every one of you, without a doubt, had other places to

13   be this Monday morning, other things to do in your lives and

14   careers that were important to you, things to do with your

15   families, perhaps, that were important to you, and you set

16   those aside, and you answered the call to jury duty and

17   appeared and presented yourself.  And even though you weren't

18   selected, I want you to understand that in our view, you each

19   rendered very real and valuable public service, and it's to be

20   recognized, it's to be appreciated, and it's to be commended.

21          The Court recognizes that and thanks each one of you

22   for being here.  We could not function as the third branch of

23   our national government without citizens like yourselves

24   answering the call to jury service and presenting yourselves

25   when called to appear like you've done this morning.  It's not

1   insignificant.  It's important, and it's very much recognized

2   and appreciated by the Court.

3          I'm going to ask you, those of you that are about to

4   be excused who were not selected, when you leave, if you'll

5   make sure that those very valuable numbers and badges get left

6   with the clerk's office.

7          If you have any questions about needing documentation

8   for an employer about where you've been this morning,

9   Ms. Clendening in the clerk's office will be happy to work with

10  you and answer and respond to any of your questions or

11  inquiries about those kind of housekeeping matters.

12         Ladies and gentlemen, thank you for being here, thank

13  you for being good citizens and for appearing and presenting

14  yourselves and participating as you have this morning.  It's

15  very important, and we all appreciate it.

16         With that, ladies and gentlemen, those of you not

17  selected to serve on this jury are excused at this time.

18         COURT SECURITY OFFICER:  All rise.

19         (Jury panel out.)

20         THE COURT:  All right.  If everyone except the eight

21  members of the jury will be seated, please.

22         I'm going to ask our courtroom deputy, Ms. Lockhart,

23  to administer the oath to the eight members of the jury at this

24  time.

25         (Jurors sworn.)

1          THE COURT:  Please have a seat.

2          Members of the jury, we are going to recess shortly

3    for lunch.  Your lunch has been provided by the Court.  It's in

4    the jury room waiting for you.  Each day during your service on

5    this jury, the Court will provide your lunch for you.  It will

6    be brought to you in the jury room so you don't have to worry

7    about finding a place to eat while you're here on jury duty.

8          Before we break for lunch, I have some instructions

9    that I need to give you that will apply throughout your time

10   serving in this case as jurors.  They're all important, and I

11   want to go over with you briefly.

12         First of all, do not discuss this case with anyone.

13   It is a fundamental rule of the Court and the judicial process

14   that when all the evidence has been presented and I instruct

15   you to retire to the jury room and to deliberate upon the

16   questions that will make up the verdict in this case, that when

17   you decide how to answer those questions, the sole source of

18   the information that you will draw upon to answer those

19   questions must be evidence that has been presented to you in

20   open court from the witness stand where the witnesses have

21   testified under oath and been subject to

22   cross-examine -- cross-examination, as well as the witnesses

23   that will be presented to you by video deposition or the

24   exhibits that the Court has admitted into evidence.  In other

25   words, members of the jury, the only information that you

1  should draw upon to answer the questions in the verdict form is

2  information that's been presented to you in this courtroom as a

3  part of this trial.  Therefore, it is absolutely essential that

4  you not communicate with anyone in any way about this case.

5  Otherwise, you will be subject to having information that you

6  arrived at and was presented to you outside of this courtroom.

7  And that, if it occurs, can jeopardize the entire process.

8          So it's absolutely essential that you not talk with

9  anyone -- that you not communicate in a broader sense with

10  anyone about this case until I've released you from your

11  service as jurors.

12         Now, when all the evidence has been presented, when

13  the attorneys have given you their closing arguments, when the

14  Court has given you my final instructions on the law, then and

15  at that point, I will ask you to retire to the jury room and to

16  deliberate on your verdict.

17         When that happens, everything changes and it becomes

18  your duty to discuss the case among the eight of you in an

19  attempt to reach a unanimous verdict.  But until that time, you

20  must not communicate with anyone about the case, and that means

21  you must not communicate among each other about the case in any

22  way, in any shape, and in any fashion.

23         And I promise you, whenever we finish for the day and

24  I release you for the night and you return to wherever you

25  live, unless you live alone, whoever is there when you walk in

1    the door, the first thing they're going to say is, well, tell

2    me what happened in federal court in Marshall today.  Do not

3    even try to answer that question because if you do, you will

4    almost assuredly violate the instruction that I'm giving you.

5            Just look whoever it is in the face, smile, and say

6    that very stern federal judge told me not to talk about the

7    case with anyone, and I'm going to do what he says.  Blame me.

8    That's part of what I'm here for.  But it is essential, ladies,

9    that there be no communication about the case and that as a

10   consequence, the sole source of the information that you will

11   have when it's time to return a verdict is the evidence that's

12   presented in open court under oath and subject to

13   cross-examination.  That's absolutely essential.

14           And as a matter of fact, my practice is to remind the

15   members of the jury of this pretty much every time you

16   get -- get up out of those seats and leave the courtroom.  So I

17   promise you, by the time this trial is over, you're going to be

18   tired of hearing me say don't discuss the case with anyone,

19   including don't discuss the case among the eight of you.  But

20   I'm going to continue to do it because that instruction is so

21   essential and so critical to the Court functioning as we are

22   intended to function.

23           And also, when I say don't communicate with anyone

24   about the case, that includes, lest there be any doubt, that

25   includes those of you that are active with social media.  And

1    that means don't post on Facebook, don't tweet on Twitter,

2    don't use Instagram, don't use any form of social media.  That

3    is communication.  So I mean when I say don't communicate about

4    the case with anyone, I mean it in the broadest sense of the

5    term.

6            Also, you should not attempt to do any research on

7    your own about anything involved in this case.  You are not to

8    go home and get on the Internet and do a browser search with

9    regard to any of these parties, in regard to any of the

10   patents, in regard to any of the issues you hear about, in

11   regard to any of the lawyers in the case.  You are not to do

12   any outside research of any kind, whether it's on the Internet

13   electronically, or whether you go to the local library and pull

14   an encyclopedia off the shelf the old-fashioned way, do not do

15   any research about anything related to the case.

16           Again, the fundamental principle is that the sole

17   source of the information that you will draw upon to discharge

18   your duty as jurors by answering the questions in the verdict

19   form must come from the material and the evidence and the

20   testimony that's presented in open court, under oath, subject

21   to cross-examination.  That's a fundamental principle.  That's

22   why you can't discuss the case with anyone, including

23   yourselves, until I tell you otherwise.  And that's why you

24   cannot and must not do any research of any kind.

25           In regard to the research, it's been my practice since

1   I've been on the bench to remove the temptation that is

2   sometimes present with smartphones in your hands and in your

3   purses and in your pockets.  So I'm going to ask you once we

4   return from lunch today, if you have a cell phone, a smartphone

5   with you, please leave it in your automobile.  Please leave it

6   at home tomorrow.  Do not bring it back into the courthouse.

7   Do not bring it into the jury room.  Do not have it with you.

8   If you don't have it, there'll be no temptation to Google this

9   or check this on Yahoo! Or do any of the things I've told you

10  not to do.  So leave your devices outside of the courtroom from

11  this point forward.

12          Now, you need to understand, the lawyers in the case

13  will have their electronic devices through the trial.  They're

14  entitled to have them and use them because it's a part of the

15  tools that they use to discharge their -- their duties and

16  their obligations, but they're under strict instructions not to

17  allow those to ring, to sound, or to disrupt the Court.  And if

18  it's violated, the Court will take care of it if it happens.

19  But if you see counsel using a smartphone or a tablet, don't

20  think, well, why do they get to do that because I don't get to

21  do that.  There's a difference, and my practice is to not allow

22  members of the jury to bring those kind of devices into the

23  courtroom.

24          Again, we'll have recesses throughout the trial.

25  We'll have breaks for lunch.  If you need to check an important

1   email or send a text messages, you can certainly -- you will

2   certainly have opportunities where you can go to your vehicle

3   and check on your device if you need to leave it in your

4   vehicle.  But if you don't need to do it for that purpose, it's

5   probably simpler just to leave it at home.  But you're not to

6   have your electronic devices with you in the courtroom after we

7   reconvene after lunch today.

8          Also, ladies and -- ladies of the jury, I don't think

9   this is likely, but it is within the realm of possibility, this

10  is an important case, there are no unimportant cases that get

11  to trial in federal court.  It's important to both sides and to

12  all these parties, and it is possible that some third party

13  could attempt to contact you while you're serving as jurors and

14  influence your decisions in this case.  I don't think that's

15  going to happen, but you need to know that it was -- it's

16  within the realm of possibility.

17         If anyone from any source makes any contact or

18  attempted contact with you while you're serving as a juror in

19  this case that you feel is inappropriate in any way, then you

20  should notify Ms. Clendening in the clerk's office immediately.

21  She will let me know, and the Court will deal with it.  Again,

22  I don't think it's likely, but as I say, there are very few

23  unimportant cases that get to trial in federal court.  It is

24  possible.  So I want to at least make you aware of that.

25         Also, ladies and gentlemen -- excuse me, I'm sorry,

 1   that's a habit.  Members of the jury, you need to understand

 2   that throughout the trial in this case, I have made it clear to

 3   counsel and to the parties that the members of the respective

 4   trial teams, the witnesses, the corporate representatives, the

 5   paralegals and support staff, anyone that's here in connection

 6   with either Plaintiff or Defendant, they're not to talk with

 7   you.  And if you pass one of these folks coming up -- down the

 8   steps in the front of the courthouse or in the hall or at some

 9   point if you come in contact and walk in close proximity to any

10   of these folks, they're not going to stop and say good morning,

11   Ms. So-and-so, how are you, and enter into conversation with

12   you.  They're not going to be friendly and gregarious like most

13   of us in East Texas always are.

14         That's because I've instructed them not to, and that's

15   because, again, it goes back to that same fundamental

16   principle, the sole source of any information that you have to

17   answer the questions in the verdict form must come from what's

18   been presented in open court under oath and subject to

19   cross-examination.

20         So if one of these folks walks by and doesn't smile

21   and doesn't speak and doesn't act like you would expect, don't

22   hold that against them, don't think they're being rude or

23   unfriendly.  Understand that that's what the Court requires of

24   them and the reason why I require it of them, and take that

25   into account.

1          This is a small courthouse.  You will almost assuredly

2   pass somebody on the sidewalk out front or on the steps, and so

3   when that happens and they don't engage you and they're not

4   friendly and open and gregarious, understand why, and don't

5   hold it against them.  They're doing what I require of them.

6          All right.  Ladies and -- ladies of the jury, this is

7   the first time I've had an all female jury.  So I will probably

8   mess this up at various times.  Just bear with me.

9          Members of the jury, your lunch is provided for you in

10  the jury room.  We're going to recess until approximately

11  12:30.  And about 12:30, we will come back in the courtroom.

12  I'll begin with me preliminary instructions, and then I'll

13  proceed with opening statements from the lawyers in the case.

14         But enjoy your lunch.  It awaits you in the jury room.

15  And you're excused for lunch at this time.

16         COURT SECURITY OFFICER:  All rise for the jury.

17         (Jury out.)

18         THE COURT:  All right.  Counsel, we will recess for

19  the lunch.  The time is a little more advanced than I thought.

20  So rather than 12:30, we'll try to make it 12:40.

21         Mr. Stevenson, you're going to present openings for

22  the Plaintiff?

23         MR. STEVENSON:  Yes, Your Honor.

24         THE COURT:  And, Mr. Haslam, for the Defendants?

25         MR. HASLAM:  Yes.

1          THE COURT:  Okay.  Any questions before we recess for

2    lunch?

3          MR. BAXTER:  No, Your Honor.

4          MR. SMITH:  No, Your Honor.

5          THE COURT:  The Court stands in recess.

6          (Recess.)

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                         8/20/2018
      SHELLY HOLMES, CSR-TCRR                    Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25