```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4   OPTIS WIRELESS TECHNOLOGY,      )(
     LLC, PANOPTIS PATENT            )(
 5   MANAGEMENT, LLC, OPTIS          )(
     CELLULAR TECHNOLOGY, LLC,       )(
 6   PLAINTIFFS                      )(     CIVIL CASE NO.
                                     )(     2:17-CV-123-JRG-RSP
 7   VS.                             )(     MARSHALL, TEXAS
                                     )(
 8   HUAWEI TECHNOLOGIES CO. LTD.,   )(
     HUAWEI DEVICE USA, INC.,        )(
 9   HUAWEI DEVICE CO. LTD.,         )(     AUGUST 24, 2018
     DEFENDANTS                      )(     9:00 A.M.

10

11                   TRANSCRIPT OF JURY TRIAL

12       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                 UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:       Mr. Samuel F. Baxter
                               McKool Smith, PC
17                             104 E. Houston Street
                               Suite 300
18                             Marshall, Texas 75670

19

20   COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                               Official Court Reporter
21                             United States District Court
                               Eastern District of Texas
22                             Marshall Division
                               100 E. Houston
23                             Marshall, Texas 75670
                               (903) 923-7464

24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFFS:        Mr. Theodore Stevenson, III
                                Mr. Marcus L. Rabinowitz
 2                              McKool Smith, PC
                                300 Crescent Court
 3                              Suite 1500
                                Dallas, Texas 75201
 4
                                Mr. Kevin L. Burgess
 5                              Ms. Lindsay M. Leavitt
                                Mr. Kevin P. Hess
 6                              Ms. Christine M. Woodin
                                McKool Smith, PC
 7                              300 W. 6th Street
                                Suite 1700
 8                              Austin, Texas 78701

 9                              Mr. David T. DeZern
                                Gray Reed & McGraw, LLP
10                              1601 Elm Street
                                Suite 4600
11                              Dallas, Texas 75201

12
     FOR THE DEFENDANTS:        Mr. Robert T. Haslam
13                              Mr. Stanley Young
                                Mr. Anupam Sharma
14                              Mr. Thomas E. Garten
                                Mr. James Hovard
15                              Ms. Tess Hamilton
                                Covington & Burling, LLP
16                              333 Twin Dolphin Drive
                                Suite 700
17                              Redwood Shores, California 94065

18                              Mr. Heng Gong
                                Covington & Burling, LLP
19                              The New York Times Building
                                620 Eighth Avenue
20                              New York, New York 10018

21                              Mr. Paul J. Wilson
                                Mr. Ali Mojibi
22                              Mr. Christopher G. Higby
                                Covington & Burling, LLP
23                              One CityCenter
                                850 Tenth Street, NW
24                              Washington, DC 20001

25
```

```
 1   FOR THE DEFENDANTS:          Mr. Michael C. Smith
                                  Siebman Forrest Burg & Smith, LLP
 2                                113 East Austin Street
                                  Marshall, Texas 75670
 3

 4                        P R O D E E D I N G S

 5

 6        (Jury out.)

 7         COURT SECURITY OFFICER:  All rise.

 8         THE COURT:  Be seated, please.

 9         All right.  Are the parties prepared to read into the

10   record the list of -- or the list of items from the list of

11   pre-admitted exhibits that have been used during yesterday's

12   portion of the trial?

13         MR. STEVENSON:  We are, Your Honor.  We're currently

14   getting it.

15         And if Defendants are ready to go, we'd ask if they

16   could go first in their listing --

17         THE COURT:  Are Defendants prepared to go?

18         MR. SMITH:  I was going to say the same thing he just

19   said, Your Honor.  I apologize.

20         THE COURT:  All right.  We'll wait a minute.

21         While we're waiting on that, Mr. Smith, I have before

22   me a copy of Huawei's proffer of claim constructions for jury

23   instructions.  I assume this is the proffer that you mentioned

24   wanting to make for the record earlier?

25         MR. SMITH:  That's correct, Your Honor.  That is the
```

1  proffer of the proposed jury instructions that we would ask the

2  Court to include in the charge rather than the ones that were

3  adopted by the Court from the magistrate judge.

4       THE COURT:  All right.  Well, I'll -- I'll direct that

5  you file this with the clerk, and I'll accept the proffer, but

6  the request is consistent with the prior claim construction the

7  Court overruled.

8       MR. SMITH:  Thank you, Your Honor.

9       MS. WOODIN:  Your Honor --

10      MR. STEVENSON:  We're prepared to read in our exhibits

11 now.

12      THE COURT:  All right.  Why don't you proceed to do

13 that, please, Ms. Woodin.

14      MS. WOODIN:  Yes, Your Honor.

15      The exhibits used on the record yesterday by

16 Plaintiffs is Plaintiffs' Exhibit 3, and Defendants' Exhibits

17 82, 99, and 100.

18      THE COURT:  All right.  Any objection to that

19 rendition by Plaintiffs from Defendants?

20      MS. WOODIN:  And I'm sorry, Your Honor.  Also

21 Defendants' Exhibit 1.

22      THE COURT:  All right.  Now you're complete?

23      MS. WOODIN:  Yes, Your Honor.

24      THE COURT:  Okay.  Then is there any objection from

25 Defendants?

```
 1          MR. SMITH:  No, Your Honor.

 2          THE COURT:  Do Defendants have a similar rendition to

 3   offer?

 4          MR. SMITH:  Yes, we do, Your Honor.

 5          Yesterday the Defendants used the following exhibits:

 6   Plaintiffs' Exhibits 10, 57, 60, 81, 82, 83, 99, 103, 117, 288,

 7   289, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316,

 8   317, 318, 319, 338, 344, 3 -- Your Honor, I apologize.  I

 9   didn't -- I did not change over from the Plaintiffs' numbers to

10   the Defendants.

11          The numbers that were used yesterday are Plaintiffs'

12   10.  And then the following Defendants' exhibits:  57, 60, 81

13   through 83, 99, 103, 117, 288, 289, 306 through 319, 338, 344,

14   345, and 351.

15          And that concludes our offer.

16          THE COURT:  Is there any objection to that rendition

17   from Defendants -- excuse me, from Plaintiffs?

18          MS. WOODIN:  No, Your Honor.

19          THE COURT:  Okay.  Are there any other housekeeping

20   matters counsel is aware of that the Court should take up

21   before we proceed and conduct or have the Court conduct the

22   formal charge conference?

23          MR. STEVENSON:  None from Plaintiff.

24          MR. SMITH:  None from the Defendant.

25          THE COURT:  All right.  Then let me ask a
```

 1   representative of both sides who's going to -- who are going

 2   speak to the issues related to the charge and verdict form to

 3   go to the podium.  And as is the Court's practice, I will go

 4   through page-by-page each of the documents being the final jury

 5   instructions and the verdict form.  And at any point where we

 6   reach a page where counsel for either side believes an

 7   objection is appropriate, either because something's been

 8   included or something's been omitted, then they're free to make

 9   those objections at that point.  But going through it

10   page-by-page is the Court's way of making sure we don't

11   overlook or unintentionally miss anything.

12           So, Mr. Stevenson, you're going to speak for

13   Plaintiffs?

14           MR. STEVENSON:  Yes, Your Honor.

15           THE COURT:  And Mr. Smith for Defendants?

16           MR. SMITH:  Yes, Your Honor.

17           THE COURT:  All right.  Then we'll proceed with the

18   formal charge conference.  We'll begin with the final jury

19   instructions.

20           Turning to Page 1 of the final jury instructions as

21   have been provided to the parties by the Court, is there

22   objection from either party?

23           MR. STEVENSON:  No objection.

24           MR. SMITH:  No objection.

25           THE COURT:  Turning then to Page 2, is there objection

```
 1    from either party?

 2              MR. STEVENSON:  No objection.

 3              MR. SMITH:  No objection.

 4              THE COURT:  Page 3, is there objection?

 5              MR. SMITH:  No objection.

 6              MR. STEVENSON:  No objection.

 7              THE COURT:  Page 4, is there objection?

 8              MR. STEVENSON:  No objection.

 9              MR. SMITH:  No objection.

10              THE COURT:  Page 5, is there an objection?

11              MR. STEVENSON:  No objection.

12              MR. SMITH:  No objection.

13              THE COURT:  Page 6, is there objection?

14              MR. STEVENSON:  No objection.

15              MR. SMITH:  No objection.

16              THE COURT:  Turning then to Page 7, is there

17    objection?

18              MR. STEVENSON:  No objection.

19              MR. SMITH:  No objection.

20              THE COURT:  Page 8, is there any objection?

21              MR. STEVENSON:  No objection.

22              MR. SMITH:  No objection.

23              THE COURT:  Page 9, is there any objection?

24              MR. STEVENSON:  No objection.

25              MR. SMITH:  No objection.
```

```
1              THE COURT:  Page 10, is there any objection from
2  either party?
3              MR. STEVENSON:  No objection.
4              MR. SMITH:  No objection.
5              THE COURT:  Page 11, is there objection?
6              MR. STEVENSON:  No objection.
7              MR. SMITH:  No objection.
8              THE COURT:  Page 12, is there objection?
9              MR. STEVENSON:  No objection.
10             MR. SMITH:  No objection.
11             THE COURT:  Page 13, is there objection?
12             MR. STEVENSON:  No objection.
13             MR. SMITH:  No objection.
14             THE COURT:  Page 14, is there objection?
15             MR. STEVENSON:  No objection.
16             MR. SMITH:  No objection.
17             THE COURT:  Page 15, is there objection?
18             MR. STEVENSON:  No objection.
19             MR. SMITH:  No objection.
20             THE COURT:  Page 16, is there objection?
21             MR. STEVENSON:  No objection.
22             MR. SMITH:  No objection.
23             THE COURT:  Page 17, is there objection?
24             MR. STEVENSON:  No objection.
25             MR. SMITH:  No objection.
```

```
 1            THE COURT:  Page 18, is there objection?
 2            MR. STEVENSON:  No objection.
 3            MR. SMITH:  No objection.
 4            THE COURT:  Page 19, is there objection?
 5            MR. STEVENSON:  No objection.
 6            MR. SMITH:  No objection.
 7            THE COURT:  Page 20, is there objection?
 8            MR. STEVENSON:  No objection.
 9            MR. SMITH:  No objection.
10            THE COURT:  Page 21, is there objection?
11            MR. STEVENSON:  No objection.
12            MR. SMITH:  No objection.
13            THE COURT:  And, counsel, on Pages 20 and 21, I'll
14  note for the record that therein are the various
15  Georgia-Pacific factors that the Court intends to charge the
16  jury on.  It's clear that that is less than all of the 15
17  factors.
18            Do both Plaintiffs and Defendants agree that these are
19  the proper Georgia-Pacific factors to charge the jury on and
20  that the Court should not charge the jury on those factors not
21  set forth on Pages 20 and 21 of the final jury instructions?
22            MR. STEVENSON:  Plaintiff agrees.
23            MR. SMITH:  Defendant agrees.
24            THE COURT:  All right.  Moving on then to Page 22.
25            MR. STEVENSON:  No objection.
```

1          THE COURT:  Is there objection from either party?

2          MR. SMITH:  No objection.

3          THE COURT:  Page 23, is there objection?

4          MR. STEVENSON:  No objection.

5          MR. SMITH:  No objection.

6          THE COURT:  Page 24?

7          MR. STEVENSON:  Plaintiffs object to the royalty

8    stacking instruction in the second to the last paragraph.

9          THE COURT:  All right.  That objection is overruled.

10         Is there any objection from Defendants?

11         MR. SMITH:  No objection.

12         MR. STEVENSON:  And, Your Honor, just to state the

13   basis -- the basis of the royalty stacking instruction, for the

14   record, is that under Ericsson versus D-Link, an instruction is

15   not appropriate for royalty stacking when the accused infringer

16   does not put in evidence of their actual stack, which Huawei

17   has failed to do.

18         THE COURT:  All right.  The Court's ruling is the

19   same.  The objection of Plaintiffs is overruled.

20         We'll turn then to Page 25 of the final jury

21   instructions.  Is there any objection from either party?

22         MR. STEVENSON:  No objection.

23         MR. SMITH:  No objection.

24         THE COURT:  Turning then to Page 26, is there

25   objection?

1                MR. STEVENSON:  No objection.

2                MR. SMITH:  No objection.

3                THE COURT:  Page 27, is there objection?

4                MR. STEVENSON:  Objection from Plaintiffs to the

5    instruction regarding a lump-sum royalty, and that objection

6    also goes to the damages blank on the verdict form -- not the

7    damages blank, excuse me, the reasonable royalty or lump-sum

8    question in the damages question of the verdict form.

9                THE COURT:  And we'll get to the verdict form

10   separately.

11               MR. STEVENSON:  All right.

12               THE COURT:  But the Court -- go ahead.

13               MR. STEVENSON:  If the Court would permit, I'd like to

14   address the Court for a moment on that -- on the issue of lump

15   sum.

16               THE COURT:  Just give me a succinct statement of the

17   basis for your objection.

18               MR. STEVENSON:  Yes, Your Honor.

19               There's no evidence to support a lump-sum verdict.

20   Both experts calculated a per unit royalty, albeit from

21   different sources, but both ended up with a per phone royalty

22   under each of the patents, and then they applied that to a

23   royalty base in Plaintiffs' Exhibit 2050 that was merely

24   through the date of trial -- actually shortly before the date

25   of trial.  So there was no evidence, no testimony in the record

 1   that a lump sum, fully paid up exhausting patent rights beyond

 2   the expiration was part of anybody's damages calculation, and

 3   we don't feel that would be appropriate because there are --

 4   there just isn't evidence to support it.

 5           The methodologies were remarkably consistent in

 6   applying it to an agreed-upon royalty base, with no testimony

 7   about lump sum or any of that.  And that royalty base does not

 8   extend past trial.

 9           THE COURT:  All right.  Plaintiffs' objection, as

10   stated in the record by Mr. Stevenson, is overruled.

11           Are there other matters that either party wishes to

12   object to on Page 27 of the final jury instructions?

13           MR. STEVENSON:  None from Plaintiff.

14           MR. SMITH:  None from Defendant, Your Honor.

15           THE COURT:  Then we'll turn to Page 28.  Are there

16   objections from either party here?

17           MR. STEVENSON:  No objection.

18           MR. SMITH:  No objection.

19           THE COURT:  Page 29, are there objections?

20           MR. STEVENSON:  No objection.

21           MR. SMITH:  No objection.

22           THE COURT:  Page 30, are there objections?

23           MR. STEVENSON:  No objection.

24           MR. SMITH:  No objection.

25           THE COURT:  Page 31 and 32 comprise Exhibit A to the

```
 1    final jury instructions.  Is there objection to any portion of

 2    Exhibit A?

 3              MR. STEVENSON:  No objections.

 4              MR. SMITH:  No objection.

 5              THE COURT:  Pages 33 and 34 comprise Exhibit B to the

 6    final jury instructions.  Is there objection to any portion of

 7    Exhibit B?

 8              MR. STEVENSON:  No objection.

 9              MR. SMITH:  No objection.

10              THE COURT:  Page 35, being the last page of the final

11    jury instructions, sets forth Exhibit C to the final jury

12    instructions.  Is there any objection to any portion of

13    Exhibit C?

14              MR. STEVENSON:  No objections.

15              MR. SMITH:  No objection.

16              THE COURT:  All right.  That will complete the final

17    charge conference with regard to the final jury instructions.

18              And we'll next turn to, as a part of the final

19    charge -- formal charge conference, I should say, verdict form.

20    Turning to the verdict form that the Court's furnished to the

21    parties, and based upon the input, as was the final jury

22    instructions from the informal charge conference held yesterday

23    evening with counsel for all parties, we'll turn to Page 1 of

24    the verdict form.

25              Is there objection from either party as to anything
```

1    set forth or omitted from Page 1 of the verdict form?

2              MR. STEVENSON:  No objection.

3              MR. SMITH:  No objection.

4              THE COURT:  Page 2, is there any objection?

5              MR. STEVENSON:  No objection.

6              MR. SMITH:  No objection.

7              THE COURT:  Page 3, is there any objection?

8              MR. STEVENSON:  No objection.

9              MR. SMITH:  No objection.

10             THE COURT:  Page 4, where Question 1 to the jury is

11   located, is there any objection?

12             MR. STEVENSON:  No objection.

13             MR. SMITH:  No objection.

14             THE COURT:  Next is Page 5, wherein Question 2 to the

15   jury is located.  Is there any objection?

16             MR. STEVENSON:  No objection.

17             MR. SMITH:  No objection.

18             THE COURT:  Page 6 is next, wherein Question 3 to the

19   jury is located.  Is there any objection?

20             MR. STEVENSON:  No objection.

21             MR. SMITH:  No objection.

22             THE COURT:  Next is Page 7.  Is there any objection

23   from either party?

24             MR. STEVENSON:  No objection.

25             MR. SMITH:  No objection.

```
 1          THE COURT:  Next is Page 8, wherein Question 4 is
 2  located.  Is there any objection?
 3          MR. STEVENSON:  Plaintiffs object to the question
 4  asking if the amounts are a lump sum or a running royalty, for
 5  the basis previously articulated that there's no evidence to
 6  support a lump sum.  We'd also object that neither party has
 7  articulated a lump sum and would also object that a jury should
 8  not be able to exhaust future rights in a United States patent,
 9  that that is a matter as to future infringement for the Court,
10  not the jury.
11          THE COURT:  All right.  The objection of Plaintiffs
12  with regard to Page 8 of the verdict form is overruled.
13          Is there any objection to Page 8 from the Defendants?
14          MR. SMITH:  No, Your Honor.
15          THE COURT:  Turning then to Page 9 which is the final
16  page of the verdict form, is there objection from either party?
17          MR. STEVENSON:  No objections.
18          MR. SMITH:  No objection.
19          THE COURT:  All right.  That that will complete the
20  final charge conference as to the verdict form, and, in fact,
21  completes the final charge conference as a whole.
22          Counsel, as you're aware, it's the Court's practice to
23  prepare and generate eight final hard copies of the final jury
24  instructions so that those may be sent back to the jury, along
25  with one clean copy in hard copy form of the verdict form.  It
```

1   will take Court a few minutes to do that.

2           It's my intention to recess and produce those copies,

3   after which I intend to return, bring in the jury, and proceed

4   to give the jury my final jury instructions and then hear

5   closing arguments from counsel for Plaintiffs and Defendants.

6           Am I correct that Mr. Burgess will present the first

7   closing argument for Plaintiffs, followed by a second closing

8   argument from Mr. Stevenson?

9           MR. STEVENSON:  Correct.

10          THE COURT:  And I trust, Mr. Stevenson, Plaintiffs are

11  aware that the Court's practice is that of the 30 minutes

12  allotted, at least 15 minutes or half of the time must be used

13  in the first closing argument from Plaintiffs?

14          MR. STEVENSON:  We are aware.

15          THE COURT:  All right.  And am I correct, Mr. Haslam,

16  you'll present the closing argument for Defendants?

17          MR. SMITH:  That's correct, Your Honor.

18          THE COURT:  Okay.  One thing I do want to say to those

19  of you present before I recess, the Court considers its final

20  instructions to the jury and closing arguments of counsel to be

21  the most serious part of a very serious process.

22          Consequently, once I begin my final jury instructions,

23  which will be followed by closing arguments, I will insist upon

24  a bare minimum of any movement coming and going from the

25  courtroom.

```
 1           Those of you in the gallery are welcome to be here,
 2    but I will not have any disruptions.  I do not want to hear
 3    shuffling papers.  I do not want to see people fumbling through
 4    backpacks looking for things.  I do not want to see people
 5    coming and going, and though they try to be quiet, opening and
 6    closing the doors, inevitably they cause noise and an
 7    accompanying disruption.
 8           If anyone is going to be present in the gallery during
 9    my instructions and closing arguments, make sure you have
10    visited the restroom beforehand.  Do what you can and what you
11    need to to make sure that you can be as still and as quiet as
12    possible throughout the entire process.
13           I think the trial itself, the issues before the Court
14    and the jury warrant that kind of seriousness, and I'm going to
15    insist on it as we go through the final jury instructions and
16    final closing -- or closing arguments by counsel.
17    All right.  With that, the Court stands in recess.
18           COURT SECURITY OFFICER:  All rise.
19           (Recess.)
20           (Jury out.)
21           COURT SECURITY OFFICER:  All rise.
22           THE COURT:  Be seated, please.
23           Before I bring in the jury, let me ask, Mr. Burgess,
24    and, Mr. Stevenson, what would Plaintiff desire with regard to
25    a warning from the Court regarding your time?
```

1          MR. BURGESS:  15 minutes, Your Honor.

2          THE COURT:  When you've used 15 minutes?

3          MR. BURGESS:  Yes, sir.

4          MR. STEVENSON:  And, Your Honor, I'd like to get a

5    warning with three minutes left.

6          THE COURT:  Three minutes left.

7          MR. STEVENSON:  And may I ask the Court one question

8    about demonstratives?

9          THE COURT:  All right.

10          MR. STEVENSON:  Prior to Mr. Burgess's portion of the

11    closing, may we have leave to put the foam boards with the red

12    checkmarks up on that easel?

13          THE COURT:  That's not a problem.  Do you intend the

14    easel to stay where it is, or are you planning on moving it?

15          MR. STEVENSON:  We intend it to stay where it is.

16          THE COURT:  All right.  Then with regard to putting up

17    or taking down boards, just do that as you are prepared to.

18    And when you're ready, we'll follow the same practice as we

19    have through the trial.  When you finish your argument, and if

20    you've put something and left it up on the easel, take it down,

21    turn it around.  But other than that, that's fine.

22          MR. STEVENSON:  Thank you.

23          THE COURT:  Mr. Haslam, would you like a warning on

24    your time, and if so, what?

25          MR. HASLAM:  I think a warning when I have 40 minutes

```
 1   left.
 2              THE COURT:  40 minutes left?
 3              MR. HASLAM:  I'll take a five -- five-minute warning,
 4   Your Honor.
 5              THE COURT:  Five minutes remaining, I will warn you.
 6              All right.  Anything else before I bring in the jury?
 7              If not, Mr. Nance, please bring in the jury.
 8              COURT SECURITY OFFICER:  All rise for the jury.
 9              (Jury in.)
10              THE COURT:  Good morning, ladies.  Welcome back.
11   Please have a seat.
12              Members of the jury, you've now heard the evidence in
13   this case, and I'll now instruct you on the law that you must
14   apply.  Each of you are going to have your own hard copy of
15   these final jury instructions to take with you to the jury
16   room.  So you certainly can take notes if you want to, but you
17   need to know that you'll each have your own copy of these
18   instructions when you retire to deliberate.
19              It's your duty to follow the law as I give it to you.
20   On the other hand, and as I've -- and as I've said previously,
21   you, the jury, are the sole judges of the facts in this case.
22              Do not consider any statement that I've made in the
23   course of the trial or may make during these instructions as an
24   indication to you that I have any opinion about the facts in
25   this case.
```

1          You're about to hear closing arguments from the

2    attorneys.  Statements and arguments of the attorneys, I remind

3    you, are not evidence, and they are not instructions on the

4    law.  They're intended only to assist the jury in understanding

5    the evidence and the parties' contentions.

6          A verdict form has been prepared for you.  You'll take

7    this verdict form with you when you retire to the jury room,

8    and when you have reached a unanimous decision or agreement as

9    to the verdict, you'll have your foreperson fill in the blanks

10   in the verdict form reflecting those unanimous agreements.

11   Then your foreperson will sign and date the verdict form.

12         Answer each question in the verdict form from the

13   facts as you find them to be.  Do not decide who you think

14   should win this case and then answer the questions to reach

15   that result.  Again, your answers and your verdict must be

16   unanimous.

17         In determining whether any fact has been proven in

18   this case, you may, unless otherwise instructed, consider the

19   testimony of all the witnesses, regardless of who may have

20   called them, and you may consider the effect of all the

21   exhibits received and admitted into evidence, regardless of who

22   may have produced or presented them.

23         You, the jury, are the sole judges of the credibility

24   of each and every witness and the weight and effect to be given

25   to all the evidence in this case.

 1          As I've previously told you, the attorneys in this

 2    case are acting as advocates for their respective and competing

 3    parties.  They have a duty to object when they believe evidence

 4    is offered that should not be admitted under the rules of the

 5    Court.

 6          In that case, when the Court has sustained an

 7    objection to a question addressed to a witness, you must

 8    disregard that question entirely, and you may draw no

 9    inspection -- and you may draw no inference from its wording or

10    speculate about what the witness would have said if the Court

11    had permitted them to answer the question.

12          But, on the other hand, if an objection was overruled,

13    then you're to treat the answer to the question and the

14    question itself just as if no objection had been made; that is,

15    like any other question and answer throughout the trial.

16          Now, at times during the course of the trial, it's

17    been necessary for the Court to talk to the lawyers here at the

18    bench and outside of your hearing or to talk to them -- talk to

19    them when you were outside of the courtroom.  This happens

20    because there are times in trials like this when things arise

21    that do not directly involve the jury.  You should not

22    speculate, ladies of the jury, about what was said during such

23    discussions that took place outside of your presence.

24          Now, there are two types of evidence that you may

25    consider in properly finding the truth as to the facts in this

1    case.  One is direct evidence, such as the testimony of an

2    eyewitness.  The other is indirect or circumstantial evidence,

3    that is, the proof of a claim -- a chain, rather, of

4    circumstances that indicates the existence or nonexistence of

5    certain other facts.

6         As a general rule, you should know that the law makes

7    no distinction between direct and circumstantial evidence but

8    simply requires that you, the jury, find the facts based on all

9    the evidence presented, both direct and circumstantial.

10        The parties have stipulated or agreed to some facts in

11   the case, and a list of those stipulations has been included in

12   each of your juror notebooks.  When the lawyers for both sides

13   stipulate as to the existence of a fact, you must, unless

14   otherwise instructed, accept the stipulation as evidence and

15   regard the fact as proven.

16        Certain testimony during the course of the trial has

17   been presented to you through what we call depositions.  A

18   deposition is the sworn, recorded answers to questions asked to

19   a witness in advance of the trial.  If a witness cannot be

20   present to testify in person, the witness's testimony may be

21   presented under oath in the form of a deposition.

22        As I told you earlier, before the trial began, the

23   attorneys representing all the parties questioned these

24   deposition witnesses under oath.  At that time, a court

25   reporter was present, and the witnesses were sworn.  Deposition

1  testimony is entitled to the same consideration by you as

2  testimony given by a witness in person from the witness stand

3  in open court.

4        As a result, you should judge the credibility and

5  importance of deposition testimony to the best of your ability

6  just as if the witness had testified to you in person in open

7  court.

8        Now, while you should consider only the evidence in

9  this case, you should understand, ladies, that you are

10  permitted to draw such reasonable inferences from the testimony

11  and the exhibits as you feel are justified in the light of

12  common experience.

13        In other words, members of the jury, you may make

14  deductions and reach conclusions that reason and common sense

15  lead you to draw from the facts that have been established by

16  the testimony and the evidence in this case.

17        However, you should not base your decision on any

18  evidence not presented by the parties in open court during the

19  course of the trial, including your own personal experiences.

20        Now, unless I instruct you otherwise, you may properly

21  determine that the testimony of a single witness is sufficient

22  to prove any fact, even if a greater number of witnesses may

23  have testified to the contrary, if considering all of the other

24  evidence you believe that single witness.

25        When knowledge of a technical subject may be helpful

to the jury, a person who has special training and experience in that technical field, called an expert witness, is permitted to state his or her opinions on those technical matters to the jury.

However, you should understand you're not required to accept those opinions.  As with any other witness, it's solely up to you to decide who you believe and who you don't believe and whether or not you want to rely or not rely on their testimony.

Now, during the course of the trial, certain exhibits have been shown to you that were illustrations.  We call these type of exhibits demonstrative exhibits.  Often they're simply called, for short, demonstratives.

Demonstrative exhibits are a party's description, picture, drawing, or model to describe something involved in the trial.

If your recollection of the evidence differs from the demonstratives, you should rely on your recollection. Understand, demonstrative exhibits, which are sometimes called jury aids, are not evidence themselves, but the witness's testimony when they use a demonstrative is evidence.

In any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiffs for some issues, and it's on the Defendants for other issues.

1        There are two burdens of proof that you'll apply in

2  this case, the preponderance of the evidence and clear and

3  convincing evidence.

4        The Plaintiffs in this case, Optis Wireless Technology

5  LLC, PanOptis Patent Management LLC, and Optis Cellular

6  Technology LLC, who I'll refer to and have referred to

7  throughout the trial collectively as the Plaintiffs or simply

8  PanOptis, have the burden of proving patent infringement by a

9  preponderance of the evidence.

10        PanOptis also has the burden of proving willful patent

11  infringement by a preponderance of the evidence.

12        And PanOptis also has the burden of proving damages

13  for any patent infringement by a preponderance of the evidence.

14        A preponderance of the evidence means evidence that

15  persuades you that a claim is more probably true than not true.

16  Sometimes this is talked about as being the greater weight and

17  degree of credible testimony.

18        The Defendants in this case, Huawei Device USA, Inc.,

19  and Huawei Device (Shenzhen) Company Limited, who I've referred

20  to and will refer to collectively as Huawei or as the

21  Defendants, have the burden of proving patent invalidity by

22  clear and convincing evidence.

23        Clear and convincing evidence means evidence that

24  produces in your mind an abiding conviction that the truth of

25  the parties' factual contentions are highly probable.  Although

proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If the proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

These standards are different from what you've learned about in criminal proceedings where a fact must be proven beyond a reasonable doubt.

On a scale of the various standards of proof, as you move from the preponderance of the evidence, where the proof need only be sufficient to tip the scales in favor of the party proving a fact, to the other end of the spectrum, beyond a reasonable doubt, where the fact must be proven to a very high degree of certainty, you can think of clear and convincing evidence as being between those two points on the spectrum.

In determining whether any fact has been proved by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations of the parties, the testimony of all the witnesses, regardless of who called them, and all the exhibits that have been received into evidence by the Court during the course of the trial, regardless of who may have produced them.

Now, as I did at the start of the case, I'll first

1    give you a summary of each side's contentions.  I'll then

2    provide you with detailed instructions on what each side must

3    prove to win on each of its contentions.

4              As I've told you previously, this is an action

5    alleging patent infringement.  The case concerns five separate

6    United States patents.

7              They are:

8              United States Patent 6,604,216, which we've referred

9    to throughout the trial as the '216 or the '216 patent.

10             United States Patent 7,769,238, which we referred to

11   throughout the trial as the '238 or the '238 patent.

12             United States Patent 8,208,569, which we have referred

13   to throughout the trial as the '569 patent or the '569 patent.

14             United States Patent 8,385,284, which we've referred

15   to throughout the trial as the '284 patent or the '284 patent.

16             And United States Patent 8,437,293, which we've

17   referred to throughout the trial as the '293 or the '293

18   patent.

19             I will refer to these patents collectively as the

20   patents-in-suit or as the asserted patents.  And in so doing,

21   I'm referring to all five of them, as I told you, collectively.

22             Now, the Plaintiff, PanOptis, contends that the

23   Defendants, Huawei, directly infringed the following claims of

24   the patents-in-suit:

25             Claim 1 of the '216 patent.

1          Claim 1 of the '238 patent.

2          Claims 11 and 17 of the '569 patent.

3          Claim 1 of the '284 patent.

4          And Claim 14 of the '293 patent.

5          These are the asserted claims.

6          The Plaintiffs, PanOptis, seeks money damages from the

7    Defendants, Huawei, for allegedly infringing all of the

8    asserted claims by making, using, selling, or offering for sale

9    within the United States and/or importing into the United

10   States products that PanOptis argues are covered by those

11   claims.

12         For the '216, '569, '284, and '293 patents, Huawei's

13   accused products are those listed on Exhibit A that I've

14   attached to these instructions.  And as I've told you, you'll

15   each have a copy of these instructions, including the exhibits

16   attached to it.

17         For the '238 patent, Huawei's accused products are

18   those listed in Exhibit B that's been attached to these

19   instructions.

20         Huawei, the Defendants, denies that they have

21   infringed any claim of the asserted patents.  Huawei contends

22   that during the terms of these patents, it did not make, sell,

23   use, or offer for sale within the United States or import into

24   the United States any product that infringes any of the

25   asserted claims of the asserted patents.

1          Huawei also denies that PanOptis is entitled to any

2     damages.

3          Huawei contends that all of the asserted claims of all

4     of the asserted patents are invalid as obvious in view of prior

5     art that existed before PanOptis's alleged inventions.

6          Let me say that again.  Huawei contends that all the

7     asserted claims of all the asserted patents are invalid as

8     obvious in view of prior art that existed before PanOptis's

9     patents were effective, and, therefore, all the asserted claims

10    of all the asserted patents in this case are invalid.

11         You should understand invalidity is a defense to

12    infringement.  Invalidity and infringement are separate and

13    distinct issues, however.

14         Your job is to decide whether Huawei has infringed any

15    of the asserted claims of the asserted patents and whether any

16    of the asserted claims are invalid.

17         If you decide that any claim of any asserted patent

18    has been infringed and is not invalid, you'll then have to

19    decide what amount of money damages should be awarded to

20    PanOptis to compensate it for that infringement.

21         You'll also need to make a finding as to whether that

22    infringement was willful.  If you decide that any infringement

23    was willful, that decision should not affect any of the damages

24    that you award.

25         I will take willfulness into account later.

```
 1          Before you can decide many of the issues in this case,

 2   you'll need to understand the role of the patent claims.  The

 3   patents -- excuse me, the patent claims are the numbered

 4   sentences at the end of each patent.  The claims are important

 5   because it's the words of the claims that define what a patent

 6   covers.  The figures and the text in the rest of the patent

 7   provide a description and/or examples of the invention, and

 8   they provide a context for the claims, but it is the claims,

 9   ladies of the jury, that define the breadth of the patent's

10   coverage.

11          Each claim is effectively treated as if -- as if it

12   were its own separate patent, and each claim may cover more or

13   cover less than any other claim.  Therefore, what a patent

14   covers depends, in turn, on what each of its claims covers.

15          Now, you will first need to understand what each claim

16   covers in order to decide whether or not there is infringement

17   of any claim and to decide whether or not the claim is invalid.

18          The law says that it's my role to define the terms of

19   the claims, and it's your role to apply my definitions to the

20   issues that you are asked to decide in this case.  Therefore,

21   as I explained to you at the start of the trial, I have already

22   determined the meanings of some of the claim terms in this case

23   and have provided them to you with my constructions or

24   definitions to those construed terms, and those have been

25   included in your juror notebooks.
```

1          You must accept my definitions or constructions of

2     those words in the claims as being correct.

3          It's your job to take these definitions that I have

4     given you and apply them to the issues that you are deciding,

5     including the issues of infringement and validity.

6          You should disregard any evidence presented at trial

7     that contradicts or is inconsistent with the constructions and

8     definitions that I have given you.

9          For the claim terms that I have not construed or

10    defined, you are to apply and use the plain and ordinary

11    meaning of the terms as understood by one of ordinary skill in

12    the art; that is, in the field of the technology of the patent

13    at the time of the alleged invention.

14         The meaning of the words in the patent claims must be

15    the same when you decide the issues of both infringement and

16    invalidity.

17         I'll now explain to you how a claim defines what it

18    covers.

19         A claim sets forth, in words, a set of requirements.

20    Each claim sets forth its requirements in a single sentence.

21    If a device or method satisfies each of the requirements, then

22    it is -- then it is said to cover that claim and it infringes

23    that claim.

24         There can be several claims in a patent.  Each claim

25    may be narrower or broader than another claim by setting forth

1    more or fewer requirements.  The coverage of a patent is

2    assessed on a claim-by-claim basis.

3            In patent law, the requirements of a claim are often

4    referred to as the claim elements, and they're often sometimes

5    called the claim limitations.

6            When a thing, such as a product or process, meets all

7    of the requirements of a claim, the claim is said to cover that

8    thing, and that thing is said to fall within the scope of that

9    claim.  In other words, a claim covers a product or process

10   where each of the claim elements or limitations is present in

11   that product or process.

12           If a product or process is missing even one limitation

13   or element of a claim, then that product or process is not

14   covered by the claim.  And if the product or process is not

15   covered by the claim, then it does not infringe that claim.

16           Now, the beginning portion or preamble of a number of

17   the claims in this case use the word "comprising."  The word

18   "comprising," when used in a preamble, means including but not

19   limited to or containing but not limited to.

20           When comprising is used in the preamble of a claim, a

21   device that includes all the limitations of the claim is

22   covered by the claim, even if the device covers additional

23   elements.  For example, a claim to a table comprising a

24   tabletop, legs, and glue would be infringed by a table that

25   includes a tabletop, legs and glue, even if it also contains

1   other features, such as wheels on the ends of the legs.

2          Now, this type of case involves two types of patent

3   claims:  Independent claims and dependent claims.

4          An independent claim, ladies of the jury, does not

5   refer to any other claim in the patent.  An independent claim

6   sets forth all the requirements that must be met in order to be

7   covered by that claim.  Therefore, it's not necessary to look

8   at any other claim to determine what an independent claim

9   covers.

10          However, a dependent claim does not itself recite all

11   the requirements of the claim but refers to one or more other

12   claims, at least one of which is an independent claim for some

13   of its requirements.

14          In this way, the claim depends from the other claim,

15   hence the term "dependent claim."

16          A dependent claim incorporates all the requirements of

17   the claim or claims to which it refers, or said another way,

18   from which it depends, as well as the requirements within the

19   dependent claim itself.  The dependent claim adds its own

20   requirements to the claim or claims to which it refers.

21          To determine what a dependent claim covers, it's

22   necessary to look at both the dependent claim and the other

23   claim or claims to which it refers, or said another way, from

24   which it depends.

25          A product or a process that meets all the requirements

1    of both the dependent claim and the claim or claims to which it

2    refers or from which it depends is covered by the dependent

3    claim.

4          For each of the asserted claims in this case, their

5    independence or dependence is as follows:

6          For the '216 patent, Claim 1 is an independent claim;

7          For the '238 patent, Claim 1 is an independent claim;

8          For the '569 patent, Claim 11 is an independent claim,

9    but Claim 17 is a dependent claim;

10         For the '284 patent, Claim 1 is an independent claim;

11   and

12         For the '293 patent, Claim 14 is a dependent claim.

13         Please note while dependent Claim 14 for patent '293

14   depends from Independent Claim 12, Independent Claim 12 is not

15   an asserted claim in this case and should not be -- and should

16   only be, rather, considered in the context of Claim 14's

17   dependency upon it.

18         Now, certain claims use the phrase "means for."  This

19   "means for" phrase has a special meaning in patent law.  It's

20   called a means-plus-function requirement.  It does not cover

21   all the structures that could perform the function set forth in

22   the claim.  Instead, it covers a structure or set of structures

23   that performs that function and that is either identical or

24   equivalent to the structures described in the patent for

25   performing the function.

1          The issue of whether two structures are identical or

2     equivalent is for you to decide.  I'll explain to you later how

3     to determine whether two structures or two sets of structures

4     are equivalent to one another.

5          In the claim construction section of your juror

6     notebooks, I've identified the structures described in the

7     patents for performing the relevant functions.  You should

8     apply my definitions to those functions and the structures

9     described in the patent for performing them, and you should --

10     and as you would, rather, as you would apply my definition to

11     any other claim term.

12          Now, a patent owner has the right to stop others from

13     using the invention covered by its patent claims in the United

14     States during the life of the patent.  If any person makes,

15     uses, sells, or offers for sale within the United States or

16     imports into the United States what is covered by the patent

17     claims without the patent owner's permission, that person is

18     said to infringe the patent.

19          In reaching your decision on infringement, keep in

20     mind, ladies, that only the claims of a patent can be

21     infringed.  You must compare the asserted claims, as I've

22     defined each of them, to the accused products and determine

23     whether or not there is infringement.

24          You should not compare the accused products with any

25     specific example set out in the patent or with the patent

owner's commercial products or with any prior art in reaching your decision on infringement.

The only correct comparison is between the accused products and the language of the claims themselves, as the Court has construed or defined them.

You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence that's been presented to you by the parties over the course of the trial.

The issue of infringement is assessed on a claim-by-claim basis.  That means there may be infringement as to one claim even if there is no infringement as to other claims.

However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to or depends on that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the additional requirements of any dependent claims have been satisfied.

That's because a dependent claim includes all the requirements of any of the claims to which it refers, plus its own additional requirements.

1    In order to prove direct infringement of a patent

2    claim, the Plaintiffs, PanOptis, must show by a preponderance

3    of the evidence that the accused product or process includes

4    each and every requirement or limitation of the claim, either

5    literally or under the Doctrine of Equivalents.

6    In determining whether the accused product or process

7    literally infringes one of the asserted claims in this case,

8    you must compare the accused product or process with each and

9    every one of the requirements or limitations of that claim to

10   determine whether the accused product or process contains each

11   and every limitation recited in the claim.

12   A claim requirement is present if it exists in an

13   accused product or process just as it is described in the claim

14   language, either as I have explained that language to you, or

15   if I did not explain it or construe it, as it would be

16   understood by its plain and ordinary meaning by one of ordinary

17   skill in the art.

18   If an accused product or process omits any requirement

19   recited in a claim, then you must find that the particular

20   product or process does not literally infringe that particular

21   claim.

22   If an accused product or process does not meet all the

23   requirements of a claim and thus does not literally infringe

24   the claim, there can still be direct infringement if that

25   product or process satisfies the claim under the Doctrine of

```
 1   Equivalents.
 2            Under the Doctrine of Equivalents, an accused product
 3   or process infringes a claim if the accused product or process
 4   performs steps or contains elements corresponding to each and
 5   every requirement of the claim that are equivalent to, even
 6   though not literally met by the accused product or process.
 7            You may find that a step or element is equivalent to a
 8   requirement of a claim that is not literally met if a person
 9   having ordinary skill in the field of the technology of the
10   patent would have considered the differences between them to be
11   insubstantial or would have found that the structure performs
12   substantially the same function in substantially the same way
13   to achieve substantially the same results.
14            In order to prove that an accused product or process
15   meets a limitation by equivalents, PanOptis must prove the
16   equivalency of the claim element by a preponderance of the
17   evidence.
18            A patent can be directly infringed even if the alleged
19   infringer did not have knowledge of the patent and without the
20   infringer knowing that what it was doing infringed the claim.
21            A patent may also be directly infringed even though
22   the infringer -- the accused infringer believes in good faith
23   that what it is doing is not infringement of the patent.
24            Now, as I've explained to you previously, certain
25   claims include requirements that are means -- that are in
```

means-plus-function form.

A product meets a means-plus-function requirement of a claim if, one, it has a structure or set of structures that performs the identical function recited in the claim, and, two, that structure or set of structures is either identical or equivalent to one or more of the described structures that I defined earlier as performing the associated function of the claim term.

If a product does not perform the specific function recited in the claim, the means-plus-function requirement is not met, and the product does not directly infringe the claim.

Alternatively, even if the product has a structure or set of structures that performs the function recited in the claim but the structure or set of structures is neither identical nor equivalent to the structure that I defined to you as being described in the patent and performing this function, then the product does not directly infringe the asserted claim.

In this case, PanOptis argues that Huawei has infringed and further that Huawei has infringed willfully. If you've decided that Huawei has infringed, you must go on and address the additional issue of whether or not this infringement was willful.

Willfulness requires you to determine whether PanOptis proved it is more likely than not that the infringement by Huawei was especially worthy of punishment.  You may not

1   determine that the infringement was willful just because Huawei

2   knew of the asserted patents and infringed them.

3          Instead, willful infringement is reserved for only the

4   most egregious behavior, such as where the infringement is

5   malicious, deliberate, consciously wrongful, or done in bad

6   faith.

7          To determine whether Huawei acted willfully, consider

8   all the facts, and these may include but are not limited to the

9   following:

10          (1) whether or not Huawei acted consistently with the

11   standards of behavior for its industry.

12          (2) whether or not Huawei reasonably believed that it

13   did not infringe or that the patent was invalid.

14          (3) whether or not Huawei made a good faith effort to

15   avoid infringing the asserted patents -- for example, whether

16   Huawei attempted to design around the asserted patents.

17          And, (4), whether or not Huawei tried to cover up its

18   infringement.

19          None of these factors alone is determinative, and this

20   is not an exhaustive list of the things that you should

21   consider.

22          Your determination of willfulness should incorporate

23   the totality of the circumstances based on all of the evidence

24   presented during the trial.

25          If you decide that any infringement was willful, that

1    decision should not affect any damages award that you might

2    make.  As I've said, the Court will take willfulness into

3    account later.

4         I'll now instruct you on the rules that you must

5    follow in deciding whether or not Huawei has proven that the

6    asserted claims of the asserted patents are invalid.

7         A United States patent is accorded a presumption of

8    validity based on the presumption that the United States Patent

9    and Trademark Office, which you've heard referred to throughout

10   the trial simply as the PTO, has acted correctly in issuing the

11   patent.

12        This presumption of validity extends to all issued

13   United States patents, including those that claim the benefit

14   of an earlier patent application, such as so-called

15   continuation or continuation-in-part applications.

16        Now, to prove that any claim of a patent is invalid,

17   Huawei, the Defendants, must persuade you by clear and

18   convincing evidence that the claim is invalid.

19        You have heard evidence of prior art that the Patent

20   Office may or may have -- may or may not have evaluated.  The

21   fact that any particular reference was or was not considered by

22   the Patent Office does not change Huawei's burden of proof.

23   However, in making your decision whether Huawei has met its

24   burden of proof by clear and convincing evidence as to a

25   particular patent claim, you may take into account the fact

1    that the prior art was not considered by the Patent Office.

2          Prior art differing from the prior art considered by

3    the Patent Office may, but does not always, carry more weight

4    than the prior art that was considered by the Patent Office.

5          Again, members of the jury, the ultimate

6    responsibility for deciding whether the claims of the patent

7    are valid is up to you.

8          Keep in mind that everyone has the right to use

9    existing knowledge and principles.  A patent cannot remove from

10   the public the ability to use what was known or obvious before

11   the invention was made or patent protection was sought.

12         Like infringement, invalidity is determined on a

13   claim-by-claim basis.  In making your determination as to

14   invalidity, you should consider each claim separately.  If one

15   claim of a patent is invalid, this does not mean that any other

16   claim is necessarily invalid.

17         Claims are construed the same way for determine --

18   determining infringement as for determining invalidity.

19         Now, in patent law, a previous device, system, method,

20   publication or patent that predates the claimed invention is

21   generally called a prior art reference.  Prior art may include

22   any of the following:

23         1.  Any product or system that was known or used by

24   others in the United States before the patented invention was

25   made;

1          2.   Any patent that issued or any printed publication

2     that was published anywhere in the world before the patented

3     inventions were made;

4          3.   Any product or system that was in public use or on

5     sale in the United States more than one year before the

6     applications for the asserted patents were filed;

7          4.   Any patents that issued or any public -- any

8     printed publication that was published anywhere in the world

9     more than one year before the application of the assert -- for

10    the asserted patents were filed;

11         5.   Any patent application that was filed in the

12    United States by someone other than the inventors of the

13    asserted patents before the invention was made.

14         In this case, Huawei contends that the items listed in

15    Exhibit C to these final jury instruction are prior art as to

16    the '293, the '569, and the '238 patents.

17         The priority dates for the '216, the '284, the '569,

18    the '293, and the '238 patents are as follows:

19         For the '216 patent, the priority date is December the

20    1st, 1999.

21         For the '284 patent, the priority date is December the

22    20th, 2007.

23         For the '569 patent, the priority date is June the

24    12th, 2003.

25         For the '293 patent, the priority date is June the

1    19th, 2007.

2          And for the '238 patent, the priority date is June --

3    is April the 15th, 2002.

4          A provisional patent application is a legal document

5    filed with the United States Patent and Trademark Office --

6    Office to establish an early filing date, but it does not

7    become a formal patent application unless the applicant files

8    for a patent within one year.

9          Huawei contends that certain United States patents are

10   prior art to certain of the asserted claims based on the filing

11   dates of the prior art patent's provisional applications.  An

12   issued patent is given the benefit of the earlier filing date

13   of its provisional application if:

14         (1) the provisional application contains a written

15   description of the invention claimed in the issued patent in

16   such full, clear, concise, and exact terms to enable a person

17   having ordinary skill in the art to practice the invention

18   claimed in the issued patent;

19         And, (2), the subject matter relied on in the issued

20   patent is supported by the provisional application.

21         The written-description requirement is satisfied if a

22   person having ordinary skill in the art reading the provisional

23   patent application would have recognized that it describes the

24   full scope of the claimed invention as it is finally claimed in

25   the issued patent and that the inventor actually possessed that

1   full scope by the filing date of the provisional application.

2        The written description requirement may be satisfied

3   by any combination of the words, structures, figures, diagrams,

4   formulas, et cetera, contained in the provisional application.

5        The full scope of a claim or any particular

6   requirement in a claim need not be expressly disclosed in the

7   provisional application if a person having ordinary skill in

8   the field of the technology of the patent at the time of the

9   filing would have understood that the full scope or the missing

10  requirement is in the written description of the provisional

11  application.

12       It's not necessary that each and every aspect of the

13  claim in the issued patent be explicitly discussed and specific

14  examples of what is claimed are not required, as long as a

15  person having ordinary skill would understand that any aspect

16  not expressly discussed is implicit in the provisional

17  application as originally filed.

18       The enablement requirement is satisfied if the

19  provisional patent application would permit persons having

20  ordinary skill in the art to make and use the full scope of the

21  invention claimed in the issued patent at the time of the

22  provisional filing without having to conduct undue

23  experimentation.  However, some amount of experimentation to

24  make and use the invention is allowable.

25       Now, Huawei contends that certain prior art references

1  listed above qualify as printed publications before the

2  priority dates of the asserted patents.

3         A printed publication must have been maintained in

4  some tangible form, such as printed pages, typewritten pages,

5  Internet publication or photocopies, and must have been

6  sufficiently accessible to persons interested in the subject

7  matter of its contents.

8         Information is publicly accessible if it was

9  distributed or otherwise made available to the extent that

10  persons interested and ordinarily skilled in the subject matter

11  exercising reasonable diligence can locate it.  It's not

12  necessary for the printed publication to have been available to

13  every member of the public.

14         An issued patent is a printed publication.  A

15  published patent application is a printed publication as of its

16  publication date.

17         Huawei contends that all of the patents-in-suit are

18  invalid as being obvious.  Even though an invention may not

19  have been identically disclosed or described before it was made

20  by an inventor in order to be patentable, the invention also

21  must not have been obvious to a person of ordinary skill in the

22  field of technology of the patent at the -- at the time the

23  invention was made or before the filing date of the patent.

24         Huawei, the Defendants, are required to establish that

25  a patent claim is invalid by showing by clear and convincing

evidence that the claimed invention would -- would have been

obvious to persons having ordinary skill in the art at the time

the invention was made or the patent was filed in the field of

the invention.

In determining whether a claimed invention is obvious,

you must consider the level of ordinary skill in the field of

the invention that someone would have had at the time the

invention was made or the patent was filed, the scope and

content of the prior art, and any differences between the prior

art and the claimed invention.

Keep in mind, ladies of the jury, that the existence

of each and every element of the claimed invention in the prior

art does not necessarily prove obviousness.  Most, if not all,

inventions rely on the building blocks of prior art.

In considering whether a claimed invention is obvious,

you may, but you are not required to find obviousness, if you

find that at the time of the claimed invention or the patent's

filing date there was a reason that would have prompted a

person having ordinary skill in the field of the invention to

combine the known elements in a way the claimed invention does,

taking into account such factors as:

(1) whether the claimed invention was merely the

predictable result of using prior art elements according to

their known functions.

(2) whether the claimed invention provides an obvious

1   solution to a known problem in the relevant field.

2           (3) whether the prior art teaches or suggests the

3   desirability of combining elements claimed in the invention.

4           (4) whether the prior art teaches away from combining

5   elements in the claimed invention.

6           And, (5), whether the -- whether the change resulted

7   more from design incentives or other market forces.

8           To find that it rendered the invention obvious, you

9   must find that the prior art provided a reasonable expectation

10  of success.

11          In determining whether the claimed invention was

12  obvious, consider each claim separately.  Do not use hindsight.

13  In other words, you should not consider what a person of

14  ordinary skill in the art would know now or what has been

15  learned from the teachings of the asserted patents.

16          In making these assessments, you should take into

17  account any objective evidence, sometimes called secondary

18  considerations, that may shed light on the obviousness or not

19  of the claimed invention, such as:

20          (1) whether the claimed invention was commercially

21  successful as a result of the merits of the claimed invention,

22  rather than as the result of design need or market-pressure

23  advertising or similar activities.

24          (2) whether the invention satisfied a long-felt need.

25          (3) whether others had tried and failed to make the

invention.

(4) whether others invented the invention at roughly the same time.

(5) whether others copied the invention.

(6) whether there were changes or related technologies or market needs contemporaneous with the invention.

(7) whether the inventor achieved unexpected results.

(8) whether others in the field praised the invention.

(9) whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention.

(10) whether others sought or obtained rights to the patent from the patentholder.

And, (11), whether the inventor proceeded contrary to accepted wisdom in the field.

No one of these factors alone is dispositive, and you must consider the obviousness or non-obviousness of the invention as a whole.  These factors are relevant only if there is a connection or nexus between the factor and the asserted claims of the asserted patents.

Even if you conclude that some of the above indicators have been established, those factors should be considered along with all the other evidence in the case in determining whether Huawei has proven that the claimed invention would have been obvious.

```
 1            Several times in my instructions, I've referred to a

 2   person of ordinary skill in the art or in the field of the

 3   invention.  It's up to you, ladies of the jury, to decide the

 4   level of ordinary skill in the field of the invention.

 5            In deciding what the level of ordinary skill in the

 6   field of the invention is, you should consider all the evidence

 7   introduced during the trial, including but not limited to the

 8   following:

 9            (1) the levels of education and experience of the

10   inventor and other persons actively working in the field.

11            (2) the types of problems encountered in the field.

12            (3) prior art solutions to those problems.

13            (4) rapidity with which innovations are made.

14            And, (5), the sophistication of the technology.

15            If you find that Huawei has infringed any valid claim

16   of PanOptis's asserted patents, then you must consider what

17   amount of damages to award PanOptis.

18            I'll now instruct you about the measure of damages,

19   but by instructing you on damages, I am not suggesting which

20   party should win this case on any issue.

21            The damages that you award must be adequate to

22   compensate PanOptis for any infringement you may find.

23   However, you must not award PanOptis more damages than are

24   adequate to compensate it for the infringement, nor should you

25   include any additional amount for the purpose of punishing
```

1   Huawei or setting an example.

2        PanOptis has the burden to establish its damages by a

3   preponderance of the evidence.  PanOptis is not entitled to

4   damages that are remote or speculative.

5        PanOptis seeks damages in the form of a reasonable

6   royalty.  A reasonable royalty is defined as the amount of

7   money PanOptis and Huawei would have agreed on as a fee for

8   Huawei's use of PanOptis's inventions at the time the

9   infringement began.

10       The determination of a damages award, however, is not

11   an exact science, and the amount need not be proven with

12   unerring precision.  You may approximate, if necessary, the

13   amount to which PanOptis is entitled.

14       Now, while damages may not be determined by mere

15   speculation or guess, it may be proper to award a damages

16   amount if the evidence shows the extent of the damages as a

17   matter of just and reasonable inference.

18       I'll give you more detailed instructions regarding

19   damages shortly.  However, note that PanOptis is entitled to

20   recover no less than a reasonable royalty for each infringing

21   sale or use of its patented technology.

22       A royalty is a payment made to a patentholder in

23   exchange for the right to make, use, or sell the claimed

24   invention.

25       A reasonable royalty is the amount of royalty payment

1  that a patentholder and the alleged infringer would have agreed

2  to in a hypothetical negotiation taking place at a time prior

3  to when the infringement first began.

4       In considering this hypothetical negotiation, you

5  should focus on what the expectations of the patentholder and

6  the alleged infringer would have been had they entered into an

7  agreement at that time and had -- and had they acted reasonably

8  in their negotiations.

9       In determining this, you must assume that both parties

10  believe the patent -- or in this case, the patents were valid

11  and infringed and that both parties were willing to enter into

12  an agreement.

13       The reasonable royalty you determine must be a royalty

14  that would have resulted from the hypothetical negotiation and

15  not simply a royalty that either party would have preferred.

16       Evidence of things that happened after the

17  infringement first began can be considered in evaluating the

18  reasonable royalty only to the extent that the evidence aids in

19  assessing what royalty would have resulted from a hypothetical

20  negotiation.

21       Your determination does not depend on the actual

22  willingness of the parties to the lawsuit to engage in such

23  negotiations.

24       Your focus, as part of this hypothetical negotiation,

25  should be on what the parties' expectations would have been had

1   they willingly entered into negotiations for royalties at the

2   time of first infringement.

3          Where the parties dispute a matter concerning damages

4   for infringement, it is PanOptis's burden to prove that it is

5   more probable than not that PanOptis's version is correct.

6          PanOptis must prove the amount of its damages with

7   reasonable certainty but need not prove the amount of damages

8   with mathematical precision.  But, again, PanOptis is not

9   entitled to damages that are remote or speculative.

10          If you find that any of the asserted patents are both

11   infringed and not invalid, you must award damages to compensate

12   for any such infringement.

13          A reasonable royalty must reflect that the '216, the

14   '569, the '293, and the '284 patents have been declared to be

15   essential to the cellular standards of the European

16   Telecommunications Standards Institute, sometimes called ETSI,

17   E-T-S-I.

18          Further, PanOptis committed to license the '216, the

19   '569, the '293, and the '284 patents on fair, reasonable, and

20   non-discriminatory, often called FRAND, F-R-A-N-D, terms.

21          Both this FRAND commitment, I'll refer to at times in

22   my instructions to standard essential patents -- because of

23   this FRAND commitment, I'll refer in my instructions at times

24   to standard essential patents.  By referring to standard

25   essential patents, the Court is not instructing you that the

1    asserted patents are actually essential to any standard.

2    Again, it's up to you, the jury, to decide whether or not

3    PanOptis has proven that the patents are standard essential and

4    infringed.

5           Ericsson and Panasonic -- Panasonic, PanOptis's

6    predecessors in interest with respect to the asserted

7    patents -- submitted written commitments to ETSI covering the

8    '216, the '569, the '293 patent, and the '284 patent in which

9    they agreed to grant irrevocable licenses on fair, reasonable,

10   and non-discriminatory, or FRAND, terms and conditions.

11          Because Ericsson and Panasonic -- Panasonic are

12   predecessors in interest to PanOptis, PanOptis has the same

13   FRAND obligations as Ericsson and Panasonic had when they

14   submitted their written commitments to ETSI.

15          You must make sure that any reasonable royalty

16   determination takes into account PanOptis's FRAND obligations

17   as the Court has just explained them to you.  A reasonable

18   royalty in this case for the '216, '569, '293, and '284 patents

19   cannot exceed the amount permitted under PanOptis's FRAND

20   obligations.

21          In determining what amount is a FRAND royalty, you may

22   consider any evidence of patent hold-up and royalty stacking.

23          The '238 patent has not been declared essential to any

24   cellular standard, and, therefore, a reasonable royalty

25   determination regarding the '238 patent need not take into

1    account any FRAND obligations.

2           I'll provide you with additional instructions on how a

3    FRAND commitment for the asserted patent affects your

4    determination of reasonable royalty.

5           In determining the reasonable royalty, you should

6    consider all the facts known and available to the parties at

7    the time the infringement began.  Some of the kinds of factors

8    that you may consider in making your determination are as

9    follows:

10          1.  The royalties received by the patentee for

11   licensing of the patents-in-suit proving or tending to prove an

12   established royalty.

13          2.  The rates paid by a licensee for the use of other

14   patents comparable to the patents-in-suit.

15          3.  The nature and scope of the license as exclusive

16   or non-exclusive or as restricted or non-restricted in terms of

17   territory or with respect to the parties to whom the

18   manufacture -- manufactured products may be sold.

19          4.  Whether being able to use the patented invention

20   helps in making sales of other products or services;

21          5.  The duration of the patent and the term of the

22   license.

23          6.  The extent to which the infringer has made use of

24   the invention and any evidence probative of the value of that

25   use.

1          7.   The portion of the profit or of the selling price

2     that may be customary in the particular business or in

3     comparable businesses to allow for the use of the invention or

4     analogous inventions.

5          8.   The portion of the realizable profits that should

6     be credited to the invention as distinguished from non-patented

7     elements, the manufacturing process, business risks, or

8     significant features or improvements added by the infringer.

9          9.   The opinion and testimony of qualified experts.

10          10.   The amount that a licensor, such as the patentee,

11     and a licensee, such as the infringer, would have agreed upon

12     at the time the infringement began if both sides had been

13     reasonably and voluntarily trying to reach an agreement.

14          Now, no one of these factors is dispositive, and you

15     can and should consider evidence that has been presented to you

16     in this case on each of these factors.

17          You may also consider any other factors that in your

18     minds would have increased or decreased the royalty the alleged

19     infringer would have been willing to pay and the patentholder

20     would have been willing to accept acting as normally prudent

21     business people.

22          When determining a reasonable royalty, you may

23     consider evidence concerning the amounts that other parties

24     have paid for rights to the '216, '569, '293, '284, or '238

25     patents or for rights to similar technologies.

1             A license agreement need not be perfectly comparable

2    to a hypothetical license that would have been negotiate --

3    negotiated between PanOptis and Huawei in order for you to

4    consider it.

5             However, if you choose to rely upon evidence from any

6    license agreements, you must account for any differences

7    between those licenses and the hypothetically negotiated

8    license between PanOptis and Huawei when you make your

9    determination of reason -- of a reasonable royalty, including

10   the types of technology licensed, whether the license contained

11   a cross-license and/or similar patent protections, whether the

12   license contained any value related to a release of liability,

13   the date when the license was entered, the financial or

14   economic conditions of the parties at the time the parties

15   entered into a license, the of extent of use, if any, of any

16   particular licensed patents, the number of patents involved in

17   the license, whether or not the license covered foreign

18   intellectual property rights, the extent to which litigation

19   may have affected the license, and whether contrary to the

20   hypothetical negotiation, the licensee in the real-world

21   license at the time of entering the license believed that the

22   patents were either not infringed or were invalid.

23            This difference should also account for the assumption

24   of the parties during the hypothetical negotiation that the

25   patents covered by the hypothetical license were valid and

1   infringed, assumptions that may not have existed when other

2   comparable license were -- licenses were agreed upon.

3         Damages for patent infringement must be apportioned to

4   reflect the value the invention contributes to the accused

5   products or features and must not include value from the

6   accused products or features that is not attributable to the

7   patent.

8         For the '216, '569, '293, and '284 patents, which have

9   a FRAND obligation to ETSI as part of the LTE standards, you

10  must consider the following two factors:

11        (1) any royalty for the patented technology must be

12  apportioned from the value of the standard as a whole; and.

13        (2) the FRAND royalty rate must be based on the

14  incremental value that the patented technology adds to the

15  product, not any value added by the standardization of that

16  technology.

17        In considering the evidence of a reasonable royalty,

18  you are not required to accept one specific figure or another

19  for the reasonable royalty.  You are entitled to determine what

20  you consider to be a reasonable royalty based on your

21  consideration of all the evidence presented by the parties,

22  whether that evidence is of a specific figure or a range of

23  figures.

24        A reasonable royalty can take the form of a run --

25  running royalty or a fully paid-up, lump-sum royalty.

1        A running royalty is a fee that is paid for the right

2   to use the patent that is paid for each unit or infringing

3   product sold.

4        A paid-up lump-sum is when the infringer pays a single

5   price for a license covering both past and future infringing

6   sales.

7        If you find PanOptis is entitled to damages, you must

8   decide whether the parties would have agreed to a running

9   royalty or a fully paid-up lump-sum royalty at the time of the

10  hypothetical negotiation.

11       Now, with these instructions, ladies of the jury,

12  we're ready to hear closing arguments for the attorneys in this

13  case.

14       We'll now hear the first closing argument from the

15  Plaintiffs.

16       Mr. Burgess, you may present the Plaintiffs' first

17  closing argument.

18       MR. BURGESS:  Thank you, Your Honor.

19       THE COURT:  You may proceed.

20       MR. BURGESS:  Thank you, Your Honor.

21       Members of the jury, when this case started, you heard

22  that it was a trespass case.  It turns out, it's a case of very

23  determined willful trespass.

24       PanOptis has been negotiating with Huawei for years,

25  but Huawei just won't pay fair value for PanOptis's patents,

1  even though its 4G competitors have paid over a hundred million

2  dollars in aggregate license fees for PanOptis's patents.

3         You see, Huawei is the odd man out, and it is bound

4  and determined to keep it that way.  Huawei thinks that if it

5  just keeps making low-ball offers, it can continue to string

6  PanOptis along and never have to pay fair value.

7         But you can change that today.

8         We're here right now because Huawei left PanOptis no

9  choice but to file this lawsuit to protect its intellectual

10  property.  And it's up to you to decide if they had any defense

11  worth bringing.

12         Here's what we know so far.  Huawei could not muster

13  infringement defenses on two of the five patents.  They

14  couldn't muster invalidity defenses on another two of the

15  patents.

16         Their damages model assumes that all of the patents

17  are worth the same thing, and we saw yesterday that they have a

18  couple of experts who seemed to have copied from one another.

19         Huawei should have voluntarily resolved this case long

20  ago by taking a license that was fair, reasonable, and

21  non-discriminatory.  But they didn't.  And it's now up to you

22  to finally hold them accountable for their continued patent

23  infringement.

24         Huawei's admitted during this trial that it uses the

25  LTE standard.  Despite this, Huawei refuses to pay for the

1    technology it uses.

2          To avoid -- to avoid paying a reasonable royalty in

3    this case, Huawei argues that the patents are obvious, or if

4    they're not obvious, they're only worth $125,000.00, which by

5    the way, is less than half what Huawei paid their expert to

6    write his reports in this case.

7          In a little while, you're going to go back to the jury

8    room to decide whether we've proven by a preponderance of the

9    evidence that Huawei infringes PanOptis's patents.  And even

10   though we only need to tip the scales just very slightly, I

11   think you're going to find that the evidence of Huawei's

12   infringement is clear and unmistakable.

13         We've shown you that PanOptis's four radio patents are

14   essential to the LTE standard.  And Huawei admits its phones

15   use that standard.  That's patent infringement.

16         PanOptis's one video patent is similar.  Huawei admits

17   that its products use the H.264 video standard.  And that takes

18   care of most of the limitations of this big long claim we went

19   through.  And the few that are left over that relate to sound,

20   Huawei doesn't contest that they implement those.

21         That's patent infringement.

22         Now, during our opening statement, we told you that we

23   were going to go through every one of these claims and show you

24   that every one of the words was satisfied in Huawei's products.

25   And we did that.  It took a lot of time, but we did it, and we

1    discharged our burden.

2           And now after checking all these boxes, it couldn't be

3    clearer that Huawei infringes.  In fact, Huawei didn't even

4    argue that it doesn't infringe the '293 or '569 patents.  And

5    Huawei's arguments on the other three patents are unconvincing,

6    and I'm going to remind you why.

7           Starting with the video patent, the '238.  After

8    Dr. Madisetti had explained how Huawei's products satisfy each

9    of the 12 limitations of the '238 patent, Huawei's only quibble

10   was that the one unique value has to denote the number of

11   non-zero coefficients and only the number of non-zero

12   coefficients.

13          But you can see for yourself that's not what the Court

14   said.  Remember how Dr. Madisetti very carefully linked each

15   part of the Court's construction to the table from the H.264.

16   And Huawei's own expert, you heard him say, that if you agree

17   with Dr. Madisetti that a pair like 2,2 is a unique value, then

18   you should find infringement.  And this same expert admits that

19   every pair like 2,2 in this table is unique, just like latitude

20   and longitude.

21          Let's move to the '216 patent.

22          Now, you've heard a lot about something called the

23   channel interleaver, the so-called second shuffler, and how it

24   supposedly avoids infringing the '216 patent.  But that's just

25   a smoke screen.  Of course, there's a channel interleaver.  But

1    it doesn't matter because the claim only requires the bits to

2    be in order until they reach the modulator.

3         The claim doesn't care one way or another about

4    whether there's a channel interleaver inside the modulator.

5    You can check the claim for yourself.  Nothing in the

6    modulating circuit element prohibits interleaving.

7         And that's why Dr. Bims fought so hard to keep from

8    saying that the channel interleaver is inside the modulator.

9    But remember what his report says about the channel

10   interleaver?  It interleaves at the modulation symbol level.

11        Even though we're not exactly sure who wrote this part

12   of his report, it couldn't be slanted enough to hide the fact

13   that the channel interleaver is inside the modulation circuit.

14        And Huawei's arguments on the '284 patent fare no

15   better.  After Dr. Womack showed that the '284 patent is in the

16   LTE standard and infringed by Huawei, Dr. Bims came back and

17   said, no, that's wrong.

18        You heard Dr. Bims argue that there's no infringement

19   because of the 0s that are highlighted in green here in the RV

20   column of the LTE table on the right.  That's another smoke

21   screen.

22        Look at how the LTE -- LTE table on the right lines up

23   with the table from the patent, Table 3 on the left.  The RV

24   columns in the two table -- two tables are nearly identical.

25   And that's it, that covers infringement for all the patents.

1          Question 1 in your verdict form will look like this.

2    If you think we've carried our burden of proving infringement,

3    then this is how you should answer the questions.

4          Mr. Stevenson's going to talk to you about Question 2

5    in a few minutes, and what he's going to tell you is that not

6    only does Huawei infringe, but they infringe willfully.

7          Question 3 is to do with Huawei's invalidity claims.

8          First of all, Huawei didn't even argue to you that the

9    '216 and '284 patents are invalid.  But for the other three,

10   Huawei says they're obvious.  They're invalid because they're

11   obvious.  They ask you to go back in time with perfect 20/20

12   hindsight, understanding how the inventions work, and conclude

13   that the -- PanOptis's inventions were obvious.

14         But I want you to remember one thing.  Huawei didn't

15   show you one single piece of prior art that satisfied all the

16   limitations of any of the asserted claims.

17         Huawei's evidence falls far short of the clear and

18   convincing evidence threshold, particularly considering their

19   expert's failure to adequately address PanOptis's secondary

20   considerations of non -- non-obviousness.

21         And you may -- you may remember yesterday, the page

22   after page after page after page after page of yellow.  Well,

23   that was all to do with secondary considers of non-obviousness.

24         And there's a lot to consider.  Remember, Huawei

25   offered to buy the '238 patent, offered to license the other

 1  patents multiple times.  And even though Huawei's offers were

 2  far too low, they clearly wanted these patents.  After all,

 3  would you will offer to license or buy a patent that you

 4  thought was invalid or that you weren't using?

 5       Let's start with Huawei's invalidity defense on the

 6  video patent they tried to buy, the '238 patent.

 7       Huawei's expert on this pat -- patent, Dr. Schonfeld,

 8  used this figure, Figure 2 from the Bjontegaard '387 patent

 9  when he was analyzing it for you.  And he used it for a number

10  of the claim limitations in order to conclude incorrectly that

11  the claim is obvious.

12       But what he didn't tell you, and what he had to admit

13  on cross-examination, was that Figure 2 wasn't added until

14  after the priority date of the '238 patent, which means

15  Figure 2 is simply too late to be used to invalidate PanOptis's

16  patent.

17       Specifically, what you were told is that Figure 2

18  didn't appear on this timeline until all the way on the right,

19  on August 30th, 2002, which is well after the priority date and

20  April 15th, 2002 of the '238 patent.

21       Now, Huawei tries to get around this very clear

22  problem by suggesting that Figure 2 should get the same date as

23  the provisional, even though it wasn't in it.

24       You heard Dr. Schonfeld say the words in the

25  provisional are the same as Figure 2.  They're the same.  But

 1   you know that's not true.  If that were true, Huawei wouldn't

 2   have shown you the figure, they would have just shown you the

 3   words.  But that's not what they did.

 4            Turning to the '293 patent, Huawei says it would have

 5   been obvious to combine the Lohr patent with a 3G, or third

 6   generation, so the last generation of cell phone technology

 7   system.  But the inventors of the Lohr patent clearly were

 8   experts on their own system, and we know from looking at the

 9   very beginning of the patent that they knew all about 3G

10   technology.

11            And, yet, they didn't disclose the invention of the

12   '293 patent.  It wasn't obvious to them.  And you shouldn't

13   find it would have been obvious to anybody else.

14            You remember yesterday when Dr. Wells tried to explain

15   that the '569 patent is obvious, but he couldn't explain it

16   using the plain and ordinary meaning of simple words in the

17   claim like "groups."

18            And you may recall the Court's -- Court's instruction

19   yesterday while Dr. Wells was testifying.  There were no

20   special definitions of the claim language in the '569 patent,

21   and you should give the terms their plain and ordinary

22   meanings.

23            And I think you know that the plain and ordinary

24   meaning of "groups" is not code blocks, as Dr. Wells tried to

25   convince you.  But I suspect Huawei's lawyer may come up here

1    and talk to you about figures in the '569 patent.  But if he

2    does that, please remember that all that matters are the words

3    of the claims, not Huawei's strained interpretations of figures

4    in the patent.

5          You may also remember that Dr. Wells showed you the

6    figure from the Wallace patent.  That was their main -- their

7    main invalidity reference, and this is -- these were two

8    figures that he put in his expert -- expert report, it's --

9    it's the figure from the Wallace patent side-by-side.  And it

10   was clear from Dr. Wells -- Dr. Wells's testimony that he

11   thought that just coloring the two sides of the figures

12   different colors made them different.

13         But, of course, that's not true, and that couldn't be

14   more clear than in these two figures from Dr. Wells's expert

15   report, which show that the two sides of the figures are the

16   same regardless of the colors that Dr. Wells uses.

17         And that's it for Huawei's invalidity defenses.

18         Question 3 in your verdict form will look like this:

19   If you agree that Huawei failed to prove by clear and

20   convincing evidence that these patents are invalid, we ask you

21   to put a "no" on each of these lines.

22         Question 4 is about damages.  And we're here today to

23   ask you to award a reasonable royalty for Huawei's use of

24   PanOptis's intellectual property.  Huawei owed -- Huawei owes

25   rent, and we're asking you to set the price.

1          Now, you heard from our experts, and they told you

2     that they calculated damages based on the actual technical --

3     technical benefit of the patents.  They analyzed non-infringing

4     alternatives, they ran simulations, they compiled data, and

5     they carefully determined the actual benefits in terms of

6     quantifiable bandwidth savings.

7          THE COURT:  15 minutes have been used.

8          MR. BURGESS:  Thank you, Your Honor.

9          For four of the five patents, Huawei's experts ran no

10    simulations at all.  And, of course, they didn't need to

11    because Huawei just assumed that all the patents are worth the

12    same thing.  No need for simulations to conclude that.

13         But the jury instructions you just heard told you that

14    you should -- you should consider the value that the invention

15    contributes to the accused products.  And that's just what our

16    experts measured.  All Huawei could do was quibble with their

17    models.  They couldn't be bothered to run their own.

18         And when they did run their own, they got the exact

19    same result as PanOptis.  For the '238 patent, Huawei asked --

20    asked you to reject Dr. Madisetti's model even though their

21    expert tested the model and got just the same results.

22         Instead, Huawei wants you to believe that the benefits

23    of the video coding patent are miniscule, amounting to .13

24    percent compression or 13 -- 13 pennies on a hundred dollar

25    bill.

1        And that's even though Dr. Bjontegaard described the

2   benefits of related technology as having significant bit rate

3   savings.

4        And the savings of the '238 patent are significant, as

5   Dr. Madisetti shows, and that should be unsurprising.  After

6   all, Huawei itself wanted to buy this patent.

7        The expert test -- the experts testified to the

8   substantial benefits of the inventions, and we ask you to award

9   damages consistent with the innovations included in the

10  patents.

11       This is the last time that I'll be able to talk to

12  you, and on behalf of myself, my client, PanOptis, and our

13  entire team, and I'm sure Huawei, I just want to express my

14  sincere thanks for your patience, and it was a pleasure to

15  present our case to you.

16       THE COURT:  Defendants may now present their closing

17  argument to the jury.

18       You may proceed, Mr. Haslam.

19       MR. HASLAM:  I'm going to start not where I intended

20  to start, but I want you to remember what the Judge said about

21  attorney argument on the one hand and evidence on the other.

22       What you just heard was attorney argument, and as I go

23  through my presentation, I'm going to show you that some of the

24  things you just heard are just plain wrong.  And some of them

25  are wrong based on the jury instructions that you're going to

1   receive.

2           But before I do that, on behalf of myself, my client,

3   Huawei, and my -- all of my colleagues who are the brains and

4   horsepower behind the presentation, I'm just the tip of the

5   sword here, some would say I'm the dull tip of the sword, I

6   want to thank you for giving a week of your lives to help us

7   solve this dispute.

8           As Judge Gilstrap said, you are one of the pillars of

9   our democracy.  The job you play as the sole triers of fact is

10  what makes our system as great as it is, that you who take time

11  out of your lives will sit there impartially and fairly listen

12  to the evidence on things that may affect your lives, the

13  details of which you probably never needed to know this much

14  about.  So thank you.

15          You received basically almost an undergraduate course

16  in wireless communications and LTE this week, and I'm going to

17  go through and just give you a brief review of some of what I

18  think the highlights are, just like Dr. Burgess did, that I

19  think are going to lead you in the opposite direction of what

20  he said.

21          But before I do that, before I get to the technology,

22  I want to start with what I started with on Monday.  This is a

23  case about five patents.  We got here because this is also a

24  case about a failed negotiation.

25          Both Huawei and PanOptis are -- bargained hard over

1  the past few years trying to resolve this dispute, and they

2  didn't, and that's why we're here.

3        But bargaining hard by both sides doesn't mean each

4  side was unreasonable.  But when there's a failed negotiation

5  after hard bargaining, it is often the case that each side

6  says, oh, I was reasonable, but they weren't.

7        And I think that's what you have here with PanOptis

8  trying to tell you that Huawei didn't negotiate in good faith,

9  that Huawei was giving low-ball offers.

10        $35 million in this technology for these patents is

11  not chicken feed.  But PanOptis tells you that's an insult.  I

12  don't think it is.

13        And remember how they tried to get you to think that

14  the $35 million was really $700.00?  You saw their lawyer use

15  this easel and put up his math about trying to break the $35

16  million down into what he came up with, I think, as $733.00.

17  And he started with 6,000 patents, even though Mr. Zhang said

18  that's not what this negotiation was about, it was about

19  standard essential patents.  And they went through that math

20  anyway and came up with $733.00.

21        But what did you hear yesterday?  They criticized

22  Huawei for saying that it was 1,800 standard essential patents.

23  They said that was too high, and that the Court in England said

24  it was like 800.  And I think they even suggested that it might

25  be as low as 300.

1        Well, you get a lot different math if you take $35

2   million and you divide it by anything realistic about what the

3   declared essential patents are.

4        And I want to remind you, we're not here talking about

5   6,000 patents.  We're not talking about that nice map they had

6   with patents and dollar signs all over the world.  The reason

7   they keep trying to do that is they're trying to say, well,

8   Huawei uses the LTE standard, and they don't have licenses with

9   everyone.  Well, you heard why there might be reasons why they

10  don't.  They buy chips from Qualcomm.  They buy chips from

11  Texas Instruments.  You think -- and with those come licenses.

12       And LG and Apple and Samsung and all those other cell

13  phone manufacturers are in the same business, and they have

14  their standard essential patents.  And it's not unusual for

15  parties to decide let's just let sleeping dogs lie.

16       And in any event, all those other patents doesn't make

17  a difference.  On this verdict form, there's five patents, and

18  that's what we're here to deal with.

19       Now, this trial reminded me of something a legal

20  scholar once wrote, and I'm just going to read it because I

21  didn't memorize it.

22       Cross-examination is a useful tool in the advocate's

23  toolkit, but it's like any other tool.  A hammer can be used to

24  perform a useful task of driving nails or used to perform the

25  wrongful task of bashing in someone's skull.  Cross-examination

 1   can perform the useful task of disclosing truth or used for the

 2   tasks of obscuring truth and even promoting falsehood.

 3          I think a lot of what PanOptis did this week in its

 4   cross-examinations falls more into the latter categories than

 5   the former.

 6          I take as an example the cross-examination of the

 7   experts on the virtual identity of parts of their report

 8   dealing with secondary considerations.  That was a painful and

 9   embarrassing cross-examination for me to sit through.

10          As Dr. Burgess established, there are legal doctrines

11   that the experts have to render their opinions in, and it is

12   not unusual that you will see in the experts' reports similar

13   or the same language describing the legal standards that they

14   get because the law they all have to apply is the same.

15          Secondary considerations is also a set of opinions

16   that experts give with a legal construct.  And the legal

17   construct is the same for all secondary considerations.  But

18   that's no excuse for effectively cutting and pasting those

19   portions of standard -- of the -- in their reports.

20          You should, as the Judge said, consider that and give

21   it the weight that you think you should give.  And all I would

22   ask you to do is to consider that and also consider the

23   demeanor and how our experts, Dr. Bims and Dr. Wells, responded

24   to the questions.

25          Now, one final thing, and then I'm going to get to the

1    patents.  You heard attorney argument on the -- all the

2    validity issues here.  Ask yourself this.  Why didn't they

3    bring their experts back, Dr. Madisetti, to talk about the

4    Bjontegaard patent?  Why didn't they bring their other experts

5    back to talk about the '569 and the '293?  They had an

6    opportunity to do so.

7         You remember yesterday, we took a break in the middle

8    of the afternoon after we rested our case, and Judge Gilstrap

9    told you when you come back, the Plaintiffs are going to put on

10   their rebuttal case.  And I -- I was surprised and you were

11   probably pleasantly surprised when you came back in and the

12   Judge said, they're not going to put on a rebuttal case.

13        They had every right to do so.  They had the time to

14   do so.  And the night before they told us they were going to do

15   so.  They probably didn't bring their experts back because I

16   don't think they could have helped their case, and probably

17   because we could have shown you the same kinds of similarities

18   in their reports -- across their reports on topics which are

19   based on legal doctrines.

20        And you should take that into account when you weigh

21   the attorney argument you heard from Dr. Burgess and the fact

22   that Dr. Madisetti didn't come back and tell you what was wrong

23   with the patent -- the '387 patent and the Bjontegaard

24   provisional.

25        We've got attorney argument.  I'm going to point to

1  the jury instructions that deal with the issue of whether that

2  Bjontegaard patent is treated legally as if it was filed on the

3  date of the provisional.  And I'm going to show you, and he

4  showed you, but he didn't point you to the jury instructions.

5  I'm going to show you that testimony, and I'm going to show you

6  how that testimony relates to the jury instructions you will

7  have to use to determine whether the patent, in fact, is

8  entitled to the provisional date.

9         So with that, let me get to the five patents.

10        And I'm going to start with the '284 patent.  I've

11 shown here the table that you saw during the trial from the

12 standard that is the central part of this.  And I want you just

13 to remember that the standard requires the mobile phone to

14 determine the redundancy version to use in the physical uplink

15 shared channel.

16        Now, at the beginning of the week, I put up a board

17 and said I was going to prove non-infringement and invalidity

18 of the '216 patent.  After I heard the testimony of Dr. Womack,

19 though, I did not feel the need to take the time or your time

20 to put on a validity defense.

21        So if we put that board up, I'd put a big red X by the

22 fact that I didn't show you any invalidity.

23        But here's why, remember, the claim says that there is

24 a first subset reserved for transport format and a second

25 subset reserved for redundancy version.  And "reserved" has its

1  plain and ordinary meaning.

2        When you call a restaurant and make a reservation or

3  call a hotel and make a reservation for a room, do you get

4  there and expect to have someone else sitting at your table or

5  sleeping in the beds in your room?  No, that's not the plain

6  and ordinary meaning of "reserved for."

7        And Dr. Womack agreed with us.  This is why I didn't

8  put on a validity case:  If something explicitly signals both

9  transport format and redundancy version, it was your opinion

10  that would not be covered by the claims of the '284 patent,

11  correct?

12        Yes.

13        And that would be because there would be values for

14  both transport format and redundancy version, correct?

15        Yes.

16        And you heard the testimony of Dr. Bims as he walked

17  through the source code to confirm what the standard says, that

18  Huawei phones, like every other LTE phone, uses the explicitly

19  signals values for transport format and redundancy version when

20  it uses the table.

21        Now, I don't know what they're going to put up after

22  me because I can't get up and respond to it.  But one of the

23  things -- one of the smoke and mirrors I think they tried

24  during the trial, and -- and Mr. Stevenson may get up and do it

25  here, but they put this slide up and said, well, it's okay if

1  it's explicitly signalled and implicitly signalled.  And that's

2  at the '284 patent, 15 -- Column 15, Lines 31 to 38.

3       But I read him the Court's construction which said if

4  it's implicitly signalled, there is no need to explicitly

5  signal it.

6       And Dr. Womack admitted that if it's explicitly

7  signalled, then it is.  Doesn't meet the claims.

8       Now, I'm going to go to the '284 patent -- I'm sorry,

9  the '216 patent.

10      This is the one that's all about the shuffling or the

11 double shuffling.

12      When I asked Dr. Madisetti if he agreed with what the

13 claim language said, what did he say?  He wouldn't agree that

14 the claim requires the reordered mother code word bits to be

15 forwarded -- to be modulated and forwarded to a receiver in the

16 same order in which they were reordered.

17      I didn't read that into the claim.  It's right there

18 in plain -- plain English.

19      And why -- why did he fight that?  I put up here from

20 PX-67, Page 21, Figures 5 -- Figure 5.2.2-1, the e's, remember,

21 in blue here is what Dr. Madisetti said is the subsequence of

22 reordered mother code words.

23      And, yes, you've heard a lot about the channel

24 interleaver.  And this diagram shows that the channel

25 interleaver outputs something called h's.

1          And at PX-67, at Page 34, you see the description of a

2    channel interleaver.  The output bit sequence from the channel

3    interleaver is derived as follows:  The output of the block

4    interleaver is the bit sequence read out from the columns.  The

5    bits are channel interleaving are denoted by the h's.

6          So they're still in bit form.

7          And what was the argument you heard from Dr. Burgess,

8    oh, well, Dr. Madisetti said, well, this -- forget this, this

9    is in the modulation.

10          And he pointed to Dr. Bims's report, and you heard

11    Dr. Bims explain what he was referring to, that the symbols --

12    that -- that the bits in the channel interleaver are arranged

13    in groups, and the groups are what they will ultimately be

14    modulated in, either by groups of two, four, or something else.

15          And -- and when you take into -- when you try to

16    evaluate whether Dr. Burgess, what he told you was correct or

17    not, remember this testimony from Dr. Madisetti.  This was on

18    direct.

19          Yes, in Paragraph 71 of my report, I stated that

20    modulation is a process.  It's a process by in which groups of

21    bits of information are converted to symbols.

22          That's what modulation is.  And what comes out of a

23    channel interleaver is still bits.

24          And I put here in a different standard, the one that's

25    entitled modulation, 36.211, and it's Exhibit PX-61, at

1  Sections 5.3.2 and 7.1.  After scrambling you get to the

2  modulation mapper.  The block of scrambled bits shall be

3  modulated.

4        And it says as in 7.1 -- and 7.1 says the modulation

5  mapper takes binary bits, 0 or 1, as input and produces

6  complex-valued modulation symbols.

7        So the channel interleaver is not part of the

8  modulation circuit.  Even Dr. Madisetti knows that's not right

9  because it happens in an entirely different document and in an

10 entirely different portion of the technology in the phone.

11       Now, I'm going to go to -- now, I'm going to go to the

12 '238 patent, the Bjontegaard patent.

13       Let's look at what Dr. Madisetti said about this.

14       How many times are non-zero coefficients talked about?

15 I asked him if he'd be surprised over hundred times.  After he

16 read the patent 50 hours -- for 50 hours before he came here,

17 including on the day before his testimony, and how long did it

18 take him to kind of finally admit that he wouldn't -- he didn't

19 know, but he wouldn't be surprised?

20       And what did he say isn't in there?  Any discussion of

21 trailing 1's.

22       What also did he deny?  And this you take into account

23 in determining his credibility.

24       I asked him:  Didn't Bjontegaard's proposal C028, that

25 was adapted by the JVT, proposed coding both trailing 1's and

1   non-zero coefficients, correct?

2           Yes.

3           And that proposal of adapted rather than the Nokia

4   proposal, which would have coded just non-zero coefficients,

5   correct?

6           I disagree.

7           Well, JVT was adopted at this meeting, correct?

8           I don't see that.

9           At the very bottom of -- just before the heading

10  CABAC.

11          Yes, it says here JVT was adopted, yes.

12          At your deposition, he said that Bjontegaard's

13  proposals, none of them found their way into the standard,

14  correct?

15          That's right from a technical point of view.

16          And you said none of your deposition -- none of your

17  proposals were adopted, that's what you told me at your

18  deposition, correct?

19          Yes, from a technical point of view.

20          Now, Dr. Madisetti relied on Mr. Richardson --

21  Dr. Richardson to do his simulation.  Dr. Richardson wrote the

22  book on H.264 that he -- Dr. Madisetti relied on.  And what did

23  Dr. Richardson say?

24          Yes, it was Dr. Bjontegaard's proposal, C028, that got

25  into the standard.

1          And I asked myself, why didn't Dr. Richardson come

2   here if he was the one who wrote the book on H.264?  Why didn't

3   he come here and defend PanOptis's positions on this patent?

4          I think it's because probably even he couldn't have

5   supported what they argued here today -- this week.

6          Now, on non-infringement, we just don't believe that

7   the Court's construction means what they say it means.  It

8   talks about a variable length code table that transforms into a

9   value that denotes the number of non-zero coefficients.  And

10  yet they come down and say, when it talks more specifically

11  about the code in that table is supposed to be unique and maps

12  to one unique value.  Well, that value in that same

13  construction means some totally different value.  Because the

14  first one denotes non-zero coefficients. But the second value

15  can be anything they want.

16         And that's how they try to sweep in the standard.

17         And I've just shown you here a -- a comparison of the

18  table from the patent and the table from the standard.  And

19  you've seen this before.  I'm not going to belabor it.  We

20  believe that there is no unique value of the number of non-zero

21  coefficients.

22         But if you agree with PanOptis and you say that this

23  claim covers the standard, then they've got a problem.  They

24  can't have it both ways because Dr. Bjontegaard filed a

25  provisional application before the Panasonic patent.  He gave a

1   proposal to the standards body, C028, and he later filed a

2   patent application.

3          And, yes, the patent application itself was filed

4   after the Panasonic '238 patent.  But the law says that that

5   patent is entitled to the priority date of the provisional,

6   March 22nd, 2002, if the legal requirements are met, and they

7   were.

8          Now, let me go to that issue, and you can find this --

9   the relevant jury instruction at Page 17 where the Judge gives

10  you the two-part test that determines whether the '387

11  Bjontegaard patent is entitled to be treated as -- legally as

12  if it was filed on March 22nd.

13         And that test is essentially two parts.  It's in your

14  jury instructions on Page 17.

15         But one of them is do the -- does the patent, the '387

16  patent disclose the same subject matter?  And here we see the

17  '238 patent and the Bjontegaard '387 patent.  And Dr. Burgess

18  criticized Dr. Schonfeld for comparing this.  And Dr. Burgess

19  said this morning, he never showed you the provisional

20  application, but that's wrong.

21         Right after we went through this slide with

22  Dr. Schonfeld on direct, what did he put up?  The provisional

23  application.  And he pointed in the provisional application

24  where everything that he showed in the diagrams of the patent

25  were in the provisional.  And that provisional application is

 1    DX-211.

 2            Picking a VLC table, doing it with coefficients,

 3    non-zero coefficients and trailing 1's, he covered that.  And

 4    yet you were told this morning that we only showed you this

 5    Figure 2 from the Bjontegaard patent.  That's just not right.

 6    That's attorney argument.  But it's not right.

 7            Now, I just want to make a comment right now.  I

 8    can't -- I'm -- when I sit down, I have to sit down, and

 9    Mr. Stevenson, who is a distinguished lawyer and a great

10    arguer, gets to get up and say anything he wants because he

11    knows I can't get back up and respond to it.  So I'm going to

12    trust you to take -- remember what the evidence was, and if

13    there's anymore whoppers told by Mr. Stevenson like Dr. Burgess

14    did, I'm going to trust you to sort fact from fiction and to

15    see through the smoke and mirrors and come up with the right

16    decision.

17            Now, here are the two questions that you'll find

18    relevant to the instruction on Page 17.

19            Is the subject matter relied on in the issued

20    Bjontegaard patent present in the provisional application?

21            THE COURT:  You have five minutes remaining.

22            MR. HASLAM:  Yes, it is.

23            Does the provisional application describe the

24    invention claimed in the Bjontegaard patent in such a manner

25    that a person could do -- do it without undue experimentation?

1          That's right.

2          Okay.  As usual with me, I wind up taking more time

3    talking about things than -- than I probably should.  So I'm

4    going to trust you on the obviousness.

5          The thing I want you to remember is our -- our experts

6    testified that every single limitation was in the com --

7    combined references that they talked about.  And they

8    established why there was a reason or motivation to combine

9    those references.

10          And they didn't bring an expert back to say that the

11    testimony that all of the elements of the claims were in those

12    combined references.  They didn't say that.

13          So I want to now talk about one -- one final thing,

14    and that's this 8.4 percent.  Dr. Madisetti made up a table.

15    Doesn't exist.  It's not a real table.

16          Dr. Schonfeld used one of the tables out of the

17    standard, and that's why his results, I think, are more

18    rational and more based in reality.  He used an actual table

19    and not a made up table, and you get essentially a very small

20    increase.

21          This analysis is what drives the high value that

22    Dr. Akemann puts on the value of the '284 patent.

23          Now, I want to just skip forward now, and I want to

24    talk about damages.

25          This is a FRAND case.  And the Judge told you that

1  PanOptis has the same FRAND obligations as Ericsson.  And you

2  heard what Ericsson's view of the FRAND obligation was, a

3  single-digit percentage of the sales price.

4        The market rate should act in accordance with these

5  principles in a reasonable maximum aggregate royalty rate of 6

6  to 8 percent for handsets.

7        Dr. Akemann and Dr. Becker both did a FRAND analysis.

8  Dr. Akemann didn't want to come here and tell you what his

9  FRAND analysis is.  But on this slide I show you.  He comes up

10  with $386,530.00 divided by 4 is $96,000.00 a patent.

11        Dr. Becker, for his FRAND analysis, came up with

12  103,000 divided by 4 which is 25,000.

13        And somewhere in between there is probably the right

14  result for each of the patents.

15        Now, one thing to keep in mind is remember

16  Dr. Akemann's view of FRAND is there's no cap on what you can

17  ask for, even if it drives the royalty rate higher than the

18  price of the phone.  He's not aware of any specific cap on the

19  FRAND obligations.

20        Now, on the '238 patent, that's different.  Now,

21  Dr. Akemann gave you a $7 million figure, but he also testified

22  that his other way of looking at it was 1.3 million, and both

23  of them were equally valid.  But both of these numbers are

24  driven by Dr. -- Dr. Madisetti's use of a made up table to come

25  up with his 8.4 percent.

1          THE COURT:  You have one minute remaining.

2          MR. HASLAM:  Now, you were also -- you were asked --

3    Dr. Akemann was asked, if you used the 1.5 percent, which is

4    how the .13 that Dr. Schonfeld came up with would translate to,

5    and you took his $7.7 million high number for the '238 patent,

6    you would end up with $11,000.00 if you took out the 8.4

7    percent, which we don't believe is justified.

8          So in the final analysis, we believe that the total

9    damages would be $103,000.00, approximately, for the LTE

10   patents, and $22,000.00 for a total of $125,955.00.  And that's

11   not too far off of the $11,000.00 that Dr. Akemann would come

12   up with for the '238 patent if he didn't use Dr. Madisetti's

13   test and 386,000 that he came up with using the FRAND.

14         THE COURT:  Time's expired, counsel.  Take a couple

15   sentences and finish up.

16         MR. HASLAM:  I appreciate the Court's indulgence.

17         I just want to leave you with this.  You are now going

18   to hear argument.  You're the sole judges of the facts.  I

19   believe this case is, as I said, about a failed negotiation.

20   Both parties bargained hard.  I don't think there's any willful

21   infringement here.  And as I've just gone through, I believe

22   there are valid defenses to both infringement and validity that

23   we've presented.  And on validity, I think I can fairly say

24   unrebutted by anything other than attorney argument.

25         Thank you.

1              THE COURT:  All right.  Plaintiffs, you may now

2    present your final closing argument.

3              MR. STEVENSON:  May it please the Court.

4              THE COURT:  You may proceed.

5              MR. STEVENSON:  Members of the jury, like any case of

6    trespass, the property owner is entitled to recover damages.

7    And Judge Gilstrap instructed you that to calculate damages,

8    you should award a reasonable royalty to PanOptis.

9              And the starting point for a reasonable royalty should

10   be the benefit that Huawei got from practicing -- from

11   trespassing upon PanOptis's property.

12             Our three technical experts to determine that

13   individually valued the efficiency gains from each one of the

14   asserted patents due to the inventions in this case, and it

15   adds up to $22.00 a phone.

16             The inventions that are awarded patents confer a

17   benefit of $22.00 a phone on your LTE phone.

18             And then Dr. Akemann, our damages expert, split that

19   benefit between the two parties, and his opinion was that

20   PanOptis would receive approximately $4.00 of that -- of that

21   advantage, of the efficiency gain, and Huawei would leave --

22   would receive over 18 of that in terms of efficiency gains to

23   their products.

24             Now, given Huawei's trespass, one might in fairness

25   conclude that PanOptis ought to get every benefit that Huawei

 1   received from its trespass.

 2           But our expert, Dr. Akemann, he pushed back on that,

 3   and he said in a hypothetical negotiation, the law requires a

 4   splitting of the benefits, and in his view, when they were

 5   split, Huawei would actually get the lion's share of them.

 6           He concluded, as part of that, Huawei would cut a

 7   better deal with PanOptis, so we, in his view, as a reasonable

 8   royalty should get $4.00 for the five patents per unit, a

 9   little bit under, while Huawei is left with an $18.00 gain in

10   value as a result of its trespass.

11           But that's not good enough for Huawei, and on the

12   other hand, it suggests that it should just pay pennies.  And

13   their starting point is to look at my client's worldwide

14   portfolio offer, and there's a lot of problems with that

15   approach.

16           You know, when PanOptis made that offer a couple of

17   months ago, it was just trying to get a deal done, right?

18   You've got a 50-person company that's negotiating with the

19   No. 2 cell phone manufacturer in the world, and they went as

20   low as they could possibly go.  And they tried to reach a deal

21   out of court.  And today, that offer doesn't govern the

22   damages, not after we've gone to a verdict.

23           So then Huawei's damage's witnesses took that offer

24   and they averaged it across all the patents worldwide, and it

25   doesn't matter if it's 6,000 or 1,600 or it's a huge number of

```
 1   patents.
 2           And they applied that rate to the four radio patents
 3   here, and it's a very un -- unfair approach to us, very unfair
 4   for three reasons.
 5           The first is it doesn't account for the individual
 6   differences in -- in patent value, the -- the efficiency gains.
 7   It just wipes that all out and ignores them.
 8           Secondly, it doesn't recognize that U.S. patents are
 9   the most valuable patents in the world.  And despite what
10   Huawei's witnesses said, the U.S. patent system is the best in
11   the world, and U.S. patents are the most valuable patents in
12   the world.  And we're asserting U.S. patents in this case.
13           And then he assumed that our patents were just average
14   across the portfolio.  Now, common sense, right, does anyone
15   really think that if we're going to go into court against the
16   No. 2 cell phone manufacturer in the world that we're just
17   going to pull out average patents for -- from our portfolio?
18   No.  We came to court with our good ones.  We came to court
19   with the carving station patents, and they want to pay the
20   salad bar price.
21           The damages will we request in this case that you
22   award in response to Question No. 4 are for the '216 patent
23   $102,742.00; for the '569, $1,733,862.00; for the '284,
24   $753,276.00; for the '293, $246,844.00; and for the video
25   compression patent, the '238, $7,716,841.00.
```

1          And that is based on a reasonable royalty, and you're

2   going to be asked to check a box there, lump sum or reasonable

3   royalty.  It is based on a reasonable royalty.  And what that

4   means is it's based on a unit by unit, how much of -- how much

5   of the -- how much of each unit worth comparison multiplied by

6   how many infringing sales there were.

7          Now, let me turn to the Question No. 2, and that's

8   willfulness.  And I want to end with this because I think this

9   is what this case is really about.

10          Judge Gilstrap instructed you that willful

11   infringement is conscious, deliberate infringement.  And here,

12   the evidence is overwhelming.

13          First, our first piece of evidence.  During the case

14   two months ago, Huawei offered to license these patents as part

15   of a worldwide deal, and if you don't infringe a patent or if

16   that patent is invalid, you don't need a license.

17          But Huawei's offer was a very clear statement that

18   they know the patents are valid, they know they infringe them,

19   and that they are consciously doing it.

20          And then when the parties didn't reach agreement on

21   financial terms, what did Huawei do?  At that point, they don't

22   have permission.  They tried to get it, they weren't willing to

23   pay enough, they don't have permission, they didn't stop

24   selling in the United States.

25          That is conscious indifference to patent rights.

 1            Second, in cross-examination of Huawei's corporate

 2    representative, the person they brought to sit at the trial

 3    table as their representative of their company, we asked that

 4    very question, and we asked him in testimony:  How many

 5    essential patents do you think we have, somewhere between 20

 6    and 200?

 7            And remember, by definition, if a patent is essential,

 8    their phones infringe it.

 9            And so that means in order to practice the standard,

10    you would need a license to those patents, right?

11            Yes.  If they're valid, yes.

12            And then he went on to say:  Okay.  Yes, sir, of those

13    million phones you import, they are all infringing on the

14    patents, are they not?

15            Well, if we actually implement those patents, then

16    yes, they -- and PanOptis proved that, then, yes, we would

17    infringe.

18            And they are implementing the standard.  Huawei

19    stipulated to it, and it's in your juror notebook.  They

20    infringe, and they know it.

21            And, in fact, Huawei didn't even try to contest the

22    validity of two of the patents.  They didn't try to contest

23    infringement of two of the other patents.

24            And Judge Gilstrap isn't going to even have you

25    consider those issues in your deliberations because there's

 1   just no contest there.

 2          And the rest of Huawei's defenses, they're just very,

 3   very weak.  And that is why we didn't call witnesses in our

 4   rebuttal case, because Huawei either didn't present defenses or

 5   the defenses they presented were so weak we didn't need to

 6   present any further evidence to prevail.

 7          Now, for Huawei to suggest in this case that it has a

 8   good faith belief just isn't believable.  You know, in some

 9   trials, there's legitimate differences of opinion, right?  And

10   I don't begrudge a hard fought trial as long as everybody

11   follows the rules of court.  But what that means is you come

12   into your court with your witnesses, you put out your position

13   honestly, and you trust a jury to listen and be fair and to get

14   it right.

15          And that's how we came to court.

16          Huawei's experts didn't follow the rules.  And this

17   isn't just boilerplate, no.  We showed you paragraph after

18   paragraph where it was actually substantive opinions, where

19   they switched out patent numbers, and that was the only

20   difference between the two to argue for individual patents.

21   That's not just boilerplate.

22          But the worst part about it is, the worst part, is the

23   witnesses lied about it on the stand.

24          We asked Dr. Bims:  Are these your opinions?

25          He said he was proud of his report.

```
 1              Do you stand by them?  Did you write them?
 2              Yes, they're my opinions.  Yes, I wrote them.
 3              But the truth is, then, when we compared the two
 4  reports side-by-side, 18 pages of yellow identicality.  He then
 5  came back and said he didn't personally write every word
 6  despite what he had said before.  The lawyers for Huawei wrote
 7  them.
 8              And then he said, instead of just fessing up, they did
 9  submit text, which I reviewed to make sure it accurately
10  reflected my opinions.
11              And he -- he wouldn't even then say, yeah, they wrote
12  them, I admit.  When it's clear as day.
13              But the -- the important question for -- for you,
14  members of the jury, is why would they do this?  Why?  Why not
15  just have the experts write their own reports?
16              I think the answer is they couldn't risk it.  They
17  couldn't risk having these experts do their own work.  They
18  were afraid of what the experts would say if they actually told
19  the truth about how weak these patents are.
20              THE COURT:  Three minutes remaining.
21              MR. STEVENSON:  And you have every right to ask
22  yourself if they scripted this, what else was scripted?
23              And then at the end of the case, we came to damages.
24  And I think that's really where you saw what Huawei was about.
25              Huawei suggested that it should only pay pennies for
```

1    these patents because to pay more would be non-economical.

2             And the truth is, though, this isn't just bargaining

3    hard, and it's not just PanOptis.  Huawei doesn't pay royalties

4    to anybody.

5             So if look at, for instance, the pie chart that was

6    presented that has all the 4G patentholders, remember that?

7    All these companies have infringing -- have patents.  50

8    companies, 1,400 patents, and Huawei infringes them all.  But

9    it only licenses four or five of the companies.

10            Then they wanted to give the example of the MPEG LA

11   pool.  You'll remember that.  A different group, 700 essential

12   H.264 patents.  By definition, Huawei infringes them all.  50

13   companies, no licenses.

14            And worst yet, MPEG LA, one-stop shopping to get all

15   the patents signed up.  And their experts wanted to tell you

16   that's the reasonable rate you should look at.  And they

17   haven't even taken it.

18            And at the same time Huawei is ignoring industry wide

19   patents, they're spending enormous amounts to buy what they

20   call litigation quality patents.  And they proudly tell you now

21   they own over 7,000 patents.  But when we tried to sell them

22   our video compression patent and they weren't willing to pay

23   fair value, they turned around and said, well, it's invalid,

24   it's not infringed, and if it is infringed, $22,000.00.

25            This continuing industry wide pattern of disrespect

1    for intellectual property rights just has to stop.

2           And rather than buying patents and spending enormous

3    amounts year after year to build a war chest --

4           THE COURT:  One minute remaining.

5           MR. STEVENSON:  -- I suggest Huawei should spend its

6    money compensating the victims of patent infringement like the

7    one in this case.

8           This is one case and one verdict that you will issue.

9    And we suggest you answer yes to the questions of willfulness.

10          I think Huawei needs to hear from you that their

11   attitudes towards patent rights is -- is unacceptable, and in

12   the future they need to pay fair royalties, and not just to

13   PanOptis but to all the essential patentholders.  And you can

14   let Huawei know how you feel about this by answering Question

15   No. 2 on the verdict form.

16          Members of the jury, this is our final word -- our

17   final chance to speak with you.  And on behalf of PanOptis, on

18   behalf of the members of our trial team, we thank you.  We

19   thank you very much for your consideration of the case.

20          We know you've taken a big chunk of your lives out,

21   taken a whole week of your lives, and you've listened to our

22   dispute.  You've listened to it patiently.  You've -- you've

23   paid a lot of attention to all the evidence.  We deeply

24   appreciate it, and we look forward to receiving your verdict.

25          Thank you.

1          MR. HASLAM:  May we approach, Your Honor?

2          THE COURT:  Approach the bench.

3          (Bench conference.)

4          MR. HASLAM:  I believe the Court needs to give a

5    curative instruction.  That closing argument was blatantly

6    saying you should punish Huawei for patents that are not in

7    this case and that you should find willful infringement because

8    they didn't take the MPEG LA, that they haven't taken licenses

9    from every one else in that pie chart.  That is not what this

10   jury is supposed to decide on.  It's the willful infringement

11   of these five patents, and he has just told them you find

12   willful infringement, and you find infringement, and you find a

13   lack of validity in these defenses --

14         THE COURT:  Objection is overruled.  Return to your

15   seats.

16         (Bench conference concluded.)

17         THE COURT:  All right.  Members of the jury, I'd like

18   to give you a few final instructions before you begin your

19   deliberations.

20         You must perform your duty as jurors without bias or

21   prejudice as to any party.  The law does not permit you to be

22   controlled by sympathy, prejudice, or public opinion.  All

23   parties expect that you will carefully and impartially consider

24   all the evidence and follow the law as I have given it to you

25   and reach a just verdict regardless of its consequences.

1          Answer each question in the verdict form from the

2     facts as you find them to be, following all the instructions

3     that the Court has given you.

4          Do not decide who you think should win and then answer

5     the questions to reach that result.  Your answers and your

6     verdict, I remind you, must be unanimous.

7          You will notice on the verdict form that one part of

8     Question 1 and two parts of Question 3 have already been

9     answered by the Court.  Those answers have been determined as a

10    matter of law by the Court, and you must accept them as

11    correct.  However, you should not draw any inference from those

12    answers in your consideration of the rest of Question 1 and the

13    rest of Question 3.

14         In the event that your answer -- in the event that you

15    answer Question 4, you should treat the Court's answers no

16    differently from any answers you gave in Question 1 and

17    Question 3 in following the instructions set out in the verdict

18    form.

19         You should consider and decide this case as a dispute

20    between persons of equal standing in the community, of equal

21    worth, and holding the same or similar stations in life.

22         This is true in patent cases between corporations,

23    partnerships, or individuals.  A patent owner is entitled to

24    protect his or her rights under the laws of the United States.

25    This includes bringing a suit in a United States District Court

1    for money damages for infringement.

2         The law recognizes no distinction among types of

3    parties.  All corporations, partnerships, and other

4    organizations, regardless of their size, stand equal under the

5    law, and regardless of who owns them, and they must be treated

6    as equals.

7         When you retire to the jury room to deliberate on your

8    verdict, you're each going to receive a copy of these final

9    jury instructions to take with you and to review.

10         If you desire, during your deliberations, to review

11    any of the exhibits which the Court has admitted into evidence

12    during the course of the trial, then you should advise me by a

13    written note signed by your jury foreperson, delivered to the

14    Court Security Officer, and I'll then send that exhibit or

15    those exhibits to you.

16         Once you retire, you should first select your

17    foreperson and then conduct your deliberations.

18    If you recess during your deliberations, follow all the

19    instructions that the Court has given you about your conduct

20    during the trial.

21         After you have reached your verdict, your foreperson

22    is to fill in the verdict form reflecting your unanimous

23    answers to those questions.  Do not reveal your answers until

24    such time as you are discharged by me, unless I direct you

25    otherwise.  And you must never disclose to anyone, not even to

1  me, your numerical division on any unanswered question.

2          Any notes that you've taken during the course of the

3  trial are aids to your memory only.  If your memory should

4  differ from your notes, you should rely on your memory and not

5  your notes.  The notes are not evidence, ladies.

6          A juror who has not taken notes should rely on her own

7  independent recollection of the evidence and should not be

8  unduly influenced by the notes of other jurors.

9          Notes are not entitled to any greater weight than your

10  own recollection or impression, and that's why each juror

11  should consider those notes accordingly.

12          If you want to communicate with me at any time during

13  your deliberations, you should give a written message or a

14  question signed by your juror foreperson to the Court Security

15  Officer who will bring it to me.  I'll then respond to you as

16  promptly as possible, either in writing or by having you

17  brought back into the courtroom where I can address you orally.

18          However, in any case, I will always first disclose to

19  the attorneys for the parties your question and my response

20  before I answer your question.

21          After you've reached a verdict and I've discharged you

22  from your position as jurors, you are not required to talk with

23  anyone about your service in this case unless the Court orders

24  otherwise.

25          However, at that time, you will be free to talk about

```
 1    your jury service if you choose to.  That decision at that time

 2    will be up to you, and it will be your decision alone.

 3              I'll now hand eight copies of these final jury

 4    instructions and one clean copy of the verdict form to the

 5    Court Security Officer to deliver to the jury.

 6              Members of the jury, you may now retire to the jury

 7    room to deliberate upon your verdict.  We await your division.

 8              COURT SECURITY OFFICER:  All rise for the jury.

 9              (Jury out.)

10              THE COURT:  I'd like to see counsel at the respective

11    tables, trial tables, in chambers.

12              Pending either a question from the jury or the return

13    of a verdict, we stand in recess.

14              (Recess.)

15              (Jury out.)

16              COURT SECURITY OFFICER:  All rise.

17              THE COURT:  Be seated, please.

18              After the jury withdrew to the jury room to begin

19    their deliberations and the Court recessed, the Court met with

20    counsel in chambers.  And at that time, the Court was advised

21    that the Defendants wished to withdraw certain defenses.

22    Therefore, I'm back on the record for the purpose of Defendants

23    enunciated into the record what -- the withdraw they intend to

24    make.

25              So I'll hear from Defendants' counsel, Mr. Young, in
```

```
1    that regard at this time.

2              MR. YOUNG:  Thank you very much, Your Honor.

3              Huawei withdraw's its Affirmative Defenses 5, 6, 7, 8,

4    9, and 10, all of which are defenses to the enforceability of

5    the declared standard essential patents of PanOptis.

6              Huawei does not waive any objections that it may have

7    to the amount of any jury verdict that may relate to those

8    patents and does reserve the right to file appropriate JMOL

9    and/or new trial motions as to those issues.  But the

10   affirmative defenses that I mentioned as to the enforceability

11   of the patents are withdrawn.

12             THE COURT:  All right.  Any question as to the

13   withdraw by the Defendants?  Is that clear to Plaintiffs?

14             MR. STEVENSON:  No questions.

15             THE COURT:  All right.  So noted in the record.

16             We stand in recess.

17             MR. YOUNG:  Thank you.

18             (Recess.)

19             (Jury out.)

20             COURT SECURITY OFFICER:  All rise.

21             THE COURT:  Be seated, please.

22             Counsel, the Court's received the following note from

23   the jury.  I'll read it as received.

24             Judge Gilstrap, 1, we would like to see the emails

25   between PanOptis and Huawei, please, in regards to the
```

1    negotiations starting at the beginning of negotiations to end

2    of negotiations.

3              2, we would like to see the Bjontegaard patent.

4              Thank you.

5              And it is signed by Debi Hall, as foreperson.

6              If I'm not mistaken, that would be Juror No. 6.

7              I'll mark this in the upper right-hand corner with a 1

8    for identification as the first note received from the jury

9    during this trial.  I'll hand the original note to the

10   courtroom deputy to be included in the papers of this case.

11             Counsel, we've made a quick review of the exhibit list

12   with regard to the emails requested in Item 1.  What I'm going

13   to do is go off the record and direct a representative of both

14   sides to come forward and meet with Ms. Lockhart and look at

15   what she's got identified.

16             Certainly, you know your exhibits, but if the two

17   parties and the courtroom deputy can put their heads together,

18   hopefully, you can agree what's an appropriate response

19   concerning the first request.

20             The second request as to that particular prior art

21   patent should be straight forward.

22             We'll go off the record at this time.

23             (Off the record discussion.)

24             THE COURT:  Let's go back on the record.

25             All right.  Counsel, having worked together in

1    response to what the jury's requested, I find that -- we'll

2    start with the second part of their request first, DX-212

3    appears to be the Bjontegaard patent.

4           Both sides agree that in response to the second part

5    of the jury's first note, I should send this back to them?

6           MR. STEVENSON:  Agreed.

7           MR. HASLAM:  Agreed.

8           THE COURT:  Okay.  All right.  With regard to the

9    first portion of the note from the jury, I have the following,

10   which appear to be agreed-upon emails responsive to the first

11   request.  Those would be PX-643, PX-679, PX-683, PX-714,

12   PX-719, PX-736, and PX-739.

13          Do both sides agree those are appropriate and

14   responsive to the jury's note?

15          MR. STEVENSON:  Agreed.

16          MR. SMITH:  Agreed.

17          THE COURT:  All right.  Then I have a remaining group

18   of exhibits -- I have a remaining group of exhibits that there

19   appears to be some lack of unanimity on as to whether they are

20   responsive to the note and whether or not they should go back.

21          I have DX-367, which appears to be the Huawei proposal

22   to PanOptis.  I'm looking through it.  I don't see anything

23   that indicates this is or is attached to an email.

24          Does either side have anything to indicate this is a

25   part of the emails requested?

```
1        MR. SMITH:  Not within the record before the Court at
2   this point.  Your Honor, the presentations that the Court's
3   referring to now that came from Huawei are -- are documents
4   that were provided.  They were provided, I am advised by
5   Mr. Zhang, as attachments to email, if the Court wants to
6   examine Mr. Zhang to consider that, but the -- the documents
7   that we transmitted were extensive enough that they were not
8   emails, they were -- they were documents that were then
9   attached to emails, and the transmitting emails are not in
10  evidence.
11        But we would submit that the jury's note indicates
12  that they're looking for the communications with regard to
13  negotiations.  Yes, they used the word "emails," but I don't
14  believe that that's a substantive distinction.  And if the
15  Court sends the ones that are emails, those are all the
16  Plaintiffs' exhibits, and the only ones that aren't going back
17  are the four that are -- just happen to be Defendants'
18  exhibits.
19        THE COURT:  It looks like, Mr. Smith, in the disputed
20  group, there are two Defendants' exhibits and two Plaintiffs'
21  exhibits.  I have DX-367 and 380 and PX-738 and 737.  Those
22  appear to be the four disputed exhibits.
23        MR. SMITH:  I misspoke.  I thought the other two
24  DX-368 and 372.
25        THE COURT:  That's not what I have before me.
```

1           Well, the jury said we would like to see the emails

2   between PanOptis and Huawei.  So my inclination is to send them

3   emails and anything that on its face clearly appears to have

4   been attached to an email.

5           But if these documents, PX-737 and 738 and DX-367 and

6   380, aren't indicative of emails and if you can't show me where

7   they were attached to one or more of the agreed upon emails

8   that are going to go back, then I think it goes beyond the

9   scope of what the jury's requested.

10          I mean, if I'm not going to hold the response to

11  emails, then the wheels to me seem to come off, and it could be

12  anything and everything that touches on this subject in the

13  most broad and generic sense, and I don't think that's -- I

14  don't think that's appropriate.

15          But if there's argument that these are somehow shown

16  to be attached to or tied to the agreed upon emails, I'm happy

17  to -- I'm happy to hear that.

18          MR. SMITH:  Your Honor, it appears we missed one.

19  There is a DX-376, which is a letter from Huawei that

20  references on its face that it was by email.

21          THE COURT:  I don't seem to have that.

22          MR. SMITH:  And I apologize.  I think we -- we did not

23  pull that.

24          THE COURT:  What's that number again?

25          MR. SMITH:  DX-376.

1          THE COURT:  Can we pull that exhibit?

2          Okay.  I've been handed DX-376.  The first thing it

3    says is via email.

4          So I assume that goes in the agreed upon stack,

5    Mr. Stevenson?

6          MR. STEVENSON:  Agreed.

7          THE COURT:  Okay.  That still leaves us with the four

8    that do not on their face show that they are either part and

9    parcel of an email transmission or an attachment to an email

10   transmission.

11         And, Mr. Smith, unless you've got something to tie it

12   to an email, I'm going to respond based on what the note says,

13   which is emails.  I'm just very concerned that if I take your

14   proposal to broaden it to something beyond emails, there'll be

15   no parameters here at all.

16         MR. SMITH:  Well, Your Honor, then our request would

17   be if the Court could ask the jury for clarification whether

18   they want the emails or if they want all correspondence between

19   the parties or documents exchanged between the parties.

20         THE COURT:  I'm happy to tell them that I'm sending

21   them these exhibits.  And I'm happy to tell them if these are

22   not sufficient and they want additional documents that have

23   been produced during the trial to send me another note and ask

24   for it.  I'm happy to -- I'm not going to try and indicate to

25   them that this is all they will get.

1            But I'm not going to go beyond the face of the note

2    and send them things that are not emails or not direct

3    attachments to emails.

4            MR. SMITH:  I understand the Court's ruling, Your

5    Honor.

6            THE COURT:  Okay.  So let's go off the record again,

7    and, Ms. Lockhart, if you'll pull up your form for a response

8    to the jury, I'll tell you what I want it to say, and then you

9    can type it and print it.

10           (Off the record discussion.)

11           THE COURT:  Is there objection to that response from

12   Plaintiff or Defendant?

13           MR. STEVENSON:  No objection.

14           MR. SMITH:  No objection, other than those previously

15   stated, Your Honor.

16           THE COURT:  All right.  If you'll print that,

17   Ms. Lockhart, I will hand you the -- I have the exhibits to go

18   with it.  If you'll print it and bring it to me, I'll sign it.

19   The four exhibits that were not either emails on their face or

20   shown to be attachments to emails, I'm going to hand back to

21   you.

22           And if you'll send one -- if you'll send one of my law

23   clerks to the printer, they can bring that back, because it

24   appears while we were responding to that note, another note

25   came in.  So I have a second note.

1          And this note, which I'll mark as Item 2 in the upper

2    right-hand corner for identification, reads as follows:

3          Judge Gilstrap, we would like to see the LVC (sic)

4    table from the LTE standard.

5          Thank you, Debi Hall, foreperson.

6          I'll make some copies for counsel, and then I'll hand

7    the original to the courtroom deputy.

8          And we'll go off the record, and I'll give you an

9    opportunity to consult with each other hopefully to agree on

10   what the proper response should be.

11         We're off the record.

12         (Off the record discussion.)

13         THE COURT:  All right.  Counsel, in response to Jury

14   Note No. 2 having looked through the exhibits with you, I'm

15   proposing to send the following written response to the jury.

16   Response to Jury Note No. 2:

17         Members of the jury, in response to your note, I have

18   located what appears to be the VLC table from the H.264

19   standard.  This relates to the '238 patent and is PX-112,

20   period.

21         If this is what you are requesting, please send me

22   another note confirming that you would like to see this.  If

23   that is not what you are requesting, please send me another

24   note identifying more clearly what you would like the Court to

25   send to you.

1          Is there any objection to that from Plaintiff?

2          MR. STEVENSON:  No objection.

3          THE COURT:  Is there any objection to that from

4   Defendant?

5          MR. HASLAM:  No.

6          THE COURT:  Okay.  I'll print it, sign it, and give it

7   to the Court Security Officer and direct him to return it to

8   the jury or deliver it to the jury.

9          And awaiting either another note or a verdict, we

10   stand in recess.

11          COURT SECURITY OFFICER:  All rise.

12          (Recess.)

13          (Jury out.)

14          THE COURT:  Be seated, please, counsel.

15          We've got a third note, which is as you might expect,

16   reads as follows:

17          Judge Gilstrap, yes, we would like to review VLC table

18   from H.264 standard, PX-112.

19          Thank you, Debi Hall, foreperson.

20          I'll mark that as Exhibit 3.  And I'll hand the note

21   to the courtroom deputy.

22          And in response, I'll send the jury not only PX-112,

23   but a written note that says:  Members of the jury, in response

24   to your note, attached is PX-112.

25          Any objection from Plaintiff?

```
 1              MR. STEVENSON:  No objection.

 2              THE COURT:  Any objection from Defendant?

 3              MR. HASLAM:  No.

 4              THE COURT:  All right.  As soon as that can print,

 5   I'll sign it, put it with the exhibit, which if you'll hand it

 6   up to the courtroom deputy, Mr. Stevenson.

 7              Then I'll send those into the jury by way of our Court

 8   Security Officer.

 9              Counsel, if you would like a copy for your complete

10   record, here's a copy of the third note for each side.

11              MR. SMITH:  Thank you, Your Honor.

12              THE COURT:  All right.  I've signed the written

13   response.  I'll place it with PX-112, hand it to the Court

14   Security Officer, direct that he deliver it to the jury.

15              And, counsel, pending another note or the return of a

16   verdict, we stand in recess.

17              MR. STEVENSON:  Your Honor.

18              THE COURT:  Yes.

19              MR. STEVENSON:  I wanted to give you a brief status

20   update on the bench trial.

21              Mr. Young and I met and conferred.  We have four

22   witnesses, he has one witness, Mr. Zhang.  We think from our

23   side, with direct and cross, we only need about two hours.

24              THE COURT:  Two hours total?

25              MR. STEVENSON:  Two hours total for our case, direct
```

     1    and cross.

     2          THE COURT:  And what for the Defendants' case

     3    time-wise?

     4          MR. YOUNG:  Cross, we may need, depending on the

     5    testimony, an equal, roughly equivalent amount time of

     6    PanOptis's witnesses.

     7          I gave Mr. Stevenson the name of our one witness

     8    who -- whom the Court has already heard this week, Mr. Zhang.

     9    I'll have to consider whether, based on what they say, there's

    10    actually very much that we'll have him say.  So that's a may

    11    call rather than a will call.

    12          THE COURT:  So, clearly, we ought to be able to do

    13    this in four or five hours?

    14          MR. STEVENSON:  Clearly.

    15          MR. YOUNG:  I think that's fair, Your Honor.

    16          THE COURT:  Okay.  I'll still be looking for your

    17    letter briefs by the end of the day as to whether or not

    18    there'll be a bench trial at all, and if there is, then we'll

    19    proceed on the assumption that it will take that amount of

    20    time.  If it is, we'll start it at 8:00 o'clock Monday.  But

    21    I'll let you know after I review your briefing.

    22          MR. STEVENSON:  Thank you.

    23          MR. YOUNG:  Thank you.

    24          THE COURT:  Thank you.

    25          We're in recess.

```
 1              (Recess.)

 2              (Jury out.)

 3              COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Be seated, please.

 5              Counsel, we've received a fourth note from the jury.

 6    I've previously given you a Xerox note of this in chambers or a

 7    Xerox copy of this in chambers.  I'll mark the original as Item

 8    4 in the upper left-hand corner and deliver it to the courtroom

 9    deputy.

10              I've prepared a response to this note.  Let me read

11    the note into the record, and then I will give you my proposed

12    response.  The note reads as follows:

13              Judge Gilstrap, may we see further discussion evidence

14    regarding PX-643 and Huawei's question of the initial validity

15    of the '283 patent (sic)?

16              Thank you, Debi Hall, foreperson.

17              I'll hand the original note back to the courtroom

18    deputy.

19              In response, counsel, I've prepared the following, and

20    I have a hard copy if one representative of each side would

21    like to approach so you can read along with me.  I believe this

22    is appropriate, but I want to go over it with you and see if

23    you concur.

24              This response to the jury's note would read as

25    follows:
```

```
 1              Members of the jury, the Court, as I have previously
 2    told you, will not be able to send you a transcript of any
 3    portion of the trial testimony.  This is why I have instructed
 4    you that you must rely on your memories.  I am able to send
 5    specific exhibits to you when requested.  And I am able to
 6    answer questions on the law if they arise.  However, in
 7    response to this message from you, you must rely upon your
 8    memories of the testimony and evidence presented during the
 9    trial.
10              Do either Plaintiff or Defendant have any objection to
11    the Court sending this written response to the jury regarding
12    Note No. 4?
13              MR. STEVENSON:  No objection.
14              MR. SMITH:  No objection.
15              THE COURT:  Then I'll sign the written response and
16    hand it to the courtroom -- Court Security Officer to deliver
17    to the jury.
18              And I'll hand a signed duplicate to the courtroom
19    deputy for her files.
20              And with that, awaiting either another note or a
21    return of the verdict, we stand in recess.
22              (Recess.)
23              (Jury out.)
24              COURT SECURITY OFFICER:  All rise.
25              THE COURT:  Be seated, please.
```

1              Counsel, we have a fifth note from the jury.

2              I'll mark it as Item 5, and I'll read it to you, and

3      then I'll hand the original to the courtroom deputy.

4              Judge Gilstrap, we need a new copy of Page 4, Question

5      1, and a new copy of Page 5, Question 2.

6              Signed Debi Hall, foreperson.

7              I would propose to send them a completely clean copy

8      of the verdict form.

9              Anybody have any objection to that?

10             MR. STEVENSON:  No objection.

11             MR. SMITH:  No objection.

12             THE COURT:  All right.  Ms. Denton, if you'll take --

13     rather than send in a written reply, just them a clean copy of

14     the verdict form.

15             And I'll hand the note to the courtroom deputy.

16             Don't know why they need a new one, but it indicates

17     we might be getting close.

18             We stand in recess.

19             (Recess.)

20             (Jury out.)

21             COURT SECURITY OFFICER:  All rise.

22             THE COURT:  Be seated, please.

23             Ms. Denton, would you bring in the jury, please?

24             (Jury in.)

25             THE COURT:  Please be seated.

1           Members of the jury, it looks to me that you've been

2    deliberating for about five hours since just after lunch or

3    after noon today.

4           It's 5:20, more or less by my clock.  It's a Friday

5    evening.  I want you to know that you should continue to

6    deliberate, if necessary, up until an hour from now.  But if by

7    6:15 you've not reached a verdict, then you should recess for

8    the evening and come back tomorrow morning at 8:30 a.m. and

9    continue your deliberations then.

10          If you reach a verdict before 6:15, let the Court

11   Security Officer know.  If you don't, I'm not prepared to stay

12   up here with my staff all hours of the night on a Friday night,

13   and we'll reconvene and let you continue your deliberations at

14   8:30 tomorrow morning.

15          So with that, continue to work, and we'll see where we

16   are if and when we're still where we are right now at 6:15.

17          But those are my instructions to you, and with that,

18   you're excused.

19          COURT SECURITY OFFICER:  All rise.

20          (Jury out.)

21          THE COURT:  The Court stands in recess.

22          COURT SECURITY OFFICER:  All rise.

23          (Recess.)

24          (Jury out.)

25          COURT SECURITY OFFICER:  All rise.

```
 1              THE COURT:  Be seated, please.

 2              Counsel, we have received another note.

 3              I'll mark it as No. 5 (sic), I believe, for

 4    identification, and after I've read it, I will hand it to the

 5    courtroom deputy.

 6              Judge Gilstrap, we would like to review Dr. Vijay

 7    Madisetti and Dr. Dan Schonfeld's reports.

 8              Thank you, Debi Hall, foreperson.

 9              I've prepared the following response that I'd like to

10    read to counsel and get your comments on before I return it to

11    the jury:

12              Members of the jury, in response to your request to

13    review the reports of Dr. Madisetti and Dr. Schonfeld, their

14    reports are not evidence in the case, and I cannot send them to

15    you.  However, the testimony of these two witnesses is

16    evidence, and you should rely on your memories regarding their

17    testimony as to their reports and the subject matter contained

18    therein.

19              Any objections to that response from Plaintiffs?

20              MR. BAXTER:  No, Your Honor.

21              THE COURT:  Any objection from Defendants?

22              MR. HASLAM:  No, Your Honor.

23              THE COURT:  Then I'll sign the written response to the

24    jury, and I'm told this is Note 6.  I'll correct the

25    identification on the original as I hand it to the courtroom
```

1  deputy.  I'll sign the written response.  I'll hand it to the

2  Courtroom Security Officer, and ask her to deliver it to the

3  members of the jury.

4        I'll also hand a duplicate of the same to the

5  courtroom deputy for her files.

6        And with that, counsel, we stand in recess.

7        COURT SECURITY OFFICER:  All rise.

8        (Recess.)

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes _____          8/24/2018___
     SHELLY HOLMES, CSR-TCRR                  Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25