**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **OPTIS WIRELESS TECH., LLC, ET AL.,** | |
| **Plaintiffs,** | **Civil Action No. 2:17-cv-123 JRG-RSP** |
| **v.** | **PUBLIC VERSION** |
| **HUAWEI TECHS. CO. LTD., ET AL.,** | |
| **Defendants.** | |

**DEFENDANTS HUAWEI DEVICE USA INC. AND HUAWEI DEVICE (SHENZHEN)
CO., LTD.'S BENCH TRIAL OPENING BRIEF**

**Table of Contents**

I.      INTRODUCTION ........................................................................................... 1

II.     JURISDICTION AND STANDING ARE ABSENT......................................... 3

        A.      PANOPTIS' COUNT IX DOES NOT PRESENT A JUSTICIABLE
                CASE OR CONTROVERSY. .................................................................. 3

                1.      NO CASE OR CONTROVERSY EXISTS OVER FRAND-
                        COMPLIANCE OF THE SEPTEMBER 2017 OFFER AS TO
                        U.S. PATENTS......................................................................... 4

                2.      A JUDICIAL REMEDY WOULD NOT REDRESS ANY
                        INJURY TO PANOPTIS. ........................................................... 5

                        A)      THE REQUESTED RELIEF COULD NOT COMPEL
                                THE PARTIES TO ENTER INTO A WORLDWIDE
                                LICENSE. ....................................................................... 5

                        B)      THE SEPTEMBER 2017 OFFER HAS BEEN
                                RESCINDED, AND THE NEW OFFERS THAT
                                PANOPTIS MADE DURING THE TRIAL ARE NOT
                                PROPERLY PART OF COUNT IX................................. 6

                        C)      PANOPTIS SEEKS A PURELY ADVISORY OPINION............. 7

        B.      EQUITABLE AND POLICY CONSIDERATIONS CANNOT PROVIDE
                JURISDICTION IN THE ABSENCE OF A CASE OR CONTROVERSY......... 8

        C.      ALTERNATIVELY, THE COURT SHOULD EXERCISE ITS
                DISCRETION TO DECLINE TO ISSUE A DECLARATORY
                JUDGMENT. ....................................................................................... 11

III.    THE BURDEN OF PROOF SHOULD LIE WITH PANOPTIS. .................... 12

IV.     IF CONSIDERED ON THE MERITS, PANOPTIS' REQUEST FOR RELIEF IN
        COUNT IX SHOULD BE DENIED. .............................................................. 14

        A.      PANOPTIS' CONTINUED INSISTENCE ON AN INDIVISIBLE,
                GLOBAL OFFER AFTER SUING HUAWEI FOR INFRINGING U.S.
                PATENTS VIOLATES FRAND........................................................... 14

        B.      THE PROPOSED RATES IN THE SEPTEMBER 2017 OFFER DO NOT
                COMPLY WITH FRAND.................................................................... 18

                1.      THE 4G MAJOR MARKETS END USER DEVICE RATE IS
                        NOT FRAND........................................................................... 18

2.      THE 2G RATES IN THE SEPTEMBER 2017 OFFER ARE NOT
        FRAND. ................................................................................................ 20

3.      THE INFRASTRUCTURE RATES IN THE SEPTEMBER 2017
        OFFER ARE NOT FRAND. .................................................................... 21

C.  DR. AKEMANN'S ANALYSIS RELIES ON FLAWED
    ESSENTIALITY ASSUMPTIONS. ....................................................................... 23

        1.      THE TECHNICAL TESTIMONY IS CONCLUSORY AND
                UNSUPPORTED. ................................................................................... 24

        2.      BIAS MAKES WARDEN'S TESTIMONY UNRELIABLE. ................. 25

        3.      THE CLAIM CHART EVIDENCE IS INSUFFICIENT,
                INCLUDING BECAUSE IT IS NOT LINKED TO THE
                TESTIMONY OF HAIMOVICH OR WARDEN. ................................... 26

        4.      PANOPTIS' DROPPING OF ASSERTED PATENTS
                UNDERMINES ITS ASSERTIONS. ....................................................... 27

        5.      PANOPTIS' ESSENTIALITY PERCENTAGE IS TOO HIGH
                ACCORDING TO OTHER INDUSTRY INFORMATION. ................... 28

D.  THE JURY'S VERDICT ON DAMAGES HAS NO RELEVANCE TO
    WHETHER PANOPTIS' SEPTEMBER 2017 OFFER IS FRAND. ................... 28

V.      CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013)............................................................................................................3

*Apple Inc. v. Motorola Mobility, Inc.*,
   No. 11-CV-178-BBC, 2012 WL 7989412 (W.D. Wis. Nov. 8, 2012) ........................8, 16, 17

*Apple Inc. v. Telefonaktiebolaget LM Ericsson, Inc.*,
   No. 15-CV-00154-JD, 2015 WL 1802467 (N.D. Cal. Apr. 20, 2015) ......................................5

*Bennett v. Spear*,
   520 U.S. 154 (1997)......................................................................................................3, 5

*Carmona v. Sw. Airlines Co.*,
   604 F.3d 848 (5th Cir. 2010) ..............................................................................................13

*In re Certain 3G Mobile Handsets and Components*,
   337-TA-613 (Apr. 27, 2015)...............................................................................................14

*In re Certain Wireless Devices*,
   337-TA-800 (June 28, 2013)...............................................................................................14

*Collins v. Wayne Corp.*,
   621 F.2d 777 (5th Cir. 1980) ........................................................................................25, 26

*Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*,
   986 F.2d 1463 (5th Cir. 1993) ............................................................................................12

*Dominion Energy, Inc. v. Alstom Grid LLC*,
   725 F. App'x 980 (Fed. Cir. 2018) ......................................................................................24

*Dow Jones & Co. v. Ablaise Ltd.*,
   606 F.3d 1338 (Fed. Cir. 2010)............................................................................................8

*Dow Jones & Co. v. Harrods, Ltd.*,
   237 F. Supp. 2d 394 (S.D.N.Y. 2002)..................................................................................12

*Eastman Kodak Co. v. Kavlin*,
   978 F. Supp. 1078 (S.D. Fla. 1997) .....................................................................................12

*El Dia, Inc. v. Hernandez Colon*,
   963 F.2d 488 (1st Cir. 1992)...............................................................................................12

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)............................................................................9

*Harris Corp. v. Fed. Express Corp.*,
  670 F. Supp. 2d 1306 (M.D. Fla. 2009)................................................................8

*Hebert v. Rogers*,
  890 F.3d 213 (5th Cir. 2018) ........................................................................25, 26

*Henderson ex. rel. Henderson v. Shinseki*,
  562 U.S. 428 (2011)............................................................................................10

*Hodges v. United States*,
  597 F.2d 1014 (5th Cir. 1979) ..............................................................................7

*Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
  589 F.3d 1179 (Fed. Cir. 2009)..........................................................................24

*InterDigital Commc'ns, Inc. v. ZTE Corp.*,
  No. 1:13-CV-00009-RGA, 2014 WL 2206218 (D. Del. May 28, 2014)................8

*Kim v. ConAgra Foods, Inc.*,
  465 F.3d 1312 (Fed. Cir. 2006)..........................................................................24

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)..........................................................................................3, 5

*Microsoft Corp. v. Motorola, Inc.*,
  795 F.3d 1024 (9th Cir. 2015) ..............................................................................4

*Microsoft Corp. v. Motorola, Inc.*,
  963 F. Supp. 2d 1176 (W.D. Wash. 2013)..........................................................13

*Mims v. United States*,
  375 F.2d 135 (5th Cir. 1967) ..............................................................................23

*Motorola – Enforcement of GPRS standard essential patents*,
  Case AT.39985, 2014 E.C.R. 2892.................................................2, 15, 16, 17, 18

*Mueller Sys., LLC v. Robert Teti*,
  199 F. Supp. 3d 270 (D. Mass. 2016) .................................................................12

*Neopost Industrie B.V. v. PFE Int'l, Inc.*,
  403 F. Supp. 2d 669 (N.D. Ill. 2005) ..................................................................24

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................25

*Saint Lawrence Comm'ns LLC v. Motorola Mobility LLC*,
  No. 2:15-CV-351-JRG, 2018 WL 915125 (E.D. Tex. Feb. 15, 2018) ............................16, 17

*Sinram-Marnis Oil Co. v. City of New York*,
  139 A.D.2d 360 (N.Y. App. Div. 1988) ....................................................................................7

*St. Paul Ins. Co. v. Trejo*,
  39 F.3d 585 (5th Cir. 1994) ....................................................................................................12

*State of N.J., Dep't of Envtl. Prot. & Energy v. Heldor Indus., Inc.*,
  989 F.2d 702 (3d Cir. 1993)....................................................................................................11

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001)...............................................................................................24

*United Steelworkers of Am. v. Bell Foundry Co.*,
  626 F.2d 139 (9th Cir. 1980) ....................................................................................................7

*Voda v. Cordis Corp.*,
  476 F.3d 887 (Fed. Cir. 2007)..............................................................................................1, 4

## Statutes & Rules

28 U.S.C. § 2201(a) .....................................................................................................................11

Fed. R. Civ. P. 12(h)(3).................................................................................................................10

Fed. R. Civ. P. 16(d) ......................................................................................................................7

## Other Authorities

Restatement (Second) of Contracts § 42 (1981) ...........................................................................7

## I.   INTRODUCTION

Throughout the parties' negotiations, Huawei has consistently attempted to negotiate a license to PanOptis' portfolio of declared standard-essential patents ("SEPs") on the fair, reasonable, and non-discriminatory ("FRAND") terms that Huawei is entitled to receive and that PanOptis is obligated to offer. Huawei has negotiated for a worldwide license, but it has also requested a U.S.-only license that would resolve this lawsuit. PanOptis insists on tying any U.S. license to a license on all of PanOptis' other SEPs worldwide, including in China and Germany, where other litigations are pending. PanOptis so insists even though Huawei's sales in the U.S. comprise less than 1% of its total sales worldwide.

The question raised by PanOptis' Count IX is whether PanOptis' September 2017 offer (PX 0736) complied with PanOptis' FRAND obligations as to U.S. patents. Any ruling answering this question, however, would be purely advisory and will not resolve the dispute between the parties. PanOptis is adamant that its offers to Huawei are global in nature and cannot be divided by jurisdiction, that no one can extrapolate a U.S.-only rate from those offers, and that the operative September 2017 offer is no longer even on the table for Huawei to accept. Further, as the Court recognized in limiting PanOptis' Count IX to U.S. patents (Dkts. 214 and 246), the Court should refrain from exercising its discretion to adjudicate FRAND issues as to foreign patents since doing so would necessitate determinations concerning the scope, infringement, and validity of non-U.S. patents governed by non-U.S. laws. *See Voda v. Cordis Corp.*, 476 F.3d 887, 902 (Fed. Cir. 2007); Dkt. 214 at 16 ("At least under the Declaratory Judgment Act, the foreign part of PanOptis' claim should be dismissed for the reasons explained in *Voda*, even if jurisdiction *could* be exercised."). For these reasons, the Court does not have jurisdiction to decide Count IX on this record, and, even if it did have jurisdiction, it should decline as a

discretionary matter to issue declaratory relief.

On the merits, PanOptis' pursuit of U.S. patent litigation while refusing Huawei's request for an offer for a U.S. SEP license, particularly where only a comparatively tiny portion of the relevant sales take place in the U.S., should disqualify PanOptis' global bundled offer from receiving the FRAND certification it seeks from this Court. While worldwide licenses are common and negotiations over such licenses may comport with FRAND, PanOptis' pursuit of U.S. patent litigation under the facts present here mandates that it make a U.S.-only offer that can be assessed for FRAND compliance. The situation here is analogous to that in a case in which the European Commission found a violation of Article 102 of the Treaty on the Functioning of the European Union. In that case, the patent holder attempted to extract a global license from a potential licensee by suing it for an injunction in a particular country while refusing to offer a country-specific FRAND license that would resolve the parties' lawsuit in that country—even after the potential licensee offered to take a country-specific license, just as Huawei has done here. Case AT.39985, Motorola – Enforcement of GPRS standard essential patents, 2014 E.C.R. 2892, ¶¶ 492–496. Like the patent holder in the injunction case, PanOptis' conduct here is neither fair nor reasonable.

In addition, substantial portions of the September 2017 offer are not FRAND according to the findings of PanOptis' own expert, a fact that PanOptis' mid-trial attempt to present a new, revised offer implicitly admits. The data on which PanOptis' economic expert relies are also unreliable, including because PanOptis' technical experts failed to link their overly general opinions to any particular patents or claims in view of PanOptis' decision not to introduce their claim charts into the record.

Accordingly, the Court should find that it lacks jurisdiction to decide Count IX, or,

alternatively, decline to grant relief on that Count.

## II.   JURISDICTION AND STANDING ARE ABSENT.

### A.   PanOptis' Count IX Does Not Present a Justiciable Case or Controversy.

As Huawei noted prior to the bench trial, in light of the record developed at the jury trial, PanOptis' Count IX does not present an actual case or controversy between the parties. *See* Dkt. 280. Count IX seeks only an adjudication as to whether PanOptis has complied with its FRAND obligations as to U.S. patents. Because PanOptis has not made an offer to license only its U.S. patents, and PanOptis' witnesses at trial testified that the September 2017 offer indisputably *cannot* be unpacked to calculate a U.S.-only rate, there is presently no case or controversy over whether PanOptis has complied with its FRAND obligations as to U.S. patents.

For a declaratory judgment claim to raise an Article III case or controversy, the dispute must "be 'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)). This requirement must be met "not only at the time the [declaratory judgment] complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotations and citation omitted). Further, "the 'case' or 'controversy' requirement of Article III" requires, "generally speaking," that "a plaintiff … demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The "party seeking a declaratory judgment," which is PanOptis here, "has the burden of establishing the existence of an actual case or controversy." *MedImmune*, 549 U.S. at 140 (quoting *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95

(1993)). *See generally* DCL4–DCL5.

### 1. No Case or Controversy Exists Over FRAND-Compliance of the September 2017 Offer as to U.S. Patents.

PanOptis has not satisfied its burden of demonstrating an Article III case or controversy. No dispute exists between the parties as to whether PanOptis' offer satisfies FRAND requirements with respect to U.S. patents, which is the subject matter of PanOptis' Count IX, for there has never been an offer that can be evaluated in such a manner. As PanOptis itself recognizes, at this point in the litigation, PanOptis' request for declaratory judgment as to FRAND compliance must relate only to U.S. patents. *See* PCL9. The Court dismissed Count IX as to non-U.S. patents in recognition of the international comity concerns set forth in *Voda*, 476 F.3d at 897–905, acknowledging that "[c]ourts in other countries apply their own law governing FRAND compliance … and this law … can be very different from United States law." Dkt. 214 at 15–16.[1]

However, PanOptis has never given Huawei an offer as to U.S. patents only. PanOptis refuses to do so, despite Huawei's requests for such an offer and its willingness to accept one. DFF58; DFF68–DFF71. Nor has PanOptis made an offer from which a rate for PanOptis' U.S. SEPs can be determined. To the contrary, PanOptis asserts that it is impossible to determine proposed U.S. patent rates from its September 2017 offer. DFF73–DFF77.

---

[1] As far as just the "case or controversy" requirement is concerned, Huawei does not dispute that, as PanOptis puts it, "[t]his Court … has jurisdiction to adjudicate a global breach of contract claim." *See* PCL13. The international comity reasons set forth in *Voda* and acknowledged by the Court, however, relate to the particular nature of PanOptis' Count IX, which as originally pled would have required the Court to consider what royalty is reasonable for FRAND-encumbered patents in foreign jurisdictions, each of which has its own patent damages law and claim construction doctrines that may affect essentiality. As Huawei explained in its prior briefing on the motion to dismiss, Dkt. 145 at 6, the *Microsoft Corp. v. Motorola, Inc.* case cited by PanOptis, *see* PCL13, is not to the contrary, as Motorola affirmatively stipulated to a bench trial adjudicating the FRAND issue as to foreign patents. 795 F.3d 1024, 1038–39 (9th Cir. 2015). No such stipulation exists in this case.

PanOptis' Count IX therefore asks this Court to issue a declaration that addresses an entirely hypothetical issue and that cannot resolve the parties' actual dispute. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. at 127. PanOptis has not explained how the Court can declare that PanOptis' worldwide, non-segregable September 2017 offer complied with PanOptis' FRAND obligations with respect to U.S. patents when, to date, PanOptis has made no offer from which it contends a rate for its portfolio of U.S. SEPs can be derived. The Declaratory Judgment Act is not a means "to obtain piecemeal adjudication of defenses that *would not finally and conclusively resolve* the underlying controversy." *MedImmune*, 549 U.S. at 127 n.7 (emphasis in original).

### 2.     A Judicial Remedy Would Not Redress Any Injury to PanOptis.

Even if PanOptis' offer could be parsed to determine a U.S.-only rate, a favorable decision on Count IX would not redress any injury to PanOptis. *See Bennett*, 520 U.S. at 162. PanOptis sued Huawei for infringement of U.S. patents, and any injury it may have sustained on that score has been addressed in the jury trial (as to which Huawei reserves its objections).

### a)     The Requested Relief Could Not Compel The Parties to Enter Into a Worldwide License.

PanOptis has not alleged, and cannot allege, any separate remaining injury relating to the September 2017 global license offer it asks the Court to assess for FRAND compliance. That is because the Court's determination on Count IX would not, and could not, require Huawei to accept that offer. *See Apple Inc. v. Telefonaktiebolaget LM Ericsson, Inc.*, No. 15-CV-00154-JD, 2015 WL 1802467, at *2 (N.D. Cal. Apr. 20, 2015) ("[T]here exists no legal basis upon which Apple may be compelled to take a license for Ericsson's patents on a portfolio-wide basis, as much as Ericsson may be able to point to business realities that make such an outcome unlikely, imprudent or uneconomical on Apple's part.").

This is particularly the case given that the September 2017 licensing offer includes royalty rates for sales in China, where Huawei does 60% of its cell phone business. DFF7–DFF8. Even if PanOptis' offer were determined to be FRAND as to the U.S. patents, that does not mean that Huawei should or would accept an offer that may exceed a FRAND rate as to patents in China or other jurisdictions which are not at issue in this litigation. Huawei is willing to accept a U.S. license for the Major Market Rate in PanOptis' September 2017 offer, but PanOptis has stated it will not enter into such a U.S.-only license, and to date no U.S.-only license has been offered. DFF60; DFF68–DFF70; DFF75. PanOptis also has explicitly stated that it will not offer a license to Huawei in the future that is limited to the United States. DFF58; DFF74–DFF75.

<div style="text-align:center">

**b)**      **The September 2017 Offer Has Been Rescinded, and the New Offers That PanOptis Made During the Trial Are Not Properly Part of Count IX.**

</div>

PanOptis made clear at the trial that the September 2017 offer as presented to Huawei in PX 0736 and during the parties' negotiations is no longer available to Huawei. During the jury trial, PanOptis' corporate representative Mr. Warren testified that the September 2017 offer was no longer "still on the table" and that PanOptis was now seeking the maximum 0.9% royalty permitted under PanOptis' agreements with Ericsson, LG and Panasonic. 8-20 PM Trial Tr. 98:14–99:7. Later, during the bench trial and without PanOptis previously apprising Huawei or the Court, Mr. Warren appeared to change course again, describing yet another license offer— which he was apparently making available to Huawei from the stand—that (unlike the September 2017 offer) is separable between end user devices and infrastructure. 8-27 Bench Trial Tr. at 36:21–23, 71:19–72:2 (Warren commits "right here that that offer is segregable, and if Huawei wishes the handset portion of it, they can do that without having to take the infrastructure"). Even if Mr. Warren had not made clear that the September 2017 offer was "off the table," this modification would rescind the September 2017 offer that is the subject of this

<div style="text-align:center">6</div>

bench trial.[2] Because the licensing offer that was presented by PanOptis at the Pretrial

Conference as the subject of Count IX is no longer available, any declaration that the Court

would issue on Count IX would not redress any real and cognizable injury to PanOptis. *See* Dkt.

243 at 4 ("PanOptis contends that its most recent offer to Huawei [i.e. PX 0736] complies with

its obligations to ETSI, and if executed, would result in a license on FRAND terms and

conditions."); Fed. R. Civ. P. 16(d) ("Th[e Pretrial Order] controls the course of the action unless

the court modifies it."). Moreover, it would be improper to issue relief as to any of the new offers

generated by PanOptis during the trial. *See Hodges v. United States*, 597 F.2d 1014, 1017–18

(5th Cir. 1979) ("[C]ourts have usually precluded an offer of proof of a new claim or defense

where it is first presented at trial without prior mention of the claim or defense in either the

pleadings or the pretrial order.").

<p align="center">c)      <strong>PanOptis Seeks a Purely Advisory Opinion.</strong></p>

Given the above, PanOptis' Count IX essentially requests a purely advisory opinion as to

whether PanOptis' September 2017 worldwide, non-segregable offer—which is no longer even

on the table for Huawei to accept—complies with FRAND with respect to U.S. patents. Such an

opinion from the Court will neither redress any injury nor resolve any actual dispute between the

parties in this case. PanOptis admits as much, explaining in its letter brief to the Court that it

seeks resolution of Count IX merely so that it may "modify its license offer consistent with the

Court's analysis" and "rely upon [the Court's decision] in its existing licensing program with

regard to Huawei and others." Dkt. 279 at 2; DFF78 (advice sought on PanOptis' negotiations

---

[2] *See United Steelworkers of Am. v. Bell Foundry Co.*, 626 F.2d 139, 141 (9th Cir. 1980)
("[U]nder traditional rules governing the formation of contracts, a modification of an offer
operates as a revocation of that offer."); *Sinram-Marnis Oil Co. v. City of New York*, 139 A.D.2d
360, 371–72 (N.Y. App. Div. 1988) ("[A] material change in an offer once communicated to the
offeree constitutes a revocation of the original offer terminating the offeree's power to accept the
original offer."); Restatement (Second) of Contracts § 42 (1981) (same).

<p align="center">7</p>

with numerous other parties). To the extent that the relief sought does relate to Huawei, the only purpose of the determination as to U.S. patents requested by PanOptis under Count IX would be "to alter the current negotiating power between the parties," which is insufficient to confer standing on a declaratory judgment plaintiff. *See InterDigital Commc'ns, Inc. v. ZTE Corp.*, No. 1:13-CV-00009-RGA, 2014 WL 2206218, at *3 (D. Del. May 28, 2014); *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC, 2012 WL 7989412, at *5 (W.D. Wis. Nov. 8, 2012) ("There is no guarantee that the parties will complete the negotiation and actually enter into a licensing agreement under which Apple will pay Motorola for the use of its technology. In these circumstances, I am not persuaded that the case should proceed.").

### B.   Equitable and Policy Considerations Cannot Provide Jurisdiction in the Absence of a Case or Controversy.

At the close of the bench trial, the Court asked counsel for Huawei whether dismissing Count IX for lack of a case or controversy after Huawei dismissed its affirmative defenses would be "fundamentally fair." 8-27 Bench Trial Tr. 192:10–17. For the reasons set forth below, it would be fair. However, even if it were not, such "equitable and policy considerations . . . are not part of the Court's jurisdictional analysis." *Harris Corp. v. Fed. Express Corp.*, 670 F. Supp. 2d 1306, 1310 n.5, 1311 (M.D. Fla. 2009); *see also Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010) ("[N]o amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy.").

On the issue of fairness, as Huawei's counsel explained to the Court, no gamesmanship or unfairness occurred. Huawei's withdrawal of its FRAND affirmative defenses, like its withdrawal of other, non-FRAND affirmative defenses, occurred as the litigation approached the end. 8-27 Bench Trial Tr. 198:8–11. That withdrawal took into account a weighing of the

8

chances of success in light of the burden of proof applied to such affirmative defenses (which would not apply to the denial of PanOptis' claims for relief). Huawei withdrew its FRAND affirmative defenses "in part because of testimony that occurred during the [jury] trial" that confirmed that PanOptis was seeking a FRAND adjudication as to all of the patents in its portfolio, worldwide, and that the parties did not have a live dispute as to whether PanOptis had offered a FRAND license as to only PanOptis' U.S. patents—the subject matter of Count IX— because it was undisputed that PanOptis had made, and would make, no such offer. 8-27 Bench Trial Tr. 194:21–196:18. PanOptis raised no objection to Huawei's dropping of its affirmative defenses. 8-24 Trial Tr. 101:12–14. Huawei's counsel also explained that Huawei would have made the same argument regarding the justiciability of Count IX even if it had not withdrawn its affirmative defenses. 8-27 Bench Trial Tr. 198:18–22; *see also* Dkt. 214 at 16 (recognizing that "a party cannot confer subject-matter jurisdiction on a federal court through estoppel" (citation omitted)).

Moreover, the affirmative defenses had nothing to do with the presentation of evidence to the jury. FRAND issues were relevant to the jury trial for two reasons, wholly unrelated to the affirmative defenses, and as to both of which Huawei could and would have presented evidence even if it had never raised the affirmative defenses. First, as explained at the pre-trial conference, Huawei argued FRAND issues as a defense to willful infringement—namely, that because Huawei acted reasonably in continuing to utilize industry standard wireless protocols while negotiating in good faith towards a license to PanOptis' SEP portfolio on FRAND terms, Huawei should not be held to have willfully infringed PanOptis' SEPs. *See, e.g.*, 7-27 Pre-Trial Conf. Tr. 68:10–20; 70:6–16. Second, in keeping with the Federal Circuit's decision in *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir. 2014), Huawei argued that the FRAND commitment

imposed a limitation on damages because the asserted patents were FRAND-encumbered

through declarations by PanOptis and its predecessors to ETSI.[3] The Court acknowledged that

there was nothing improper about the FRAND arguments Huawei made to the jury. 8-27 Bench

Trial Tr. 206:17–18.

Although, in retrospect, Huawei may have been able to file a motion to dismiss Count IX

on jurisdictional grounds at an earlier date, *see* 8-27 Bench Trial Tr. 199:4–200:10, and

Huawei's counsel in fact apologized for not recognizing this issue earlier and doing so, *id.* at

200:8–10, the jurisdictional issue must nevertheless be resolved. Objections to the lack of

subject-matter jurisdiction "may be raised at any time." *Henderson ex. rel. Henderson v.*

*Shinseki*, 562 U.S. 428, 434 (2011); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at

any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Thus, the

Supreme Court has noted that a party, even "after losing at trial, may move to dismiss the case

because the trial court lacked subject-matter jurisdiction." *Henderson*, 562 U.S. at 434–35. This

is true "even if the party had previously acknowledged the trial court's jurisdiction," which

PanOptis alleges Huawei did here, *see* PCL8, and even if "many months of work on the part of

the attorneys and the court may be wasted." *Henderson*, 562 U.S. at 435. Here, where PanOptis

introduced substantial evidence during the jury trial reinforcing the fact that there was no case or

controversy with respect to a U.S.-only license or U.S. FRAND compliance, and where there

will not be such a case or controversy in the future given PanOptis' refusal to offer a U.S.-only

license (as discussed above), the fact that Huawei failed to recognize and raise the jurisdictional

defect with respect to Count IX sooner cannot change the fact that jurisdiction no longer exists.

---

[3] PanOptis acknowledges this point, as it asserted throughout the jury trial that the damages it
was seeking for the asserted SEPs were FRAND.  *See, e.g.*, 8-21 PM Sealed Trial Tr. at 15:25–
17:6 (Akemann).

Indeed, even if it were the withdrawal of the affirmative defenses that created the absence of jurisdiction, the Third Circuit has held that a federal court must not resolve a dispute that has become moot because of a party's withdrawal of an objection, notwithstanding the late timing of that withdrawal. *State of N.J., Dep't of Envtl. Prot. & Energy v. Heldor Indus., Inc.*, 989 F.2d 702, 708–09 (3d Cir. 1993). The Third Circuit explained that "[w]hile [the court is] sympathetic to the bankruptcy judge when presented with the eleventh-hour negation of a great deal of effort because of DEP's withdrawal of its objections," the bankruptcy judge should have recognized that the withdrawal of the objection rendered the court's decision an impermissible advisory opinion. *Id.* The Third Circuit further noted that a dispute is not one falling into the "capable of repetition, yet evading review" exception to mootness, if the court could adequately address the issue in a later case where the party adhered to its objection, *id.* at 708, as would be the case with any Huawei FRAND affirmative defenses here.

**C.   Alternatively, the Court Should Exercise Its Discretion to Decline to Issue a Declaratory Judgment.**

In addition, even if jurisdiction existed, the Court should exercise its discretion under the Declaratory Judgment Act to decline to issue a ruling for two reasons. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of an interested party seeking such declaration.") (emphasis added). *First*, as discussed in Section II.A.2., above, due to the mid-trial changes in PanOptis' licensing offer and the inability to force Huawei into a license that may exceed FRAND as to non-U.S. patents, any relief ordered by the Court will not resolve the parties' licensing dispute. In deciding declaratory judgment claims, courts should consider whether "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and whether the declaration "will terminate and afford relief from the uncertainty, insecurity, and

controversy giving rise to the proceeding." *Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993) (citing Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2759 at 647–48); *see also St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994) (listing judicial economy as one factor in determining discretionary exercise of declaratory judgment jurisdiction); *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 494 (1st Cir. 1992) ("[C]ourts should withhold declaratory relief as a matter of discretion if such redress is unlikely to palliate … the fancied injury.").

*Second*, as noted in Section II.A.1., above, a judgment on Count IX would, given the evidence at trial of an offer that PanOptis claims cannot be evaluated on a U.S.-only basis, exceed the scope of Count IX resulting from the Court's earlier dismissal as to non-U.S. patents. Even if the Court had jurisdiction to issue such a judgment, potential conflicts with foreign law, including in China and Germany, where litigations are currently pending over non-U.S. patents, counsel that a U.S. "federal court should stay its hand." *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1090 (S.D. Fla. 1997) (dismissing declaratory judgment that may conflict with Bolivian case); *see also Mueller Sys., LLC v. Robert Teti*, 199 F. Supp. 3d 270, 283 (D. Mass. 2016) (dismissing declaratory judgment that "may create friction" with Canadian judicial system); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 440–41 (S.D.N.Y. 2002) (dismissing declaratory judgment due to risk of "unjustifiable interfere[nce] with the exercise of jurisdiction by tribunals of another sovereign nation" and "unnecessary tensions between the judicial power of the United States and that of the United Kingdom").

## III.     THE BURDEN OF PROOF SHOULD LIE WITH PANOPTIS.

Both parties agree that "to determine the burden of proof in an action brought under the Declaratory Judgment Act, a court must look to the burden of proof in the underlying substantive claim." PCL3 (citing *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199

(2014)). With respect to the underlying substantive claim, "a party has the burden of proof on an issue when the facts with regard to the issue lie peculiarly within the knowledge of that party." *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 862 (5th Cir. 2010); *see also* DCL1.

Here, PanOptis bears the burden of proving that its own licensing offer is FRAND-compliant, as many of the key "facts with regard to the issue lie peculiarly within the knowledge of" PanOptis. *See Carmona*, 604 F.3d at 862. PanOptis has the greater knowledge regarding its patent portfolio, the value of the patents within that portfolio, and, most importantly, PanOptis' history of licensing its patent portfolio to others. Therefore, PanOptis is in the best position to present evidence relevant to whether its September 2017 offer complies with FRAND. For example, Dr. Akemann considered PanOptis' third-party licenses as the "most instructive" and "most probative" factors in forming his FRAND opinion. DFF79. But Huawei does not have access to those licenses. DFF80. Moreover, PanOptis did not share with Huawei its calculation methods for its September 2017 offer based on the *Unwired Planet* decision, despite Huawei's request for that information. DFF67.

The cases cited by PanOptis are not to the contrary. In *Microsoft Corp. v. Motorola, Inc.*, which was not a declaratory judgment case, the court did not analyze which party bore the burden on FRAND issues, but instead just accepted that Microsoft, as the plaintiff suing for breach of contract, bore the burden, without analyzing the effect of any unequal availability of information. *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1187 (W.D. Wash. 2013). Similarly, in *TCL Communications Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, the court offered no analysis for imposing the burden on the accused infringer other than rejecting TCL's only burden-related argument that the burden should be "shared." No. 14-

cv-00341-JVS, 2016 WL 7042085, at *3 (C.D. Cal. Aug. 17, 2016).[4] Neither of those cases is

instructive here, where Huawei is asserting that PanOptis bears the burden on its declaratory

judgment claim seeking a declaration of FRAND compliance with respect to its September 2017

offer.

## IV.     IF CONSIDERED ON THE MERITS, PANOPTIS' REQUEST FOR RELIEF IN COUNT IX SHOULD BE DENIED.

### A.     PanOptis' Continued Insistence on an Indivisible, Global Offer After Suing Huawei for Infringing U.S. Patents Violates FRAND.

As noted above, PanOptis has never given Huawei a U.S.-only offer, despite the fact that

Huawei has specifically sought such a license and offered to settle the case relating to U.S. SEPs

(DFF58, DFF60),[5] and despite the fact that PanOptis itself has chosen to sue Huawei for

infringement of alleged U.S. SEPs and asked the U.S. court to assess FRAND compliance. Over

60% of Huawei's handset sales occur in China, and its sales in the United States are

insignificant. DFF7–8. Under these circumstances and in keeping with the requirement that the

---

[4] The two International Trade Commission decisions PanOptis cites are irrelevant. Neither decision evaluated the burden of proof on whether a party is liable for breaching the FRAND commitment. Both of the decisions instead addressed violation of FRAND as a factor to consider in evaluating whether an exclusion order would be in the public interest. *See* Initial Determination on Remand, *In re Certain 3G Mobile Handsets and Components*, 337-TA-613, at 35–40 (Apr. 27, 2015); Initial Determination, *In re Certain Wireless Devices*, 337-TA-800, at 417–34 (June 28, 2013). In that context, the administrative law judge in Inv. No. 337-TA-613 noted that the ITC rules required that "[t]he proponent of any factual proposition," which in that case was the accused patent infringer who claimed that an exclusion order would violate the FRAND commitment, "shall be required to sustain the burden of proof with respect thereto." Initial Determination on Remand, *In re Certain 3G Mobile Handsets and Components*, 337-TA-613, at 39 (Apr. 27, 2015). Moreover, in reviewing the ALJ's determination in that investigation, the Commission ruled that the determinations with respect to the public interest and FRAND issues were moot. Commission Opinion on Remand, *In re Certain 3G Mobile Handsets and Components*, 337-TA-613, at 50 n.27 (Sept. 21, 2015).

[5] In addition to offering to take a license to the U.S. part of PanOptis' portfolio, Huawei has also entertained PanOptis' offer of arbitration, contrary to PanOptis' claims in its Findings of Facts. *See* PFF54. Mr. Warren admitted that Huawei has stated that arbitration would be possible as long as the parties could agree on terms. *See* 8-27 Bench Trial Tr. 63:2–6.

parties act in good faith during negotiations over FRAND-encumbered patents (PCL18),[6]

PanOptis should be required to offer Huawei a U.S.-only license in response to Huawei's own

offer to enter into a U.S.-specific license. PanOptis' refusal to do so, as part of an effort through

U.S. litigation to compel Huawei's agreement on terms in China, Germany and elsewhere where

Huawei's sales are much more significant, makes its September 2017 offer non-FRAND.

The decision of the European Commission in the litigation between Motorola and Apple,

Case AT.39985, Motorola – Enforcement of GPRS standard essential patents, 2014 E.C.R. 2892

("European Comm. Motorola Decision"), is instructive. Motorola sued Apple in Germany on a

number of SEPs and other patents and sought injunctions against Apple for its infringement.

European Comm. Motorola Decision, 2014 E.C.R. 2892, ¶¶ 115–117. Apple made a series of

licensing offers to Motorola—just as Huawei has done with respect to PanOptis during the

parties' negotiations leading up to trial. Apple's second offer was to license all of Motorola's

telecommunications SEPs for the territory of Germany. *Id.* ¶ 125(a). Motorola rejected this offer

in part because "the offer was not worldwide in scope but covered only Germany." *Id.* ¶ 127(f).

The Commission rejected Motorola's position on country-specific licensing, and held that

Motorola had abused its dominant position by continuing to seek an injunction against Apple in

Germany after Apple's offer to take a Germany-only offer. *Id.* ¶¶ 492–496. The Commission

considered Apple's country-specific offer to be FRAND, and concluded that the offer to license

---

[6] PanOptis' failure to provide a U.S.-only offer is a breach of this requirement to negotiate in good faith. PanOptis' attempts to imply that Huawei did not act in good faith during negotiations are without merit. PanOptis suggests that Huawei provided inaccurate sales data to PanOptis during negotiations in 2015. *See* PFF48, PFF53 n.2. But Mr. Zhang, Huawei's corporate representative, explained that any discrepancy in sales data provided was due to the timing of the disclosure: Huawei itself did not have final sales data for 2015 or later at the time of its disclosure, and used estimates and data provided by PanOptis instead. *See* 8-22 AM Sealed Trial Tr. 39:11–23. There is no evidence that Huawei made any effort to mislead PanOptis during negotiations.

in Germany "was a clear indication of Apple's willingness to enter into a licensing agreement on

FRAND terms and conditions." *Id.* ¶¶ 437, 440, 444; *see id.* ¶¶ 303, 420, 433, 437–438, 440–

441, 444, 490–491, 495, 519.

Huawei has clearly communicated its desire for a U.S.-only license here. DFF58. Huawei

has stated its willingness to accept PanOptis' 0.259% "Major Market" 4G handset rate for U.S.

sales. DFF60. PanOptis' rejection of any U.S.-only license, despite Huawei's miniscule sales in

the U.S., violates the FRAND duty given PanOptis' current U.S. litigation and Huawei's

overtures regarding a U.S.-only license. The fact that PanOptis sought only damages and a

declaratory judgment in this lawsuit, as opposed to the injunctions at issue in the *Motorola* case,

does not change the fact that PanOptis is using its U.S. SEPs in a U.S. litigation as leverage to

impose on Huawei a global license covering patents in other countries where those countries'

own courts are adjudicating those patents. PanOptis, like Motorola, seeks to force Huawei into a

*global* license using litigation in a national court, despite the fact that Huawei is clearly willing

to enter into a license to the patents issued in that court's jurisdiction. This is neither fair nor

reasonable in view of the geographic distribution of Huawei's sales. It is also an inappropriate

use of this Court's jurisdiction and resources to evaluate FRAND terms for non-U.S.

jurisdictions where Huawei has significant sales. This Court should therefore decline to endorse

PanOptis' worldwide, indivisible offer as FRAND compliant and should decline to issue the

requested declaratory relief under Count IX.[7]

---

[7] Huawei acknowledges that relief similar to what PanOptis requests under Count IX may be
reasonable in different circumstances, such as where a substantial portion of a potential
licensee's sales are in one country and a SEP patentee sues the potential licensee in that country.
In that case, a global license would not be so different in its coverage from a country-specific
license, given that substantial sales occur in the country of suit. That is not the situation here.
Given Huawei's geographic sales distribution, requiring a U.S.-specific license is appropriate.
The *Saint Lawrence* case, in which this Court held that a decision to license SEPs on a
(continued…)

While global licensing may be more efficient in the context of a *negotiation*, PanOptis chose to abandon those potential efficiencies and incur the expense and time of country-by-country litigation by suing Huawei in the U.S. as well as in Germany. In this context, the efficiencies of global licensing are inapplicable, and the pursuit of a global license constitutes a violation of FRAND—particularly where the potential licensee has relatively few sales in the country where the lawsuit is brought.

The European Commission specifically rejected the efficiency rationale in the *Motorola* litigation, dismissing Motorola's arguments that portfolio licensing generated efficiencies by avoiding "patent-by-patent licensing negotiations" and "patent-by-patent litigation on validity and infringement." European Comm. Motorola Decision, 2014 E.C.R. 2892, ¶¶ 488–89. The European Commission stated that (1) Apple's offer of a Germany-only license would also generate efficiencies, and (2) "it is in the public interest to allow challenges to the validity of patents and to ensure that royalties are not unduly paid." *Id.* ¶¶ 490–91. A U.S.-only license in the present case would efficiently dispose of the U.S. part of the parties' dispute, which is the only part before the Court. While the U.S. represents only a tiny percentage of Huawei's sales, it is home to the largest number of PanOptis' SEPs. *See* PX 2074A. Huawei also challenged the validity of the Asserted Patents in this litigation, furthering the Commission's second stated reason for requiring country-specific license offers. PanOptis itself clearly believes that country-specific damages actions have value and provide benefits that outweigh any efficiency concerns—otherwise, it would have continued to pursue a global license through negotiation. *See*

---

worldwide basis does not constitute patent misuse, is distinguishable. *See Saint Lawrence Comm'ns LLC v. Motorola Mobility LLC*, No. 2:15-CV-351-JRG, 2018 WL 915125, at *9–10 (E.D. Tex. Feb. 15, 2018). In *Saint Lawrence*, there was no evidence in the record that Motorola offered to take a U.S.-only license or that Motorola had an insignificant share of its sales in the U.S., as is the case for Huawei here.

2014 E.C.R. 2892, ¶ 519 ("As for the allegedly slow, costly and retrospective nature of damage actions, the fact that Motorola is seeking damages and rendering of accounts from Apple in Germany shows that Motorola nonetheless considers that such actions do provide it with a certain level of protection of its commercial interests.").

**B.    The Proposed Rates in the September 2017 Offer Do Not Comply with FRAND.**

PanOptis' September 2017 offer has multiple components: rates for 2G, 3G, and 4G technologies, rates for both infrastructure and handsets, and rates for multiple regions. What it does not have are any terms specific to a U.S.-only license. For that reason alone, as discussed above, there is no evidence that PanOptis' indivisible *global* offer is FRAND as to U.S. patents. Nevertheless, even if this Court rejects Huawei's jurisdictional arguments, exercises its discretion to decide Count IX, and determines that PanOptis' refusal to offer Huawei a U.S.-only license in the circumstances present here does not itself violate the FRAND obligation, testimony from Dr. Akemann during the bench trial establishes that the offer as a whole is not FRAND.[8]

**1.    The 4G Major Markets End User Device Rate Is Not FRAND.**

Dr. Akemann provided testimony regarding implied rates for PanOptis' 4G portfolio based on a top-down approach using an aggregate royalty rate for the use of all LTE essential patent families across the industry. 8-27 Bench Trial Tr. 140:17–141:15. That testimony, and Dr. Akemann's analysis, was based on an incorrect premise: that the appropriate aggregate royalty for all LTE essential patent families is 10% of the sales price of a device. *Id.* at 141:16–22. The assumption about the appropriate aggregate royalty rate for LTE is a critical input into Dr.

---

[8] PanOptis' assertion that "Huawei presented no evidence at the bench trial in support of these allegations" of FRAND breach, (PFF12) is wrong. Huawei elicited testimony from Dr. Akemann and PanOptis' other witnesses that establish that PanOptis September 2017 offer is not FRAND, including testimony regarding PanOptis' offered rates, the nature of PanOptis' offer, and Dr. Akemann's analysis detailed below.

Akemann's analysis. When conducted using the proper assumption—that the aggregate royalty rate is closer to 6%—Dr. Akemann's top-down analysis shows that PanOptis' 4G major markets rate contained in the September 2017 offer is well above an appropriate FRAND rate.

Dr. Akemann assumed a 10% aggregate royalty rate based on deposition testimony from Huawei in which a witness was asked about a public statement Huawei made in 2008 regarding its FRAND licensing rate for LTE patents. 8-27 Bench Trial Tr. 141:16–142:11. Huawei's position on its LTE licensing rates was based on an understanding, *as of 2008*, that the aggregate royalty for LTE would be no more than 10%. *See* PX 2315 at 98:4–11. But Dr. Akemann ignored further testimony from the same witness that showed that Huawei's understanding, in its role as both a licensor and licensee of SEPs, has evolved since 2008 in light of significant developments in the industry. Specifically, as the functionality of mobile phones has increased and diversified over the ensuing 10 years—a point that Dr. Akemann himself concedes (DFF102)—Huawei understood that the aggregate royalty for LTE would decrease as a component of phone price. *See* PX 2315 at 100:3–18.[9] In light of the significant changes in the capabilities of LTE-compliant devices since 2008, Huawei's witness posited that a reasonable aggregate royalty would be in the 6–8% range for LTE, with 6% being "more appropriate." *Id.* at 101:23–102:5. A 6% aggregate rate is consistent with statements from Ericsson and others in the industry regarding the appropriate aggregate royalty for LTE. Ericsson—the source of many of PanOptis' purported LTE SEPs—stated that a 6–8% aggregate royalty was reasonable. DX 138 at 1; *see also* DX 137 at 1 (statement from Alcatel-Lucent, Ericsson, NEC, NextWave Wireless, Nokia,

---

[9] This is confirmed by testimony from Huawei's damages expert, Dr. Becker, who noted that as of 2012 there were many components of a cell phone that were unrelated to LTE functionality, such as the battery, camera, screen and touch panel. *See* 8-23 PM Trial Tr. 62:9–63:19 (Becker); DX 103.

Nokia Siemens Networks and Sony Ericsson that "the companies support that a reasonable maximum aggregate royalty level for LTE essential IPR in handsets is a single-digit percentage of the sales price").

Using a 6% aggregate royalty in Dr. Akemann's top-down analysis gives a 0.184% Major Markets rates for 4G end user devices, a calculation that Dr. Akemann confirmed in his testimony. DFF103. The rate that PanOptis actually offered in its September 2017 offer was 0.259%, which is 40% higher.[10] *Id.* Therefore, taking into account the fundamental flaw in Dr. Akemann's aggregate rate assumption, it is clear that PanOptis' Major Markets rate for 4G end user devices is not FRAND even under PanOptis' own methodology.

## 2.    The 2G Rates in the September 2017 Offer Are Not FRAND.

PanOptis' proposed rates for 2G end user devices are also flawed. PanOptis offered 0.116% for these devices in Major Markets, 0.058% in Other Markets, and 0.048% in China. PX 0736 at POHW_00033439 (§ 4.2.1). These rates are higher than the implied FRAND portfolio rates that Dr. Akemann calculated when he used Ericsson's portfolio as a benchmark, in some cases significantly higher. DFF95–96. For example, the Major Markets 2G end user rate in the September 2017 offer is about 4.5 times the 0.026% rate that Dr. Akemann calculated as an *average* for Major Markets using inputs from the *TCL-Ericsson* litigation. DFF95; 8-27 Bench Trial Tr. 157:12–15. This is not the high end of a "range" of acceptable values—it is well above an acceptable rate, even under Dr. Akemann's own calculations. Dr. Akemann's focus on the range of implied FRAND rates even in light of discrepancies like these (*see* 8-27 Bench Trial Tr.

---

[10] Using an 8% aggregate royalty rate leads to 0.245% under Dr. Akemann's calculations, which is also lower than PanOptis' offered Major Markets 4G rate. These calculations assume an industry-wide total of 1761 patents, which is the average that Dr. Akemann himself calculated from the sources that he used. PX 2077A.

157:16–21) misses the point. PanOptis' 2G rates are not FRAND.

### 3. The Infrastructure Rates in the September 2017 Offer Are Not FRAND.

Though PanOptis did not provide any evidence or analysis regarding FRAND compliance for its proposed infrastructure rates, testimony from Dr. Akemann establishes that those rates are not FRAND. PanOptis' proposed Major Markets and China infrastructure rates for 2G, 4G, and 4G are higher than the corresponding implied FRAND rates that Dr. Akemann calculated for end user devices (the only FRAND analysis he did conduct). DFF97–98. Although PanOptis tried to downplay infrastructure, Huawei Technologies Co., Ltd., one of the largest infrastructure manufacturers in the world and the proposed licensee in PanOptis' September 2017 offer (PX 0736 at POHW_00033431), sells very significant amounts of infrastructure equipment. DFF10–DFF11. PanOptis itself has claimed that it owns "[m]ore than 160 infrastructure families" and "[n]early 55 hybrid mobile device/infrastructure families" in just its Cellular portfolio (see DX 366 at 22), though it offered no evidence to corroborate this claim at trial. As explained below, the infrastructure rates in PanOptis' September 2017 offer are not FRAND, and the offer as a whole is therefore not FRAND in light of Huawei's significant infrastructure sales, which PanOptis itself has acknowledged. See DFF10–11, DFF13 (citing PX 0736).[11]

---

[11] PanOptis' statement that "Huawei's infrastructure-related entity, Huawei Technologies Co. Ltd. was dismissed from this action by party agreement precisely because infrastructure was not the focus of the parties' dispute" is misleading. See PFF76. It also further demonstrates why a declaratory judgment claim seeking the Court's imprimatur on a global rate that involves patents not properly at issue here does not present an Article III case or controversy. Huawei Technologies Co., Ltd. is the proposed licensee in PanOptis' September 2017 offer. It was dismissed by agreement from this lawsuit because it did not import or sell in the United States any of the products accused of patent infringement—which are all end user devices. But while the parties' dispute regarding *patent infringement* was limited to end user devices, PanOptis has attempted to place the entirety of its September 2017 offer in issue in Count IX. The September (continued…)

During Mr. Warren's redirect testimony at the bench trial, PanOptis attempted to run

away from the non-FRAND terms of its September 2017 offer by changing that offer to allow

Huawei to accept the rates for end user devices without taking the rates for infrastructure

devices. DFF72. This newly hatched end user device-only offer had never been conveyed to

Huawei prior to Mr. Warren's testimony during trial, and directly contradicts both PanOptis'

own prior representations and the terms of the offer itself. PanOptis never indicated prior to trial

that the September 2017 offer was divisible by product type. DFF69. The document  itself

confirms that infrastructure is an indivisible component of the offer. PX 0736. The first sentence

of the cover letter treats the entire attached proposed license as a unified proposal covering all of

the patents in PanOptis' portfolio that were not subject to the *Unwired Planet* ruling. *See* PX

0736 at 1 ("PanOptis has continued to analyze the decision of the UK High Court and is prepared

to make the attached licensing offer to Huawei for the balance of the PanOptis cellular SEP

portfolio (those cellular SEPs which would not be covered by the current UK Settled Licence).").

And the terms of the proposed license make it clear that the written agreement will "merge[] and

supersede[] all prior and contemporaneous oral or written discussions, negotiations,

understandings, representations, warranties and agreements of the Parties." *Id.* at

POHW_00033446 (§ 13.1). The cover letter of the September 2017 proposal also refers directly

to Huawei's infrastructure sales, noting that they were "significant." DFF13. The offer document

requires a finding that the offer was intended to cover those products. The Court should reject

---

2017 offer, PX 0736, includes infrastructure, just as it includes handset patents that were not
asserted in the lawsuit and just as it includes technologies, like 3G and 2G, that were not part of
PanOptis' infringement theories for the particular patents asserted in this case. The fact that
PanOptis seeks a declaration that the September 2017 offer is FRAND without offering any
evidence or analysis justifying the infrastructure rates contained in it is yet another reason that
the Court should decline to decide Count IX.

PanOptis' attempt to excise the infrastructure portion of the September 2017 offer. Even if the proposal otherwise could be considered FRAND, and it cannot, the proposal is not FRAND with the infrastructure portions included in it.

### C.      Dr. Akemann's Analysis Relies on Flawed Essentiality Assumptions.

Dr. Akemann's opinion that PanOptis' offer is FRAND depends on assumptions regarding the strength of PanOptis' SEP portfolio that are unsupported in the record. The lack of support for these assumptions undermines the credibility of Dr. Akemann's opinion to the point that, regardless of which party bears the burden on Count IX, the Court should not find that the September 2017 offer is FRAND as to U.S. patents. *See Mims v. United States*, 375 F.2d 135, 140 (5th Cir. 1967) ("[O]ne of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the credibility and weight of expert opinion testimony are for the trier of facts, and that such testimony is ordinarily not conclusive even where it is uncontradicted."); *see also* DCL45.

The only support in the record for Dr. Akemann's assumptions regarding PanOptis' actual standard essential patents ("ASEPs") consists of the opinion of PanOptis' technical experts and conclusions drawn from PanOptis-prepared claim charts. DFF20. Dr. Akemann assumes that of the over 82 PanOptis patent families that have been declared essential to LTE, for example, 54 families actually are essential to practicing the LTE standard. DFF82. Dr. Akemann similarly assumed that PanOptis has 11 families of 3G ASEPs and 3 families of 2G ASEPs. PX 2073A; PX 2074A. Dr. Akemann relied on these assumptions in both his analysis that uses the Ericsson rate as a benchmark and his top-down analysis. DFF94; PFF108; PX 2075A; PX 2076A. However, the opinions and claim charts allegedly supporting Dr. Akemann's assumptions fall far short of credible evidence on essentiality for five separate reasons.

### 1.    The Technical Testimony Is Conclusory and Unsupported.

The technical expert testimony that Dr. Akemann relies upon is conclusory, and not adequately supported to justify Dr. Akemann's assumptions as to ASEPs. In order for such expert testimony to support a finding of essentiality—which requires a finding that practicing the standard necessarily infringes the purported essential patent (PCL16; DCL13)—the testimony must be something more than a conclusory and unsupported statement that a patent is essential. *See Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009) ("An expert's unsupported conclusion on the ultimate issue of infringement will not alone create a genuine issue of material fact.") (citation omitted); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (conclusory expert testimony is not sufficient); *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) (non-precedential) (holding that the fact-finder's verdict may not be supported only by conclusory and unsupported expert testimony); *Neopost Industrie B.V. v. PFE Int'l, Inc.*, 403 F. Supp. 2d 669, 676 (N.D. Ill. 2005) ("A plaintiff in a patent infringement case cannot meet its burden of proof by resting on a witness's summary testimony. Thus, a witness' general opinion that an accused device infringes a patent, standing alone, is insufficient to establish infringement.") (citations omitted). As the Federal Circuit has made clear "[b]road conclusory statements offered by [a party's] experts are not evidence." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (citations omitted).

For all of the purported ASEPs other than the four wireless patents asserted in this case, PanOptis' only expert testimony is from either PanOptis' expert Dr. Haimovich (for 30 of the purported LTE ASEPs) or PanOptis' employee Mr. Warden (for the other 20 purported LTE ASEPs and all of the purported 2G and 3G ASEPs). DFF20; DFF34. Dr. Haimovich and Mr. Warden's statements on the record regarding essentiality are wholly conclusory and unsupported.

DFF33. Dr. Haimovich and Mr. Warden merely explained the process they went through in preparing their reports and their associated claim charts (which are not in evidence), and then offered the unsupported opinion that the patents each one analyzed were actually essential to various wireless standards. DFF35. Neither expert provided on the record any analysis of particular patents, claim terms, or particular claims. Neither expert properly analyzed the scope of the claims in light of the intrinsic and extrinsic evidence. DFF40; DFF43; *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1315–19 (Fed. Cir. 2005) (en banc) (patent claims must be construed in light of intrinsic and extrinsic evidence). Neither expert offered any opinion on whether the patents he analyzed are valid. DFF38. Strikingly, neither expert even offered any testimony on whether particular patents among the families that PanOptis claims to be essential actually are essential. DFF34. In a case where the number of patents being analyzed for essentiality is limited and confined to a single party's portfolio, more is required to establish the size and scope of that party's portfolio.

## 2. Bias Makes Warden's Testimony Unreliable.

The Court should further discount Mr. Warden's testimony due to his pecuniary interest in the outcome of this case. "A pecuniary interest in the outcome of a case may, of course, bias a witness." *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir. 1980). Indeed, the Court may reject even unanimous expert testimony for objective reasons, such as evidence that the expert had an interest or bias. *Hebert v. Rogers*, 890 F.3d 213, 225–26 (5th Cir. 2018). Mr. Warden is a paid employee of PanOptis responsible for valuing the patents in PanOptis' portfolio. DFF41. For that reason, Mr. Warden is not a disinterested expert witness, particularly on the issue of whether PanOptis has a valuable portfolio of SEPs. To the contrary, ███████████████ ████████████████████████████████████████████ ██████████████████████████████████ DFF42. PanOptis' financial

performance will indisputably be affected by the outcome of this case. *Id.*

### 3. The Claim Chart Evidence Is Insufficient, Including Because It Is Not Linked to the Testimony of Haimovich or Warden.

The PanOptis negotiation claim charts in evidence do not support Dr. Akemann's assumptions on essentiality. Dr. Akemann himself did not even rely on them, perhaps recognizing their lack of evidentiary value. DFF85. The claim charts consist solely of excerpts of standards purportedly mapped to claim limitations. DFF48. They contain no annotations, no explanations, no analysis of any kind, and no conclusions. *Id.* The only witness who testified regarding the preparation and significance of the claim charts that were put in evidence was PanOptis' corporate representative Mr. Ray Warren, who has not practiced in the field of electrical engineering and, like Mr. Warden, clearly has a financial interest in the outcome of this case. DFF47; *see also* DFF45. Mr. Warren did not discuss any technical aspects of the patents in suit (or any other patent for that matter), but instead left that to the technical experts. DFF47. Like the testimony of Mr. Warden and Dr. Haimovich, the claim charts do not contain any of the necessary analysis to support a finding of essentiality. Further, the negotiation claim charts that are in evidence were prepared by interested PanOptis employees "in the course of [PanOptis'] regularly conducted business." DFF44. The preparation of the claim charts by biased individuals is a further reason to discount their value. *See Collins*, 621 F.2d at 784.

Mr. Warden and Dr. Haimovich did *not* prepare the claim charts that are in evidence; other claim charts that they *did* testify to preparing were not introduced into evidence. DFF45. Without their charts, Mr. Warden's and Dr. Haimovich's testimony is not linked to any patents or claims and thus cannot support Dr. Akemann's conclusions.

Moreover, PanOptis' self-interested assertion that all of the patents in its portfolio are "charted" or "chartable," PFF21–PFF22, does not carry any weight. Mr. Warren acknowledged

that the existence of claim charts, by itself, does not establish that a patent is essential to a standard, explaining that "there's a couple of differences between having a chart and deciding that [a patent is] actually essential." DFF50. Indeed, while PanOptis has charted 70 patent families against the LTE standard, it is contending here that only 54 of these actually are standard essential. DFF50.

### 4.   PanOptis' Dropping of Asserted Patents Undermines Its Assertions.

PanOptis' dropping of patents originally asserted in this case further undermines Dr. Akemann's essentiality numbers. While PanOptis' Third Amended Complaint originally alleged that Huawei infringed six of PanOptis' patents based on those patents' purported essentiality to the LTE standard, PanOptis dropped two of those six patents prior to trial, U.S. Patent Nos. 8,102,833 ("the '833 patent") and 7,940,851 ("the '851 patent"). DFF24; DFF28–DFF29. PanOptis presumably recognized that it would not be able to demonstrate infringement of these patents based on the LTE standard. For the '833 patent, for example, PanOptis may have recognized that while the standard requires mapping signals to a matrix by sets of multiple rows, the '833 patent requires mapping signals to a matrix only one row at a time. DFF25–27. Following the trial in which PanOptis presented no evidence as to either the '833 or '851 patents, the Court entered judgment as a matter of law that these two patents are not infringed, establishing that neither patent is in fact standard essential. DFF30. Because Dr. Akemann had earlier counted the '833 patent among a total of 55 purported LTE ASEPs, he served revised calculations which assumed only 54 LTE ASEPs after PanOptis dropped the '833 patent.[12] DFF86.

PanOptis' assertion and subsequent dropping of the '833 and '851 patents suggests that

---

[12] PanOptis dropped the '851 patent before Dr. Akemann served his initial report.

there are additional patents among the 54 assumed LTE ASEPs that actually are not essential. DFF31. PanOptis claimed at trial that "common sense" would show that it came to court, not just with "average patents … from [its] portfolio," but instead with its "good ones." *Id.* That same common sense suggests that PanOptis pulled above-average patents from its portfolio to put in its complaint in the first place. If two of PanOptis' best LTE patents were adjudicated as not being actually essential, many more of the 50 unasserted purported LTE ASEPs are likely not in fact standard essential.

**5.      PanOptis' Essentiality Percentage Is Too High According to Other Industry Information.**

Dr. Akemann's assumptions on essentiality are contrary to a report prepared by third party PA Consulting. Dr. Akemann's assumption of 54 LTE ASEPs would mean that over 62% of PanOptis' patents that are declared essential to LTE actually are essential. DFF82. According to the PA Consulting report, however, only 34% of declared essential patents are essential. DFF83. This study, which Dr. Akemann relied upon in preparing his reports, suggests that Dr. Akemann's reliance on PanOptis' conclusory expert analysis that over 62% of its portfolio was actually essential (roughly twice the industry average) inflated his estimate of the value of PanOptis' LTE portfolio.

**D.      The Jury's Verdict on Damages Has No Relevance to Whether PanOptis' September 2017 Offer Is FRAND.**

PanOptis is wrong to suggest that the jury's verdict on damages for the four purported LTE essential asserted patents is in any way probative of the issues raised by Count IX.[13] *See*

---

[13] Here, PanOptis tries to have it both ways. PanOptis characterized the testimony of Huawei's damages expert, Dr. Becker, on royalty stacking, as "theoretical," and asserts that "Huawei presented no evidence that PanOptis' rates would result in a royalty stacking problem." PFF110. But PanOptis creates a real royalty stacking issue by impliedly linking the jury's verdict to what would be a non-FRAND portfolio-wide rate. PanOptis wants this Court to use the jury verdict on (continued…)

PCL34–35. The jury was instructed to determine damages for only four U.S. patents in light of Huawei's U.S. sales. It was not instructed to take into account the remainder of PanOptis' patent portfolio, whether in the U.S. or elsewhere, and no substantive evidence was presented on those non-asserted patents before the jury. This is particularly important because the jury's damages award was based on specific—though disputed—evidence provided by PanOptis' technical experts on the "bandwidth efficiency" created by each of the LTE asserted patents. *See* 8-21 PM Trial Tr. 156:11–157:2 (Akemann). Those alleged efficiency gains were the "foundation" of Dr. Akemann's damages analysis. *Id.* at 157:10–14 (Akemann). The jury heard no such testimony regarding any non-asserted patents, and had no information on which to base a valuation of PanOptis' full SEP portfolio. Non-U.S. patents are also subject to different laws regarding damages and FRAND; U.S. damages law, and U.S. damages determinations are not relevant to non-U.S. patents. DCL30. Under these circumstances, it is inappropriate to extrapolate a royalty rate for PanOptis' entire SEP portfolio from the jury's damages award.[14] The jury's damages

---

four alleged LTE patents to evaluate the FRAND rate for a portfolio containing 54 patents. This implies that the jury's verdict for four patents can be applied to 54. Extrapolating the [redacted] royalty rate from the jury's verdict to the full 4G portfolio (54 patents) gives a [redacted] royalty rate. This is close to the value of *all* LTE essential patents (10%) used by Dr. Akemann in his top-down FRAND analysis (and exceeds the correct aggregate rate of about 6%, discussed above). PanOptis is only one of dozens of companies that own patents declared essential to LTE. *See* 8-23 PM Trial Tr. 64:13–65:3 (Becker). For one thing, applying the ratio used by Dr. Akemann, a [redacted] rate for PanOptis' 4 asserted patents would mean a [redacted] rate for Ericsson's 87 purported SEPs. *See* PX 2075A. Royalty stacking under this approach is far from a hypothetical concern and counsels against using the jury verdict as a guide for a FRAND portfolio rate. Indeed, even setting aside differences in how FRAND is assessed across jurisdictions, the fact that the jury's award for the four asserted patents implies aggregate rates of this magnitude makes clear that the damages award (and PanOptis' methodology for how it arrived at those damages figures) cannot be compliant with FRAND under U.S. law, an issue Huawei will address in separate briefing.

[14] In addition, Huawei believes that the jury's damages award was in error, that the alleged technical benefits of the Asserted Patents were unsupported and inaccurate, and that Dr. Akemann's economic model based on those alleged benefits was unreliable and speculative, points it will address in JMOL briefing. Under these circumstances, it is equally inappropriate to give the jury's verdict weight at this stage on an unrelated issue.

award is simply irrelevant to the FRAND royalties for non-asserted U.S. and foreign patents.

## V.      CONCLUSION

Huawei respectfully requests that this Court find that it lacks jurisdiction to decide PanOptis' FRAND declaratory judgment claim (Count IX), or exercise its discretion to decline to address Count IX. Alternatively, the Court should grant judgment in favor of Huawei on Count IX on the merits since the evidence presented shows that PanOptis' September 2017 offer was not FRAND.

Dated: September 25, 2018

By: */s/ Stanley Young* _____

Robert T. Haslam (rhaslam@cov.com)
*Lead Attorney*
Stanley Young (syoung@cov.com)
Anupam Sharma (asharma@cov.com)
Thomas E. Garten (tgarten@cov.com)
James Hovard (jhovard@cov.com)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Gregory S. Nieberg (gneiberg@cov.com)
Heng Gong (hgong@cov.com)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
Facsimile: (212) 841-1010

Paul J. Wilson (pwilson@cov.com)
Ali Mojibi (amojibi@cov.com)
Christopher G. Higby (chigby@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

Michael C. Smith (michaelsmith@siebman.com)
Texas Bar No. 18650410
SIEBMAN, FORREST, BURG & SMITH, LLP
113 East Austin Street
Marshall, TX 75670
Telephone: (903) 938-8900
Facsimile: (972) 767-4620

*Attorneys for Defendants*
**HUAWEI DEVICE USA INC. AND HUAWEI
DEVICE (SHENZHEN) CO., LTD.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail and notice via the Court's CM/ECF system per Local Rule CV-5(a)(3) this 25th day of September 2018.

<div align="right">

*/s/ Stanley Young*

</div>

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this matter.

<div align="right">

*/s/ Stanley Young*

</div>