IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OPTIS WIRELESS TECHNOLOGY, LLC, PANOPTIS PATENT MANAGEMENT, LLC, OPTIS CELLULAR TECHNOLOGY, LLC., | § § § § § § § | |
| *Plaintiffs*, | § | |
| v. | § § | CIVIL ACTION NO. 2:17-CV-00123-JRG |
| HUAWEI DEVICE USA, INC., HUAWEI DEVICE (SHENZHEN) CO., LTD., | § § § § | |
| *Defendants*. | § § | |

**MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.  INTRODUCTION**

This case concerns the licensing of standard essential patents in the telecommunications industry.  A key goal in the telecommunications industry is interoperability: the ability for devices made by different manufacturers to connect with one another in a network environment.  OSENGO, KRISTEN, PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT 1-13 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division, 2018).  This goal is most often achieved through the implementation of standards.  A standard is a uniform design for a product and is intended to represent the "best technological solution" to achieve a particular goal.  *Id.* at 1-2. Standards are established by standards-setting organizations, with the relevant organization in this case being the European Telecommunications Standards Institute ("ETSI").  *Id.* at 1-3, 2-41. ETSI is comprised of hundreds of industry participants who, through consensus, develop and adopt

standards related to mobile cellular technologies, including the 2G, 3G, and 4G/LTE standards. *Id.* at 2-41–2-57.

Patented technology that is "essential" to implement a standard is called a Standard Essential Patent ("SEP"). *See ETSI Rules of Procedure*, Annex 6, Clause 15. A patent is "essential" if it is not technically possible to practice the standard without infringing the patent. *Id.* ETSI has an intellectual property rights ("IPR") policy that "define[s] contractual terms for disclosure and licensing of patents that are essential for standard implementation." TAFFET, RICHARD & HARRIS, PHIL, PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT at 4-2 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division, 2018) [hereinafter TAFFET, PATENTS AND STANDARDS]. ETSI's IPR Policy requires SEP-holders to (1) formally declare any patents that are essential to a standard and (2) state whether they are prepared to grant an irrevocable license to those patents to companies that practice the standard on terms that are fair, reasonable, and non-discriminatory ("FRAND"). *Id. See also ETSI Rules of Procedure*, Annex 6, Clauses 4, 6.1. The commitment to license SEPs on FRAND terms creates a contract between the SEP-owner and ETSI, in which companies that implement the standard are third-party beneficiaries of that contract. TAFFET, PATENTS AND STANDARDS, at 4-10.

Plaintiffs Optis Wireless Technology, LLC, PanOptis Patent Management, LLC, and Optis Cellular Technology, LLC (collectively "PanOptis") are members of ETSI and own patents declared essential to the 2G, 3G, and 4G/LTE standards. (PX2073A; PX 2074A; *see also* Dkt. No. 304 at 14:19–15:4.) PanOptis has made a commitment to license its SEPs on FRAND terms. (Dkt. No. 243 at 8.) Defendants Huawei Device USA, Inc. and Huawei Device (Shenzhen) Co.,

Ltd.[1] (collectively "Huawei") manufacture and sell products that incorporate the 2G, 3G, and 4G/LTE standards and are third-party beneficiaries of PanOptis' FRAND commitment. (Dkt. No. 303 at 64:15–23.) In September 2017, PanOptis offered Huawei a license to its SEPs. (PX 0736; Dkt. No. 313 at 38:7–48:5.) Huawei declined the offer, contending that it was not FRAND. (Dkt. No. 313 at 37:8–12.) To date, the parties have been unable to agree on the terms of a license.

PanOptis filed suit against Huawei on February 10, 2017 for patent infringement and equitable relief. (Dkt. No. 1.) Count IX of PanOptis' Third Amended Complaint requests a declaration that PanOptis complied with its FRAND obligations in its negotiations with Huawei and that its September 2017 offer to Huawei was FRAND. (Dkt. No. 31 ¶¶ 181–85.) On July 11, 2018, the Court granted Huawei's motion to dismiss Count IX as to the non-U.S. patents, which limited Count IX to a declaration as to U.S. patents only. (Dkt. No. 214 at 16; Dkt. No. 246.) The Court held a bench trial on Count IX on August 27, 2018. (Dkt. Nos. 293, 313–14.) Following the bench trial, the parties filed post-trial briefs and proposed findings of fact and conclusions of law. (Dkt. Nos. 324, 334, 355, 359, 362.)

Pursuant to Federal Rule of Civil Procedure 52(a), the following constitutes the Court's Findings of Fact and Conclusions of Law. In short, the Court finds that it has not been presented with evidence from which it can adjudicate whether PanOptis complied with its FRAND obligations in its negotiations with Huawei and that its September 2017 offer to Huawei was FRAND as to PanOptis' U.S. SEPs. Accordingly, in the exercise of its discretion, the Court declines to issue a declaratory judgment.

---

[1] Huawei Device (Shenzhen) Co., Ltd. was formerly known as Huawei Device Co., Ltd. (Dkt. No. 242.)

## II. FINDINGS OF FACT ("FF")

### A. The Parties

**[FF1]** Plaintiffs Optis Wireless Technology, LLC ("Optis Wireless"), Optis Cellular Technology, LLC ("Optis Cellular"), and PanOptis Patent Management, LLC ("PPM") (collectively "PanOptis") are each limited liability companies organized and existing under the laws of the State of Delaware and maintain their respective principal places of business in Plano, Texas. (Dkt. No. 31 ¶¶ 2–4.) PanOptis owns patents that relate to wireless communication technologies. (*Id.* ¶ 182.)

**[FF2]** Defendant Huawei Device USA, Inc. is a corporation organized under the laws of Texas with its principal place of business in Plano, Texas. (Dkt. No. 39 ¶ 6.) Defendant Huawei Device (Shenzhen) Co., Ltd. (together with Huawei Device USA, Inc., "Huawei") is a corporation organized under the laws of China and has its principal place of business in Shenzhen, China. (Dkt. No. 39 ¶ 7; Dkt. No. 239.) Huawei manufactures and sells mobile device products that incorporate wireless communication technologies, including smartphone handsets and tablets. (Dkt. No. 303 at 64:15–23.)

### B. The Instant Lawsuit and Procedural History

**[FF3]** On February 10, 2017, PanOptis filed the original complaint against Huawei in this lawsuit. (Dkt. No. 1.) On April 14, 2017, PanOptis filed a Third Amended Complaint, alleging that certain Huawei products infringe U.S. Patent Nos. 7,769,238; 6,604,216; 7,940,851; 8,385,284; 8,208,569; 8,102,833; and 8,437,293. (Dkt. No. 31.) PanOptis later dropped its patent infringement claims for U.S. Patent Nos. 7,940,851 and 8,102,833. (Dkt. No. 240.)

**[FF4]** Count IX of PanOptis' Third Amended Complaint seeks equitable relief. (Dkt. No. 31 ¶¶ 181–185.) PanOptis requests "a declaratory judgment that it has complied with its

obligations arising from declaring its patents essential to various standards, and any applicable laws, during [its] negotiations with Huawei concerning a worldwide license under the PanOptis standards essential patents." (*Id.* ¶ 185.) The relief sought in Count IX implicates both U.S. and non-U.S. patents. (Dkt. No. 103 at 55:2–9 ("So going back to the declaratory judgment request that PanOptis filed, it couldn't be clearer that in Paragraph 184, we're seeking a declaration of FRAND terms for a worldwide license under PanOptis' entire portfolio of standards essential patents. That's patents in multiple – many, many countries. And that's what is before the Court. So it isn't just limited to the United States, it's worldwide.").)

**[FF5]** On May 14, 2018, Huawei moved to dismiss Count IX for lack of subject matter jurisdiction "to the extent it encompasses non-U.S. patents." (Dkt. No. 145 at 1.)

**[FF6]** On July 11, 2018, the Court granted Huawei's motion to dismiss as to the non-U.S. patents, which limited Count IX to a declaration as to U.S. patents only. (Dkt. No. 214 at 16 ("At least under the Declaratory Judgment Act, the foreign part of PanOptis' claim should be dismissed for the reasons explained in *Voda*, even if jurisdiction *could* be exercised."); Dkt. No. 246.) The Court reasoned that "[c]ourts in other countries apply their own law governing FRAND compliance and royalty rate determinations, and this law, like foreign infringement law, can be very different from United States law." (Dkt. No. 214 at 15.)

**[FF7]** The patent infringement claims were tried before a jury from August 20, 2018 to August 24, 2018. (Dkt. Nos. 265, 268, 271, 277, 283.) The jury returned a verdict on August 27, 2018, finding (1) that Huawei willfully infringed each of the asserted claims; (2) that none of the asserted claims were invalid; and (3) that PanOptis was entitled to damages in the form of a running royalty. (Dkt. No. 291.)

**[FF8]** Following the submission of the evidence to the jury, the Court held a bench trial on Count IX on August 27, 2018. (Dkt. No. 293.) Count IX concerns the parties' licensing negotiations. PanOptis owns SEPs relating to the 2G, 3G, and 4G/LTE standards and the parties agree that PanOptis is bound to license those patents on FRAND terms. (Dkt. No. 310 at 54:5–14.) Huawei manufactures and sells products that incorporate the 2G, 3G, and 4G/LTE standards and is entitled to a license to PanOptis' SEPS on FRAND terms. (Dkt. No. 303 at 64:15–23.) In September 2017, PanOptis offered Huawei a license to its SEPs. (PX0736.) Huawei declined the offer, contending that it was not FRAND and that PanOptis breached its FRAND obligations during negotiations. (Dkt. No. 70 at 31–33; DX 367; DX 372; Dkt. No. 304 at 18:11–19:7; Dkt. No. 309 at 7:23–8:10.) To resolve this dispute, PanOptis requests a declaration that it has complied with its FRAND obligations and that its September 2017 offer is FRAND. (Dkt. No. 31 ¶¶ 181–185.)

### C. PanOptis' Standard Essential Patents

#### i. Portfolio Formation

**[FF9]** Plaintiffs Optis Wireless and Optis Cellular own patent portfolios related to wireless communications: the Optis Cellular Portfolio and the Optis Wireless Portfolio. (Dkt. No. 297 at 82:16–24.) Plaintiff PPM is an entity that possesses the rights to license those portfolios. (*Id.* at 77:17–24.)

**[FF10]** The Optis Cellular Portfolio contains patents that were obtained from Ericsson and LG and includes at least 270 granted patents with over 25 declared essential patent families. (Dkt. No. 304 at 32:4–8; PX2073A.) The Optis Wireless Portfolio contains patents that were obtained from Ericsson and Panasonic and includes at least 470 granted patents with over 47 declared essential patent families. (Dkt. No. 304 at 32:16–20; PX2073A.) Ericsson, LG, and

Panasonic are PanOptis' predecessors-in-interest to the patents in these portfolios. (Dkt. No. 310 at 54:5–14.)

### ii. Actual Standard Essential Patents

**[FF11]** PanOptis contends that in its Optis Cellular and Optis Wireless portfolios, 54 patent families are essential to the 4G/LTE standard, 11 patent families are essential to the 3G standard, and 3 patent families are essential to the 2G standard. (Dkt. No. 313 at 51:21–52:5, 91:22–92:4.) PanOptis claims these families include patents from around the world, including China, Europe, and many other jurisdictions. (Dkt. No. 313 at 87:10–88:8; PX 2074A.)

**[FF12]** PanOptis presented evidence at trial to support its contentions regarding the number of actual standard essential patents ("ASEPS") that it owns. To demonstrate essentiality, PanOptis presented evidence from two sources. First, in the jury trial, PanOptis' experts Dr. Madisetti, Dr. Womack, and Dr. Gitlin opined that four asserted patents are essential to the 4G/LTE standard. (Dkt. No. 299 at 35:22–36:8; Dkt. No. 301 at 33:17–22, 61:15–23.) Second, in the bench trial, PanOptis' expert Dr. Haimovich and PanOptis' employee Mr. Warden opined that 50 patent families in PanOptis' portfolio are essential to the 4G/LTE standard, 11 patent families are essential to the 3G standard, and 3 patent families are essential to the 2G standard. (*Id.* at 88:1–3, 91:22–92:4, 121:18–24, 150:11–23; *see also* PX 2073A.) To support these opinions, PanOptis' witnesses created claims charts and reviewed the patents and their file histories. (Dkt. No. 313 at 51:25–52:1, 91:1–92:4, 109:21–110:3, 118:19–119:6.)

### D. PanOptis' FRAND Commitment

**[FF13]** PanOptis is a member of ETSI and is bound by the ETSI IPR Policy. (Dkt. No. 286–1 ¶18.)

**[FF14]** The ETSI IPR Policy requires members to notify ETSI if they believe a patent may be essential to a standard by using IPR licensing declaration forms. (*Id.*) When submitting these declarations, members state whether they are prepared to grant licenses to those patents on FRAND terms. (*Id.*)

**[FF15]** PanOptis has declared that the patents in its Optis Cellular and Optis Wireless portfolios are SEPs and has made a commitment to grant licenses to those patents on FRAND terms. (Dkt. No. 243 at 8.)

**[FF16]** Huawei seeks a license to PanOptis' SEPs on FRAND terms. (Dkt. No. 286–1 ¶¶ 21–25.)

### E. The Parties' Negotiations

**[FF17]** PanOptis first contacted Huawei regarding a potential license to PanOptis' SEPs in early 2014. (Dkt. No. 243 at 8; Dkt. No. 297 at 96:7–9.) The parties met several times over the following years to discuss a potential license to PanOptis' SEPs. (Dkt. No. 297 at 96:11–19.) PanOptis made several offers to Huawei, each of which had a geographic scope beyond the United States. (PX 0671; PX 0696; PX 0736.)

**[FF18]** In 2016, PanOptis acquired Unwired Planet and its patent portfolio. (Dkt. No. 313 at 30:22–31:6.) At that time, Unwired Planet was involved in a litigation against Huawei in the United Kingdom concerning a FRAND license. (*Id.* at 30:22–32:5.) The case went to trial in October 2016 and the UK court issued a decision in April 2017 (the "Unwired Planet decision"). (*Id.* at 33:2–6.) The court performed a comparable license analysis to adjudicate FRAND "benchmark rates" for Unwired Planet's portfolio. (PX 0786 ¶ 478.)

**[FF19]** Huawei proposed that the parties use the Unwired Planet decision as a benchmark for considering a FRAND license for the Optis Wireless and Optis Cellular portfolios. (Dkt. No. 313 at 33:21–34:22.)

**[FF20]** In response to Huawei's proposal, PanOptis' head of licensing and corporate representative, Mr. Warren, undertook a calculation to extrapolate the ruling from the Unwired Planet decision to determine appropriate rates for the essential patents in the Optis Wireless and Optis Cellular portfolios. (Dkt. No. 313 at 34:23–35:1.)

**[FF21]** Based on Mr. Warren's calculation, PanOptis presented Huawei with a new offer on the Optis Wireless and Optis Cellular portfolios in September 2017. (PX 0736; Dkt. No. 313 at 35:2–18, 38:7–48:5.) The offer included rates for major markets, other markets, and China. (*Id.*) Huawei did not accept the offer and responded with a series of counter-offers. (Dkt. No. 313 at 37:8–12.) PanOptis declined these counter-offers and proposed the parties settle their dispute through arbitration. (*Id.* at 38:1–6.) The parties could not agree on the terms of arbitration and PanOptis subsequently filed the instant lawsuit. (*Id.* at 62:23–63:17.)

**[FF22]** After suit was filed, the parties continued negotiations in an effort to resolve the dispute outside litigation. (Dkt. No. 304 at 23:24–30:14.) In June 2018, Huawei sent a letter to PanOptis indicating that it was willing to enter into a license to PanOptis' U.S. SEPs at certain rates. (Id. at 30:12–20.) PanOptis' corporate representative, Mr. Warren, testified that PanOptis would not allow Huawei to take a U.S.-only license. (Dkt. No. 313 at 74:12–23.)

### F. PanOptis' September 2017 Offer

#### i. The Terms of the Offer

**[FF23]** On September 29, 2017, PanOptis provided a draft global license agreement to Huawei for the Optis Wireless and Optis Cellular portfolios (the "September 2017 offer"). (Dkt. No. 313 at 35:9–36:25; PX 0736.)

**[FF24]** The September 2017 offer was a global offer that included proposed rates by territory and product type. (PX 0736.) The rates proposed by PanOptis are summarized in the table below.

|  |  | 4G | 3G | 2G |
|---|---|---|---|---|
| **End User Devices** | Major Markets | 0.259% | 0.077% | 0.116% |
|  | Other Markets | 0.130% | 0.039% | 0.058% |
|  | China | 0.100% | 0.027% | 0.048% |
| **Infrastructure Equipment** | Major Markets | 0.372% | 0.062% | 0.133% |
|  | Other Markets | 0.186% | 0.031% | 0.067% |
|  | China | 0.142% | 0.022% | 0.055% |

**[FF25]** This offer is world-wide in scope has an eight-year term spanning from January 1, 2013 to December 31, 2020 and defines "major markets" to include over 40 countries, including the United States, Canada, France, Germany, and Japan. (PX 0736 at §§ 1.21, 1.4, 1.20, 1.27.)

#### ii. The Global and Blended Nature of the Offer

**[FF26]** PanOptis' corporate representative, Mr. Warren, repeatedly testified that the September 2017 offer is not separable or divisible by product type, technology, region, or country. For example, Mr. Warren testified that PanOptis has never offered a license covering only PanOptis' U.S. SEPs. (Dkt. No. 298 at 31:16–25; *see also* Dkt. No. 313 at 57:4–8 (testifying that

10

there is nothing in the offer that says that Huawei can accept parts of those rates while not accept other parts of those rates); *id.* at 57:24–58:3 (testifying that Huawei would have to accept the rates for all of the regions, including a major markets region, a China region, and other markets region); *id.* at 74:20–23 (confirming that "there is not, and has never been, any offer that PanOptis has made for only the United States patents."); *id.* at 75:16–22 (testifying that Huawei could not separately accept offers for China, major markets, and other markets); *id.* at 79:21–25 (PanOptis has never indicated to Huawei during negotiations that Huawei could take a single country license).)

**[FF27]** Mr. Warren testified that it would not be "acceptable" to take a blended rate, such as the "Major Markets" rate in the September 2017 offer, and apply it to a single country like the United States. (Dkt. No. 313 at 78:19–79:11.)

**[FF28]** Mr. Warren also testified that PanOptis has not calculated how much Huawei would need to pay for U.S. patents under PanOptis' September 2017 offer. (Dkt. No. 313 at 62:11–15.)

**[FF29]** In an earlier proceeding before the Court, PanOptis represented that its offers to Huawei are global or blended in nature and cannot be unpacked to provide a U.S.-only rate. In its objection to Magistrate Judge Payne's recommendation regarding Huawei's motion to dismiss, PanOptis argued that "there is no 'foreign part' of PanOptis' claim for a declaration of FRAND compliance, as its offer to Huawei was a global offer, with no U.S.-only rate, that cannot be accepted on a country-by-country basis." (Dkt. No. 229 at 1; *see also id.* at 2 ("PanOptis made a single, integrated offer to Huawei to license it under PanOptis' global patent portfolio. PanOptis never made a U.S.-only offer to Huawei. So Huawei never had the ability to accept a U.S. part of PanOptis' offer, not just because there was never a U.S.-only part, but also because PanOptis

11

presented the global integrated licensing terms as a single package.").) PanOptis went on to explain that "[t]he Court cannot simply pull out a U.S.-only rate from the offers Huawei allege violate FRAND, as the implicit rate for U.S. patents is bundled with the other rates in the offers." (*Id.* at 5–6.)

**[FF30]** PanOptis' economic expert, Dr. Akemann, testified that a worldwide license rate would not be applicable to the U.S. alone. (Dkt. No. 303 at 49:12–23.) To get to a U.S. rate for the asserted patents in the jury trial, for example, Dr. Akemann testified that he would need to unpack the global rate into country-specific, patent-specific components and that this is "not easy to do." (*Id.* at 49:24–50:9.) Dr. Akemann did not understand the September 2017 offer to contain a U.S.-only offer or rate. (Dkt. No. 313 at 170:25–171:10.)

**[FF31]** Dr. Akemann testified that he was unable to opine on what a U.S.-only offer rate was or would be based on the September 2017 offer. (Dkt. No. 313 at 171:11–21.) He also testified that he has offered no opinions as to whether there was FRAND compliance by PanOptis with respect to only U.S. patents. (*Id.*)

### G. Expert Testimony on Comparable Licenses

**[FF32]** PanOptis presented expert testimony regarding comparable licenses. (Dkt. No. 313 at 13:21–14:10.) PanOptis' expert, Dr. Akemann, considered PanOptis' portfolio licenses with third parties in forming his FRAND opinion. (*Id.*) Specifically, Dr. Akemann considered PanOptis' licenses with Kyocera and ZTE. (*Id.*)

**[FF33]** The Kyocera license covers the patents in the Optis Wireless and Optis Cellular portfolios over a worldwide geographic scope. (PX 0790; Dkt. No. 314 at 4:7–14.) The ZTE license covers the patents in the Optis Wireless portfolio and sales of mobile devices in the United

States, the United Kingdom, Canada, Spain, Italy, Germany, and France. (PX 0788; Dkt. No. 314: 17:11–18.)

**[FF34]** Dr. Akemann opined that the comparison of the comparable license rates to the rates in the September 2017 offer supports the conclusion that PanOptis' September 2017 offer is consistent with FRAND principles from an economic perspective. (Dkt. No. 314 at 19:8–14.)

### H. Expert Testimony on FRAND Royalty Range

**[FF35]** PanOptis also presented expert testimony on a FRAND royalty range and how that range compared to PanOptis' September 2017 offer to Huawei. (Dkt. No. 314 at 25:22–26:24.) PanOptis' expert, Dr. Akemann, presented a FRAND analysis of PanOptis' offer and opined that it fell within the range of rates that would be FRAND according to certain benchmarks. (*Id.*)

**[FF36]** In calculating this FRAND range, Dr. Akemann used several rates as benchmarks, including the multi-mode market rate from the Unwired Planet decision and the rate from the Huawei-Ericsson license agreement. (Dkt. No. 314 at 30:10–25, 31:18–32:9.)

**[FF37]** Based on these ranges, Dr. Akemann testified that PanOptis' offer to Huawei fell inside the range of rates that would comply with FRAND for a worldwide license to PanOptis' SEPs. (Dkt. No. 313 at 137:15–20.)

**[FF38]** Dr. Akemann also provided testimony regarding the range of rates created for PanOptis' portfolio using a "top-down" approach. (Dkt. No. 313 at 138:2–8.) He testified that this calculation shows that PanOptis' offer to Huawei would not create any danger of royalty stacking, and instead implies a reasonable aggregate royalty rate across the industry. (*Id.* at 142:12–21.)

## III. CONCLUSIONS OF LAW ("CL")

### A. Subject Matter Jurisdiction

**[CL1]** A court has subject matter jurisdiction to issue a declaratory judgment if "there is a justiciable case or controversy." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007); *see also* 28 U.S.C. § 2201. A controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127. A court cannot issue a declaratory judgment to render an advisory opinion on "what the law would be upon a hypothetical set of facts." *Id.* (internal citation omitted).

**[CL2]** PanOptis' Count IX requests a declaratory judgment that it has not breached its contractual FRAND obligations. The Court previously dismissed PanOptis' Count IX as to foreign patents, which limits its request for declaratory judgment on FRAND compliance to only U.S. patents. (Dkt. Nos. 214, 246.)

**[CL3]** The Court, however, has not been presented with any evidence by which it can adjudicate whether PanOptis' September 2017 offer was FRAND as to U.S. patents only. The September 2017 offer is an offer for a worldwide license to PanOptis' SEPs and those SEPs include both U.S. and non-U.S. patents. Based on the evidence adduced at trial, this offer cannot be segregated or analyzed by product, region, or patent; nor has either party attempted to analyze the offer only as to U.S. patents.

**[CL4]** PanOptis' corporate representative, Mr. Warren, testified that the September 2017 offer was not divisible and that no U.S.-only rate had been calculated from the offer. (Dkt. No. 298 at 31:16–25; Dkt. No. 313 at 62:11–15.) Similarly, PanOptis' expert, Dr. Akemann, testified that he did not analyze the offer only has to U.S. patents and has offered no opinions on

whether the offer is FRAND as to U.S. patents. (Dkt. No. 313 at 171:11–21.) The FRAND analyses presented at trial made no distinction between the U.S. and non-U.S. SEPs in PanOptis' offer. (Dkt. No. 313 at 13:21–14:10; Dkt. No. 314 at 4:7–14, 17:11–18, 19:8–14 (comparable license analysis); *id.* at 25:22–26:24, 30:10–25, 31:18–32:9; Dkt. No. 313 at 137:15–20, 138:2–8 (FRAND royalty range analysis).) Therefore, based on the evidence at trial, PanOptis has not made an offer from which a U.S. rate for PanOptis' U.S. SEPS can be fairly or readily discerned.

**[CL5]** PanOptis' Count IX, as it currently stands, asks the Court to issue a declaration as to whether PanOptis' worldwide, non-segregable offer is FRAND as to U.S. patents, even though the Court has not been presented with any offer from which a rate for U.S. SEPs can be derived or discerned. Since the Court cannot determine whether PanOptis complied with its FRAND obligations as to the U.S. SEPs in its offer to Huawei, any declaration by the Court would amount to an advisory opinion. Accordingly, the Court declines to issue the declaratory judgment that PanOptis requests in Count IX as a matter of discretion. *See Medimmune*, 549 U.S. at 136 (holding that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants"). This Court declines to issue a judicial declaration not clearly aligned with evidence which stands on all fours with the declaration sought. To declare PanOptis' FRAND obligation as either me or unmet without the benefit such would inject confusion and uncertainty into this area of both the law and commerce.

## IV. CONCLUSION

Based on the foregoing, the Court declines to issue a declaratory judgment as to Count IX of PanOptis' Third Amended Complaint (Dkt. No. 31.)

**So ORDERED and SIGNED this 18th day of March, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE